Keely E. Duke
ISB 6044; ked@dukeevett.com
Molly E. Mitchell
ISB 10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 W. River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Dr. Michael Hajjar, MD, an individual, Dr. Thomas Manning, MD, PhD, an individual, and NS Support, L.L.C. d/b/a Neuroscience Associates,<br><br>Plaintiffs,<br>v.<br><br>St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates, Dr. Kenneth Little, MD, an individual,<br><br>Defendants. | Case No. 1:23-CV-367<br><br>**COMPLAINT**<br><br>**(Demand for Jury Trial)** |

Plaintiffs Dr. Michael Hajjar, MD, Dr. Thomas Manning, MD, PhD, and NS Support, L.L.C. d/b/a Neuroscience Associates ("Neuroscience Associates"), by and through their attorneys of record, Duke Evett, PLLC, and for a Complaint against Defendants St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates, and Dr. Kenneth Little, MD, plead and allege as follows:

## I.     PARTIES

1.      Dr. Michael Hajjar, MD is an individual residing in Ada County, Idaho and is a

member of Neuroscience Associates.

2. Dr. Thomas Manning, MD, PhD, is an individual residing in Ada County, Idaho, and is a member of Neuroscience Associates.

3. NS Support, L.L.C. is an Idaho limited liability company with its principal place of business in Ada County, Idaho doing business under the name Neuroscience Associates.

4. St. Luke's Health System, LTD, is an Idaho non-profit corporation doing business in Idaho with its principal place of business in Ada County, Idaho.

5. Clinical Neuroscience Management, PC was an Idaho professional service corporation with its principal place of business in Ada County, Idaho doing business under the name Northwest Neurosurgery Associates ("Northwest Neurosurgery Associates") and was administratively dissolved on January 14, 2023.

6. Dr. Kenneth Little, MD is an individual who, on information and belief, resides in Ada County, Idaho, and is the President of Northwest Neurosurgery Associates.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331. Plaintiffs assert federal subject matter pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

8. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in the Southern Division of the United States District Court for the District of Idaho pursuant to 28 U.S.C. § 1391.

## III.    GENERAL ALLEGATIONS

### A.    Neuroscience Associates

10. Neuroscience Associates is Southwest Idaho's only independent medical provider for neurological surgery.

11. Neuroscience Associates is owned by six neurosurgeons, including Dr. Hajjar and Dr. Manning.

12. Independent physicians have significantly more freedom to assist patients in choosing where to get medical care, based on quality and affordability, rather than employed physicians who steer the patient's medical care to the employer hospital. As such, independent physicians have the freedom to recommend patients to whichever medical facility that, in their professional opinion, would provide the appropriate care and at oftentimes more affordable costs than St. Luke's, based on that patient's particular needs and circumstances.

13. Neuroscience Associates' independent neurosurgeons must maintain medical staff privileges ("Medical Staff Membership") at area hospitals so they can treat patients, including Neuroscience Associates' patients, at each hospital.

14. Neuroscience Associates is affiliated with St. Luke's, Saint Alphonsus, Treasure Valley Hospital, and West Valley Medical Center, meaning some or all of its independent neurosurgeons have privileges at these hospitals.

15. Neuroscience Associates has had neurosurgeons on St. Luke's Medical Staff since the 1990's.

16. Maintaining Medical Staff Membership is critically important for independent neurosurgeons; without Medical Staff Membership, they have nowhere to treat their patients. As such, for example, if they do not have Medical Staff Membership at St. Luke's, they cannot treat

their patients at St. Luke's.

## B. St. Luke's Professional Services Agreement with Northwest Neurosurgery Associates

17. At all relevant times, Northwest Neurosurgery Associates has been St. Luke's exclusive provider of neurosurgery services pursuant to a professional services agreement ("PSA").

