Keely E. Duke
ISB 6044; ked@dukeevett.com
Molly E. Mitchell
ISB 10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 W. River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Dr. Michael Hajjar, MD, an individual, Dr. Thomas Manning, MD, PhD, an individual, and NS Support, L.L.C. d/b/a Neuroscience Associates, | Case No. 1:23-CV-367 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | **(Demand for Jury Trial)** |
| St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates, Dr. Kenneth Little, MD, an individual, | |
| Defendants. | |

Plaintiffs Dr. Michael Hajjar, MD, Dr. Thomas Manning, MD, PhD, and NS Support, L.L.C. d/b/a Neuroscience Associates ("Neuroscience Associates"), by and through their attorneys of record, Duke Evett, PLLC, and for a Complaint against Defendants St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates, and Dr. Kenneth Little, MD, plead and allege as follows:

### I.    INTRODUCTION

1.    Over the years, St. Luke's Health System, LTD ("St. Luke's") has obtained a

dominant share of Southwest Idaho's healthcare market by systematically acquiring independent medical providers. St. Luke's is now the area's largest healthcare provider by far and leverages its size to charge rates that are well above competitive. In short, commercial payors are forced to play ball with St. Luke's regardless of the reasonableness of its rates because—due to the market share St. Luke's commands—health care plans for insureds in Southwest Idaho absolutely must provide coverage for healthcare provided at St. Luke's facilities, otherwise insureds will not have sufficient options for their healthcare needs. The trickle-down effect from leveraging St. Luke's dominant market share to charge higher than competitive rates is apparent: to account for St. Luke's higher than competitive rates, commercial payors must charge higher premiums for their health care plans, and when employers must pay more for healthcare plans, these increased costs are ultimately borne by the employees.

2.      Commercial payors, employers, and employees are not the only ones affected by St. Luke's efforts to monopolize healthcare in Southwest Idaho. Such monopolization is achieved by significantly diminishing the market share for independent healthcare providers so that St. Luke's is effectively the only game in town. This lawsuit deals with St. Luke's efforts to significantly diminish the market share for independent neurosurgeons.

3.      St. Luke's and its neurosurgery provider, Northwest Neurosurgery Associates, have placed untenable call coverage burdens on independent neurosurgeons to force them to relinquish their medical staff privileges at St. Luke's facilities. St. Luke's efforts started in 2018, when it stopped paying independent neurosurgeons for emergency department call coverage (which independent neurosurgeons were required to provide to maintain their medical staff privileges). Northwest Neurosurgery Associates employed neurosurgeons were and are still compensated for call coverage, as are locum tenens physicians St. Luke's pays to alleviate call

coverage burdens for its own physicians (but not independent neurosurgeons). This forced some but not all of the independent neurosurgeons to relinquish their medical staff privileges. In August 2022, St. Luke's and Northwest Neurosurgery Associates dialed up their concerted efforts to drive out the two remaining independent neurosurgeons by changing the call coverage policy in a way that effectively requires the independent neurosurgeons to be on call 24/7/365 (and with absolutely no compensation for this call coverage).

4.    By driving out independent neurosurgeons, St. Luke's and Northwest Neurosurgery Associates are increasing St. Luke's share of the neurosurgery market in Southwest Idaho and further expanding its share of the area's healthcare market in general, including the market for neurosurgical hospital services (i.e. services related to neurosurgical such as radiology and imaging services and physical therapy). This is because independent neurosurgeons may—and almost always do—refer patients to non-St. Luke's facilities for further care (e.g. imaging, physical therapy, etc.), whereas St. Luke's neurosurgeons only refer patients to St. Luke's facilities.

5.    St. Luke's efforts to significantly diminish the independent neurosurgeons' market share and monopolize the neurosurgery market and the neurosurgical hospital services market are anticompetitive and must be stopped.

## II.    PARTIES

6.    Dr. Michael Hajjar, MD is an individual residing in Ada County, Idaho and is a member of Neuroscience Associates.

7.    Dr. Thomas Manning, MD, PhD, is an individual residing in Ada County, Idaho, and is a member of Neuroscience Associates.

8.    NS Support, L.L.C. is an Idaho limited liability company with its principal place

of business in Ada County, Idaho doing business under the name Neuroscience Associates.

9.     St. Luke's Health System, LTD, is an Idaho non-profit corporation doing business in Idaho with its principal place of business in Ada County, Idaho.

10.    Clinical Neuroscience Management, PC is an Idaho professional service corporation with its principal place of business in Ada County, Idaho doing business under the name Northwest Neurosurgery Associates.

11.    Dr. Kenneth Little, MD is an individual who, on information and belief, resides in Ada County, Idaho, and is the President of Northwest Neurosurgery Associates.

### III.     JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331. Plaintiffs assert federal subject matter pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

13.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in the Southern Division of the United States District Court for the District of Idaho pursuant to 28 U.S.C. § 1391.

### IV.     GENERAL ALLEGATIONS

**A.     St. Luke's efforts to monopolize the neurosurgery market impacts interstate commerce.**

15.    St. Luke's is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Hundreds of millions of dollars (and close to a majority) of St. Luke's, Saint Alphonsus' and Treasure Valley Hospital's ("TVH") revenues come from sources located outside of Idaho, including payments from the federal government through such programs as Medicare and payments from out of state commercial payors such as Select Health,

Coventry, Aetna and United Healthcare. This includes payments for both hospital and physicians' services. St. Luke's and Saint Alphonsus borrow at least tens of millions of dollars from lenders in interstate commerce, through their bond offerings. Moreover, St. Luke's sells medical services in interstate commerce, and its conduct has an effect on the citizens of several states. St. Luke's activities at issue include activities in Oregon, where it owns and operates medical facilities. Both St. Luke's and Saint Alphonsus treat a substantial number of patients from other states, including in particular eastern Oregon. Further, these hospitals spend millions of dollars on the purchase of supplies in interstate commerce.