18. Under a PSA, a physician practice group agrees to provide health care services exclusively for St. Luke's. Payors reimburse St. Luke's for the services provided by the practice group. Although there is no direct employment relationship between St. Luke's and physicians practicing under a PSA, the agreement sets forth the compensation St. Luke's will pay for services provided by the group's physicians. The United States District Court for the District of Idaho has described this type of relationship as "functionally equivalent to employment [with St. Luke's] to the extent that it provides, at the group level, the same clinical and financial alignment that employment provides at the individual level." *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-CV-00560-BLW, 2014 WL 407446, at *3 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

19. Northwest Neurosurgery Associates is a direct competitor of Neuroscience Associates.

20. Unlike Neuroscience Associates' neurosurgeons, the neurosurgeons employed by Northwest Neurosurgery Associates are not independent physicians. This means that if a patient comes into the St. Luke's Emergency Department and sees a Northwest Neurosurgery Associates neurosurgeon, they will be directed to St. Luke's facilities for testing, imaging, surgery etc. (to the financial benefit of St. Luke's). On the other hand, if a patient comes into the St. Luke's Emergency Department and sees a Neuroscience Associates neurosurgeon, that neurosurgeon

has the freedom to direct the patient to whichever medical facility or facilities make the most sense for the patient; as such, unlike Northwest Neurosurgery Associates' physicians, Neuroscience Associates' physicians are able to consider factors such as quality of medical care and costs for the patient to consider with respect to further medical care.  As such, with independent physicians such as Neuroscience Associates' neurosurgeons, St. Luke's knows that it will not be able to force those neurosurgeons and those neurosurgeons' patients to St. Luke's for medical care; meaning that St. Luke's will lose out on potential revenue if a patient receives treatment at Saint Alphonsus, Treasure Valley Hospital, etc. per the independent neurosurgeon's recommendation.

21. It is advantageous to St. Luke's, Northwest Neurosurgery Associates, and Dr. Little to reduce the number of and/or eliminate independent neurosurgeons from the St. Luke's Medical Staff so that St. Luke's can steer all patients that come through its emergency services to its own medical doctors and facilities, labs, imaging, operating rooms, inpatient services, therapy service, etc., while avoiding the loss of patients to competitors such as Saint Alphonsus, Treasure Valley Hospital, and others.

22. In addition, the reduction in number and/or total elimination of independent neurosurgeons from the St. Luke's Medical Staff also harms the Plaintiffs (and their patients) when the patients have an insurance plan that identifies St. Luke's as the preferred and/or in-network provider.  In such situations, it is common for patients to choose St. Luke's for any and all medical care, including Neurosurgery care, given the expense the patient would incur if the patient did not receive medical care from the preferred and/or in-network provider.  As such, if Neuroscience Associates does not maintain any neurosurgeons on St. Luke's Medical Staff, a

patient with such a health care plan will be financially penalized if the patient remains with Neuroscience Associates and seeks care outside of St. Luke's.

23. Logically, such scenarios likely impact pricing for St. Luke's services, resulting in higher prices to the patients and their insurers.

## C. Emergency Department Call Coverage

24. Federal law requires St. Luke's to have 24/7/365 neurosurgery coverage in its Emergency Department.

25. St. Luke's requires independent neurosurgeons to participate in Emergency Department call coverage in order to maintain Medical Staff Membership at St. Luke's facilities.

26. Emergency Department call coverage includes coverage for all of St. Luke's hospitals from Eastern Idaho, to McCall, to Boise, to southwest Idaho near Oregon.

27. As such, when on call, Neuroscience Associates' neurosurgeons are helping St. Luke's meet its federal law requirement across the entire St. Luke's network; a benefit that is now, as outlined below, going unpaid by St. Luke's over Neuroscience Associates' objections.

## D. Defendants' Initial Efforts to Squeeze Out Independent Neurosurgeons

28. Over the years, St. Luke's has acquired a myriad of independent medical groups and now dominates the medical care market in Idaho. Indeed, St. Luke's tried to purchase Idaho's largest independent physician practice, Saltzer Medical Group, but the merger was struck down by the United States District Court for the District of Idaho (and later the Ninth Circuit) as anti-competitive and in violation of the Clayton Antitrust Act.

29. Neuroscience Associates has not been immune from St. Luke's efforts to squeeze out independent physicians and acquire more and more market share.

30. Prior to April 16, 2018, St. Luke's compensated Neuroscience Associates' independent neurosurgeons, including Dr. Hajjar, Dr. Manning, Dr. Kelly Bridges, MD, and Dr. Richard Lochhead, MD, for Emergency Department call coverage.

31. As of April 16, 2018, St. Luke's stopped paying Neuroscience Associates' independent neurosurgeons for their call coverage. Independent neurosurgeons were still required to provide call coverage, albeit for no compensation, otherwise they would lose their Medical Staff Membership at St. Luke's (the state's largest healthcare provider).