16.     As a result of the fact that much of St. Luke's, Saint Alphonsus' and TVH's revenues come from sources located outside of Idaho, including payments from out of state commercial payors, the increases in the market power of St. Luke's, and weakening of Saint Alphonsus and TVH, described herein, will substantially affect the prices and rates negotiated with the commercial payors and, therefore, substantially affect the parties' revenues in interstate commerce. Such actions will also substantially affect the flow of patients across state lines and purchase of supplies in interstate commerce, substantially increasing St. Luke's volume of patients and interstate purchases and decreasing the volumes of other area hospitals.

**B.     St. Luke's dominates Southwest Idaho's healthcare market**

17.     St. Luke's is Southwest Idaho's largest healthcare provider and operates numerous hospitals in the area.

18.     As of 2014, St. Luke's operated the following hospitals in the area:

(1) St. Luke's Boise Medical Center, a 400–plus bed medical center in Boise; (2) St. Luke's Meridian Medical Center, a 165–plus bed hospital in Meridian; (3) St. Luke's Magic Valley Regional Medical Center, a 228–bed hospital in Twin Falls; (4) St. Luke's Jerome, a 25–bed critical-access hospital in Jerome; (6) St. Luke's McCall, a 15–bed critical access hospital in McCall; and (7) North Canyon Medical Center, a 15–bed critical access hospital in Gooding.

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.,* No. 1:12-CV-00560-BLW, 2014 WL 407446, at *2 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

19.     St. Luke's market share has only increased since then. St. Luke's also operates the St. Luke's Eagle Medical Plaza, St. Luke's Elmore Medical Center, Long-Term and Rehabilitation at St. Luke's Elmore, St. Luke's Rehabilitation Hospital in Boise, St. Luke's Nampa Medical Center, Idaho Elks Children's Pavilion, St. Luke's Canyon View Behavioral Health Services, St. Luke's Wood River Medical Center, St. Luke's Fruitland Medical Plaza, St. Luke's Children's Hospital in Boise, and Gwen Neilsen Anderson Rehabilitation Center in Twin Falls.

20.     St. Luke's operates sixteen hospitals and medical centers throughout Southwest Idaho.

21.     St. Luke's operates 277 medical clinics in Southwest Idaho and Eastern Oregon.

22.     St. Luke's is Idaho's largest employer, with a medical staff of over 1,800 physicians and advanced practice providers. St. Luke's employs over 15,000 people. For context, this is almost twice as many people as Wal-Mart employs in Idaho (Wal-Mart is the largest employer in over twenty states and is Idaho's second largest employer), and is about the same number of employees as Micron, Albertson's, and Saint Alphonsus *combined*.

23.     These numbers are especially startling since St. Luke's operations in Idaho are concentrated to the southwest part of the state. Although St. Luke's operations are limited to a geographical area that only encompasses about a third of the state, it is employing far more employees than any other employer in the state, including businesses that operate statewide like Wal-Mart and Albertson's.

**C.     Neuroscience Associates**

24.     Neuroscience Associates is Southwest Idaho's only independent medical provider for neurological surgery.

25.     Neuroscience Associates is owned by six neurosurgeons, including Dr. Hajjar and Dr. Manning.

26.     Independent physicians have significantly more freedom to assist patients in choosing where to get medical care, based on quality and affordability, rather than employed physicians who steer the patient's medical care to the employer hospital.  As such, independent physicians have the freedom to recommend patients to whichever medical facility that, in their professional opinion, would provide the appropriate care and at oftentimes more affordable costs than St. Luke's, based on that patient's particular needs and circumstances.

27.     Neuroscience Associates' independent neurosurgeons must maintain medical staff privileges ("Medical Staff Membership") at area hospitals so they can treat patients, including Neuroscience Associates' patients, at each hospital.

28.     Neuroscience Associates is affiliated with St. Luke's, Saint Alphonsus, Treasure Valley Hospital, and West Valley Medical Center, meaning some or all of its independent neurosurgeons have Medical Staff Membership at these hospitals.

29.     Neuroscience Associates has had neurosurgeons on St. Luke's Medical Staff since the 1990's.

30.     Maintaining Medical Staff Membership is critically important for independent neurosurgeons; without Medical Staff Membership, they have nowhere to treat their patients. For example, if they do not have Medical Staff Membership at St. Luke's, they cannot treat their patients at St. Luke's.

**D.     St. Luke's Professional Services Agreement with Northwest Neurosurgery Associates**

31.     At all relevant times, Northwest Neurosurgery Associates has been St. Luke's exclusive provider of neurosurgery services pursuant to a professional services agreement ("PSA").