32. Neuroscience Associates and its neurosurgeons objected to St. Luke's about-face on compensation to no avail; from April 16, 21018 to present, St. Luke's refuses to compensate Neuroscience Associates' neurosurgeons for call coverage.

33. Although St. Luke's refuses to pay independent neurosurgeons for St. Luke's mandated Emergency Department call coverage, St. Luke's continued to pay its employed neurosurgeons for Emergency Department call coverage after April 16, 2018 through the present.

34. Defendants' efforts to squeeze Neuroscience Associates out of the market did not stop at refusing to pay independent neurosurgeons for Emergency Department call coverage (with the threat of terminating Medical Staff Membership if they refused to provide call coverage free of charge).

35. Through Northwest Neurosurgery Associates and Dr. Little, the Defendants have disproportionately alleviated the call load of Defendants' neurosurgeons (who are paid for Emergency Department call coverage) by entering into contracts with locum tenens physicians to alleviate the call burden for their employed neurosurgeons.

36. On the other hand, Neuroscience Associates' independent neurosurgeons have not been provided or offered the same call coverage relief through locum tenens physicians.

37. St. Luke's pays locums tenens neurosurgeons for Emergency Department call coverage.

38. St. Luke's also pays other specialty independent physicians (e.g. oral maxillofacial surgery and orthopedics) for Emergency Department call coverage.

39. Despite the increasingly unfair burdens put in place by Defendants as to Emergency Department call coverage and the unfairness in St. Luke's stopping its payments to independent neurosurgeons for call coverage, initially Dr. Hajjar, Dr. Manning, and two other Neuroscience Associates neurosurgeons (Dr. Bridges and Dr. Lochhead) fulfilled their call coverage obligations to maintain their Medical Staff Membership.

40. However, in response to the disproportionate, uncompensated call burden placed on independent neurosurgeons versus employed St. Luke's neurosurgeons, Dr. Lochhead and Dr. Bridges eventually relinquished their Medical Staff privileges in November 2020 and January 2021, respectively.

41. Despite the disproportionated, uncompensated call burden placed on independent neurosurgeons versus employed St. Luke's neurosurgeons, Dr. Hajjar and Dr. Manning continued their Medical Staff privileges with St. Luke's.

E. **Defendants Intensify Their Efforts to Eliminate Independent Neurosurgeons from St. Luke's Medical Staff**

42. In August 2022, St. Luke's, through Northwest Neurosurgery Associates and Dr. Little, intensified their collective efforts to drive out the two remaining independent neurosurgeons by implementing a new policy that requires each neurosurgeon group to cover call for patients who consulted or saw a neurosurgeon from that group during the last two years.

43. In other words, a neurosurgeon from Northwest Neurosurgery Associates must always be covering Emergency Department call at St. Luke's because someone treated by a

neurosurgeon within the group within the past two years could come into the Emergency Department at any time. In addition, a neurosurgeon from Neuroscience Associates must also always be covering Emergency Department call at St. Luke's because someone treated by a neurosurgeon within the group within the past two years could come into the Emergency Department at any time.

44. The physicians who are members of Northwest Neurosurgery Associates are enacting policies that greatly affect their competitors' ability to practice neurosurgery at St. Luke's, but have no adverse effect on the St. Luke's employed neurosurgeons. In part, this is because St. Luke's pays locum tenens physicians to alleviate a substantial call burden for the St. Luke's employed neurosurgeons, but not the independent neurosurgeons. St. Luke's employed neurosurgeons are also paid for their time covering Emergency Department call (independent neurosurgeons are not). Northwest Neurosurgery Associates has eight neurosurgeons who can take turns covering Emergency Department call in the event call is not covered by a locums tenens physicians.

45. Neuroscience Associates' objections to this new call policy were ignored by Defendants.

46. In response to this new policy and the untenable burden it imposes on independent neurosurgeons, Dr. Manning took an approved leave of absence, effective August 1, 2022, and later resigned his Medical Staff Membership at St. Luke's, effective August 1, 2023.

47. Despite these unfair and untenable burdens, Dr. Michael Hajjar has continued as an active member of St. Luke's Medical Staff. As such, he is the sole independent neurosurgeon on St. Luke's Medical Staff.