32.     Under a PSA, a physician practice group agrees to provide health care services exclusively for St. Luke's. Payors reimburse St. Luke's for the services provided by the practice group. Although there is no direct employment relationship between St. Luke's and physicians practicing under a PSA, the agreement sets forth the compensation St. Luke's will pay for services provided by the group's physicians. The United States District Court for the District of Idaho has described this type of relationship as "functionally equivalent to employment [with St. Luke's] to the extent that it provides, at the group level, the same clinical and financial alignment that employment provides at the individual level." *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-CV-00560-BLW, 2014 WL 407446, at *3 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

33.     Northwest Neurosurgery Associates is a direct competitor of Neuroscience Associates.

34.     Unlike Neuroscience Associates' neurosurgeons, the neurosurgeons employed by Northwest Neurosurgery Associates are not independent physicians. This means that if a patient comes into the St. Luke's Emergency Department and sees a Northwest Neurosurgery Associates neurosurgeon, they will be directed to St. Luke's facilities for testing, imaging, surgery etc. (to the financial benefit of St. Luke's). On the other hand, if a patient comes into the St. Luke's Emergency Department and sees a Neuroscience Associates neurosurgeon, that neurosurgeon has the freedom to direct the patient to whichever medical facility or facilities make the most sense for the patient; as such, unlike Northwest Neurosurgery Associates' physicians,

Neuroscience Associates' physicians are able to consider factors such as quality of medical care and costs for the patient to consider with respect to further medical care. As such, with independent physicians such as Neuroscience Associates' neurosurgeons, St. Luke's knows that it will not be able to force those neurosurgeons and those neurosurgeons' patients to St. Luke's for medical care. This means that St. Luke's will lose out on potential revenue if a patient receives treatment at Saint Alphonsus, Treasure Valley Hospital, etc. per the independent neurosurgeon's recommendation. Dr. Hajjar typically refers patients for medical care at other area hospitals based on factors such as quality and cost of care. Before relinquishing his Medical Staff Membership at St. Luke's, Dr. Manning similarly would refer patients for medical care at other area hospitals based on factors such as quality and cost of care.

35.     It is advantageous to St. Luke's, Northwest Neurosurgery Associates, and Dr. Little to reduce the number of and/or eliminate independent neurosurgeons from the St. Luke's Medical Staff so that St. Luke's can steer all patients that come through its emergency services to its own medical doctors and facilities, labs, imaging, operating rooms, inpatient services, therapy service, etc., while avoiding the loss of patients to competitors such as Saint Alphonsus, Treasure Valley Hospital, and others.

36.     In addition, the reduction in number and/or total elimination of independent neurosurgeons from the St. Luke's Medical Staff also harms the Plaintiffs (and their patients) when the patients have an insurance plan that identifies St. Luke's as the preferred and/or in-network provider. In such situations, it is common for patients to choose St. Luke's for any and all medical care, including neurosurgery care, given the expense the patient would incur if the patient did not receive medical care from the preferred and/or in-network provider. As such, if Neuroscience Associates does not maintain any neurosurgeons on St. Luke's Medical Staff, a

patient with such a health care plan will be financially penalized if the patient remains with Neuroscience Associates and seeks care outside of St. Luke's.

37.     Logically, such scenarios impact pricing for St. Luke's services, resulting in higher prices to the patients and their insurers.

**E.     Emergency Department Call Coverage**

38.     Federal law requires St. Luke's to have 24/7/365 neurosurgery coverage in its Emergency Department.

39.     St. Luke's requires independent neurosurgeons to participate in Emergency Department call coverage in order to maintain Medical Staff Membership at St. Luke's facilities.

40.     Emergency Department call coverage includes coverage for all of St. Luke's hospitals throughout Southwest Idaho.

41.     As such, when on call, Neuroscience Associates' neurosurgeons are helping St. Luke's meet its federal law requirement across the entire St. Luke's network; a benefit that is now, as outlined below, going unpaid by St. Luke's over Neuroscience Associates' objections.

**F.     Defendants' Initial Efforts to Significantly Reduce the Market Share of Independent Neurosurgeons**

42.     Over the years, St. Luke's has acquired a myriad of independent medical groups and now dominates the medical care market in Idaho. Indeed, St. Luke's tried to purchase Idaho's largest independent physician practice, Saltzer Medical Group, but the merger was struck down by the United States District Court for the District of Idaho (and later the Ninth Circuit) as anti-competitive and in violation of the Clayton Antitrust Act.

43.     Neuroscience Associates has not been immune from St. Luke's efforts to reduce the market share of independent physicians and acquire more and more market share.

44.     Prior to April 16, 2018, St. Luke's compensated Neuroscience Associates' independent neurosurgeons, including Dr. Hajjar, Dr. Manning, Dr. Kelly Bridges, MD, and Dr. Richard Lochhead, MD, for Emergency Department call coverage.

45.     As of April 16, 2018, St. Luke's stopped paying Neuroscience Associates' independent neurosurgeons for their call coverage. Independent neurosurgeons were still required to provide call coverage, albeit for no compensation, otherwise they would lose their Medical Staff Membership at St. Luke's (the state's largest healthcare provider).

46.     Neuroscience Associates and its neurosurgeons objected to St. Luke's about-face on compensation to no avail; from April 16, 21018 to present, St. Luke's refuses to compensate Neuroscience Associates' neurosurgeons for call coverage.

47.     Although St. Luke's refuses to pay independent neurosurgeons for St. Luke's mandated Emergency Department call coverage, St. Luke's continued to pay Northwest Neurosurgery Associates employed neurosurgeons for Emergency Department call coverage after April 16, 2018 through the present.

48.     Defendants' efforts to significantly reduce the market share of Neuroscience Associates did not stop at refusing to pay independent neurosurgeons for Emergency Department call coverage (with the threat of terminating Medical Staff Membership if they refused to provide call coverage free of charge).