48. As such, with Neuroscience Associates down to one neurosurgeon—Dr. Hajjar—with Medical Staff Membership at St. Luke's, Dr. Hajjar is expected by St. Luke's to provide 24/7/365 Emergency Department call coverage for St. Luke's completely on his own—with no compensation from St. Luke's and no relief from locum tenens neurosurgeons and/or St. Luke's employed neurosurgeons—simply to maintain his Medical Staff Membership.

49. In addition to the disproportionate call burden, St. Luke's has also restricted Dr. Hajjar's ability to perform elective surgeries. Since 2005, Dr. Hajjar has had a full day of operating room block time every Tuesday. The same week that St. Luke's employed neurosurgeons enacted the policy of requiring two years of coverage for any patient that Dr. Hajjar has ever seen, St. Luke's administration reduced his operating room availability to one day a month instead of one day a week.

50. Under this policy, St. Luke's is effectively (and arbitrarily) doubling up on Emergency Department call coverage since two neurosurgeons (either an employed neurosurgeon from Northwest Neurosurgery Associates/locum tenens and an independent neurosurgeon from Neuroscience Associates) are always on call. Federal law does not require this. The new policy serves no purpose other than: (1) providing St. Luke's with additional Emergency Department call coverage it does not pay for and (2) placing onerous and untenable burdens on independent neurosurgeons who want to maintain Medical Staff Membership at St. Luke's.

51. In contrast, St. Luke's further alleviated call coverage burdens for its employed neurosurgeons because after the new policy went into effect, St. Luke provided even more coverage from locum tenens neurosurgeons for St. Luke's employed neurosurgeons, and not the

sole remaining independent neurosurgeon who has been providing uncompensated 24/7/365 call coverage to St. Luke's.

52. Neuroscience Associates expressed concerns about the call coverage system to the current Chief of Medical Staff, who responded he could not intervene because Northwest Neurosurgery Associates controls the neurosurgery call, not the Medical Staff.

53. In addition, in at least one instance, Dr. Hajjar has been required to cover call when a St. Luke's employed neurosurgeon refused to follow the call policy.

54. At the time of this filing, Defendants are now proposing even more onerous restrictions through Medical Staff bylaws that will further impair independent physicians, which now includes only Dr. Hajjar, in their ability to practice medicine at St. Luke's. These policies, however, have no direct, adverse effect on the employed St. Luke's physicians.

55. In addition, as a result of Defendants' unlawful actions, Neuroscience Associates' neurosurgeons who relinquished their Medical Staff membership (and any future neurosurgeons Neuroscience Associates brings on) are even further dissuaded from reapplying for Medical Staff privileges.

**F.    Plaintiffs Have Been Injured by Defendants' Anticompetitive Efforts to Eliminate Independent Neurosurgeons from St. Luke's Medical Staff.**

56. Neuroscience Associates has not been reimbursed for Dr. Hajjar's call coverage from April 16, 2018, to the present and is owed payment for such unreimbursed call coverage.

57. Neuroscience Associates has not been reimbursed for Dr. Manning's call coverage from April 16, 2018, to August 1, 2022, and is owed payment for such unreimbursed call coverage.

58. Neuroscience Associates has not been reimbursed for call coverage for two of its other neurosurgeons, Dr. Bridges and Dr. Lochhead, from April 16, 2018 through the dates of

their relinquishment of Medical Staff Membership at St. Luke's, and is owed payment for such call coverage.

59. St. Luke's, Northwest Neurosurgery Associates, and Dr. Little have worked together with the purpose of driving out independent neurosurgeons—thereby allowing their employed group of neurosurgeons to dominate and control the market and ensure patients are sent only to St. Luke's facilities—and they have done so by imposing unfair, inequitable, and untenable Emergency Department call coverage burdens and refusing to compensate Neuroscience Associates' independent neurosurgeons for the valuable services they provide for St. Luke's to meet its federal law call coverage requirements.

60. St. Luke's is also in the process of rolling out St. Luke's health care plan, a private healthcare insurance product that competes in the general insurance market and will presumably result in enrolled patients receiving medical care exclusively – or at a substantially lesser cost – at St. Luke's facilities. As such, Neuroscience Associates is down to one neurosurgeon who can care for such patients at St. Luke's.