49.     Through Northwest Neurosurgery Associates and Dr. Little, the Defendants have disproportionately alleviated the call load of Northwest Neurosurgery Associates employed neurosurgeons (who St. Luke's pays for Emergency Department call coverage) by entering into contracts with locum tenens physicians to alleviate the call burden for the employed neurosurgeons.

50.     On the other hand, Neuroscience Associates' independent neurosurgeons have not been provided or offered the same call coverage relief through locum tenens physicians.

51.     St. Luke's pays locums tenens neurosurgeons for Emergency Department call coverage.

52.     St. Luke's also pays other specialty independent physicians (e.g. oral maxillofacial surgery and orthopedics) for Emergency Department call coverage.

53.     Despite the increasingly unfair burdens put in place by Defendants as to Emergency Department call coverage and the unfairness in St. Luke's stopping its payments to independent neurosurgeons for call coverage, initially Dr. Hajjar, Dr. Manning, and two other Neuroscience Associates neurosurgeons (Dr. Bridges and Dr. Lochhead) fulfilled their call coverage obligations to maintain their Medical Staff Membership.

54.     However, in response to the disproportionate, uncompensated call burden placed on independent neurosurgeons versus employed St. Luke's neurosurgeons, Dr. Lochhead and Dr. Bridges eventually relinquished their Medical Staff privileges in November 2020 and January 2021, respectively.

55.     Despite the disproportionate, uncompensated call burden placed on independent neurosurgeons versus employed Northwest Neuroscience Associates neurosurgeons, Dr. Hajjar and Dr. Manning continued their Medical Staff Membership with St. Luke's.

**G.    Defendants Intensify Their Efforts to Eliminate Independent Neurosurgeons from St. Luke's Medical Staff**

56.     In August 2022, St. Luke's, in conjunction with Northwest Neurosurgery Associates and Dr. Little, intensified their collective efforts to drive out the two remaining independent neurosurgeons by implementing a new policy that requires each neurosurgeon group

to cover call for patients who consulted or saw a neurosurgeon from that group during the last two years.

57.     In other words, a neurosurgeon from Northwest Neurosurgery Associates must always be covering Emergency Department call at St. Luke's because someone treated by a neurosurgeon within the group within the past two years could come into the Emergency Department at any time. In addition, a neurosurgeon from Neuroscience Associates must also always be covering Emergency Department call at St. Luke's because someone treated by a neurosurgeon within the group within the past two years could come into the Emergency Department at any time.

58.     The physicians who are members of Northwest Neurosurgery Associates, in conjunction with St. Luke's, are enacting policies that greatly affect their competitors' ability to practice neurosurgery at St. Luke's, but these same policies have no adverse effect on the Northwest Neurosurgery Associates employed neurosurgeons. In part, this is because St. Luke's pays locum tenens physicians to alleviate a substantial call burden for the Northwest Neurosurgery Associates employed neurosurgeons, but not the independent neurosurgeons. Northwest Neurosurgery Associates employed neurosurgeons are also paid for their time covering Emergency Department call (independent neurosurgeons are not). Northwest Neurosurgery Associates has eight neurosurgeons who can take turns covering Emergency Department call in the event call is not covered by a locums tenens physicians.

59.     Neuroscience Associates' objections to this new call policy were ignored by Defendants. Although Northwest Neurosurgery Associates operates pursuant to a PSA with St. Luke's, St. Luke's has feigned inability to do anything about these unfair policies because the

neurosurgery department is purportedly run by Northwest Neurosurgery Associates, not St. Luke's.

60.    In response to this new policy and the untenable burden it imposes on independent neurosurgeons, Dr. Manning took an approved leave of absence, effective August 1, 2022, and later resigned his Medical Staff Membership at St. Luke's, effective August 1, 2023.

61.    Despite these unfair and untenable burdens, Dr. Michael Hajjar has continued as an active member of St. Luke's Medical Staff. As such, he is the sole independent neurosurgeon on St. Luke's Medical Staff.

62.    With Neuroscience Associates down to one neurosurgeon with Medical Staff Membership at St. Luke's, Dr. Hajjar is expected by St. Luke's and Northwest Neurosurgery Associates to provide 24/7/365 Emergency Department call coverage for St. Luke's completely on his own—with no compensation from St. Luke's and no relief from locum tenens neurosurgeons and/or Northwest Neurosurgery Associates employed neurosurgeons—simply to maintain his Medical Staff Membership.

63.    In addition to the disproportionate call burden, St. Luke's has also restricted Dr. Hajjar's ability to perform elective surgeries. Since 2005, Dr. Hajjar has had a full day of operating room block time every Tuesday. The same week that Northwest Neurosurgery Associates enacted the policy of requiring two years of coverage for any patient that any Neuroscience Associates neurosurgeon has ever seen, St. Luke's administration reduced Dr. Hajjar's operating room availability to one day a month instead of one day a week.

64.    Under this policy, St. Luke's is effectively (and arbitrarily) doubling up on Emergency Department call coverage since two neurosurgeons (either an employed neurosurgeon from Northwest Neurosurgery Associates/locum tenens and an independent

neurosurgeon from Neuroscience Associates) are always on call. Federal law does not require this. The new policy serves no purpose other than: (1) providing St. Luke's with additional Emergency Department call coverage it does not pay for and (2) placing onerous and untenable burdens on independent neurosurgeons who want to maintain Medical Staff Membership at St. Luke's.