61. The restrictions placed on independent physicians coincides with St. Luke's efforts to gain increased traction in the Idaho health insurance market. At the same time, St. Luke's is restricting patients' abilities to see physicians who are outside of St. Luke's employment, which is effectively narrowing St. Luke's network of physicians to St. Luke's employed physicians only.

### IV. CAUSES OF ACTION

#### Count I – Violation of Sherman Act (15 U.S.C. § 1)

62. Plaintiffs incorporate all previous allegations as though fully set forth herein.

63. St. Luke's, Northwest Neurosurgery Associates, and Dr. Little have conspired to create an unreasonable restraint of commerce by implementing policies that disproportionately and unfairly burden independent neurosurgeons in an effort to force independent neurosurgeons to relinquish their Medical Staff Membership at St. Luke's.

64. Defendants' efforts to force Neuroscience Associates' independent neurosurgeons to relinquish their Medical Staff Membership is to further Defendants' interests in ensuring patients are steered to St. Luke's providers and facilities, including labs, imaging, operating rooms, inpatient care, therapy care, etc.

65. Defendants' efforts to restrain commerce actually injures competition. The policies are intended to force independent neurosurgeons to relinquish their Medical Staff Membership at St. Luke's so that patients who come to the Emergency Department will be seen only by St. Luke's employed neurosurgeons/locum tenens who will channel patients to St. Luke's facilities and providers for treatment. In other words, squeezing out independent neurosurgeons will significantly reduce (or nearly eliminate) the potential for patients being referred to any non-St. Luke's facility for treatment in Southeast Idaho.

66. In addition to injuring competition, Defendants' policies have directly injured Plaintiffs. Forcing Plaintiffs to relinquish Medical Staff Membership at St. Luke's severely harms Plaintiffs because it substantially limits the number of patients they are able to treat, particularly due to St. Luke's holding a dominant market share based on its continuous efforts to acquire and drive out independent medical providers over the years (thereby eliminating competition).

67. Neuroscience Associates has been directly injured because Dr. Bridges and Dr. Lochhead provided Emergency Department call coverage without compensation and were

ultimately forced to relinquish their Medical Staff Membership due to the unfair burdens created by Defendants' policies. Dr. Hajjar has been forced to provide Emergency Department call coverage, without compensation, since April 16, 2018, and has been forced to provide call coverage every day (without compensation) since August 2, 2022. Dr. Hajjar's surgery block time was also significantly reduced, thereby limiting the time he has available to operate on Neurosurgery Associates' patients who elect St. Luke's for their surgery and/or pay less for such surgery as a result of their health plan providing further discounts of cost to the patients if their surgery care is performed at a St. Luke's facility.

68. Prior to his leave of absence and subsequent relinquishment of Medical Staff Membership at St. Luke's, Dr. Manning had been forced to provide Emergency Department call coverage, without compensation, since April 16, 2018, and he was ultimately forced to relinquish his Medical Staff Membership due to the unfair burdens created by Defendants' policies.

69. In addition to the amounts owed for call coverage that Neuroscience Associates, Dr. Hajjar and Dr. Manning provided, Plaintiffs also seek injunctive relief enjoining Defendants' unfair policies relating to Emergency Department call coverage, declaratory relief, and/or treble damages pursuant to 15 U.S.C. § 15(a).

### Count II – Unreasonable Restraint of Trade or Commerce
### (Idaho Code § 48-104)

70. Plaintiffs incorporate all previous allegations as though fully set forth herein.

71. St. Luke's, Northwest Neurosurgery Associates, and Dr. Little have conspired to create an unreasonable restraint of commerce by implementing policies that disproportionately and unfairly burden independent neurosurgeons in an effort to force independent neurosurgeons to relinquish their Medical Staff Membership at St. Luke's.

72. Defendants' efforts to force Neuroscience Associates' independent neurosurgeons to relinquish their Medical Staff Membership is to further Defendants' interests in ensuring patients are steered to St. Luke's providers and facilities, including labs, imaging, operating rooms, inpatient care, therapy care, etc.

73. St. Luke's significant reduction of Dr. Hajjar's block time has also injured competition and will do so even more dramatically as St. Luke's preferred provider plan/plans roll out in Idaho.