65.     In contrast, St. Luke's further alleviated call coverage burdens for Northwest Neurosurgery Associates employed neurosurgeons because after the new policy went into effect, St. Luke provided even more coverage from locum tenens neurosurgeons for St. Luke's employed neurosurgeons, but not the sole remaining independent neurosurgeon who has been providing uncompensated 24/7/365 call coverage to St. Luke's.

66.     Neuroscience Associates expressed concerns about the call coverage system to the current Chief of Medical Staff, who responded he could not intervene because Northwest Neurosurgery Associates controls the neurosurgery call, not the Medical Staff.

67.     In addition, in at least one instance, Dr. Hajjar has been required to cover call when a St. Luke's employed neurosurgeon refused to follow the call policy.

68.     Defendants have also proposed even more onerous restrictions through Medical Staff bylaws that will further impair independent physicians, which now includes only Dr. Hajjar, in their ability to practice medicine at St. Luke's. These policies, however, have no direct, adverse effect on the employed Northwest Neurosurgery Associates employed physicians.

69.     In addition, as a result of Defendants' unlawful actions, Neuroscience Associates' neurosurgeons who relinquished their Medical Staff membership (and any future neurosurgeons Neuroscience Associates brings on) are even further dissuaded from reapplying for Medical Staff privileges.

70.    This impacts Neuroscience Associates' ability to grow its business and compete more vigorously in the market. Neurosurgery is a highly competitive field, and Medical Staff membership at area hospitals is critical for independent neurosurgeons to develop and maintain their practice. The untenable call coverage burden is a serious deterrent that impacts Neuroscience Associates' ability to recruit and hire new neurosurgeons. Potential hires would have to elect between not having Medical Staff membership at St. Luke's—the area's largest healthcare provider by far—or bearing the disproportionate and unfair burdens created by the current call system at no pay, which also exposes them to losing such membership if they fail to meet these onerous requirements.

71.    The untenable call coverage burden also significantly impacts Neuroscience Associates' ability to compete in the market because many patients have insurance that requires or incentivizes them to receive care at St. Luke's facilities, including but not limited to patients who are insured by the St. Luke's Health Plan. Neuroscience Associates neurosurgeons who have relinquished their Medical Staff Membership at St. Luke's are unable to treat these patients, and therefore their ability to compete in the neurosurgery market is diminished.

**H.    Plaintiffs Have Been Injured by Defendants' Anticompetitive Efforts to Eliminate Independent Neurosurgeons from St. Luke's Medical Staff.**

72.    Neuroscience Associates has not been reimbursed for Dr. Hajjar's call coverage from April 16, 2018, to the present and is owed payment for such unreimbursed call coverage.

73.    Neuroscience Associates has not been reimbursed for Dr. Manning's call coverage from April 16, 2018, to August 1, 2022, and is owed payment for such unreimbursed call coverage.

74.    Neuroscience Associates has not been reimbursed for call coverage for two of its other neurosurgeons, Dr. Bridges and Dr. Lochhead, from April 16, 2018 through the dates of

their relinquishment of Medical Staff Membership at St. Luke's, and is owed payment for such call coverage.

75.     St. Luke's, Northwest Neurosurgery Associates, and Dr. Little have worked together with the purpose of driving out independent neurosurgeons—thereby allowing Northwest Neurosurgery Associates employed group of neurosurgeons to dominate and control the market and ensure patients are sent only to St. Luke's facilities—and they have done so by imposing unfair, inequitable, and untenable Emergency Department call coverage burdens and refusing to compensate Neuroscience Associates' independent neurosurgeons for the valuable services they provide for St. Luke's to meet its federal law call coverage requirements.

76.     St. Luke's is also in the process of rolling out St. Luke's Health Care Plan, a private healthcare insurance product that competes in the general insurance market and will presumably result in enrolled patients receiving medical care exclusively – or at a substantially lesser cost – at St. Luke's facilities. As such, Neuroscience Associates is down to one neurosurgeon who can care for such patients at St. Luke's.

77.     The restrictions placed on independent neurosurgeons coincides with St. Luke's efforts to gain increased traction in the Idaho health insurance market. At the same time, St. Luke's is restricting patients' abilities to see physicians who are outside of St. Luke's employment, which is effectively narrowing St. Luke's network of physicians to St. Luke's employed physicians (or physicians employed by a group that operates under a PSA with St. Luke's) only.

## I.      Healthcare provider reimbursement and competition

78.     Hospitals and other healthcare providers receive revenue through government programs (e.g. Medicare and Medicaid) and through payments by commercial payors who provide insurance to their members.

79.     Payments by commercial payors are critical to the success of any hospital due to the lower level of payments made by Medicare and Medicaid. No hospital or physician group could operate successfully based only on reimbursement from Medicare or Medicaid.

80.     Competition among healthcare providers occurs in two stages. In the first stage, providers compete to be selected as in-network providers by commercial payors (i.e. health insurance companies). Commercial payors seek to offer convenient networks of healthcare providers for their members. Typically, employees and subscribers want plans that allow them to choose from a variety of providers in convenient locations near where they live. Commercial payors negotiate contracts with hospitals and physicians to create provider networks which provide these choices.

81.     Employees and subscribers pay higher out-of-pocket costs when they see an out-of-network provider, and in some instances may have no insurance coverage for such care. Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers to minimize or avoid out-of-pocket expenses. Healthcare providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

82.     Price competition occurs primarily at the first step of competition, in negotiations between payors and providers.