74. Defendants' efforts to restrain commerce actually injures competition. The policies are intended to force independent neurosurgeons to relinquish their Medical Staff Membership at St. Luke's so that patients who come to the Emergency Department will be seen only by St. Luke's employed neurosurgeons/locum tenens who will channel patients to St. Luke's facilities and providers for treatment. In other words, squeezing out independent neurosurgeons will significantly reduce (or effectively eliminate) the potential for patients being referred to any non-St. Luke's facility for treatment in Southeast Idaho.

75. In addition to injuring competition, Defendants' policies have directly injured Plaintiffs. Forcing Plaintiffs to relinquish Medical Staff Membership at St. Luke's severely harms Plaintiffs because it substantially limits the number of patients they are able to treat, particularly due to St. Luke's holding a dominant market share based on its continuous efforts to acquire and drive out independent medical providers over the years (thereby eliminating competition).

76. Neuroscience Associates has been directly injured because Dr. Bridges and Dr. Lochhead provided Emergency Department call coverage without compensation and were

ultimately forced to relinquish their Medical Staff Membership due to the unfair burdens created by Defendants' policies.

77. Dr. Hajjar has been forced to provide Emergency Department call coverage, without compensation, since April 16, 2018, and has been forced to provide call coverage every day (without compensation) since August 2, 2022. Dr. Hajjar's surgery block time was also significantly reduced, thereby limiting the time he has available to operate on Neurosurgery Associates' patients who elect St. Luke's for their surgery and/or pay less for such surgery as a result of their health plan providing further discounts of cost to the patients if their surgery care is performed at a St. Luke's facility.

78. Prior to his leave of absence and subsequent relinquishment of Medical Staff Membership at St. Luke's, Dr. Manning had been forced to provide Emergency Department call coverage, without compensation, since April 16, 2018.

79. In addition to the amounts owed for call coverage that Neuroscience Associates, Dr. Hajjar, and Dr. Manning provided, Plaintiffs also seek injunctive relief enjoining Defendants' unfair policies relating to Emergency Department call coverage, declaratory relief, and treble damages pursuant to Idaho Code § 48-104.

## Count III – Unjust Enrichment

80. Plaintiffs incorporate all previous allegations as though fully set forth herein.

81. Plaintiffs conferred benefits on Defendants by providing Emergency Department call coverage for neurosurgery services.

82. Defendants retained the benefits of Plaintiffs' call coverage and continue to do so without providing compensation since April 16, 2018.

83. It would be unfair and unjust for Defendants to retain the benefits of Emergency Department call coverage without compensating Plaintiffs.

84. It is further unfair and unjust for Defendants to threaten to take away independent neurosurgeons' Medical Staff Membership if they refuse to provide call coverage at no cost.

85. As a direct and proximate result of Defendants' retention of these benefits, Plaintiffs have been damaged in an amount to be determined by a jury at trial.

## DEMAND FOR ATTORNEY FEES

As a further direct and proximate cause of Defendants' conduct, Plaintiffs have been required to retain counsel for the purposes of prosecuting this action, and they are entitled to recover all reasonable costs and attorneys' fees incurred in the prosecution of this lawsuit pursuant to various provisions of federal and Idaho law, including, but not limited to, 15 U.S.C. § 15(a), Idaho Code §§ 12-120(3), 12-121, 12-123, 48-113(a) and Rule 54 of the Federal Rules of Civil Procedure, and any other applicable statute, rule, regulation, and/or contractual provision. Plaintiffs are further entitled to an award of attorney fees in the amount of $10,000 in the event of default.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants as follows:

1) For compensatory damages;

2) For treble damages pursuant to 15 U.S.C. § 15(a) and Idaho Code § 48-113(2);

3) For injunctive relief enjoining Defendants' unfair practices and policies relating to Emergency Department coverage;

4) For a declaratory judgment declaring that Defendants' unfair practices and policies relating to Emergency Department coverage violate 15 U.S.C. § 15(a) and Idaho Code § 48-104;

5) For attorneys' fees and costs;

6) For prejudgment interest pursuant to Idaho Code §28-22-104(1);

7) For post-judgment interest pursuant to 28 U.S.C. § 1961 and Idaho Code § 28-22-104(2); and

8) For such other and further relief as the Court deems just and appropriate.

DATED this 15th day of August, 2023.

                        DUKE EVETT, PLLC


                        By /s/Keely E. Duke
                           Keely E. Duke, Of the Firm
                           Molly E. Mitchell, Of the Firm
                           *Attorneys for Plaintiffs*