83.     In the second stage, healthcare providers compete with other in-network providers to attract patients. Typically, managed care plans offer multiple in-network providers with

similar out-of-pocket costs. In this second stage, providers compete primarily on non-price factors to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors.

**J.      Product and geographic market**

84.     For purposes of this Complaint, the relevant product market is the provision of professional neurosurgical services. Neurosurgical services include diagnosis and surgical treatment of injuries, disorders, and diseases to the brain, spinal cord, spinal column, and peripheral nervous system. Neurosurgical hospital services are hospital services related to the provision of neurosurgical care, including radiology, imaging and other diagnostic services and physical therapy.

85.     There are no close substitutes for neurosurgical services provided by other types of physicians. Although orthopedic surgeons may perform spinal surgery, and therefore compete with neurosurgeons to a limited degree, no managed care plan could successfully offer a network of providers that only included orthopedic surgeons but no neurosurgeons. This is because only neurosurgeons perform both spinal and cranial surgery, and therefore any health care system possessing a monopoly of professional neurological services in a relevant geographic market would be able to raise prices above a competitive level.

86.     For purposes of this Complaint, the relevant geographic market is Ada and Canyon Counties. Patients do not wish to travel long distances for neurosurgical care—which is often times needed on an emergency basis—and there is no competition for neurosurgical services for hundreds of miles outside of Ada and Canyon counties. As a result, no managed care plan could successfully offer a network in Ada and Canyon Counties without including neurosurgeons located in the area.

87.     Under the Herfindahl-Hirschman Index ("HHI") test, a measure of market concentration set forth by the federal antitrust agencies in their Horizontal Merger Guidelines, competition is assessed by summing the squares of the market shares of the competitors. By that measure, the relevant markets are each "highly concentrated," defined by the federal antitrust agencies as markets with HHIs over 2,500. When markets are highly concentrated, even small shifts of patients from hospitals with smaller shares to hospitals with greater market shares can be anticompetitive; an increase of 200 HHI points is presumed anticompetitive. The market for neurosurgical services in Ada and Canyon Counties is highly concentrated.

K.     **St. Luke's uses its market share to charge higher than competitive prices**

88.     St. Luke's has in excess of a 50% share of professional neurological services in Ada and Canyon Counties, which gives St. Luke's significant market power. This market power arises for several reasons: (1) St. Luke's holds a substantial market share; (2) some payors require patients to use St. Luke's facilities; and (3) St. Luke's controls referrals from its employed primary care physicians, so they only go to Northwest Neurosurgery Associates neurosurgeons.

89.     With respect to the latter, Judge Winmill previously found that patients "largely accept the recommendations of their primary care physician as to what hospital, specialist, and ancillary services to use" and that, although physicians operating under a PSA have discretion referring patients, "in practice that discretion has been exercised to favor the hospital where the physician was employed." *Saint Alphonsus Medical Center – Nampa, Inc.*, 2014 WL 407446, at *13.

90.     Increasing St. Luke's market share allows St. Luke's to leverage its dominant position to demand higher reimbursements from commercial health plans. *Id.* at *12. And

"[w]hen health plans pay more, they pass that increase along to their customers in the form of higher premiums and higher out-of-pocket costs." *Id.*

L.   **Effects of Defendants' anticompetitive actions**

91.   Defendants' efforts to monopolize neurosurgical services in Ada and Canyon Counties has impacted Neuroscience Associates' ability to compete in the area. Specifically, except for Dr. Hajjar, Neuroscience Associates' neurosurgeons have relinquished their Medical Staff Membership at St. Luke's because of the disproportionate and onerous call burdens. This means that Neuroscience Associates neurosurgeons are severely limited in their ability to treat patients with insurance that requires or incentivizes care at St. Luke's (including but not limited to patients insured under the St. Luke's Health Plan). This has also impacted Neuroscience Associates' ability to recruit and retain other neurosurgeons; it is difficult if not impossible for newer independent neurosurgeons to enter the market if they are unable to maintain privileges at the largest healthcare provider in the area.

92.   This has reduced Neuroscience Associates' market share, and increased St. Luke's market share. Consequently, there is a dangerous probability that St. Luke's will obtain monopoly power over neurosurgical services in Ada and Canyon Counties if it has not done so already.

93.   The competitive effects of these actions also limit patients' ability to see providers outside of St. Luke's, even if the patients may receive better quality or priced healthcare elsewhere. By forcing independent neurosurgeons to give up their Medical Staff Membership, St. Luke's ensures that all patients who come into the emergency department and need neurosurgical care will be directed to St. Luke's facilities for things like imaging, physical therapy, etc. This

stymies the patient's and doctor's ability to freely choose a doctor or facility that best meets the patient's needs.

94.    Further, the growth of St. Luke's market share gives it more power over prices, and results in more patients having to use the higher priced St. Luke's physicians since they make up such a substantial portion of the market.

95.    Economic research overwhelmingly shows that high market concentration substantially increases hospital prices. For example:

a.    A 2019 study found that increases in the concentration of inpatient hospital services are associated with increases in outpatient hospital prices, as well as inpatient hospital prices. Baker LC, Bundorf MK, Kessler DP, Competition in Outpatient Procedure Markets, MEDICAL CARE 2019; 57:36-41.

b.    a 2012 study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—Update, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

c.    A 2011 study examining the effect of hospital market concentration on specific procedures found that in concentrated hospital markets, hospitals charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology*, 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

d.  Another 2011 study examining the effect of concentrated hospital markets on hospital prices in 2001 and 2004 found that "hospital prices are higher in more concentrated markets." Glenn A. Melnick, Yu-Chu Shen and Vivian Yaling Wu, The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices, 30(9) HEALTH AFFAIRS 1728, 1729-31 (2011).

e.  A 2009 study examining the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996 found that non-merging hospitals increased prices 40 percent in response to hospital mergers. Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers*, 52 J. L. & Econ. 523, 544 (2009).

f.  A 2005 study examining the effect of hospital consolidation through system acquisition (i.e. a hospital joining a wider hospital system) found that "managed care prices were higher in system hospitals than in nonsystem hospitals by an average of $103 per day." Alison Evans Cuellar and Paul J. Gertler, *How the Expansion of Hospital Systems has Affected Consumers*, 24(1) HEALTH AFFAIRS 213, 217 (Jan. 2005).

96.  Price increases from higher concentration are passed on to local employers and their employees. Self-insured employers pay the full cost of their employees' health care claims and directly bear the full burden of higher rates. Commercially insured employers are harmed by higher rates because health plans must pass on at least a portion of hospital rate increases to these employers.

97.     Employers then pass on increased health care costs to their employees, in whole or in part, in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services. This can cause Ada and Canyon County residents to forego or delay necessary health care services because of the higher costs, whereas others may drop their insurance coverage altogether.

98.     Economic research also shows that high concentration (and therefore less competition) can result in lesser quality health care. For example:

a.  A 2006 study found that "the evidence suggests that increasing hospital concentration lowers quality." William B. Vogt and Robert Town, How has hospital consolidation affected the price and quality of hospital care?, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT 4, 8-9 (Feb. 2006). The 2012 update to the Synthesis Project stated that all of the U.S. studies except for one found that competition improves quality." Martin Gaynor and Robert, The Impact of Hospital Consolidation-Update, Robert Wood Johnson Foundation. THE SYNTHESIS PROJECT 4 (June 2012).

b.  Other recent studies similarly show that greater concentration is associated with lesser quality of healthcare. Koch TG, Wendling BW, Wilson NE, Physician Market Structure, Patient Outcomes, and Spending: An Examination of Medicare Beneficiaries, Health Services Research 2018; 53(5):3549-3568. Gary J. Young, E. David Zepeda, Stephen Flaherty, and Ngoc Thai, Hospital Employment of Physicians In Massachusetts Is Associated With Inappropriate Diagnostic Imaging, Health Affairs 40:5 (May 2021) (hospital employment of radiologists resulted in 20% increase in inappropriate use of MRIs). Thus, there is a clear

relationship between St. Luke's dominant market position and its poor quality of care.

99.     Further, research shows that employment of physicians by hospitals with market power increases prices. For example:

   a.  A 2013 study found that "total per-beneficiary spending was $849 higher" at larger hospital-based physician groups as compared to independent groups. J. Michael McWilliams et al., Delivery System Integration and Health Care Spending and Quality for Medicare Beneficiaries, 173 JAMA INTERNAL MED. 1447, 1451 (June 17, 2013). That study also found that "[patient] readmission rates were highest for [larger] hospital-based groups." *Id.* at 1452.

   b.  A 2014 study found that "recent increases in the employment of physicians and acquisition of community-based physician practices by hospitals . . . result[ed] in more and more services being paid at higher hospital outpatient rates." James D. Reschovsky and Chapin White, Location, Location, Location: Hospital Outpatient Prices Much Higher than Community Settings for Identical Services, 16 NAT'L INSTITUTE FOR HEALTH CARE REFORM 2 (June 2014). This was "likely large differences in bargaining power."

   c.  A 2018 study found that prices increased when physicians' practices were acquired by hospitals, and these increases were "larger when the acquiring hospital has a larger share of its inpatient market." Capps, Dranove and Ody, "The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending" Journal of Health Economics 59 (2018) 139-152.

100.     By significantly reducing the market share of independent neurosurgeons, St. Luke's increases its control of physician referrals and causes its patients to use St. Luke's facilities and services even where those facilities and services are higher cost, lower quality, and may result in longer lengths of stay. This is consistent with numerous economic studies. St. Luke's is able to charge higher rates and provide lesser quality healthcare without losing business because of its dominant market share gained by anticompetitive practices.

## IV.     CAUSES OF ACTION

### Count I
### Violation of Sherman Act (15 U.S.C. § 2) and
### Idaho Competition Act (Idaho Code § 48-105)
### *Attempt to Monopolize*

101.     Plaintiffs incorporate all previous allegations as though fully set forth herein.

102.     By each of its anticompetitive actions described above, Defendants specifically intended to attain monopoly power in the relevant product and geographic market, as defined herein. Based on Defendants' high market share, the high barriers to entry and other competitive conditions described above, and Defendants' anticompetitive actions, there is a dangerous probability that Defendants will achieve their goals and attain monopoly power in the relevant market (professional neurosurgical services in Ada and Canyon Counties) in which they did not already possess monopoly power.

103.     Such actions constitute unlawful attempted monopolization of the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

104.     As a direct and proximate result of these violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further such injury is threatened if Defendants' actions are not enjoined.

105.     The actions of Defendants have substantially harmed competition and, if not enjoined, threaten to further harm competition in the relevant product and geographic market.

**<u>Count II</u>**
**Violation of Sherman Act (15 U.S.C. § 1) and**
**Idaho Competition Act (Idaho Code § 48-104)**
***Unreasonable Restraint of Trade***

106.     Plaintiffs incorporate all previous allegations as though fully set forth herein.

107.     St. Luke's, Northwest Neurosurgery Associates, and Dr. Little have conspired to create an unreasonable restraint of commerce by implementing policies that disproportionately and unfairly burden independent neurosurgeons in an effort to force independent neurosurgeons to relinquish their Medical Staff Membership at St. Luke's, thereby reducing the independent neurosurgeons' market share.

108.     Defendants' efforts to force Neuroscience Associates' independent neurosurgeons to relinquish their Medical Staff Membership is to further Defendants' interests in ensuring patients are steered to St. Luke's providers and facilities, including labs, imaging, operating rooms, inpatient care, therapy care, etc., and in ensuring a reduction in market share held by independent neurosurgeons.

109.     Defendants' efforts to restrain commerce actually injures competition. The policies are intended to force independent neurosurgeons to relinquish their Medical Staff Membership at St. Luke's so that patients who come to the Emergency Department will be seen only by St. Luke's employed neurosurgeons/locum tenens who will channel patients to St. Luke's facilities and providers for treatment. In other words, forcing independent neurosurgeons to relinquish their Medical Staff Membership will significantly reduce (or nearly eliminate) the potential for patients being referred to any non-St. Luke's facility for treatment in Ada and Canyon Counties.

110.    In addition to injuring competition, Defendants' policies have directly injured Plaintiffs. Forcing Plaintiffs to relinquish Medical Staff Membership at St. Luke's severely harms Plaintiffs because it substantially limits the number of patients they are able to treat, particularly due to St. Luke's holding a dominant market share based on its continuous efforts to acquire and reduce the market share of independent medical providers over the years (thereby eliminating competition).

111.    Neuroscience Associates has been directly injured because Dr. Bridges and Dr. Lochhead provided Emergency Department call coverage without compensation and were ultimately forced to relinquish their Medical Staff Membership due to the unfair burdens created by Defendants' policies. Dr. Hajjar has been forced to provide Emergency Department call coverage, without compensation, since April 16, 2018, and has been forced to provide call coverage every day (without compensation) since August 2, 2022. Dr. Hajjar's surgery block time was also significantly reduced, thereby limiting the time he has available to operate on Neurosurgery Associates' patients who elect St. Luke's for their surgery and/or pay less for such surgery as a result of their health plan providing further discounts of cost to the patients if their surgery care is performed at a St. Luke's facility.

112.    Prior to his leave of absence and subsequent relinquishment of Medical Staff Membership at St. Luke's, Dr. Manning had been forced to provide Emergency Department call coverage, without compensation, since April 16, 2018, and he was ultimately forced to relinquish his Medical Staff Membership due to the unfair burdens created by Defendants' policies.

113.    In addition to the amounts owed for call coverage that Neuroscience Associates, Dr. Hajjar and Dr. Manning provided, Plaintiffs also seek injunctive relief enjoining Defendants'

unfair policies relating to Emergency Department call coverage, declaratory relief, and/or treble damages pursuant to 15 U.S.C. § 15(a).

### Count III
### *Unjust Enrichment*

114.    Plaintiffs incorporate all previous allegations as though fully set forth herein.

115.    Plaintiffs conferred benefits on Defendants by providing Emergency Department call coverage for neurosurgery services.

116.    Defendants retained the benefits of Plaintiffs' call coverage and continue to do so without providing compensation since April 16, 2018.

117.    It would be unfair and unjust for Defendants to retain the benefits of Emergency Department call coverage without compensating Plaintiffs.

118.    It is further unfair and unjust for Defendants to threaten to take away independent neurosurgeons' Medical Staff Membership if they refuse to provide call coverage at no cost.

119.    As a direct and proximate result of Defendants' retention of these benefits, Plaintiffs have been damaged in an amount to be determined by a jury at trial.

### DEMAND FOR ATTORNEY FEES

As a further direct and proximate cause of Defendants' conduct, Plaintiffs have been required to retain counsel for the purposes of prosecuting this action, and they are entitled to recover all reasonable costs and attorneys' fees incurred in the prosecution of this lawsuit pursuant to various provisions of federal and Idaho law, including, but not limited to, 15 U.S.C. § 15(a), Idaho Code §§ 12-120(3), 12-121, 12-123, 48-113(a) and Rule 54 of the Federal Rules of Civil Procedure, and any other applicable statute, rule, regulation, and/or contractual provision. Plaintiffs are further entitled to an award of attorney fees in the amount of $10,000 in the event of default.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants as follows:

1) For compensatory damages;

2) For treble damages pursuant to 15 U.S.C. § 15(a) and Idaho Code § 48-113(2);

3) For injunctive relief enjoining Defendants' unfair practices and policies relating to Emergency Department coverage;

4) For a declaratory judgment declaring that Defendants' unfair practices and policies relating to Emergency Department coverage violate 15 U.S.C. § 15(a)(1) and (2) and Idaho Code §§ 48-104 and 48-105;

5) For attorneys' fees and costs;

6) For prejudgment interest pursuant to Idaho Code §28-22-104(1);

7) For post-judgment interest pursuant to 28 U.S.C. § 1961 and Idaho Code § 28-22-104(2); and

8) For such other and further relief as the Court deems just and appropriate.

DATED this 8th day of November, 2023.

DUKE EVETT, PLLC


By /s/Keely E. Duke
  Keely E. Duke, Of the Firm
  Molly E. Mitchell, Of the Firm
  *Attorneys for Plaintiffs*