A. Dean Bennett, ISB #7735
Zachery J. McCraney, ISB #11552
HOLLAND & HART LLP
800 West Main St., Suite 1750
P.O. Box 2527
Boise, ID 83702-7714
Telephone:  (208) 342-5000
Facsimile:  (208) 343-8869
Email: adbennett@hollandhart.com
          zjmccraney@hollandhart.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DR. MICHAEL HAJJAR, MD, an individual, DR. THOMAS MANNING, MD, PhD, an individual, and NS SUPPORT, L.L.C. d/b/a Neuroscience Associates,<br><br>                              Plaintiffs,<br><br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD, CLINICAL NEUROSCIENCE MANAGEMENT, PC, d/b/a Northwest Neurosurgery Associates, DR. KENNETH LITTLE, MD, an individual,<br><br>                              Defendants. | Case No.  1:23-cv-00367-AKB<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

I.    THE PARTIES ......................................................................................................... 3

II.   CALL COVERAGE ................................................................................................. 5

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT ................................................................................................................... 7

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT ........................................ 7

      A.    Plaintiffs' Antitrust Claims Should Be Dismissed Because They Fail to
            Plead Harm to Competition. ................................................................... 7

      B.    Plaintiffs' Antitrust Claims Should be Dismissed Because Plaintiffs Fail to
            Plead Antitrust Injury. ............................................................................. 9

      C.    Plaintiffs' Section 1 Claim Should be Dismissed Because Plaintiffs Have
            Not Alleged Concerted Action. .............................................................. 11

      D.    Plaintiffs' Section 2 Claim Should be Dismissed Because Defendants
            Have Not Engaged in Anticompetitive Conduct and Because Plaintiffs
            Fail to Allege Specific Intent to Monopolize. ....................................... 14

            1.    St. Luke's alleged policies do not constitute exclusionary conduct. ......... 14

            2.    Plaintiffs do not allege a specific intent to monopolize. ............................ 16

II.   PLAINTIFFS' STATE LAW ANTITRUST CLAIMS FAIL FOR THE SAME REASONS AS THE
      SHERMAN ACT CLAIMS. ....................................................................................... 16

III.  PLAINTIFFS' STATE LAW UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED FOR
      LACK OF SUPPLEMENTAL JURISDICTION ............................................................. 17

IV.   PLAINTIFFS ARE NOT ENTITLED TO LEAVE TO AMEND BECAUSE ANY ATTEMPTED
      AMENDMENT WOULD BE FUTILE ......................................................................... 18

CONCLUSION ............................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acri v. Varian Assocs.,*
  114 F.3d 999 (9th Cir. 1997) ................................................. 18

*Afton Energy v. Idaho Power Co.,*
  122 Idaho 333, 834 P.2d 850 (1992) ........................................ 17

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) ..................................................... 11, 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ......................................................... 6

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ..................................................... 7, 8, 9

*Austin v. McNamara,*
  979 F.2d 728 (9th Cir. 1992) ................................................ 8

*Balaklaw v. Lovell,*
  14 F.3d 793 (2d Cir. 1994) ................................................. 11

*BCB Anesthesia Care v. Passavant Mem'l Area Hosp. Ass'n,*
  36 F.3d 664 (7th Cir. 1994) ................................................. 1

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................. 6, 13, 14

*Belnap v. Steward Health Care Sys. LLC,*
  No. 2:19-cv-00330-DAK, 2020 U.S. Dist. LEXIS 23512 (D. Utah Feb. 10, 2020) ................ 1

*Bhan v. NME Hosps., Inc.,*
  772 F.2d 1467 (9th Cir. 1985) .............................................. 7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ......................................................... 7

*Canyon Cty. v. Syngenta Seeds, Inc.,*
  No. CV05-306-S-EJL, 2005 U.S. Dist. LEXIS 40467 (D. Idaho Dec. 14, 2005) ................ 18

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.,*
  611 F.3d 495 (9th Cir. 2010) .............................................. 16

*Cohlmia v. St. John Med. Ctr.*,
    693 F.3d 1269 (10th Cir. 2012) ........................................................................ 1

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ........................................................................................ 12

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) ........................................................................................ 15

*Fisher v. Aurora Health Care, Inc.*,
    558 F. App'x 653 (7th Cir. 2014) .................................................................... 11

*Foman v. Davis*,
    371 U.S. 178 (1962) ........................................................................................ 18

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
    582 F.3d 1216 (10th Cir. 2009) ...................................................................... 15

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ........................................................................ 12

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ....................................................................... 7, 9

*Glen Holly Entertainment, Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) .......................................................................... 10

*Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*,
    536 F.3d 1049 (9th Cir. 2008) .......................................................................... 6

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ........................................................................ 13

*In re Pandora Media, LLC Copyright Litig.*,
    No. 2:22-cv-00809-MCS-MAR, 2023 U.S. Dist. LEXIS 181230 (C.D. Cal. Apr. 5,
    2023) ............................................................................................................... 16

*Ireland v. Bend Neurological Assocs. Ltd. Liab. Co.*,
    No. 6:16-cv-02054-JR, 2017 U.S. Dist. LEXIS 126175 (D. Or. May 23, 2017) ..................... 8

*Levitin v. Nw. Cmty. Hosp.*,
    64 F. Supp. 3d 1107 (N.D. Ill. 2014) ................................................................ 1

*Lie v. St. Joseph Hosp.*,
    964 F.2d 567 (6th Cir. 1992) ............................................................................ 8

*Lucas v. Citizens Communs. Co.*,
    244 F. App'x 774 (9th Cir. 2007) ..................................................................... 8

*McCullough v. Lithia Kia of Anchorage,*
    No. 3:20-cv-00237-RRB, 2020 U.S. Dist. LEXIS 236139 (D. Alaska Dec. 16, 2020)...........18

*McGlinchy v. Shell Chemical Co.,*
    845 F.2d 802 (9th Cir. 1988) ...................................................................................................17

*Natkin v. Am. Osteopathic Ass'n,*
    No. 3:16-cv-01494-SB, 2018 U.S. Dist. LEXIS 7427 (D. Or. Jan. 17, 2018).....................1, 8

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.,*
    562 F. Supp. 3d 1073 (E.D. Cal. 2021)......................................................................................8

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.,*
    305 F. Supp. 3d 1065 (N.D. Cal. 2018) ...............................................................................7, 10

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018)................................................................................................................9

*Oksanen v. Page Mem'l Hosp.,*
    945 F.2d 696 (4th Cir. 1991) .................................................................................................1, 12

*Okusami v. Psychiatric Inst. of Wash., Inc.,*
    959 F.2d 1062 (1992)...........................................................................................................12, 14

*Oltz v. St. Peter's Cmty. Hosp.,*
    861 F.2d 1440 (9th Cir. 1988) .................................................................................................10

*Perinatal Med. Grp., Inc. v. Children's Hosp. Cent. Cal.,*
    No. CV F 09-1273 LJO GSA, 2010 U.S. Dist. LEXIS 36694 (E.D. Cal. Apr. 14,
    2010) .........................................................................................................................................12

*Perry v. Rado,*
    504 F. Supp. 2d 1043 (E.D. Wash. 2007)..........................................................................18, 19

*Pines Grazing Ass'n v. Flying Joseph Ranch, LLC,*
    151 Idaho 924, 265 P.3d 1136 (Idaho 2011) .........................................................................17

*Pool Water Prods. v. Olin Corp.,*
    258 F.3d 1024 (9th Cir. 2001) ..............................................................................................8, 10

*Pope v. Intermountain Gas Co.,*
    103 Idaho 217, 646 P.2d 988 (1982).......................................................................................17

*Prime Healthcare Servs. v. SEIU,*
    642 F. App'x 665 (9th Cir. 2016) .............................................................................................7

*Prime Healthcare Servs. v. SEIU,*
    Civil Action No. 11-cv-2652-GPC-RBB, 2013 U.S. Dist. LEXIS 104511 (S.D. Cal.
    July 25, 2013)...........................................................................................................................16

*Rocky Mt. Med. Mgmt., LLC v. LHP Hosp. Grp., Inc.*,
    No. 4:13-cv-00064-EJL, 2013 U.S. Dist. LEXIS 142909 (D. Idaho Sep. 30, 2013)...........9, 17

*Rowell v. Valleycare Health Sys.*,
    No. C 10-02816 CRB, 2010 U.S. Dist. LEXIS 113213 (N.D. Cal. Oct. 21, 2010).............1, 10

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ...............................................................................................14

*Sidibe v. Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) .....................................................................................9

*Smilecare Dental Grp. v. Delta Dental Plan*,
    858 F. Supp. 1035 (C.D. Cal. 1994), *aff'd* 88 F.3d 780 (9th Cir. 1996)................................14

*SmileCare Dental Grp. v. Delta Dental Plan*,
    88 F.3d 780 (9th Cir. 1996) .................................................................................................15

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ...............................................................................................10

*Spectrum Sports v. McQuillan*,
    506 U.S. 447 (1993).......................................................................................................14, 16

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    No. CV F 09-0560 LJO SMS, 2011 U.S. Dist. LEXIS 72764 (E.D. Cal. July 7, 2011) .........16

*Stucki v. City of Pocatello*,
    No. 4:15-cv-00422, 2017 U.S. Dist. LEXIS 188770 (D. Idaho Nov. 13, 2017) ....................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................................3

*Top Rank, Inc. v. Haymon*,
    No. CV 15-4961-JFW, 2015 U.S. Dist. LEXIS 164676 (C.D. Cal. Oct. 16, 2015) .................9

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).............................................................................................................14

*W. Wholesale Supply v. Holladay*,
    Civ. No. 97-0297-S-BLW, 2000 U.S. Dist. LEXIS 22012 (D. Idaho Feb. 29, 2000).............17

*Yates v. Money Source, Inc.*,
    No. 1:23-cv-00155-JLT- EPG, 2023 U.S. Dist. LEXIS 113359 (E.D. Cal. June 29,
    2023) ...................................................................................................................................13

## STATUTES

15 U.S.C. § 1 ............................................................................................................ passim

15 U.S.C. § 2 ............................................................................................................ passim

28 U.S.C. § 1367(c)(3) ..................................................................................................... 17

42 U.S.C. 1395dd ............................................................................................................. 5

Idaho Code § 48-101 ...................................................................................................... 16

Idaho Code § 48-102(3) .................................................................................................. 17

Idaho Code § 48-104 .................................................................................................. 16, 17

Idaho Code § 48-105 ...................................................................................................... 17

Sherman Act ...................................................................................................... 7, 15, 16, 17

Sherman Antitrust Act § 7 ............................................................................................... 16

## OTHER AUTHORITIES

4 Antitrust Laws and Trade Regulation, 2nd Edition § 70.02 ...................................... 12

*Awards and Accreditations*, ST. LUKE'S ONLINE, https://www.stlukesonline.org/about-st-lukes/awards-and-accreditations#:~:text=The%20 Centers%20for%20Medicare%20%26%20Medicaid (last visited Jan. 5, 2024)...................... 4

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 1, 3, 14

Federal Rule of Evidence 201 ......................................................................................... 3

Office of Inspector General, Advisory Opinion No. 12-15 (October 23, 2012)............. 6

U.S. News & World Report, *St. Luke's Regional Medical Center*, U.S. NEWS, https://health.usnews.com/best-hospitals/area/id/st-lukes-regional-medical-center-6820050#rankings ....................................................................................................... 4

Defendants St. Luke's Health System, Ltd ("St. Luke's"), Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates ("Northwest"), and Dr. Kenneth Little, MD (collectively, "Defendants"), respectfully submit this Memorandum in Support of Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## INTRODUCTION

This action concerns two doctors' attempt to turn a workplace grievance over call coverage into a multi-million-dollar antitrust lawsuit. This ploy has been rejected by countless courts. *See, e.g.*, *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 699 (4th Cir. 1991) (refusing "to cloak in federal antitrust law what is in essence a workplace dispute"); *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012) (cautioning against allowing a "physician's workplace grievance with a hospital" to be elevated to the status of an antitrust action) (citations omitted); *Levitin v. Nw. Cmty. Hosp.*, 64 F. Supp. 3d 1107, 1122 (N.D. Ill. 2014) (same); *BCB Anesthesia Care v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994) (The "hundreds or thousands of pages" in West publications devoted to staffing decisions at a single hospital "almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1"); *Natkin v. Am. Osteopathic Ass'n*, No. 3:16-cv-01494-SB, 2018 U.S. Dist. LEXIS 7427, at *18 (D. Or. Jan. 17, 2018) (noting that courts continue to rely on *BCB Anesthesia* regarding staffing at a single hospital); *Belnap v. Steward Health Care Sys. LLC*, No. 2:19-cv-00330-DAK, 2020 U.S. Dist. LEXIS 23512, at *13 (D. Utah Feb. 10, 2020) ("the court is unconvinced that one general surgeon's denial of privileges at a single hospital has or will have" an anticompetitive effect); *Rowell v. Valleycare Health Sys.*, No. C 10-02816 CRB, 2010

---

[1] Citations in the form ¶ _ reference the First Amended Complaint, Dkt. 11 ("Complaint"). For purposes of this motion only, Defendants assume the truth of the factual allegations in the Complaint except as otherwise noted.

U.S. Dist. LEXIS 113213, at *11 (N.D. Cal. Oct. 21, 2010) ("Plaintiff simply cannot turn what amounts to an employment grievance by a single doctor into a federal antitrust claim by alleging that he was excluded from the market.").

Plaintiffs, Dr. Hajjar and Dr. Manning, and a medical provider they own, Neuroscience Associates, claim Defendants violated the antitrust laws by paying their own employees and contractors for call rather than Plaintiffs, who, unlike Defendants' employees and contractors, are free to and presumably also bill, collect, and retain for their services rendered while on call. In essence, Plaintiffs are trying to use the antitrust laws to force St. Luke's to pay Plaintiffs for doing what all providers are required to do—provide for the continuous care of their patients. The antitrust laws require no such thing.

First, Plaintiffs' antitrust claims fail because their allegations, at best, allege injury to themselves, not to competition. The only harm Plaintiffs allege is that, although they are not employees or exclusive providers of St. Luke's, they lost money because they are not paid by St. Luke's for providing call coverage for their patients. But harm to a competitor, not competition, is not competitive harm that can be addressed under the antitrust laws.

Second, Plaintiffs have not suffered "antitrust injury"—that is, injury that flows directly from the alleged impact on competition—and therefore cannot assert their claims under the antitrust laws. Even if Plaintiffs sufficiently alleged anticompetitive conduct (which they haven't), their alleged injury—non-payment for call coverage—doesn't flow from it. And to the extent they're alleging that they are being excluded from providing neurosurgery services in the area, that allegation is flatly contradicted by their admission that Dr. Hajjar continues to have privileges at St. Luke's, and both individual Plaintiffs (and their colleagues at Neuroscience Associates) have medical privileges at other hospitals in the area.

Third, Plaintiffs' Section 1 conspiracy claim fails because they haven't adequately alleged concerted action between independent decisionmakers and because Plaintiffs fail to point to a conspiratorial agreement or allege specific conspiratorial actions among each of the Defendants.  In effect, Plaintiffs are alleging that Defendants "conspired" by seeking to enforce St. Luke's bylaws to ensure adequate call coverage for patients.  These bylaws are applicable to all medical staff members including independent contractors and employed physicians.  Seeking to conform to existing bylaws is not a conspiracy, regardless of the label that Plaintiffs attempt to impose.

Fourth, Plaintiffs' Section 2 attempted monopolization claim fails because Plaintiffs do not allege any anticompetitive or exclusionary conduct or a specific intent to monopolize.  The crux of Plaintiffs' Complaint is that Plaintiffs are required to cover call for their patients without receiving compensation from St. Luke's, while other neurosurgeons employed by St. Luke's are paid for call by St. Luke's.  That's not exclusionary conduct.  Whether on call or not, Neuroscience Associates is free to bill, collect, and retain fees for physician services rendered while working at St. Luke's.

Finally, Plaintiffs' state law antitrust claims fail for the same reasons as their federal claims.  And, given the stage of the proceedings and the futility of any amendment, the Court should dismiss Plaintiffs' unjust enrichment claim.

## **BACKGROUND**[2]

### I.    THE PARTIES

St. Luke's is a non-profit health system serving patients in the Treasure Valley and eastern Oregon.  ¶¶ 9, 15.  It consistently ranks among the highest quality hospitals in the region.

---

[2] On a Rule 12(b)(6) motion, a district court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citation omitted); *see also* Fed. R. Evid.

In addition to other awards and accreditations, St. Luke's has been named one of the Top 15 Health Systems in the U.S. for nine consecutive years by Merative, it received a 5/5-star rating from the Centers for Medicare & Medicaid Services, and it is accredited by the Joint Commission.[3]  It's also ranked the #1 hospital in Idaho by U.S. News & World Report.[4]

Northwest is a provider of neurosurgery services.  ¶ 31.  Although Plaintiffs allege that Northwest has eight neurosurgeons, *see* ¶ 58, it has only one—Dr. Little.  This is evident by the Professional Services Agreement ("PSA"), which is referenced in the Complaint at ¶ 31 and attached as **Exhibit 1**.[5]  *See* PSA, Ex. 1.2(a) (listing Dr. Little as Northwest's only provider).[6] While the Complaint alleges (incorrectly) that the neurosurgeons are employed by Northwest, Plaintiffs' allegations nonetheless contend that the neurosurgeons' relationship to St. Luke's is "functionally equivalent" to employment.  ¶ 32.[7]

---

201(b) (courts may take judicial notice of a fact that is "not subject to reasonable dispute because [it] (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately or readily determined from sources whose accuracy cannot reasonably be questioned").

[3] *See Awards and Accreditations*, ST. LUKE'S ONLINE, https://www.stlukesonline.org/about-st-lukes/awards-and-accreditations#:~:text=The%20Centers%20for%20Medicare%20%26%20Medicaid,Idaho%20with%20five%2Dstar%20ratings (last visited Jan. 5, 2024).

[4] *St. Luke's Regional Medical Center*, U.S. NEWS, https://health.usnews.com/best-hospitals/area/id/st-lukes-regional-medical-center-6820050#rankings (last visited Jan. 5, 2024).

[5] Pursuant to Local Rule 5.5, the PSA is being filed with redactions applied to pages containing financial information. If requested, Defendants will file an unredacted copy under seal.

[6] Although the Complaint is somewhat unclear on this point, Plaintiffs seem to allege that all neurosurgeons on St. Luke's medical staff are employees of Northwest or are "locum tenens physicians." *See, e.g.*, ¶¶ 31, 49; *but see* ¶ 54 (referring to "employed St. Luke's neurosurgeons"). That's wrong. Other than Plaintiffs, Dr. Little, and locum tenens, all neurosurgeons on St. Luke's medical staff are employees of St. Luke's. Nonetheless, St. Luke's will accept as true the Complaint's factual allegations as required.

[7] St. Luke's does not require any neurosurgeon, employed or otherwise, to refer, recommend, or admit patients to St. Luke's. *See* ¶ 89 ("physicians operating under a PSA have discretion referring patients"); PSA, ¶¶ 9.1, 10.7(b).

Neuroscience Associates is allegedly southwest Idaho's only independent medical provider for neurological surgery.  ¶ 24.  It is owned by six neurosurgeons, including Dr. Hajjar and Dr. Manning.  ¶ 25.  Neuroscience Associates is affiliated with several hospitals, including St. Luke's, Saint Alphonsus, Treasure Valley Hospital, and West Valley Medical Center, meaning that some or all of its neurosurgeons have Medical Staff Membership at each of these hospitals.  ¶¶ 28, 86.

## II.    CALL COVERAGE

Federal law requires St. Luke's to strive to have 24/7/365 neurosurgery coverage in its Emergency Department.  *See* ¶ 38; 42 U.S.C. § 1395dd.  To meet this requirement and provide charitable care, St. Luke's requires neurosurgeons holding Medical Staff Membership at St. Luke's to participate in emergency department call coverage.  ¶¶ 39, 49, 56.  This requirement is consistent with the requirement imposed on all physicians (not just neurosurgeons) holding medical staff membership at St. Luke's.

For example, the St. Luke's Regional Medical Center medical staff bylaws ("Bylaws"), which are referenced in the Complaint at ¶ 68 and attached as **Exhibit 2**, require "all medical staff members and privileged practitioners" to "assist the Hospital in fulfilling its responsibilities for providing emergency and charitable care, including without limitation service call coverage," in accordance with approved policies.  Bylaws, § 2.3.  Likewise, the Treasure Valley Medical Staff General Regulations ("MS Regulations"), which are referenced in the Bylaws at § 2.3 and attached as **Exhibit 3**, require that "[a]ll major clinical departments, consultative clinical departments and the clinical services within them will provide for 24 hour/day, 7 day/week emergency room coverage for patients who present to St. Luke's Boise or Meridian Medical Centers."  MS Regulations, § IX.A.1.  Accordingly, while Neuroscience Associates' physicians

are required to cover call for their patients, that requirement is consistent with the requirements imposed on all physicians, including those in other specialty departments.

Although federal law requires St. Luke's to strive to have neurosurgery call coverage, *see* ¶ 38, it does not require St. Luke's to pay compensation for call coverage. To the contrary, compensation for call coverage is to be closely scrutinized. *See* Office of Inspector General, Advisory Opinion No. 12-15 at 6 (October 23, 2012) ("we note that nothing in this opinion should be construed to require a hospital or other facility to pay for on-call coverage. To the contrary, on-call coverage compensation should be scrutinized").

As alleged, St. Luke's pays employed neurosurgeons and neurosurgeons who are "functionally equivalent" to employees (i.e., Dr. Little) for call coverage per the agreements between those providers and St. Luke's. St. Luke's does not pay Plaintiffs for call coverage, although Plaintiffs presumably bill for all services they provide when called. *See* ¶ 62.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court must accept the plaintiffs' factual allegations as true, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quotation omitted). Where the allegations are "merely consistent with" misconduct, a complaint fails to state a claim. *Twombly*, 550 U.S. at 557.

## **ARGUMENT**

I.   **PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT**

A.   **Plaintiffs' Antitrust Claims Should Be Dismissed Because They Fail to Plead Harm to Competition.**

Plaintiffs' antitrust case suffers from a fundamental failure to recognize that antitrust law protects competition, not individual competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). To establish their Section 1 and 2 claims, Plaintiffs must sufficiently allege harm to competition. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). Harm personal to the plaintiff is not enough. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340-45 (1990); *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).

First, Plaintiffs' "harm to competition" allegations are insufficient because they lack factual support. Plaintiffs' allegations make vague, unsubstantiated assertions that competition has been harmed because St. Luke's (1) systematically acquired unidentified independent medical groups, ¶¶ 1, 42, 100; (2) rolled out (or prepared to roll out) a private health insurance product, ¶ 76; (3) charged higher than competitive rates or demanded higher reimbursements, ¶¶ 88-90, 100; (4) provided lower quality of care, ¶ 100; and (5) steered patients to St. Luke's, ¶ 108. These mere statements—without any actual facts backing them up—don't suffice.

The Complaint doesn't refer to any specific instance—not one—of St. Luke's charging higher than competitive rates for neurosurgical services (or any other service); or of St. Luke's providing low quality neurosurgical care (or any other type of care); or of a physician "steering" a patient to St. Luke's. An antitrust claim cannot survive on antitrust buzz words like "prices are higher" or "quality of care is lower." Plaintiffs need to provide factual support. *See NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1074 (N.D. Cal. 2018) ("Naked assertions 'devoid of further factual enhancement' are insufficient to state a claim.") (alteration and citations omitted); *Prime Healthcare Servs. v. SEIU*, 642 F. App'x 665,

667 (9th Cir. 2016) ("Conclusory allegations that an agreement has the effect of reducing consumers choices or increasing prices to consumers do not sufficiently allege an injury to competition.") (alterations, internal quotations, and citations omitted); *Ireland v. Bend Neurological Assocs. Ltd. Liab. Co.*, No. 6:16-cv-02054-JR, 2017 U.S. Dist. LEXIS 126175, at *11-12 (D. Or. May 23, 2017) ("beyond speculating that defendants' conduct 'could be used' to 'raise prices for neurological services' or 'prevent other independent neurologists and neurology clinics from entering the market,' plaintiff does not identify any concrete injury to the market or consumers").

The only non-conclusory harm pleaded is that Defendants imposed supposed untenable call burdens on Plaintiffs. *See* ¶¶ 42-75.  The only injury pleaded from this harm is lost money from not being reimbursed for call coverage. *See* ¶¶ 42-77.  But lost profits or lost wages is not harm to competition.  It is harm to a competitor.  That is not the type of conduct that concerns antitrust laws. *See Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1089 (E.D. Cal. 2021) ("the antitrust laws are only concerned with acts that harm allocative efficiency and raise the price of goods above their competitive level or diminish their quality") (quoting *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (internal quotations and alterations omitted); *Lie v. St. Joseph Hosp.*, 964 F.2d 567, 570 (6th Cir. 1992) (no injury to competition when doctor could "show only that he has suffered economic injury, a loss of personal income"); *Natkin*, 2018 U.S. Dist. LEXIS 7427, at *16 ("personal economic injury, such as loss of income from market exclusion, is not enough"); *Atl. Richfield*, 495 U.S. at 352 ("The antitrust laws were enacted for the protection of competition, not competitors.") (citation omitted); *Lucas v. Citizens Communs. Co.*, 244 F. App'x 774, 776 (9th Cir. 2007) (Section 1 and 2 claims failed when plaintiff "adduced evidence showing damage to his own business" but "failed to demonstrate damage to the [relevant] market as whole"); *Austin v. McNamara*, 979

F.2d 728, 739 (9th Cir. 1992) (no injury to competition when the alleged acts "amounted to an informal and limited restraint on a single competitor in a single hospital").

Second, Plaintiffs' "harm to competition" allegations are insufficient because they don't relate to Plaintiffs' alleged relevant market. The alleged relevant market is professional neurosurgical services.  ¶ 84.  Yet the paragraphs ostensibly alleging competitive harm focus on healthcare in general.  *See* ¶¶ 15-23, 42, 78-83, 88-90, 94-100.  Even the market studies Plaintiffs cite aren't specific to professional neurosurgical services—or even to St. Luke's.  *See* ¶¶ 95-100. As the Ninth Circuit made clear in *FTC v. Qualcomm Inc.*, alleged economic harms, "even if real, are not 'anticompetitive' in the antitrust sense—at least not directly—[if] they do not involve restraints on trade or exclusionary conduct in 'the area of effective competition'"—i.e., in the relevant market. 969 F.3d at 992 (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)).  Because Plaintiffs' allegations do not involve restraints or conduct in Plaintiffs' alleged relevant market, they fail to state an antitrust claim.  *See Sidibe v. Health*, 4 F. Supp. 3d 1160, 1179 (N.D. Cal. 2013) (sources pertaining to the hospital insufficient to show injury to competition in the narrower specialty provider services market); *Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW (MRWx), 2015 U.S. Dist. LEXIS 164676, at *22-23 (C.D. Cal. Oct. 16, 2015) (dismissing antitrust claims when allegations focused on the broader market and were "completely disconnected from the relevant market definition").

## B.  Plaintiffs' Antitrust Claims Should be Dismissed Because Plaintiffs Fail to Plead Antitrust Injury.

A second and independent basis to dismiss all of Plaintiffs' antitrust claims is their failure to plead antitrust injury.  Antitrust injury is injury to a plaintiff directly linked to a defendant's alleged anticompetitive conduct.  *Atl. Richfield.*, 495 U.S. at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct").  It is required for both Section 1 and 2 claims.  *See Rocky Mt. Med. Mgmt., LLC v.*

*LHP Hosp. Grp., Inc.*, No. 4:13-cv-00064-EJL, 2013 U.S. Dist. LEXIS 142909, at *38 (D. Idaho Sep. 30, 2013) (citing *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 352 F.3d 367, 371 (9th Cir. 2003)).

 Plaintiffs fail to plead antitrust injury for the same reasons they fail to plead harm to competition.  Here, Plaintiffs vaguely state, for example, that there are alleged "increased prices" or "reduced quality." *See, e.g.*, ¶¶ 76, 89-90, 100, 108.  But Plaintiffs ***not once*** tie those vague, unsubstantiated statements of harm to their alleged financial harm—failure to pay for call services.  Plaintiffs, therefore, fail to show how their alleged injury "flows from that which makes [Defendants'] conduct unlawful." *NorthBay Healthcare Grp., Inc.*, 305 F. Supp. 3d at 1073 (quoting *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)).  Plaintiffs' allegations, "at their core, are that the defendants should give them . . . more money[.]" *Id.* at 1074.  If anything, that's harm to a competitor, not competition, and it is not actionable under the antitrust laws. *See Pool Water Prods.*, 258 F.3d at 1034 ("it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition") (citation omitted); *Rowell*, 2010 U.S. Dist. LEXIS 113213, at *10 ("There must be 'harm to the economy beyond the claimants' own injury.'") (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988).

 Relatedly, Plaintiffs' allegation that Defendants are effectively forcing Plaintiffs out of the area by increasing their call burdens is contradictory. *See* ¶¶ 42-77 (alleging Defendants, or some of them, are working together to drive out Plaintiffs and dominate the alleged market). Dr. Hajjar continues to have privileges at St. Luke's and "some or all of [Neuroscience Associates'] independent neurosurgeons have Medical Staff Membership" at other hospitals in the relevant market, including "Saint Alphonsus, Treasure Valley Hospital, and West Valley Medical Center[.]" ¶ 28.  So, even if Plaintiffs were excluded from St. Luke's (which they're

not), they wouldn't be excluded from the alleged relevant market.  *See Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (no antitrust injury when there was "no evidence to suggest that the contract caused [the plaintiff] (or other anesthesiologists) to be excluded from, or substantially limited in, the broader market for employment").

Federal courts have rejected claims similar to those asserted by Plaintiffs.  In *Fisher v. Aurora Health Care, Inc.*, an independent physician brought Section 1 and 2 claims against a hospital alleging that the hospital engaged in an anticompetitive conspiracy to drive independent physicians from the market by preventing them from obtaining backup coverage to meet the hospital's 24/7 call coverage requirement.  558 F. App'x 653, 654 (7th Cir. 2014).  The trial court dismissed the doctor's antitrust claims with prejudice.  *Id.*

On appeal, the Seventh Circuit found that the injury complained of—"the loss of medical services provided by *independent physicians*"—"does not appear to be the type that Congress sought to redress with antitrust laws." *Id.* at 656 (emphasis in original).  Moreover, the "causal connection between [the doctor's] alleged injury and the alleged antitrust violation [was] tenuous at best" given the fact that the doctor had staffing privileges at other hospitals in the area.  *Id.* Thus, the doctor's antitrust claims were properly dismissed with prejudice.  *See id.*

Like the doctor in *Fisher*, Plaintiffs' alleged injury—nonpayment of call coverage—is not of the type of injury addressed by the antitrust laws.  In addition, because Plaintiffs admittedly hold staffing privileges at other hospitals in the relevant market, the marketplace will not be deprived of independent neurosurgeons.  Plaintiffs fail to allege antitrust injury.

### C. Plaintiffs' Section 1 Claim Should be Dismissed Because Plaintiffs Have Not Alleged Concerted Action.

Plaintiffs fail to plausibly allege concerted action between independent decisionmakers. Section 1 of the Sherman Act applies only to concerted action that restrains trade.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010).  "A company cannot conspire with

itself." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003) (citing

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)).  The key, therefore,

"is whether the alleged 'contract, combination, or conspiracy' is concerted action—that is,

whether it joins together separate decisionmakers."  *Am. Needle, Inc.*, 560 U.S. at 195

(alterations omitted).

Here, Plaintiffs plead themselves out of being able to allege a conspiracy because

Defendants—by Plaintiffs' admission—have the same economic interests.  The Complaint

consistently refers to Northwest's neurosurgeons as employees of St. Luke's or "functionally

equivalent" to employees.[8]  ¶ 32; *see also* ¶¶ 4, 54, 65, 67, 109 (referring to "St. Luke's

neurosurgeons" or "St. Luke's employed neurosurgeons").  But St. Luke's cannot conspire with

its alleged employees or with those who are "functionally equivalent" to employees, especially

where, as here, Plaintiffs allege that Defendants have the same economic interests.  *See, e.g.*, ¶

35 (alleging that it is "advantageous to St. Luke's, Northwest [], and Dr. Little" to eliminate

Plaintiffs and steer all patients to St. Luke's); *Copperweld Corp.*, 467 U.S. at 769; *Oksanen*, 945

F.2d at 705; *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1065 (1992); 4 Antitrust

Laws and Trade Regulation, 2nd Edition § 70.02 (citing cases); *cf. Perinatal Med. Grp., Inc. v.

Children's Hosp. Cent. Cal.*, No. CV F 09-1273 LJO GSA, 2010 U.S. Dist. LEXIS 36694, at *18

(E.D. Cal. Apr. 14, 2010) (breaking from other circuits and finding that a hospital can conspire

with a group of physicians when the plaintiffs alleged that defendants had "different economic

interests").  As pled, St. Luke's, Northwest, and Dr. Little share a complete unity of economic

interest and cannot conspire for Section 1 purposes.

---

[8] Many of the "eight neurosurgeons" that Plaintiffs allege are employed by Northwest are
actually employees of St. Luke's. *Compare* ¶ 58 *with* PSA, Ex. 1.2(a) (listing Dr. Little as
Northwest's only provider).

A second basis to dismiss Plaintiffs' Section 1 claim is their failure to allege any conspiratorial or unlawful agreement and, relatedly, their failure to plead specific facts showing conspiratorial actions among each of the Defendants.  To survive a motion to dismiss, a Section 1 conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  "Plaintiffs must point to conduct or actions, taken as a result of an agreement or conspiracy, that undermines competition in the market."  *Yates v. Money Source, Inc.*, No. 1:23-cv-00155-JLT- EPG, 2023 U.S. Dist. LEXIS 113359, at *8 (E.D. Cal. June 29, 2023).  Plaintiffs "must plead evidentiary facts: 'who, did what, to whom (or with whom), where, and when.'"  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (citation omitted).

Plaintiffs provide no plausible facts of an illicit conspiracy or contract between Defendants.  In their Causes of Action section of the Complaint, Plaintiffs allege that Defendants "conspired to create an unreasonable restraint of commerce by *implementing policies* that disproportionately and unfairly burden independent neurosurgeons[.]"  ¶ 107 (emphasis added). The only "policy" they refer to is an August 2022 call coverage policy that allegedly "requires each neurosurgeon group to cover call for patients who consulted or saw a neurosurgeon from that group during the last two years."  ¶ 56.  However, that policy is consistent with St. Luke's Bylaws, which require "all medical staff members" to "assist the Hospital in fulfilling its responsibilities for providing emergency and charitable care, including without limitation service call coverage," in accordance with approved policies.  Bylaws, § 2.3; *see also* MS Regulations, § IX.A.1. ("all major clinical departments, consultative clinical departments and the clinical services within them will provide for 24 hour/day, 7 day/week emergency room coverage for patients who present to St. Luke's Boise or Meridian Medical Centers").

So, in effect, the alleged "conspiracy" consists of Defendants following policies to enforce St. Luke's Bylaws and requiring neurosurgeons, including Plaintiffs, to care for patients they have previously treated.  That's not unlawful.  Plaintiffs have not alleged an unlawful meeting of the minds, and their allegations fall short of raising "a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556; *see Okusami*, 959 F.2d at 1065 ("plaintiff's antitrust claims, lacking the essential element of an agreement, were properly dismissed").  Count II should be dismissed with prejudice.

> **D.    Plaintiffs' Section 2 Claim Should be Dismissed Because Defendants Have Not Engaged in Anticompetitive Conduct and Because Plaintiffs Fail to Allege Specific Intent to Monopolize.**

> **1.    St. Luke's alleged policies do not constitute exclusionary conduct.**

Plaintiffs' Section 2 claim fails because the alleged conduct is not anticompetitive.  To plead attempted monopolization under Section 2, plaintiffs must allege "anticompetitive conduct," that is, "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (citation omitted); *see also Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993) (attempted monopolization).  Because the decision of "whether specific conduct is anticompetitive is a question of law . . ., courts should evaluate allegations of anticompetitive conduct at the [Rule] 12(b)(6) stage, and dismiss complaints if they 'state no set of facts which, if true, would constitute an antitrust offense, notwithstanding their conclusory language regarding the elimination of competition and improper purpose.'"  *Smilecare Dental Grp. v. Delta Dental Plan*, 858 F. Supp. 1035, 1037 (C.D. Cal. 1994), *aff'd* 88 F.3d 780, 783 (9th Cir. 1996) (quoting *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) (alterations omitted).

Defendants' alleged actions and policies—not paying Plaintiffs for call coverage and requiring Plaintiffs (and other neurosurgeons) to ensure call coverage is adequately provided for—do not amount to anticompetitive conduct.  Indeed, St. Luke's is not excluding Plaintiffs from the alleged relevant market or forcing them to relinquish their medical staff membership.  *See* ¶¶ 60-61.  And even if it was, courts have found that a hospital's refusal to deal with a competing physician "does not constitute anticompetitive conduct within the meaning of Section 2 of the Sherman Act."  *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1221 (10th Cir. 2009); *see also SmileCare Dental Grp. v. Delta Dental Plan*, 88 F.3d 780, 786 (9th Cir. 1996) ("it is well-established that competitors do not have a general duty to deal with one another") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 483 n.32 (1992)).

Moreover, St. Luke's has legitimate reasons for its decision.  As anyone would expect, St. Luke's pays its own employed and exclusively contracted neurosurgeons for all of the services they provide, including call services.  Neuroscience Associates likewise is free to bill for services and compensate its employees however it chooses.  Nothing stops them from having a system for paying their own providers for taking call, for example.  And, presumably, Neuroscience Associates already bills, collects, and retains fees for physician services rendered while working at St. Luke's.  Of course, the money that went into payments for call services would be a loss to Neuroscience Associates' bottom line.  But the same is true for St. Luke's.  Quite simply, St. Luke's has legitimate reasons for paying its employed and exclusively contracted neurosurgeons to cover call for St. Luke's patients, and it has legitimate reasons for not paying Neuroscience Associates' neurosurgeons to cover call for Neuroscience Associates' patients.  *See SmileCare Dental Grp.*, 88 F.3d at 786 (affirming dismissal of Section 2 claim when legitimate reasons for the conduct were a "foregone conclusion").

### 2.   Plaintiffs do not allege a specific intent to monopolize.

Plaintiffs utterly fail to allege that Defendants had a specific intent to monopolize, a required element of their Section 2 claim.  *See Spectrum Sports*, 506 U.S. at 459; *In re Pandora Media, LLC Copyright Litig.*, No. 2:22-cv-00809-MCS-MAR, 2023 U.S. Dist. LEXIS 181230, at *32 (C.D. Cal. Apr. 5, 2023) ("To state a claim for attempted monopolization, a party must plead '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'") (quoting *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010)).

There are no well-pleaded allegations that Defendants specifically intended to monopolize the alleged professional neurosurgical services market.  For example, Plaintiffs haven't actually alleged that any independent neurosurgeon has been excluded from the relevant market, let alone alleged that it was Defendants' intention to do so.  And any such allegation would be implausible given Plaintiffs' admission that they hold medical privileges at other hospitals in the area.  *See* ¶ 28.  This failure is fatal to Plaintiffs' Section 2 claim.  *See Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560 LJO SMS, 2011 U.S. Dist. LEXIS 72764, at *35 (E.D. Cal. July 7, 2011) (the "plaintiff must allege 'specific intent' ultimately to seize monopoly power by destroying or excluding competition within the relevant market"); *Prime Healthcare Servs. v. SEIU*, Civil Action No. 11-cv-2652-GPC-RBB, 2013 U.S. Dist. LEXIS 104511, at *48 (S.D. Cal. July 25, 2013) (plaintiff failed to allege specific intent when it alleged that the defendant "merely had the power to control prices — not that it in fact controlled prices").

## II.   PLAINTIFFS' STATE LAW ANTITRUST CLAIMS FAIL FOR THE SAME REASONS AS THE SHERMAN ACT CLAIMS

Plaintiffs' state law antitrust claims stand or fall with their Sherman Act claims.  The Idaho Supreme Court has held "that I.C. §§ 48-101 and -104 [are] patterned after §§ 1 and 7 of

the federal Sherman Antitrust Act," and "federal decisions" applying the laws of the Sherman

Act are "persuasive guidance."  *See Afton Energy v. Idaho Power Co.*, 122 Idaho 333, 340, 834

P.2d 850, 857 (1992) (quoting *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 223 n.11, 646

P.2d 988, 994 n.11 (1982)); *see also Pines Grazing Ass'n v. Flying Joseph Ranch, LLC*,

151 Idaho 924, 929, 265 P.3d 1136, 1141 (Idaho 2011) (applying the standards applicable to

Section 1 of the Sherman Act in deciding a claim under Idaho Code § 48-104); Idaho Code § 48-

102(3) ("The provisions of this chapter shall be construed in harmony with federal judicial

interpretations of comparable federal antitrust statutes").

"[W]here plaintiffs base their state law claims on the same facts on which they base their

Sherman Act claims, federal law is determinative of federal and state antitrust claims[.]"  *Rocky

Mt. Med. Mgmt., LLC*, 2013 U.S. Dist. LEXIS 142909, at *36 (citing *McGlinchy v. Shell

Chemical Co.*, 845 F.2d 802, 811 n. 4 (9th Cir. 1988)).

Here, Plaintiffs' allegations for violations of the Sherman Act are identical to their

allegations for violations of Idaho's antitrust laws.  *See* ¶¶ 101-05 (Count I contains alleged

violations of 15 U.S.C. § 2 and I.C. § 48-105); ¶¶ 106-13 (Count II contains alleged violations of

15 U.S.C. § 1 and I.C. § 48-104).  Each count relies on the same set of facts.  Therefore,

Plaintiffs' state law antitrust claims should be dismissed for the reasons above.

## III.   PLAINTIFFS' STATE LAW UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED FOR LACK OF SUPPLEMENTAL JURISDICTION

Where a district court dismisses "all claims over which it has original jurisdiction," it

may, in its discretion, "decline to exercise supplemental jurisdiction" over pendent state law

claims. 28 U.S.C. § 1367(c)(3); *W. Wholesale Supply v. Holladay*, Civ. No. 97-0297-S-BLW,

2000 U.S. Dist. LEXIS 22012, at *51 (D. Idaho Feb. 29, 2000) (dismissing state law claims

when the federal antitrust claims were dismissed).  Although the "Court should consider

economy, convenience, fairness, and comity when determining whether to exercise supplemental

jurisdiction[,]" *Stucki v. City of Pocatello*, No. 4:15-cv-00422, 2017 U.S. Dist. LEXIS 188770, at *3 (D. Idaho Nov. 13, 2017), the "Supreme Court has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997) (alteration omitted).

Here, the "balance of factors" weighs towards dismissing the entire case. *Canyon Cty. v. Syngenta Seeds, Inc.*, No. CV05-306-S-EJL, 2005 U.S. Dist. LEXIS 40467, at *22 (D. Idaho Dec. 14, 2005). This case is still in its early stages. Defendants haven't answered the Complaint. And Plaintiffs' federal claims are hopelessly flawed. The Court should, therefore, exercise its discretion and dismiss the only remaining claim (Count III)—an unjust enrichment claim governed by state law. *See Perry v. Rado*, 504 F. Supp. 2d 1043, 1050 (E.D. Wash. 2007) (dismissing state law claims under similar circumstances).

## IV. PLAINTIFFS ARE NOT ENTITLED TO LEAVE TO AMEND BECAUSE ANY ATTEMPTED AMENDMENT WOULD BE FUTILE

Plaintiffs should not be granted leave to amend because there are no set of facts they could plead that would save their Complaint. Generally, "leave to amend a complaint should be freely given unless to do so would be futile." *McCullough v. Lithia Kia of Anchorage*, No. 3:20-cv-00237-RRB, 2020 U.S. Dist. LEXIS 236139, at *7 n.33 (D. Alaska Dec. 16, 2020) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Here, amendment would be futile.

Other courts in the Ninth Circuit have refused to grant leave to amend under similar circumstances. In *Perry v. Rado*, a doctor and a group he owned sued various healthcare groups and individuals for allegedly driving the doctor out of business. 504 F. Supp. 2d at 1045, *aff'd* 343 F. App'x 240, 241 (9th Cir. 2009). The defendants moved to dismiss the action, contending that the doctor failed to allege antirust injury. *Id*. at 1046.

The court dismissed the antitrust claims with prejudice.  The court stated that the complaint was "concerned with the impact on" the doctor "rather than with injury to competition in general."  *Id*. at 1047.  The complaint made "conclusory allegations of injury to competition." *Id*.  And there were no facts pled that showed "a cognizable antitrust injury (i.e., a rise in the price of OB/GYN services above a competitive level; decrease in the supply of OB/GYNs in the relevant market; or a decrease in the quality of OB/GYN service provided)."  *Id*.  Further, the fact that the doctor "retain[ed] privileges at [a nearby hospital] belie[d] any injury to competition in that market."  *Id*. at 1048.  Thus, there was "no reason" to provide the plaintiffs with an opportunity to amend their complaint.  *Id*. at 1050.

Like the doctor in *Perry*, Plaintiffs are concerned with the impact on themselves rather than with injury to competition, they make conclusory allegations, and they have privileges at nearby hospitals.  There is no reason to provide Plaintiffs with an opportunity to amend.  Their antitrust claims should be dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed in its entirety.  Plaintiffs' antitrust claims (Counts I and II) should be dismissed with prejudice.  And the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claim (Count III).

DATED this 8th day of January, 2024.

HOLLAND & HART LLP

By      */s/ A. Dean Bennett*
A. Dean Bennett
Zachery J. McCraney

Attorneys for Defendants

30361331_v12

# PROFESSIONAL SERVICES AGREEMENT

THIS PROFESSIONAL SERVICES AGREEMENT ("**Agreement**") is made and entered into effective October ⟨10⟩, 2012 ("**Effective Date**"), between **St. Luke's Regional Medical Center, Ltd.**, a tax-exempt Idaho nonprofit corporation ("**St. Luke's**") and **Clinical Neuroscience Management, PLLC,** an Idaho professional limited liability company wholly owned and operated by licensed physicians ("**Company**"). St. Luke's and Company are each referred to herein as a "**Party**" and are collectively referred to herein as the "**Parties**" to this Agreement. The term "**Company Providers**" as used herein, shall refer to all licensed providers employed or under contract with the Company to provide medical services as herein defined. "**Company Physicians**" shall refer to Company Providers who are physicians providing medical services as agents of Company.

## RECITALS

A.      St. Luke's owns and operates a medical center and other health care facilities in and about Boise, Idaho. In carrying out its charitable mission, St. Luke's and its Medical Staff have identified a strong community need to develop a physician-led and directed specialty service line in the area of neurosciences, which will operate as a division of St. Luke's; and

B.      Company is led by a physician who is a practicing neurosurgeon who has the leadership skills and clinical skills required to develop, direct and lead a neurosciences division at St. Luke's; and

C.      Company Providers have the credentials and experience necessary to perform the work that is required by the Company (such as physician assistants, nurse practitioners, etc.), and in the case of physicians, the Company Physicians are licensed to practice medicine in the state of Idaho, are board certified or are eligible for board certification, are members in good standing on St. Luke's Medical Staff and have been granted all clinical privileges necessary to provide the medical services required under this Agreement; and

D.      Company desires to affiliate with St. Luke's and continue to provide high quality neurosurgical services and to develop, lead and direct a robust and comprehensive neurosciences program at St. Luke's. By working together with other neuroscience professionals, St. Luke's and Company shall minimize operating expenses and implement quality improvement initiatives that will reduce cost and improve patient care. St. Luke's and Company agree that providers, patients and payers will benefit from a relationship that improves quality and uses resources efficiently.

NOW THEREFORE, in consideration of the foregoing recitals, and the mutual agreements, covenants, representations and warranties contained herein, the receipt of which are hereby acknowledged, the Parties to this Agreement hereby agree as follows:

_____          _____
St. Luke's Initials          Company Initials

# ARTICLE 1
# ENGAGEMENT

1.1     Engagement. St. Luke's hereby engages Company to provide the medical services described in Section 1.3 below and to take a lead role in developing and directing a comprehensive neuroscience program at St. Luke's, which program will include, but not be limited to, physician clinic-based services and surgical and rehabilitation services. Through this agreement, St. Luke's desires that Company take the lead role in developing and managing the neurosciences service line at St. Luke's subject to the final decision-making authority of St. Luke's.

1.2     Company Providers.   Company shall carry out the duties and responsibilities described in this Article 1 through the Company Providers. The Company Providers as of the Effective Date are identified on Exhibit 1.2(a), attached hereto and incorporated herein. Additional physicians may be added by Company as Company Providers and shall be listed on Exhibit 1.2 (a), subject to meeting the qualifications set forth in Article 3.   It is expected that St. Luke's and Company shall work together to select Company Providers who are well suited to achieve the mutually established goals and objectives of the neurosciences service line, but St. Luke's consent is not required for Company Providers to join or withdraw from participating in this Agreement or to otherwise disassociate from the Company.   Company shall require each Company Provider to execute the Acknowledgment attached hereto as Exhibit 1. 2(b), or a similar form mutually agreeable to the Parties, prior to rendering Medical Services on behalf of Company pursuant to this Agreement.

1.3     Medical Services. Company shall begin providing the medical services described on Exhibit 1.3, attached hereto and incorporated herein (collectively "**Medical Services**"), no later than the starting date identified on Exhibit 1.3 ("**Starting Date**").

1.4     Director Services.   Company and St. Luke's agree that Kenneth Little, M.D. will serve as the Director of the neurosciences service line ("**Director**"), and that the Director shall carry out the duties and responsibilities set forth on Exhibit 1.4, attached hereto and incorporated herein ("**Director Services**").   St. Luke's and Company may agree to revise and update Exhibit 1.4 from time to time, in which case the most current version of Exhibit 1.4 shall automatically supersede prior version.   The Director shall be accountable to St. Luke's CEO.   The Company may designate a different Company Physician to serve as Director, subject to obtaining St. Luke's prior consent, which consent will not be unreasonably withheld.   Compensation for Director Services may be paid directly to the Director or paid to the Company as directed by the Company.   Compensation for Director Services as of the Effective Date is described on Exhibit 7.1.

1.5     Neuroscience Center.   Company, through the Company Providers, shall provide Medical Services to patients presenting at the neuroscience center set forth on Exhibit 1.3, and other St. Luke's neuroscience facilities or such other clinic location(s) as mutually determined from time to time by the Parties (collectively the "**Neuroscience**

PROFESSIONAL SERVICES AGREEMENT

St. Luke's Initials          Company Initials

**EXHIBIT 1, Page 2**

Center"). Medical Services shall be delivered in the **Neuroscience Center** in accordance with a schedule mutually approved in advance by St. Luke's and Company, the parameters of which are set forth on Exhibit 1.2.

1.6   Company's Exclusive Rights.   St. Luke's and Company share the goal of developing a comprehensive, cost effective and high quality neuroscience program that will accept and treat patients consistent with St. Luke's values and mission. The parties believe it will be important to the success of the program for neurosurgical physicians to be clinically and economically integrated and working together to assure timely and consistent neurosurgical coverage for St. Luke's patients in need of Medical Services, to develop the desired breadth of expertise within the neuroscience service line and to develop the quality standards and efficiencies key to reducing cost and improving quality. To further these goals, during the term of this Agreement and any renewal or extension thereof St. Luke's agrees that all of St. Luke's recruitment efforts relative to neurosurgeons in the Treasure Valley region will be led by the Company and the Director. St. Luke's shall not to enter into any agreement for the provision of Medical Services or Director Services with any neurosurgeon in the Treasure Valley region, without obtaining Company's prior consent. St. Luke's agrees to work cooperatively with Company to facilitate formal arrangements with new neurosurgeons to allow such physicians to join the Company. St. Luke's will notify the Company and Director of all qualified physicians and mid-level providers contacting St. Luke's for employment or professional service opportunities in the neurosciences and engage Company in discussions with all such individuals. This provision shall not apply to contracts or contract renewals between St. Luke's and neurosurgeons existing as the Effective Date. The Company shall be involved in all recruitment activities and discussions related to new neurosurgeons joining or leaving groups that contract with St. Luke's as of the Effective Date. Nothing in this Section 1.6 shall prohibit St. Luke's from granting medical staff membership and clinical privileges to qualified neuroscience physicians.

ARTICLE 2
COMPANY DUTIES AND RESPONSIBILITIES

2.1   Standard of Care. Company will ensure that Company Providers deliver Medical Services in a professional manner consistent with the applicable standard of care in the community and in accordance with the standards of all applicable accrediting and certifying bodies, including, but not limited to, those necessary for participation by St. Luke's in the Medicare and Medicaid programs. Company Providers' conduct and all Medical Services rendered by Company Providers shall be subject to review in accordance with the process(s) established by St. Luke's Medical Staff Bylaws, Medical Staff Rules and Regulations (if applicable) and all St. Luke's policies, practices and procedures. In the event of a perceived conflict or inconsistency between St. Luke's policies, practices or procedures and the terms of this Agreement, such seemingly conflicting terms shall, to the extent possible, be interpreted in a consistent manner. If such interpretation is not possible, the terms of this Agreement shall supersede and prevail. St. Luke's will not impose employment duties or constraints of any kind which

require Company Providers to infringe the ethics of the medical profession or compromise the independence of a Company Provider's medical judgment.

2.2   Compliance.   Company will ensure that Company Providers deliver Medical Services and conduct themselves in a manner that is in compliance with the following: (a) this Agreement; (b) applicable St. Luke's and its Medical Staff's standards, policies, procedures and practices; (c) applicable Clinic standards, policies, procedures and practices; (d) standards, policies, procedures and practices that apply to such provider's respective department; and (e) applicable state and federal laws, rules, regulations and accreditation standards.   St. Luke's policies and procedures shall be made available to Company and Company Providers upon request.

2.3   Documentation.   Company will ensure that Company Providers promptly complete and maintain, in accordance with St. Luke's rules, policies, practices, instructions and St. Luke's electronic medical record system(s) (if applicable), medical records documenting all patient care services each Company Physician renders pursuant to this Agreement.   The documentation will be appropriate for the level of services provided and shall comply with legal requirements, accreditation standards, reasonable requests of payers and the conclusions of St. Luke's Compliance Department.   The obligation to maintain legally adequate patient records includes, but is not limited to: (i) promptly and accurately completing all medical and billing documents required by insurance companies, Medicare, Medicaid and St. Luke's; (ii) dictating reports thereon into the medical record in a timely manner in accordance with St. Luke's policies; and (iii) informing referring physicians of the progress of patients in a timely manner via St. Luke's approved documentation measures.

2.4   No Discrimination.   Company will ensure that Company Providers provide Medical Services in a timely, courteous and non-discriminatory manner (i.e., without regard to race, color, creed, condition, sex, age, national origin, ability to pay or handicap status) to St. Luke's patients, including, but not limited to, those who are beneficiaries of government programs and other payers with which St. Luke's has contracted to provide services.   This paragraph does not require Company Providers to accept additional patients if such physician in good faith medical judgment, cannot reasonably accept additional patients.

2.5   Termination of Patient Relationship.   Each Company Provider shall have the right to terminate a Company Provider's continuing responsibility to a patient treated pursuant to this Agreement in accordance with St. Luke's Patient Dismissal Policy.

2.6   Charitable Mission of St. Luke's.   Company, through the Company Providers, will reasonably participate in programs to provide charity care and community service, including treating patients without regard to their ability to pay.   This paragraph does not require Company Providers to accept additional patients if the Neuroscience Center is full, nor does this paragraph require Company Providers to replace current patients with patients who require charity care; however, Company Providers shall not discriminate

PROFESSIONAL SERVICES AGREEMENT

_____        _____
St. Luke's Initials         Company Initials

**EXHIBIT 1, Page 4**

against patients based on their ability to pay or "terminate" patients who are eligible for charity care.

2.7   <u>Malpractice Loss Prevention</u>.  Company agrees to participate in a malpractice loss prevention program and related activities.

2.8   <u>Administrative Duties</u>.  Company will ensure that Company Providers perform usual and customary administrative duties without additional compensation.  Examples include, without limitation, completing medical records and attending coding education sessions, new employee orientation and staff meetings.

2.9   <u>Performance Improvement</u>.   Company will ensure that Company Providers cooperate with and participate in quality assessment, utilization management and peer review procedures and activities as may be adopted from time to time by St. Luke's or the Clinic.  St. Luke's and Company may develop performance metrics in the future, the fulfillment of which may result in additional compensation to Company.

2.10   <u>Cooperation</u>.  Company will ensure that Company Providers relate to peers, St. Luke's employees and administrative staff, other personnel, patients and to all members of St. Luke's Medical Staff, in a cooperative and professional manner.

## ARTICLE 3
## COMPANY PHYSICIAN QUALIFICATIONS

3.1   <u>Licensure and Certification</u>.  Company Physicians shall at all times continuously be licensed to practice medicine in the state of Idaho, hold a current, unrestricted DEA permit and hold current, or be eligible for, board certification as required by St. Luke's Medical Staff Bylaws, Medical Staff Rules and Regulations and Credentialing Policy. Each non-physician Company Providers shall be continuously licensed to practice in his/her respective field of practice.

3.2   <u>Medical Staff Membership and Clinical Privileges</u>. Company Physicians shall at all times continuously qualify for and hold, on an unrestricted basis, those clinical privileges required to provide the Medical Services and other services required under this Agreement and shall be credentialed by St. Luke's and its Medical Staff under the same terms and conditions as all other physicians.  Nothing herein is intended to bestow upon a Company Physician such Medical Staff membership or clinical privileges.   Each Company Physician's continued reappointment (if applicable) shall be pursuant to the criteria specified in St. Luke's Medical Staff Bylaws and other Medical Staff and St. Luke's documents, all of which shall be made available to the Company and the Company Providers upon request.

3.3   <u>Notification</u>.  Company shall immediately notify St. Luke's Chief Executive Officer of any loss, suspension or material limitation of any license, certification, DEA permit, board certification or staff membership or clinical privileges held by Company

PROFESSIONAL SERVICES AGREEMENT

_____          _____
St. Luke's Initials          Company Initials

Providers (as applicable) at any hospital. Company shall also immediately notify St. Luke's Chief Executive Officer whenever Company has notice that a malpractice or professional disciplinary action against a Company Physician is initiated, settled or goes to judgment.

3.4   <u>Consequences of Failure to Comply</u>.   Company represents and warrants that Company Providers will at all times comply with the provisions and restrictions set forth in <u>Articles</u> <u>1</u>, <u>2</u> and <u>3</u> of this Agreement (collectively "**Material Company Provider Obligations**").   St. Luke's may immediately exclude a Company Provider from participating in this Agreement if, at any time:

(a)   A Company Provider fails to meet the Material Company Provider Obligations and the Company Provider did not cure the failure within fifteen (15) days to St. Luke's reasonable satisfaction; or

(b)   A Company Provider (i) dies or becomes disabled for a period of more than one hundred eighty (180) days (as determined by a physician, and mutually agreed upon by Company and St. Luke's); (ii) has his/her license to practice medicine in any state, or any license, certification, registration, permit or approval reasonably required for the lawful and reasonable conduct of the Clinic, revoked, suspended or restricted; (iii) has his/her status as a member in good standing with privileges of the medical staff of any hospital terminated or suspended pursuant to the medical staff bylaws, rules and/or regulations thereof; (iv) fails to meet or maintain his/her board certification or eligibility; (v) has his/her certification to participate in Medicare or Medicaid revoked, suspended or restricted; (vi) is disruptive and unable to work cooperatively with other physicians or St. Luke's administration and/or staff as determined by St. Luke's, with due process afforded to such Company Provider as required by St. Luke's or its Medical Staff's policies, procedures, bylaws, rules or regulations; (vii) is charged with a crime involving violence, moral turpitude or theft, or is indicted for any felony; (viii) is under investigation by any regulatory or enforcement agency for matters concerning his/her provision of patient care; or (ix) is the subject of a credible allegation of fraud, abuse or similar activities that are criminally or civilly proscribed, or enters into a consent decree or other judicial order or administrative settlement with respect to fraud, abuse or similar activities that are criminally or civilly proscribed.

**ARTICLE 4**
**COMPANY'S COMMITMENT TO ST. LUKE'S**

4.1   <u>Exclusivity</u>.   During the term of this Agreement and any renewal or extension thereof, neither Company nor Company Provider shall, without obtaining the prior written consent of St. Luke's (except as provided below), which consent will not be unreasonably withheld, directly or indirectly render Medical Services to or for any person or firm with or without compensation, or engage in any practice that competes with the business of St. Luke's. Company and Company Providers may, without obtaining St. Luke's prior written consent, engage in the following outside activities (collectively

PROFESSIONAL SERVICES AGREEMENT

_____   _____
St. Luke's Initials   Company Initials

**EXHIBIT 1, Page 6**

"**Outside Services**") and retain any compensation therefrom, to the extent such activities and/or engagements are not adverse to St. Luke's and do not interfere with Company and Company Providers' performance of the duties and responsibilities described in this Agreement: gainsharing, trauma call coverage at Saint Alphonsus Regional Medical Center, intellectual property, copyrights, patents, product consultation fees, honorariums, volunteer work and activities, and medical lectures. Company and Company Providers may only serve as expert witnesses and/or provide voluntary testimony regarding medical issues with St. Luke's prior approval, which approval will not be unreasonably withheld.

4.2    <u>Company Physician Agreements with Company</u>. The restrictions and the limited exceptions contained in this <u>Article 4</u> shall be included in the Company's agreement(s) between Company and Company Providers, and Company shall immediately allow St. Luke's to review and copy such agreements upon request.

**ARTICLE 5**
**OPERATION OF THE NEUROSCIENCE CENTER**

5.1    <u>Efficiency</u>. Company agrees to work with St. Luke's to operate the Neuroscience Center in the most efficient way possible.

5.2    <u>Creation of a Division</u>.    Medial Services shall be delivered through the Neuroscience Center, which shall be a division of St. Luke's led by the Director. The principal clinical offices of the Neuroscience Center will be located on the 10th Floor of the St. Luke's Boise Medical Center. The Neuroscience Center will provide space for physician offices, exam rooms, minor procedure space and other services as mutually agreed.

(a)    St. Luke's shall assume responsibility for quality assurance, utilization review and the coordination and integration of the Medical Services and St. Luke's services, to the extent practicable. Company Providers shall cooperate and participate in quality assessment and utilization management and peer review activities as may be adopted from time to time, or as required by St. Luke's policies, a licensing agency, accrediting organization or regulatory body.

(b)    The income, costs and expenses of the Neuroscience Center shall be integrated within St. Luke's financial system, but the financial status of the Neuroscience Center and Medical Services, with respect to this Agreement, shall remain readily identifiable.

(c)    When a Company Physician provides Medical Services to a Medicare beneficiary pursuant to this Agreement and the treatment is not required to be provided in accordance with the EMTALA "antidumping" rules, the Company Physician will cooperate with St. Luke's in providing an appropriate written notice to the beneficiary, before the delivery of services, of the amount of the beneficiary's potential financial liability.

PROFESSIONAL SERVICES AGREEMENT

_____    _____
St. Luke's Initials    Company Initials

**EXHIBIT 1, Page 7**

5.3    Staff.

(a)    The Director shall oversee the development of a staffing plan for the Neuroscience Center necessary to fully support Medical Services and Director Services provided by Company.  This will include multiple mid-level providers and administrative staff necessary to support the Director Services required hereunder.  The staffing plan shall promote the efficient delivery of quality Medical Services and shall be consistent with St. Luke's mission, vision and reasonable business limitations.  The staffing plan will include staff working in the Center and in surgery and other programs or operations that are a part of the Neurosciences Center.

(b)    If Company or a Company Provider objects to the quality or nature of services provided by any St. Luke's personnel directly engaged in the delivery of medical services, the performance or behavior problems will be addressed by the Director and St. Luke's, which may include separation from employment.  Reasonable requests by Company to remove or reassign any St. Luke's personnel will not be unreasonably denied or delayed by St. Luke's.

(c)    In addition to clinical and administrative staff, St. Luke's shall supply all technical, support and ancillary staff necessary to operate the Neuroscience Center.

(d)    The staff will include professionally qualified personnel to accurately code for medical services, which coding staff will be selected by Director and will work directly in the Neurosciences Center.  Upon mutual agreement, the coding function can be outsourced to a qualified third party.

(e)    All clinical and administrative staff shall report up through the Director and through Physician Services.

5.4    Facilities, Equipment and Supplies.  St. Luke's and Director shall jointly make decisions related to facilities, equipment and supplies for the Neuroscience Center, which shall all be provided by St. Luke's, at St. Luke's sole expense.  It is noted that these matters shall affect Company Providers' ability to provide Medical and Director Services; therefore, Company shall lead the outcome on these matters, subject to St. Luke's reasonable business limitations.  St. Luke's is responsible for ensuring that the Neuroscience Center equipment functions and is maintained in good working order and repair, subject to reasonable down time, and that the technical personnel it furnishes is appropriately skilled to carry out their responsibilities.

The Company Providers may not use the Neuroscience Center space to participate in Outside Activities or provide services other than Medical Services or Director Services, without a commercially reasonable written agreement describing the arrangement.

**EXHIBIT 1, Page 8**

5.5     Neuroscience Center Management.   St. Luke's agrees to assign experienced management personnel to the Neuroscience Center, who shall be preapproved by the Director and report to the Director and Physician Services. ("**Neuroscience Center Management**"). Neuroscience Center Management shall work closely with those in the Neuroscience Center, including Company Providers, on operational matters. Neuroscience Center Management will meet with the Director and Company Providers on a regular basis to review the Neuroscience Center and Service Line operations, engage in strategic and business planning, and develop and monitor implementation of improvement plans mutually agreed by the Parties.

5.6     Patient Records.  It is agreed that the records of patients seen during the term of this Agreement are the property of St. Luke's and the same shall be integrated into, or cross-referenced into St. Luke's medical record retrieval system.  Upon termination of this Agreement and/or a Company Provider's disassociation from the Company, St. Luke's shall have the right to retain the original versions of the medical records of patients seen by any such Company Provider(s) during the term of this Agreement, provided, however, that Company and Company Provider(s) and/or the disassociated Company Provider(s) shall have access to and the right to copy both electronic and hard copy medical records retained by St. Luke's, with the patient's written approval (if required), for purposes of providing on-going or future care, billing, reimbursement and/or professional liability defense, at the requesting party's expense, which request shall be fulfilled by St. Luke's as quickly as is possible

5.7     Confidentiality of Medical Records and Patient Health Information.  The Parties agree to maintain the confidentiality of all medical records and other patient information acquired by the Parties during the course of this Agreement.  The Parties shall comply with all applicable policies and procedures of St. Luke's concerning the use and disclosure of patient health and medical information.  St. Luke's shall train the Company Providers on such St. Luke's policies and procedures, at St. Luke's expense, and such policies and procedures shall also be made available to Company and Company Providers upon request.

**ARTICLE 6**
**BILLING AND COLLECTING**

6.1     Costs/Billing.

(a)     St. Luke's shall be solely responsible for payment of all costs and expenses of its business operation, including, but not limited to, the cost of equipment and the operation and maintenance thereof, the compensation of St. Luke's non-physician personnel and the cost of pharmaceuticals, medical and other supplies, utilities, transcription and all other operating expenses.

(b)     All professional physician fees attributable to the Medical Services rendered by Company through Company Providers under this Agreement after the Starting Date

PROFESSIONAL SERVICES AGREEMENT

_____        _____
St. Luke's Initials         Company Initials

**EXHIBIT 1, Page 9**

shall be the income of St. Luke's, and Company and the Company Providers hereby assign the same to St. Luke's.  St. Luke's or, if desired by St. Luke's, a wholly owned company of St. Luke's, is authorized to submit bills for professional services rendered by Company under this Agreement, and Company agrees to execute any documentation or certification as may be required to implement such assignments.  St. Luke's or, if desired by St. Luke's, a wholly owned company of St. Luke's, shall receive and retain all remuneration for such professional services rendered by Company through Company Providers, whether or not billed by St. Luke's.  Neither Company nor Company Providers shall receive or negotiate checks or payments attributable to the Medical Services rendered by Company under this Agreement and related activities.  Should Company or Company Providers receive directly any checks or payments which should have been sent to St. Luke's or a St. Luke's affiliate, Company and Company Providers shall deliver to St. Luke's such checks or payments within ten (10) business days of receipt.  Notwithstanding the foregoing, any and all fees unrelated to the provision of the Medical Services, including fees derived from call coverage agreements, medical directorship activities, Administrative Services, expert testimony, lecturing or other outside activities that do not interfere with the performance of Medical Services, shall be excluded from the provisions of this Section 6.1(b) and be kept by the Company.

(c)     Company and Company Providers shall fully cooperate by timely and accurately documenting the services that were delivered, and completing other documentation required for St. Luke's to bill in a timely and efficient manner.

(d)     St. Luke's, Company and Company Providers agree to be Medicare and Idaho Medicaid participating providers at all times during the Term of this Agreement.  Company and Company Providers agree to cooperate with and participate in any and all managed health care plans of third party payers and other contractual arrangements through which St. Luke's agrees to provide healthcare services during the term of this Agreement ("**Managed Healthcare Plans**").  Cooperation and participation as used herein shall include: (a) the provision of Medical Services to all participants in such Managed Healthcare Plans; and (b) the execution by Company and Company Providers of all required participating provider agreements required by such Managed Healthcare Plans in order for Company Providers to provide services to the participants of such plans.  In determining the fees for each professional service, St. Luke's and Company shall negotiate in good faith to establish fees that are reasonable and consistent with fair market value, considering fees being charged for similar services in Boise, Idaho and other comparable communities.

(e)     Company reserves the right to review any claim submitted to Medicare or Medicaid, evaluate any reimbursement received from Medicare or Medicaid and review any associated documentation or correspondence pertaining to a Medicare or Medicaid claim at any time.  Company may immediately revoke St. Luke's right to act as its billing agent with respect to reimbursement from Medicare and Medicaid.

PROFESSIONAL SERVICES AGREEMENT

St. Luke's Initials            Company Initials

**EXHIBIT 1, Page 10**

(f)     The Parties agree to work cooperatively to establish compliance plans and audit procedures to assure accurate coding and billing for all Medical Services provided hereunder.

(g)     St. Luke's shall market the Medical Services across all reasonable markets using all appropriate forums and materials pursuant to a marketing plan that is approved by the Director.

(h)     St. Luke's will, on at least a quarterly basis, provide Company with a true and correct statement disclosing Clinic's revenue, expenses, accounts receivable and an accounting of each Company Provider's productivity.

(i)     All accounts receivable and unbilled accounts in process for professional services rendered by the Company and Company Providers prior to the Starting Date shall be billed and collected by, and belong to, the Company.

(j)     Company shall, upon reasonable request, have access to relevant books and records of St. Luke's relating to performance of this Agreement.

**ARTICLE 7**
**COMPANY COMPENSATION AND BENEFITS**

7.1     <u>Compensation</u>.  During the term of this Agreement, St. Luke's shall pay Company, and Company shall accept from St. Luke's as payment in full, for the performance of the Medical Services and Administrative Services, the compensation described on <u>Exhibit 7.1</u>, attached hereto and incorporated herein.

7.2     <u>Insurance</u>.

(a)     Company shall, at its expense, secure and maintain during the term of this Agreement professional malpractice insurance covering the acts and omissions of Company Providers in the amount required to maintain clinical privileges at St. Luke's, as adjusted by St. Luke's from time to time.   St. Luke's may assist Company with the administrative processes related to applying for and maintaining malpractice insurance, but Company shall have sole responsibility for ensuring Company Physician applications and any renewal information are accurate and are submitted in a timely fashion

(b)     St. Luke's shall be named as an additional insured on such insurance to the extent permitted by the applicable insurance carrier and at no additional cost to Company. Such policies shall be with carriers acceptable to St. Luke's and Company. St. Luke's may revoke its approval of a carrier so long as such revocation is reasonable.   The liability coverage under such insurance shall cover all occurrences that arise during the term of this Agreement, regardless of when a claim is filed, and accordingly, if Company maintains an insurance policy on a claims-made basis, Company shall obtain upon the termination or cancellation of Company's policy and maintain, at its expense, "tail" professional liability

PROFESSIONAL SERVICES AGREEMENT

_____         _____
St. Luke's Initials          Company Initials

**EXHIBIT 1, Page 11**

insurance as needed to ensure continuous coverage for any claims or causes of actions asserted with respect to any acts or omissions of Company Providers. As reasonably requested by St. Luke's, Company shall provide St. Luke's with evidence of all coverage required under this Agreement. Company shall immediately notify St. Luke's legal department of any lapse in or material modification to the coverage required hereunder.

(c)   St. Luke's agrees to provide comprehensive directors and officers insurance for each Company Physician providing Director Services with coverage for such physician's performing Director Services including, without limitation, coverage for peer review, employment decisions and state or federal regulatory matters.

## ARTICLE 8
## TERM AND TERMINATION

8.1   <u>Term of Agreement</u>. This Agreement shall have a term of ten (10) years commencing on the Effective Date, unless or until earlier terminated in accordance with the terms of this Agreement.

8.2   <u>Termination of Agreement Upon Material Breach</u>.

(a)   In addition to St. Luke's ability to exclude Company Providers who fail to comply with any Material Company Provider Obligation, this Agreement may be terminated by either Party's failure to cure a material breach. In the event of a material breach by a Party, the non-breaching Party shall send written notice to the other Party specifying (i) the material breach, and (ii) providing thirty (30) days from receipt of the notice to cure the breach. If the breach is not cured within thirty (30) days to the satisfaction of the Party providing the notice of breach, this Agreement shall terminate and be of no further force or effect except as otherwise specifically provided in this Agreement. The following shall constitute grounds for material breach of this Agreement:

(i)   Loss or suspension of the right of Company or a Company Provider (unless that Company Provider is promptly excluded from providing Medical Services under this Agreement), or St. Luke's to participate in or obtain reimbursement from the Medicare or Medicaid programs;

(ii)   Conduct reasonably determined by St. Luke's or Company as discrediting to the reputation of St. Luke's or Company;

(iii)   A Party's failure or refusal to provide the other Party with any information reasonably requested by the other Party and necessary for the other Party to evaluate whether the Party to whom the request is made is in violation of this Agreement or has committed any other act or omission which is in breach of this Agreement; or

PROFESSIONAL SERVICES AGREEMENT

_____        _____
St. Luke's Initials        Company Initials

**EXHIBIT 1, Page 12**

(iv)     Any other act or omission by either Party constituting a breach of a material term or condition of this Agreement.

8.3     <u>Immediate Termination</u>.  Either Party may terminate this Agreement immediately if the other Party or any of its employees, agents or subcontractors is:  (i) suspended or excluded from participation in a Federal Health Care Program (as defined in 42 U.S.C. § 1320a-7b(f); or (ii) debarred from any federal or state procurement or nonprocurement program; or (iii) designated a Specially Designated National or Blocked Person by the Office of Foreign Asset Control of the U.S. Department of Treasury.

8.4     <u>Bankruptcy</u>.     Company may terminate this Agreement immediately if: (i) St. Luke's makes an application for the appointment of a receiver, trustee or custodian for any of St. Luke's assets; or (ii) St. Luke's files a petition or a petition is filed against St. Luke's under any section or chapter of the federal Bankruptcy Code or any similar law or regulation; or (iii) St. Luke's makes an assignment for the benefit of its creditors; or (iv) St. Luke's becomes insolvent or fails generally to pay its debts as they become due.

8.5     <u>Effect of Termination</u>.

(a)     Upon the expiration or termination of this Agreement, Company shall be entitled to the payment of any accrued, unpaid compensation as of the date of termination. Such determination shall be made by mutual agreement of the Parties.

(b)     The Parties agree to the following processes for an expeditious, fair, mutually-agreeable and orderly separation of Company and St. Luke's in the event of termination of this Agreement for any reason and/or a Company Provider's disassociation from the Company.  St. Luke's and Company, or the disassociating Company Provider, as applicable, shall jointly prepare one or more written communications which may be used by either party to inform patients and others, as applicable, of:  i) Company's or the disassociating Company Provider's departure; ii) the location of Company's or the disassociating Company Provider's new practice; iii) the effective date of the separation; and iv) the name of the physician(s) who will be available to assume responsibility for the specified patient, or group of patients, subject to the patient's request.  Prior to termination of this Agreement or disassociation of a Company Provider, neither Party, nor any Company Provider, shall directly solicit (excludes incidental patient contact with indirect marketing materials such as billboards, newspaper advertisements, etc.) or otherwise seek to induce the business or patronage of any patient, third party payer or arranger of medical care with whom Company Provider has any contact during Company's engagement.  The Parties agree that the above provisions are reasonable and necessary to avoid gaps in patient care and to protect the Parties' respective legitimate interests in their reputations and their relationships with patients, and that a Party would be irreparably injured by another Party's breach(es) of these obligations.  An aggrieved Party shall be entitled to an injunction to prevent such breach without proof of actual damages.  An aggrieved Party shall further be entitled to recover damages in the amount

PROFESSIONAL SERVICES AGREEMENT                    _____        _____
                                                                              St. Luke's Initials         Company Initials

**EXHIBIT 1, Page 13**

of injury to its reputation and lost revenue from the breaching Party in the event of breach of these obligations.

8.6     Final Compensation.  Following any termination or disassociation of a Company Physician, a final determination of any compensation or other obligations due from either Party to the other shall be made by mutual agreement of the Parties within thirty (30) days of the date of such termination, and any amount determined to be owing by either Party as a result of such determination shall be due and payable immediately upon ten (10) business days following the determination.  Company further agrees that if St. Luke's advances any compensation before it has been earned or accrued, or advances any money to a Company Physician during the course of Company's engagement, St. Luke's is authorized to deduct from Company's compensation sufficient funds to repay such advances. Such determination and payment shall not affect a release of either Party from any obligation arising pursuant to any term or provision of this Agreement that may mature, arise or accrue or be discovered thereafter.

8.7     Return of Property.  Upon termination of this Agreement by any means and/or a Company Provider's disassociation from the Company, each Party shall at once deliver to the appropriate Party all documents, medical records, charts, effects, money or other property belonging to such appropriate Party, in which it may have an interest, for which it may be liable to others, or which ought to be in such appropriate Party's charge or custody.

**ARTICLE 9**
**RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION**

9.1     Independent Contractors.  St. Luke's hereby engages Company as an independent contractor to render Medical Services and Director Services through Company Providers, and Company hereby accepts such engagement.  St. Luke's will not impose duties or constraints of any kind that would require Company Providers to infringe the ethics of the medical profession or which would compromise the independence of Company Providers' medical judgment.  It is understood and agreed that in the performance of all Services under this Agreement, Company and Company Providers shall at all times act as independent contractors of St. Luke's and the same are not agents or employees of St. Luke's for any purpose.  Further, it is expressly understood and agreed by the Parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation between the Parties; it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement.

(a)     Company Providers shall not be entitled to any of the benefits provided to St. Luke's employees, including but not limited to vacation pay, sick leave pay, retirement benefits, social security, worker's compensation, health and disability or unemployment insurance benefits or other employee benefits of any kind.

PROFESSIONAL SERVICES AGREEMENT

St. Luke's Initials _____     Company Initials _____

(b)     Company Providers will not be treated as St. Luke's employees for federal tax purposes.  St. Luke's will not withhold on behalf of Company or Company Providers any sums for income tax, unemployment insurance, Social Security or any other employee withholding pursuant to any law or requirement of any governmental body or make available any of the benefits afforded to St. Luke's employees.  All such payments, withholding and benefits, if any, are the sole responsibility of Company.  In the event the Internal Revenue Service or other governmental agency should question or challenge the independent contractor status, the Parties hereby agree that Company and St. Luke's shall have the right to participate in any discussion or negotiation occurring with such agency or agencies regardless of with whom or by whom such discussions or negotiations are initiated.

(c)     Neither Party shall, during the term of this Agreement, assume or incur any liability or obligation of any kind on behalf of the other Party without the other Party's express written consent.

(d)     Nothing herein shall be construed as a requirement, express or implied, that the Parties shall refer any patient in order to receive the benefits and compensation herein.

9.2    <u>Indemnification</u>.

(a)     For and in consideration of St. Luke's not exercising any control over the means, manner or methods by which Company carries out its duties under this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Company agrees to indemnify, defend and hold harmless St. Luke's and its parent corporation, subsidiaries, officers, directors, employees and agents ("**St. Luke's Indemnified Parties**") from and against any liability, claim, action, loss, cost (including attorneys' fees), damage or expense incurred or suffered by St. Luke's Indemnified Parties, directly or indirectly, arising out of a material breach of this Agreement by, or the grossly negligent or intentionally wrongful acts or omissions of, Company or Company Providers arising under or relating to this Agreement, to the extent not covered by insurance. The indemnification obligation under this Section shall not exceed $300,000 per year or $1 million in aggregate during the term of this Agreement.

(b)     For and in consideration of Company not exercising any control over the means, manner or methods by which St. Luke's carries out its duties under this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, St. Luke's agrees to indemnify, defend and hold harmless Company and its officers, directors, employees and agents, including Company Providers ("**Company Indemnified Parties**") from and against any liability, claim, action, loss, cost (including attorneys' fees), damage or expense incurred or suffered by Company Indemnified Parties, directly or indirectly, arising out of a breach of this Agreement by, or the grossly negligent or intentionally wrongful acts or omissions of, St. Luke's or its

PROFESSIONAL SERVICES AGREEMENT                    _____        _____
                                                   St. Luke's Initials    Company Initials

officers, directors, employees and agents, arising under or relating to this Agreement, to the extent not covered by insurance.

## ARTICLE 10
## MISCELLANEOUS PROVISIONS

10.1   Recitals and Exhibits.  The recitals set forth hereinabove are hereby restated in full and by this reference incorporated herein as a substantive part of this Agreement.  All Exhibits to this Agreement are hereby incorporated herein as a substantive part of this Agreement.

10.2   Entire Agreement.  This Agreement and all Exhibits hereto constitute the entire final and complete Agreement between the Parties attending to the subject matter described herein, and they supersede and replace all written and oral agreements heretofore made or existing by and between the Parties, or their representatives, insofar as the subject matter of this Agreement is concerned.  There shall be no modification hereunder unless it is in written form and signed by the Parties.  It is agreed by each of the Parties that there have been no representations or warranties except those contained in this Agreement.

10.3   Assignment.  This Agreement may not be assigned without the prior written consent of Company and St. Luke's.

10.4   Invalidity or Unenforceability of Particular Provisions.  It is the intent of the Parties that this Agreement be in compliance with applicable laws, statutes, rules and regulations including, but not limited to, Medicare and Medicaid provisions.  If either Party determines in good faith upon the advice of counsel, or receives general or specific notice from a governmental agency that this Agreement or any part hereof (i) violates or fails to comply with any state or federal law, regulation, rule or administrative policy or would result in Stark law restrictions on referrals to St. Luke's (or any St. Luke's affiliate) or the tax-exempt status of any bonds issued on its/their behalf, (iv) exposes any organization manager or disqualified person of St. Luke's (or its affiliates)   to immediate sanctions by the Internal Revenue Service or results in private inurement or private benefit, or (v) exposes any person or Party or its affiliates to any other sanctions by any other regulatory agency, Company and St. Luke's shall attempt to amend this Agreement or alter the operation of the practice at the Location therein in order to avoid the adverse consequence. If the Parties hereto, acting in good faith, are unable to make amendments or alterations to avoid the adverse consequence within thirty (30) days of either Party's notice to the other under this Section 10.4, or if either Party determines in good faith that compliance with such requirements is impractical or unfeasible, this Agreement shall immediately terminate upon notice by either Party.  St. Luke's and Company agree that they will use their best efforts, in the event of any termination under this Section 10.4 to ensure that patient care is not adversely affected by such termination.

PROFESSIONAL SERVICES AGREEMENT

St. Luke's Initials          Company Initials

**EXHIBIT 1, Page 16**

10.5   Notice.  Any notice required or desired to be given with respect to this Agreement shall be in writing and shall be deemed delivered effective when personally delivered or two (2) days after it is deposited in the United States Mail, registered or certified, or one (1) day after it is deposited with a national overnight carrier such as FedEx or UPS for overnight mail service, addressed to the Party intended to receive notice at the Party's address set forth below, or to such other address as a Party may have specified by prior written notice to the other Party:

| | |
|---|---|
| St. Luke's: | St. Luke's Regional Medical Center, Ltd.<br>Attn:  CEO<br>190 E. Bannock<br>Boise, ID  83712 |
| Company: | Clinical Neuroscience Management, PLLC<br>Attn: Kenneth M. Little, MD<br>2023 Claremont Drive<br>Boise, ID 83702 |

10.6   Survival.  Sections 5.4, 5.5, 7.2, 8.6, 8.7, 8.8, the Exhibits and Articles 9 and 10 shall survive the expiration or termination of this Agreement for any reason.

10.7   Conformance with Law.

(a)   For the purpose of implementing Section 1861(v)(1)(i) of the Social Security Act, as amended, and any written regulations pursuant thereto, Company agrees to comply with the following statutory requirements governing the maintenance of documentation to verify the cost of services rendered pursuant to this Agreement, until the expiration of four years after furnishing of the services provided under this Agreement. Company shall, upon written request, make available to the Secretary of the U.S. Department of Health and Human Services (the "**Secretary**"), or, upon written or oral request, make available to the U.S. Comptroller General, and their representatives, this Agreement and all books, documents and records necessary to certify the nature and extent of the cost of those services.  No attorney-client, accountant-client or other legal privilege will be deemed to have been waived by either Party by virtue of this provision.

(b)   The Parties hereby acknowledge and agree that none of the benefits derived hereunder require or are in any way contingent upon the admission, recommendation, referral or any other arrangement for the provision of any item or service by any of the Parties to any entity or person, including but not limited to St. Luke's.  Further, no Party hereto has entered into this Agreement with the intention of inducing or accepting inducement for such referrals.

(c)   The amount of compensation payable by St. Luke's to Company pursuant to this Agreement is set in advance and does not exceed the fair market value of the services that Company will render to St. Luke's.

PROFESSIONAL SERVICES AGREEMENT                    _____        _____
                                                   St. Luke's Initials      Company Initials

**EXHIBIT 1, Page 17**

10.8    Dispute Resolution.   The Parties shall in good faith attempt to resolve any controversy, dispute or disagreement arising out of or relating to this Agreement, or the alleged breach thereof, by negotiation.  If any such controversy, dispute or disagreement is not resolved within sixty (60) days of the date it was first identified to the non-complaining Party, that controversy, dispute or disagreement shall be submitted to non-binding mediation, which shall be conducted in Boise, Idaho, before a mediator mutually acceptable to the Parties, in accordance with informal rules established by the mediator. Each Party shall be responsible for its own fees and costs to participate in mediation.  If the controversy, dispute or disagreement is not resolved through mediation, either Party may initiate formal legal action.

10.9    Governing Law, Venue and Attorneys' Fees.   The validity, interpretation, performance, remedies and all other issues arising under or out of this Agreement shall be governed by the laws of the state of Idaho.  In the event of any suit or action arising out of this Agreement, the losing Party shall pay the prevailing Party's reasonable costs and attorneys' fees, as determined by the court in such suit or action, including such attorneys' fees and costs on appeal.   The venue of any suit shall be in a court of competent jurisdiction in Ada County, Idaho.

10.10   Confidentiality.

        (a)    No Party hereto shall disclose this Agreement, the substance of this Agreement nor any information it shall acquire in the course of its performance hereunder, to any person or entity who or which is not a party hereto, unless required by law, except to those employees or agents of either Party, including accountants and attorneys, whose assistance is necessary to either Party's performance of its respective duties and obligations hereunder.  In the event that one of the Parties hereto discloses the terms of this Agreement to any third party not authorized to receive said disclosures, such shall be grounds for immediate termination of this Agreement.

        (b)    Subject to Section 5.5 and Section 8.6 and except as stated elsewhere herein, all patient lists and demographic and marketing information developed after the Starting Date regarding the Medical Services are the personal property of St. Luke's and constitute confidential trade secrets of St. Luke's.  The unauthorized use, reproduction or dissemination or publication of such patient lists, demographic and marketing information constitutes a violation of St. Luke's exclusive right to the use of such information, and any action or attempt on the part of Company to utilize such information for any purpose not specifically permitted hereunder shall give rise to a right to recover damages and obtain injunctive and any other relief available under Idaho law on the part of St. Luke's.

10.11   Agreement Creates No Ownership Rights.  Except as specifically provided in this Agreement, neither Party shall have any interest arising from or by reason of this Agreement in the ownership of the property of the other Party, including both tangible and intangible assets.

PROFESSIONAL SERVICES AGREEMENT                 _____        _____
                                                St. Luke's Initials      Company Initials

**EXHIBIT 1, Page 18**

10.12  No Third Party Liability.  Except as otherwise provided by law or as specifically agreed by any person against whom a claim for payment may be asserted, the obligations of each Party hereunder shall be solely those of that Party and shall not be deemed or construed to create any obligation or liability on the part of any member of the Party's governing board or any officer of that Party, any other individual or any other corporation or other entity or organization, regardless of any pre-existing relationship between such individual or entity and that Party.

10.13  Time is of the Essence.  Time is of the essence of each and all of the agreements, covenants and conditions of this Agreement.

10.14  Non-Waiver.  Waiver or failure to enforce any of the terms and conditions hereof in a particular circumstance shall not be construed as a general waiver or continuing waiver thereof by a Party, and waiving Party shall be free to reinstate such term or condition with or without notice to the other Party, unless and except to the extent that such waiver is provided in writing, in which case the waiving Party's rights shall be determined in accordance with such writing.

10.15  Construction.  Any captions to or headings of the articles, sections, subsections, paragraphs or subparagraphs of this Agreement are solely for the convenience of the Parties and shall not be interpreted to affect the validity of this Agreement or to limit any rights, obligations or responsibilities of the Parties arising hereunder.  All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.

10.16  Authorization; No Violation.  Each Party represents and warrants to the other Party as follows:  (i) it is a corporation or professional limited liability company duly organized, validly existing and in good standing under the laws of the state of Idaho and is authorized to conduct business in Idaho; (ii) such Party has all necessary power to carry on its business now being conducted; (iii) such Party has the corporate authority to execute, deliver and perform this Agreement and all agreements executed and delivered by it pursuant to this Agreement and has taken all action required by laws, its organizational documents or otherwise to authorize the execution, delivery and performance of this Agreement and related documents; (iv) the execution and delivery of this Agreement does not and shall not, subject to the consummation of the transactions contemplated hereby, violate any provision of the organizational documents (including operating agreement, bylaws or otherwise) of such Party or any provisions of or result in the acceleration of, any obligation under any mortgage, lien, lease, agreement, instrument, order, arbitration award, judgment or decree, to which such Party is a party, or by which it is bound; and (v) this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable in accordance with its terms.

PROFESSIONAL SERVICES AGREEMENT

_____       _____
St. Luke's Initials           Company Initials

**EXHIBIT 1, Page 19**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.**

By:     Chris Roth
Title:   Chief Executive Officer

**CLINICAL NEUROSCIENCE MANAGEMENT, PLLC**

By:     Kenneth M. Little, M.D.
Its:     Duly Authorized Company Representative

PROFESSIONAL SERVICES AGREEMENT

_____          _____
St. Luke's Initials            Company Initials

**EXHIBIT 1, Page 20**

**EXHIBIT 1.2(a)**

**COMPANY PROVIDERS**

1.    Kenneth M. Little, M.D.

**EXHIBIT 1.2(b)**

**ACKNOWLEDGMENT**

I, the undersigned provider ("**Company Provider**") have reviewed and acknowledge receipt of the foregoing Professional Services Agreement, effective October 10, 2012 ("**Agreement**"), between St. Luke's Regional Medical Center, Ltd. ("**St. Luke's**"), and Clinical Neuroscience Management, PLLC ("**Company**").   In consideration of my selection to provide Medical Services on behalf of the Company, either as a member, owner, independent contractor, employee or through another arrangement, I agree to be personally bound by the terms and conditions of the Agreement, which are personal in nature (credentialing, exclusivity, licensure, conduct, Material Company Provider Obligations, etc.) and any such amendments to the Agreement, applicable to Company Providers and which are personal in nature, with the same effect as if I had personally executed such Agreement or future amendments.

Dated October _10_, 2012.

_____
Signature

_Kenneth M. Little_
Please print name

**EXHIBIT 1.3**

**DESCRIPTION OF SERVICES**

1.     **Medical Services.**   Company, through Company Providers, agrees to render the professional neurosurgery services historically provided by each Company Physician, including, but not limited to, a work schedule consistent with each Company Physician's clinical privileges and competencies (collectively "**Medical Services**").     Outside Activities (as defined in <u>Section 4.2</u> of the Agreement) are excluded from the definition of Medical Services.

2.     **Starting Date and Term of Agreement.**   Company agrees to begin providing Medical Services beginning no later than December 1, 2012 ("**Starting Date**").

3.     **Practice Locations.**   Company agrees to deliver Medical Services at the following location(s):

      a.     The Neurosciences Center;

      b.     St. Luke's, Boise;

      c.     Such other locations as mutually agreed.

4.     **Work Schedule.**   Company agrees to deliver Medical Services pursuant to a schedule consistent with past practices and customary historic hours of operation.

PROFESSIONAL SERVICES AGREEMENT

_____          _____
St. Luke's Initials          Company Initials

Page - 23

**EXHIBIT 1, Page 23**

**EXHIBIT 1.4**

**DIRECTOR SERVICES**

**Director shall be responsible to lead and direct the Neurosciences Center and provide leadership and direction to the Neurosciences Service Line at St. Luke's. As a part of such Director duties, Director shall perform the following duties:**

1.  Develop/enhance a reporting structure for the Neurosciences Service Line (includes, without limitation, epilepsy, DBS, intracranial, neurology, neurodiagnostics, etc.).

2.  Provide leadership to the Neuro Division of the Ortho/Neuro MSO as long as such company continues to exist.

3.  Identify and monitor community need for additional neuroscience physicians and neuroscience sub-specialists and lead the recruitment of neuroscience professionals.

4.  Develop a non-physician staffing plan for the Neuroscience Center and provide management and oversight of professional providers and staff involved in the service line.

5.  Oversee the development of a robust marketing plan to promote the Neurosciences Service Line and personally promote the Service Line throughout the Treasure Valley region and other areas served by St. Luke's as requested in cooperation with local leadership.

6.  Oversee the quality of the Service Line and the skills and expertise of providers who impact the patient experience.

7.  Serve as the physician leader for the Service Line in medical staff, physician services, governance and operational matters.

8.  Assure that the Service Line meets or exceeds standards of applicable accrediting and regulatory bodies.

9.  In coordination with administrative, implement and lead quality, service, and patient safety initiatives related to the Service Line.

10. Manage and coordinate consistent standards of care for the Service line regardless of the site of service.

11. Assist in developing and implementing strategy for clinical integration and becoming an Accountable Care Organization, and in redesign of the care delivery system to promote and demonstrate quality improvements.

12. Respond to problems to improve Service Line performance.

13. Serve as a role model of the St. Luke's Values.

14. Perform other duties and responsibilities as assigned.

PROFESSIONAL SERVICES AGREEMENT

St. Luke's Initials          Company Initials

**EXHIBIT 1, Page 24**

**EXHIBIT 7.1**

<u>**COMPENSATION**</u>



**EXHIBIT 1, Page 25**



**EXHIBIT 1, Page 26**

**APPENDIX A**

**COMPENSATION EXAMPLE**



**FIRST AMENDMENT TO**
**PROFESSIONAL SERVICES AGREEMENT**

THIS FIRST AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT (this "**Amendment**") is made and entered into effective October 1, 2015 to that certain Professional Services Agreement ("**Agreement**") by and between ST. LUKE'S MEDICAL REGIONAL MEDICAL CENTER, LTD., a tax-exempt Idaho non-profit corporation ("**St. Luke's**"), and CLINICAL NEUROSCIENCE MANAGEMENT, PLLC, an Idaho professional limited liability company ("**Company**"). St. Luke's and Company are each referred to herein as a "Party" and are collectively referred to herein as "Parties" to this Amendment.

WHEREAS, the Parties entered into a Professional Services Agreement effective on or about December 1, 2012, whereby Company agreed to provide certain professional services for St. Luke's; and

WHEREAS, the Parties agree to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

**ARTICLE 1**

1.0  <u>Amendment to Description of Services</u>. Exhibit 1.3 to the Agreement ("Description of Services") is hereby amended by adding a new paragraph 5 to that Exhibit as follows:

> "5.      **Call Coverage.**  Company Providers will provide neurosurgery call coverage for St. Luke's consistent with other neurosurgeons providing call coverage at St. Luke's. Generally, the goal is for call coverage to be no more than one-in-eight days for an individual physician. The Parties recognize, however, that there may be times when community neurosurgeons do not take call which may place a greater burden on Company Providers. Company Providers agree, therefore, to individually cover up to one-in-four days when necessary on a temporary basis to assure St. Luke's has seven day per week call coverage. When an individual physician's call burden falls below one-in-six (e.g. one-in-five) for more than thirty (30) days, St. Luke's and Provider shall work together to reduce the call burden in an effort to bring the call burden back to no more than one-in-six, including accelerating recruitment efforts or contracting with other local providers. During extreme emergencies, Provider Physicians may be called upon to provide more than one-in-six call coverage, but in such events St. Luke's shall immediately take all reasonable measures to retain locum tenens neurosurgeons or otherwise retain additional neurosurgeons to assist with call to bring the call burden back to at least one-in-four.

## ARTICLE 2

2.0   <u>Amendment to Director Services</u>.   Exhibit 1.4 to the Agreement (describing "Director Services") is hereby deleted in its entirety and replaced with Exhibit 1.4 attached hereto.

## ARTICLE 3

3.0   <u>Clarification of Definition of Clinic</u>.   Additionally, the Parties acknowledge and agree that "Neuroscience Center" as defined in Section 1.5 of the Agreement refers to the Neurosurgical Clinic ("Clinic") located on the 10th floor of the St. Luke's Medical Center in which the Company provides clinical neurosurgical services.  This Clinic functions in concert with the Neurosciences Service Line at St. Luke's but operates as distinct medical clinic.  The Parties' respective obligations with respect to operation of the Neuroscience Center as described in the Agreement are intended to refer to the Clinic rather than the Neurosciences Service Line at St. Luke's.

## ARTICLE 4

4.0 <u>Changes to Compensation</u>.   Exhibit 7.1 to the Agreement regarding compensation is hereby amended as follows:





## ARTICLE 5

5.0   Except as specifically amended by this Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

This Amendment is entered into effective as of the date first set forth above.

ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

By:     Kathy D. Moore, Chief Executive Officer
Date:     10/30/15

CLINICAL NEUROSCIENCE MANAGEMENT, PLLC

By:     Kenneth M. Little, M.D., its Member
Date:     10·9·15

EXHIBIT 1, Page 31

**EXHIBIT 1.4**

**DIRECTOR SERVICES**

**Director shall be responsible to lead and direct the Clinic and provide input and direction to the Neurosciences Service Line ("Service Line") at St. Luke's as follows:**

1.  Work with the Service Line Director at St. Luke's to advise the Service Line (includes, without limitation, epilepsy, DBS, intracranial, neurology, neurodiagnostics, etc.**)**.
2.  Provide input and direction to the Neuro Division of the Ortho/Neuro MSO as long as such company continues to exist.
3.  Identify and monitor community need for additional neuroscience physicians and neuroscience sub-specialists and lead the recruitment of neurosurgical professionals.
4.  Develop a non-physician staffing plan for the Clinic and provide management and oversight of professional providers and staff involved in the Clinic.
5.  Provide input and direction regarding marketing plans to promote the Service Line and personally promote the Service Line throughout the Treasure Valley region and other areas served by St. Luke's as requested in cooperation with local leadership.
6.  Provide input and direction regarding the quality of the Service Line and the skills and expertise of providers who impact the patient experience.
7.  As requested serve as a physician leader for the Service Line in medical staff, physician services, governance and operational matters.
8.  Work with the Service Line Director to assure that the Service Line meets or exceeds standards of applicable accrediting and regulatory bodies.
9.  In coordination with administrative staff, implement and lead quality, service, and patient safety initiatives related to the Service Line.
10. Provide input and direction regarding standards of care for the Service Line regardless of the site of service.
11. Assist in developing and implementing strategy for clinical integration and becoming an Accountable Care Organization, and in redesign of the care delivery system to promote and demonstrate quality improvements.
12. Respond to problems to improve Clinic and Service Line performance.
13. Serve as a role model of the St. Luke's Values.
14. Perform other duties and responsibilities as assigned.

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE

## SECOND AMENDMENT TO
## PROFESSIONAL SERVICES AGREEMENT

THIS SECOND AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT ("Second Amendment") is made and entered into effective as of the date of last signature ("Second Amendment Effective Date") by and between ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., a tax-exempt Idaho non-profit corporation ("St. Luke's") and CLINICAL NEUROSCIENCE MANAGEMENT, PLLC, an Idaho Professional limited liability company ("Company").  St. Luke's and Company are each referred to herein as a "Party" and are collectively referred to herein as the "Parties" to this Agreement.

WHEREAS, the Parties entered into a Professional Services Agreement effective on or about December 1, 2012, whereby Company agreed to provide certain professional services for St. Luke's; and

WHEREAS, the Parties agree to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

### ARTICLE I

Exhibit 1.3 to the Agreement ("Description of Services") is hereby deleted in its entirety and replaced with the new Exhibit 1.3, attached hereto and incorporated hereof.

### ARTICLE II

Exhibit 1.4 to the Agreement ("Director Services") is hereby deleted in its entirety and replaced with the new Exhibit 1.4, attached hereto and incorporated hereof.

### ARTICLE III

Exhibit 5.1 to the Agreement ("Payment") is hereby deleted in its entirety and replaced with the new Exhibit 5.1, attached hereto and incorporated hereof.

### ARTICLE IV

Except as specifically amended by this Second Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

EXHIBIT 1, Page 33

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE

## SIGNATURE PAGE

This Second Amendment is entered into effective as of the date of last signature.

ST. LUKE'S

*Kathy Moore*
FE14B6BEA0A1418...
_____

By:  Kathy D. Moore
Title:  Chief Executive Officer

Date: 12/1/2017

CLINICAL NEUROSCIENCE MANAGEMENT, PLLC ("Company")

*Kenneth Little, MD*
CBFDC54BC58F40D...
_____

By: Kenneth M. Little, M.D.
Title: Member
Date: 12/1/2017

SECOND AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT - PAGE 2

**EXHIBIT 1, Page 34**

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE

**EXHIBIT 1.3**

**DESCRIPTION OF SERVICES**

**1.**     **Medical Services.**   Company Provider agrees to accept patient referrals and render professional neurosurgery services, consistent with Company Provider's training and scope of practice.

**2.**     **Director Services.**   Company Provider agrees to perform services as Executive Medical Director of Neurosurgery/Spine Division SLC described in Exhibit 1.4, attached hereto and incorporated hereof.

**3.**     **Starting Date and Term of Agreement.**   Company Provider agrees to begin providing Medical Services beginning no later than 12/1/2012 ("Starting Date").

**4.**     **Site(s).**   Company Provider agrees to deliver services at the location(s) set forth below and/or at other location(s) as needed to meet patient needs and as agreed to by the Parties.  In the event the Sites listed below include locations not owned or operated by the St. Luke's entity indicated on the signature page ("St. Luke's Contracting Entity"), Company Provider shall remain under contract with the St. Luke's Contracting Entity while performing services at the location operated by the other St. Luke's entity or entities, but Company Provider shall comply with the medical staff bylaws, policies, procedures, and practices applicable to the location at which services are rendered.

      1.  The Neurosciences Center
      2.  St. Luke's Regional Medical Center – Boise
      3.  Such other locations as mutually agreed

**5.**     **Work Schedule.**   Company Provider agrees to deliver services pursuant to a schedule consistent with past practices and customary historic hours of operation.

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE

EXHIBIT 1.4
**DIRECTOR SERVICES**



# Job Description

**Title:**          **Executive Medical Director, Neurosurgery/Spine Division SLC**

--------------------------------------------------------------------------------------------------------------

## I.     JOB SUMMARY

The Executive Medical Director of Neurosurgery/Spine Division of the St. Luke's Clinic is a practicing physician that has demonstrated a high level of clinical skill in neurosciences and spine care and is seen as an influential administrative leader among his/her peers and executive leadership. The EMD will be a major contributor to service line and overall system strategy as a senior leader in the organization.

The focus of the EMD of Neurosurgery/Spine responsibilities will be to develop a highly reliable Division that integrates closely with other specialties across the delivery system.  He/she will seek to reduce variation in spine care and intracranial care in an effort to achieve ever-improving outcomes at the lowest total cost of care. The EMD will work with operational leaders, service line leaders, nursing leaders, and other providers to develop standard work flows, common performance measures, and an emphasis on safe, timely, effective, efficient, equitable, patient-centered care.

The EMD will work closely with multiple stakeholders throughout the SLHS region and SLHP network to promote the Neuroscience/Spine Division as a resource for excellent patient centered care which will require a very collaborative approach with employed and independent practice groups.

It is anticipated that the Executive Medical Director of Neurosurgery/Spine Division will spend at least .6 FTE in clinical practice with the remainder of time spent in administrative duties.

## I.      DUTIES AND RESPONSIBILITIES

### Leadership

1. Responsible, in collaboration with the appropriate Sr. Director and nursing leadership, for overall supervision and oversight of the Neuroscience/Spine Division of the St. Luke's Clinic across the health system.
2. Uses influence to drive standardization and improvements in patient care with independent spine and intracranial providers.
3. Serves as a role model and leader for St. Luke's values and leadership behaviors.
4. Promotes high-quality,safe, patient-centered care.
5. Works closely with administrative leadership to develop operational and capital budgets for the Neurosurgery/Spine Division.

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE

6.  Works closely and collaboratively with the elected medical staff leadership and serves as the St. Luke's Clinic liaison to the medical staff structure, the Ortho-Neuro Service Line, and the SLHP network in matters related to Neurosurgery/Spine Division functions.
7.  Serves as physician leader of SLHS Neurosurgery/Spine Division for the advancement of cooperative, collegial, working relationships with St. Luke's Clinic specialty and primary care providers.  Facilitates and leads efforts to include independent medical staff in the development of integrated care delivery.
8.  Provides leadership for innovation and development of quality measurement and benchmarking tools and associated methodologies for clinical performance improvement, and engages physicians and other members of the care team in these efforts on an ongoing basis, implementing new evidence-based patient care processes as identified for service excellence and efficiency.
9.  Identifies and monitors the need for additional neurosurgery physicians and other subspecialists and leads the recruitment process where appropriate.
10. Provides input and direction in the development of a marketing plan to promote the Neurosurgery/Spine Division throughout the SLHS service area.
11. Serves as  a physician leader for the Neurosurgery/Spine Division in medical staff, physician services, governance and operatoinal matters.
12. Assures that the Neurosurgery/Spine Division meets or exceeds standards of applicable accrediting and crendialing bodies.
13. Participates in the annual performance evaluation for medical staff that reports to the EMD of Neurosurgery/Spine.
14. Investigates and responds to quality of care and service concerns and assures prompt action is taken for resolution.

**Performance Improvement & Compliance**
1.  Develops and implements programs, systems, policies and procedures to establish, benchmark and improve performance standards for the Neurosurgery/Spine Division.
2.  Educates physicians and other providers in the Neurosurgery/Spine Division and works to ensure their compliance with applicable policies and procedures, Joint Commission standards, and state and federal rules, regulations and laws.
3.  Seeks out opportunities to improve the efficiency of the Division through the development, management and evaluation of the budget, guidelines and protocols.
4.  Develops and implements plans to maintain or improve patient, staff and physician satisfaction.

**Strategic Planning & Business Development**
1.  In collaboration with the appropriate Sr. Director(s), leads the development and implementation of a strategic plan for the Neurosurgery/Spine Division that aligns with the SLHS strategy.
2.  Assesses and evaluates the need for additional services, locations, practitioners, staff and equipment to optimize access and efficiency.
3.  Serves as the primary spokesperson for the Neurosurgery/Spine Division in coordination with St. Luke's Communications & Marketing Department.

**Professional Development**
1.  Actively participate in appropriate staff meetings, in-services, and continuing education.
2.  Maintain competencies required for the position.

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE

**EXHIBIT 5.1**
**PAYMENT**



**EXHIBIT 1, Page 38**

DocuSign Envelope ID: A8801AA8-6B4D-45CF-BAF4-5BB6121114DE



DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

**THIRD AMENDMENT TO**
**PROFESSIONAL SERVICES AGREEMENT**

THIS THIRD AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT ("Third Amendment") is made and entered into effective as of June 1, 2019 ("Third Amendment Effective Date") by and between ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., a tax-exempt Idaho non-profit corporation ("St. Luke's"), and CLINICAL NEUROSCIENCE MANAGEMENT, PLLC, an Idaho professional limited liability company ("Company"), doing business as Northwest Neurosurgery Associates. It amends the October 10, 2012 Professional Services Agreement (the "Agreement") entered into between the Parties.

**ARTICLE 1**

That certain First Amendment to Professional Services Agreement, dated October 1, 2015, and that certain Second Amendment to Professional Services Agreement, dated December 1, 2017, are hereby deleted and shall have no further force or effect.

**ARTICLE 2**

Section 8.1 of the Agreement is hereby amended and restated in its entirety to provide as follows:

> "This Agreement shall have a term commencing on the Effective Date and continuing through October 9, 2032, unless or until earlier terminated in accordance with the terms of this Agreement."

**ARTICLE 3**

Exhibit 1.3 to the Agreement (Description of Services) is hereby amended and restated in its entirety by the new Exhibit 1.3 attached hereto and incorporated herein.

**ARTICLE 4**

Exhibit 1.4 to the Agreement (Director Services) is hereby amended and restated in its entirety by the new Exhibit 1.4 attached hereto and incorporated herein.

**ARTICLE 5**

Exhibit 7.1 to the Agreement (Compensation) (incorrectly identified in the Second Amendment as Exhibit 5.1) is hereby amended and restated in its entirety by the new Exhibit 7.1 attached hereto and incorporated herein.

**ARTICLE 6**

A new Section 8.8 is hereby added to the Agreement and shall provide as follows:

> "8.8  Termination by Company.  Company shall have the absolute right to terminate this Agreement at any time (a) upon one (1) year's

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

notice of Company Physician's intent to relocate his residence outside the State of Idaho, and (b) upon three (3) months' notice in the event Company Physician relocates his residence outside the State of Idaho due to exigent circumstances."

## ARTICLE 7

Promptly after execution and delivery of this Third Amendment, all of Company's compensation, earned by Company pursuant to the compensation structure and formulae up to the Third Amendment Effective Date, shall be paid to Company.

## ARTICLE 8

Except as expressly amended by this Third Amendment, all terms and conditions of the Agreement, but not including the First Amendment or the Second Amendment, shall remain in full force and effect.

INTENDING TO BE LEGALLY BOUND, the Parties hereto enter into this Third Amendment as of the date first set forth above.

ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

By:     Pam Lindemoen
Its:    Chief Executive Officer
Date:   6/14/2019

CLINICAL NEUROSCIENCE MANAGEMENT, PLLC

By:     Kenneth M. Little, M.D., its Managing Member
Date:   6/17/2019

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

**EXHIBIT 1.3**

**DESCRIPTION OF SERVICES**

**1.**      **Medical Services**.   Company agrees to accept patient referrals and render professional neurosurgery services, consistent with Company Physician's training and scope of practice.

**2.**      **Director Services**.   Company Physician agrees to perform services as Executive Medical Director of Neurosurgery/Spine Division SLC, as described in Exhibit 1.4 attached and incorporated into the Agreement.

**3.**      **Starting Date and Term of Agreement**.   Company agrees to begin providing Medical Services beginning June 1, 2019.

**4.**      **Site(s)**.   Company agrees to deliver Medical Services at the location(s) set forth below and/or at other location(s) as needed to meet patient needs and as agreed to by the Parties. In the event the Sites listed below include locations not owned or operated by the St. Luke's entity indicated on the signature page ("St. Luke's Contracting Entity"), Company shall remain under contract with the St. Luke's Contracting Entity while performing Medical Services at the location operated by the other St. Luke's entity or entities, but Company shall comply with the medical staff bylaws, policies, procedures, and practices applicable to the location at which Medical Services are rendered.

1.      The Neurosciences Center
2.      St. Luke's Regional Medical Center – Boise
3.      Such other locations as mutually agreed

**5.**      **Work Schedule**.   Company agrees to deliver Medical Services pursuant to a schedule consistent with past practices and customary historic hours of operation.

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

**EXHIBIT 1.4**

**DIRECTOR SERVICES**

**I.      TITLE**

Executive Medical Director, Neurosurgery/Spine Division SLC

**II.     JOB SUMMARY**

The Executive Medical Director ("<u>EMD</u>") of Neurosurgery/Spine Division of the St. Luke's Clinic is a practicing physician that has demonstrated a high level of clinical skill in neurosciences and spine care and is seen as an influential administrative leader among his/her peers and executive leadership.  The EMD will be a major contributor to service line and overall system strategy as a senior leader in the organization.

The focus of the EMD of Neurosurgery/Spine responsibilities will be to develop a highly reliable Division that integrates closely with other specialties across the delivery system. He/she will seek to reduce variation in spine care and intracranial care in an effort to achieve ever-improving outcomes at the lowest total cost of care. The EMD will work with operational leaders, service line leaders, nursing leaders, and other providers to develop standard work flows, common performance measures, and an emphasis on safe, timely, effective, efficient, equitable, patient-centered care.

The EMD will work closely with multiple stakeholders throughout the SLHS region and SLHP network to promote the Neurosurgery/Spine Division as a resource for excellent patient centered care which will require a very collaborative approach with employed and independent practice groups.

It is anticipated that the EMD of Neurosurgery/Spine Division will spend at least .6 FTE in clinical practice with the remainder of time spent in administrative duties.

**III.    DUTIES AND RESPONSIBILITIES**

<u>Leadership</u>

1.      Responsible, in collaboration with the appropriate Sr. Director and nursing leadership, for overall supervision and oversight of the Neurosurgery/Spine Division of the St. Luke's Clinic across the health system.

2.      Uses influence to drive standardization and improvements in patient care with independent spine and intracranial providers.

3.      Serves as a role model and leader for St. Luke's values and leadership behaviors.

4.      Promotes high-quality, safe, patient-centered care.

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

5.    Works closely with administrative leadership to develop operational and capital budgets for the Neurosurgery/Spine Division.

6.    Works closely and collaboratively with the elected medical staff leadership and serves as the St. Luke's Clinic liaison to the medical staff structure, the Ortho-Neuro Service Line, and the SLHP network in matters related to Neurosurgery/Spine Division functions.

7.    Serves as physician leader of SLHS Neurosurgery/Spine Division for the advancement of cooperative, collegial, working relationships with St. Luke's Clinic specialty and primary care providers. Facilitates and leads efforts to include independent medical staff in the development of integrated care delivery.

8.    Provides leadership for innovation and development of quality measurement and benchmarking tools and associated methodologies for clinical performance improvement, and engages physicians and other members of the care team in these efforts on an ongoing basis, implementing new evidence-based patient care processes as identified for service excellence and efficiency.

9.    Identifies and monitors the need for additional neurosurgery physicians and other subspecialists and leads the recruitment process where appropriate.

10.   Provides input and direction in the development of a marketing plan to promote the Neurosurgery/Spine Division throughout the SLHS service area.

11.   Serves as a physician leader for the Neurosurgery/Spine Division in medical staff, physician services, governance and operational matters.

12.   Assures that the Neurosurgery/Spine Division meets or exceeds standards of applicable accrediting and credentialing bodies.

13.   Participates in the annual performance evaluation for medical staff that reports to the EMD of Neurosurgery/Spine.

14.   Investigates and responds to quality of care and service concerns and assures prompt action is taken for resolution.

**Performance Improvement & Compliance**

1.    Develops and implements programs, systems, policies and procedures to establish, benchmark and improve performance standards for the Neurosurgery/Spine Division.

2.    Educates physicians and other providers in the Neurosurgery/Spine Division and works to ensure their compliance with applicable policies and procedures, Joint Commission standards, and state and federal rules, regulations and laws.

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

3.   Seeks out opportunities to improve the efficiency of the Division through the development, management and evaluation of the budget, guidelines and protocols.

4.   Develops and implements plans to maintain or improve patient, staff and physician satisfaction.

**Strategic Planning & Business Development**

1.   In collaboration with the appropriate Sr. Director(s), leads the development and implementation of a strategic plan for the Neurosurgery/Spine Division that aligns with the SLHS strategy.

2.   Assesses and evaluates the need for additional services, locations, practitioners, staff and equipment to optimize access and efficiency.

3.   Serves as the primary spokesperson for the Neurosurgery/Spine Division in coordination with St. Luke's Communications & Marketing Department.

**Professional Development**

1.   Actively participate in appropriate staff meetings, in-services, and continuing education.

2.   Maintain competencies required for the position.

IV.   **MUTUAL COMMITMENTS**

Company Physician, consistent with his role as the Executive Medical Director, Neurosurgery/Spine Division SLC, affirms his historical commitment to 1) organize meaningful meetings and motivate other providers to attend such meetings, 2) to complete patient documentation in a timely and accurate manner consistent with established guidelines, and 3) to be a role model consistent with both St. Luke's and Medical Staff values and to participate with other colleagues in 360 feedback and coaching efforts. St Luke's agrees to provide Company Physician with 1) the appropriate resources, 2) the administrative support, 3) the authority,  and 4)  any and all other support as shall be necessary or appropriate such that mutually established performance and value goals are achievable and that Company Physician is empowered to perform his role as EMD of the Neurosurgery/Spine Division. St. Luke's specifically and expressly agrees that Company Physician shall, in conjunction with St. Luke's management, have  authority and decision-making power relative to all surgical and nonsurgical spine-related, and all neurosurgery, operations of St. Luke's system-wide, which shall include, without limitation, all related operating rooms, ambulatory clinics, preoperative activities, perioperative activities, inpatient services and acute care services. The Parties hereby agree that this Section IV is a critical and material provision of this Agreement, and to the extent of any conflict with Article 5 of the Agreement, this Section IV shall control. The Parties acknowledge and agree that this Exhibit 1.4 shall be reevaluated and amended, by mutual written agreement, as part of a restructure and reorganization of the Neurosurgery/Spine Division, on or before January 1, 2020; provided, however, that if the Parties are making progress toward such

EXHIBIT 1, Page 45

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

mutual written agreement on such date, St. Luke's may extend the deadline to April 1, 2020.  If the Parties cannot reach such mutual written agreement by the January 1, 2020 deadline (or the extended deadline), Company shall have the unilateral right to immediately terminate this Agreement.  In the interim, prior to such deadline (or extended deadline), Company and Company Physician shall report solely and directly to St. Luke's Vice President of Acute Affairs and CEO for the individual St. Luke's facilities, Pam Lindemoen.

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

**EXHIBIT 7.1**

**COMPENSATION**



EXHIBIT 1, Page 47

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1



**EXHIBIT 1, Page 48**

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1



DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

**EXHIBIT A**

**INITIAL PLAN**

[to be incorporated post-signing]

DocuSign Envelope ID: FB13D1BA-07B6-45E5-B8AD-BA07A2FD7FE1

**EXHIBIT B**

**COMPENSATION ILLUSTRATION**
**(for illustration purposes only)**



DocuSign Envelope ID: E2D85D86-5A65-46B6-BB3E-55C4A5884A2A

# FOURTH AMENDMENT TO
# PROFESSIONAL SERVICES AGREEMENT

THIS FOURTH AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT ("Fourth Amendment") is made and entered into effective as of the date of last signature below, by and between ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., a tax-exempt Idaho non-profit corporation ("St. Luke's"), and CLINICAL NEUROSCIENCE MANAGEMENT, PLLC, an Idaho professional limited liability company ("Company"), doing business as Northwest Neurosurgery Associates. This Fourth Amendment amends the October 10, 2012 Professional Services Agreement entered into between the Parties, as previously amended by that certain Third Amendment to Professional Services Agreement dated June 1, 2019 (as so amended, the "Agreement"). Capitalized terms in this Fourth Amendment shall have the meanings assigned to them in the Agreement.

## ARTICLE 1

The Parties agree that Company and Company Physician shall report to the President of the St. Luke's Clinic, Robert Cavagnol, M.D.  Any contrary language in the Agreement shall be of no further force or effect.

## ARTICLE 2

For the avoidance of doubt, the Parties agree that Performance Compensation shall continue to be paid on a monthly basis, and that Company Physician shall continue to be paid for medical and administrative work (described as "Other Services" in Section 2 of Exhibit 7.1 to the Agreement) based on actual work performed rather than on a draw against estimated earnings.

INTENDING TO BE LEGALLY BOUND, the Parties hereto enter into this Fourth Amendment:

ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

*Chris Roth*
674F2FABAD684F7...

By:   Chris Roth
Its:   Chief Executive Officer
Date: ___6/4/2021___

CLINICAL NEUROSCIENCE MANAGEMENT, PLLC

*Kenneth Little, MD*
4655312E3AEC463...

By:   Kenneth M. Little, M.D., its Managing Member
Date: ___6/26/2021___

DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

**FIFTH AMENDMENT TO**
**PROFESSIONAL SERVICES AGREEMENT**

THIS FIFTH AMENDMENT TO PROFESSIONAL SERVICES AGREEMENT ("Fifth Amendment") is made and entered into effective as of the date of last signature below, by and between ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., a tax-exempt Idaho non-profit corporation ("St. Luke's"), and CLINICAL NEUROSCIENCE MANAGEMENT, PC, an Idaho professional corporation ("Company"), doing business as Northwest Neurosurgery Associates. This Fifth Amendment amends the October 10, 2012, Professional Services Agreement ("Agreement") entered into between the Parties. Capitalized terms in this Fifth Amendment shall have the meanings assigned to them in the Agreement.

**ARTICLE 1**

Section 1.3.1 of Exhibit 7.1 to the Agreement is hereby deleted in its entirety and replaced with the following new Section 1.3.1:



**ARTICLE 2**

Exhibit 7.1 to the Agreement is hereby amended to include the following Section 2.3:



DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

## ARTICLE 3

Section 9.2(b) of the Agreement is hereby deleted in its entirety and shall be replaced with the following:

(b)      For and in consideration of the representations, warranties and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, St. Luke's agrees to indemnify, defend and hold Company and Company's Providers, Company's Physicians and the Company's affiliated entities (including parent and subsidiary companies) and each of their respective estates, heirs, devisees, officers, directors, members, shareholders, managers, employees, contractors, insurers, attorneys, agents and representatives (collectively, "Company Indemnified Parties") for, from and against any and all actions, suits, litigation, liabilities, claims, losses, costs (including attorneys' fees) damages, expenses, including without limitation any obligation to pay money or perform or not perform actions that relate to any threatened, pending or completed actions, suits or proceedings, whether civil, criminal, administrative or investigative, based on facts or circumstances occurring or discovered at any time after the Effective Date, arising from or related to any act or omission by St. Luke's, including without limitation breach of this Agreement, or otherwise directly or indirectly arising from or related to the Company's or any Company Provider or Company Physician's performance of or any actions taken or omissions in connection with or related to this Agreement (collectively, a "Claim"), expressly including that certain action styled *Hajjar, et al. v. St. Luke's Health System, LTD, et al., Case No. 1:23-cv-367*, pending in the United States District Court for the District of Idaho and in which the Company and Kenneth Little, M.D. have been named as co-defendants; provided, however, that the Parties understand and agree that a professional liability action asserted against Company, a Company Provider, or a Company Physician shall not constitute a Claim as defined in this Section 9.2(b).

i.      **Future Reduction**. If in the future the extent to which St. Luke's legal ability to indemnify the Company Indemnified Parties is reduced by a change in the applicable law or regulations, St. Luke's obligations under this Agreement shall not be reduced for any Claims based on events that occurred prior to such reduction.

ii.      **Partial Indemnification**. If a Company Indemnified Party is entitled to indemnification by St. Luke's for part, but not all, of a Claim, St. Luke's shall indemnify such Company Indemnified Party for that part of the Claim.

iii.      **Advancement of Expenses**.   St. Luke's shall pay or reimburse the Company Indemnified Parties' attorneys' fees, judgments, fines, and any amounts paid in settlement and incurred by the Company Indemnified Parties (collectively, "Expenses") in connection with or related to a Claim

DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

as the same are incurred and before the final disposition of such Claim. St. Luke's shall pay such Expenses for or on behalf of the Company Indemnified Parties' Expenses within 30 days after receiving the statement or invoice describing such Expenses.

iv.     **Limitations of Liability**. St. Luke's shall not be liable for a Claim finally adjudicated and finding that (a) a Company Indemnified Party intentionally inflicted harm on St. Luke's, or (b) a Company Indemnified Party intentionally violated a criminal law.

v.     **Notification, Defense and Settlement of Claims**.

A.     **Notice**. Promptly after a Company Indemnified Party receives actual notice of a Claim, such Company Indemnified Party shall notify St. Luke's in writing of the Claim. If (a) such Company Indemnified Party fails to promptly notify St. Luke's of the Claim in writing and (b) St. Luke's is prejudiced by the failure to receive prompt written notice, then St. Luke's shall be relieved from its obligation to indemnify such Company Indemnified Party under this Agreement.

B.     **Defense**. After a Company Indemnified Party properly notifies St. Luke's of a Claim, St. Luke's shall assume defense of the Claim at St. Luke's expense upon the Company Indemnified Party's written request. St. Luke's shall notify the Company Indemnified Party of such assumption in writing. St. Luke's shall pay the Company Indemnified Party's Expenses and indemnify the Company Indemnified Parties, but shall <u>not</u> assume the defense of a Claim if: (a) there is a conflict of interest between St. Luke's and the Company Indemnified Parties in the conduct of the defense as determined by the Company in its sole discretion; or (b) St. Luke's and the Company Indemnified Parties cannot agree on counsel that is reasonably satisfactory to the Company Indemnified Parties. Neither party shall unreasonably withhold, condition, or delay its agreement on counsel.

C.     **Settlement**. To the fullest extent allowed by any applicable insurance policy providing coverage for a Claim, neither St. Luke's nor the Company Indemnified Parties shall settle a Claim without the written consent of the other party; provided, however, that St. Luke's may settle a Claim, in accordance with any applicable insurance policy providing coverage for such Claim, after consultation with but not consent from the Company Indemnified Parties, if such settlement includes only the payment of monies by St. Luke's or its insurer(s) and there is no agreement, injunctive

DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

relief or other court order affecting a Company Indemnified Party including, but not limited to, any agreement, injunction or other court order which could adversely affect any Company Indemnified Party's professional practice, title, role, privileges or activities at St. Luke's or at any other facility or with any other group or organization. Neither St. Luke's nor the Company Indemnified Parties shall unreasonably withhold, condition or delay such consent. Notwithstanding anything contained herein to the contrary, the nature, limits, coverage, status or existence of any insurance policy shall not eliminate or limit St. Luke's obligation to defend and indemnify the Company Indemnified Parties pursuant to this Section 9.2(b).

vi. **General Provisions**.

A. **No Presumption**. The termination of any Claim by judgment, order, settlement (whether with or without court approval), conviction, or upon a plea of *nolo contendere* or its equivalent, shall not create a presumption that the Company Indemnified Parties were in fact liable or culpable, did not meet an applicable standard of conduct or that a court determined indemnification was not permitted by law.

B. **Nonexclusivity and Continuing Obligation**. The rights of the Company Indemnified Parties under this Agreement shall be in addition to, and not be limited by, any rights the Company Indemnified Parties have under any other agreement, document or insurance policy. St. Luke's obligations under this Agreement shall be continuing obligations and shall expressly and unconditionally survive the expiration or termination of this Agreement.

C. **Subrogation and Duplicate Payments**. St. Luke's shall not be required to make payments under this Agreement to the extent the Company Indemnified Parties have actually received payments from another source to satisfy a Claim. If the Company Indemnified Parties, at any time, have a claim against a third party for recovery of amounts paid by St. Luke's under this Agreement, then (a) St. Luke's shall have a right of subrogation to the extent of the amounts paid by St. Luke's plus all related costs and expenses, including attorney's fees, and (b) the Company Indemnified Parties shall perform all reasonable acts necessary to permit St. Luke's to exercise the Company Indemnified Parties' rights of recovery, at no cost to the Company Indemnified Parties.

D. **Binding Effect**. St. Luke's shall cause any assignee or successor to St. Luke's (whether direct, indirect, by merger, sale of assets,

DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

assumption reinsurance, consolidation, or otherwise) to assume this Agreement in a manner that binds the successor to perform in the same manner and to the same extent St. Luke's would be required to perform. The failure of any assignee or successor to enter into this written agreement shall not prejudice the rights of the Company Indemnified Parties nor relieve the assignee or successor of its obligations.

[signatures on following page]

DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

INTENDING TO BE LEGALLY BOUND,  the Parties hereto enter into this Fifth Amendment:

ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.

By:     Sandee Gehrke
Its:     Chief Executive Officer
Date: _____12/21/2023_____

CLINICAL NEUROSCIENCE MANAGEMENT, PC

By:     Kenneth M. Little, M.D., its President
Date: _____12/21/2023_____

**FIFTH AMENDMENT TO PROFESSIONAL SERVICES
AGREEMENT – KENNETH M. LITTLE, M.D. - 6**
16949214.7 [11773-7]

DocuSign Envelope ID: 62B06055-8522-43E1-B63C-D0950015C88A

**ATTACHMENT 1**

# Goal Development

| | Culture & People | Quality & Safety | Access | Professional Development |
|---|---|---|---|---|
| Goal Category | Choose either DEI or wellness as an area of focus for your service line | Clinical quality outcomes or safety improvements | Action to improve access to care for patients | This for your own personal growth as a leader. Consider talking to your dyad or coach to come up with an area of focus to be more effective in your role |
| Defining your goal | Activities you will lead for your service line that advance this work in a demonstrable way | Create a clinical practice guideline aimed at improving quality outcomes or other efforts to deliver safer care | Oversee an effort to create additional access to care for patients | Actions to improve could include reading, getting feedback from others, setting a target for rounding or communication (or other actions) |
| Example (for illustrative purposes only) | Stand up and oversee a service line specific workgroup to find and implement 3 activities to improve provider wellness and wellbeing | Every colorectal surgical operation will follow the infection prevention bundle, track, measure, and report at department meetings | Set the expectation that each provider will participate in a schedule that staggers late hours in the clinic | Rob's goal:  improve self-awareness, vulnerability, and humility.  Read Insight, Getting Along, Leadership and Self-Deception, partner with Mo on feedback from my team through confidential interviews |

# St. Luke's Regional Medical Center

**MEDICAL STAFF BYLAWS**

**Volume I:**

**Governance, Structure and Function of the Medical Staff**

Approved by Medical Staff:  <u>09/21/2018, 01/07/2020; 11/25/2021</u>

Approved by Board:  <u>11/13/2018, 02/13/2020; 12/16/2021</u>

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

# Contents

**MEDICAL STAFF BYLAWS** ....................................................................................................1

**Volume I:** ...............................................................................................................................1

**Governance, Structure and Function of the Medical Staff** ..........................................1

Approved by Medical Staff:   09/21/2018 .............................................................................1

DEFINITIONS .......................................................................................................................6

**ARTICLE I** ........................................................................................................................11

**ARTICLE II** .......................................................................................................................11

2.1      Eligibility and Qualifications for Membership and/or Privileges ........................11

2.2      Non-Discrimination .............................................................................................14

2.3      Responsibilities of Membership .........................................................................14

2.4      Categories of Medical Staff Membership ...........................................................16

2.4.1      Active................................................................................................................16

2.4.2      Associate..........................................................................................................17

2.4.3      Emeritus...........................................................................................................18

2.4.4      Change in Staff Category.................................................................................19

2.4.4      Limitations of Prerogatives..............................................................................19

2.5      Member Rights and Conflict Management Mechanisms .....................................19

2.5.1      Immunity from liability .....................................................................................20

2.5.2      Right of Indemnification ...................................................................................20

2.5.3      Right to Notification of Investigations..............................................................20

2.5.4      Access to Committees .....................................................................................20

2.5.5      Communication and Influence with MEC .........................................................20

2.5.6      Right to Information ..........................................................................................21

2.5.7      Access to Credentials Files .............................................................................21

2.5.8      Confidentiality ..................................................................................................21

2.5.9      Recall of Elected Leaders ...............................................................................21

2.5.10      Right to Initiate Meetings and Address Medical Staff Conflicts .....................21

2.5.11      Right to Request Review of Policies................................................................21

2.5.12      Right to Petition for Medical Staff Bylaws Amendments.................................22

2.5.13      Further Due Process Rights ...........................................................................22

**ARTICLE III** ......................................................................................................................22

3.1      Appointment and Reappointment to Medical Staff Membership and/or Clinical Privileges ......22

With and/or Without Membership ...........................................................................................22

3.2      Temporary, Disaster, and Emergency Privileges.................................................24

**EXHIBIT 2, Page 2**

3.3    Medical Staff Credentials Procedure Policy ................................................................24

**ARTICLE IV** ................................................................................................................24

**OFFICERS OF THE MEDICAL STAFF** ....................................................................24

4.1    Officers of the Medical Staff ....................................................................................24

4.2    Qualifications .............................................................................................................24

4.3    Selection ....................................................................................................................25

4.4    Election ......................................................................................................................26

4.5    Term ...........................................................................................................................26

4.6    Duties of Elected Officers .........................................................................................26

4.7    Removal ......................................................................................................................28

4.8    Vacancy in the Position of Chief of Staff .................................................................29

4.9    Vacancy of Chief of Staff Elect ................................................................................29

4.10   Vacancy in the Position of Immediate Past Chief .....................................................29

**ARTICLE V** .................................................................................................................29

**CLINICAL ORGANIZATION OF THE MEDICAL STAFF** ....................................29

5.1    Designation of Medical Staff Departments ...............................................................29

5.2    Organization of Medical Staff Departments ..............................................................30

5.3    Functions of Medical Staff Departments ...................................................................30

5.4    Department Chair .......................................................................................................31

5.5    Removal of a Medical Staff Department Chair ..........................................................31

5.6    Department Chair Responsibilities ............................................................................32

5.7    Vacancies in the position of Department Chair .........................................................33

5.8    Departmental Meetings ..............................................................................................33

5.9    Clinical Sections ........................................................................................................33

5.9.1    Section Chair Responsibilities ....................................................................34

**ARTICLE VI** ...............................................................................................................34

**MEDICAL STAFF COMMITTEES AND LIAISONS** ..............................................34

6.1    Types of Committees .................................................................................................34

6.2    Committee Chairs ......................................................................................................35

6.3    Membership and Appointment to Committees ..........................................................35

6.4    Medical Executive Committee ...................................................................................36

6.5    Medical Staff Representation on Hospital Committees .............................................39

6.6    Medical Staff Liaisons ...............................................................................................39

6.7    Special or Ad Hoc Committees ..................................................................................39

**ARTICLE VII** .............................................................................................................39

3

**GENERAL MEDICAL STAFF MEETINGS** ...................................................................39

   7.1    General Medical Staff Meetings ....................................................................39

   7.2    Special Meetings of the Medical Staff ..........................................................40

   7.3    Attendance at General Medical Staff Meetings ............................................40

   7.4    Quorum ..........................................................................................................40

   7.5    Minutes ..........................................................................................................40

   7.6    Conduct of Meetings .....................................................................................41

**ARTICLE VIII** ...........................................................................................................41

**COMMITTEE MEETINGS** ........................................................................................41

   8.1    Regular Meetings ..........................................................................................41

   8.2    Special Meetings ...........................................................................................41

   8.3    Notice of Meetings .......................................................................................41

   8.4    Quorum ..........................................................................................................41

   8.5    Manner of Action ..........................................................................................42

   8.6    Minutes ..........................................................................................................42

   8.7    Attendance Requirements ..............................................................................42

   8.8    Mandatory Special Appearance Requirement ...............................................42

**ARTICLE IX** ..............................................................................................................43

**CONFIDENTIALITY, IMMUNITY, AUTHORIZATIONS AND RELEASES** ...............43

   9.1    Agreements, Authorizations and Releases ....................................................43

   9.2    Confidentiality ...............................................................................................44

   9.3    Immunity from Liability ................................................................................45

   9.4    Activities and Informed Covered ..................................................................45

   9.5    Cumulative Effect ..........................................................................................46

**ARTICLE X** ...............................................................................................................46

**GENERAL PROVISIONS** ..........................................................................................46

   10.1   Medical Staff Rules, Regulations, and Policies ............................................46

   10.2   Payment of Fees and Dues ............................................................................46

   10.3   Conflict of Interest ........................................................................................46

   10.4   Peer Review Body .........................................................................................47

   10.5   Joint Conference ...........................................................................................47

   10.6   Interpretation of Bylaws ...............................................................................48

   10.7   Histories and Physicals .................................................................................48

   10.8   Dentists and Podiatrists .................................................................................49

**ARTICLE XI** ..............................................................................................................49

**EXHIBIT 2, Page 4**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

**ADOPTION AND AMENDMENT OF MEDICAL STAFF GOVERNING DOCUMENTS** ............49

11.1   Formulating and Reviewing Medical Staff Bylaws Amendments ................................................49

11.2   Methods of Adoption and Amendment to Volume I, (Medical Staff Governance,  Structure and Function) and the Volume II (Corrective Action and Fair Hearing  Manual) of these Bylaws ..............49

11.3   Methods of Adoption and Amendment to the Medical Staff Credentials Procedure  Policy, and medical staff rules, regulations, and policies and procedures .................................................................50

11.4   Technical/Legal Changes to Medical Staff Documents ............................................................50

11.5   Adoption of the Bylaws ............................................................................................................50

**EXHIBIT 2, Page 5**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

<u>DEFINITIONS</u>

ADVANCED PRACTICE PROVIDER (APP): Licensed physician assistants, advanced practice nurses (including nurse practitioners), certified registered nurse anesthetists, certified nurse midwives, and psychologists.  A sponsoring physician is required for all advanced practice providers other than psychologists.

ADVERSE DECISION: A professional review action (as defined by the federal Health Care Quality Improvement Act) in which the Board or Medical Executive Committee denies, terminates, limits, suspends, modifies a grant of privileges or medical staff membership for failure to adhere to the Hospital's or medical staff's code of conduct policy, other unprofessional conduct, or for issues related to clinical competence. The term is used interchangeably in these bylaws with "adverse recommendations" and "adverse action".

ALLIED HEALTH PROFESSIONAL (AHP): Individual other than a licensed physician, advanced practice provider, or limited license provider who is properly licensed and authorized by law to provide direct or indirect healthcare to St. Luke's patients and who is eligible to receive and exercise clinical privileges pursuant to the bylaws and policies of the medical staff.

APPLICANT: An individual submitting an application for medical staff membership and/or clinical privileges.

BOARD or BOARD OF DERECTORS: The governing body of Hospital.

BOARD CERTIFICATION: The designation conferred by one of the affiliated specialties of the American Board of Medical Specialties (ABMS), the American Osteopathic Association (AOA), the Royal College of Physicians and Surgeons of Canada, or the American Board of Oral and Maxillofacial Surgery, upon a physician or oral surgeon who has successfully completed an approved educational training program and an evaluation process, including passing an examination, in the applicant's area of clinical practice.

BYLAWS: The two volumes that make up the Medical Staff Bylaws are: Volume I- Governance, Structure and Functions of the Medical Staff, Volume II – Corrective Action and Fair Hearing Manual.

CHAIR: The individual responsible for directing the functions and meetings of a committee or task force.

CHIEF EXECUTIVE OFFICER (CEO): The individual named by the Board to act on behalf of the Board in the overall management of St. Luke's Hospitals. The CEO may also be referred to as the President of the Hospital.

CHIEF MEDICAL OFFICER (CMO) or EQUIVALENT: A physician executive appointed by the Chief Physician Executive to assist in various administrative activities as assigned by the CEO or System leadership.

6

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

CHIEF PHYSICIAN EXECUTIVE (CPE): The senior physician executive appointed by St. Luke's Health System to assist it in the various administrative functions across the health system.

CHIEF OF STAFF: A member of the active medical staff who is elected in accordance with these Bylaws to serve as chief administrative officer of the Medical Staff.

CLINICIAN: A person who is licensed to provide direct patient care in a clinical setting and who does so within a defined scope of practice. Relevant examples would include physicians, dentists, APP's, psychologists, and nurses.

COMPLETED APPLICATION: An application for medical staff membership and/or privileges shall be considered complete when it has been submitted electronically through the Health System's application portal with all provisions completed or accompanied by an explanation as to why items are unavailable, the forms signed where applicable, applicable fees are paid, all supporting information has been verified (including responses for references) and all information requested by committees of the medical staff or Board has been provided. An application shall become incomplete if the need arises for new, additional, or clarifying information at any time during the application's evaluation by the medical staff and/or Board. The Chair of the Credentials Committee or the Chief of Staff have discretion to determine if an application is complete or sufficiently complete to permit further evaluation.

CORRECTIVE ACTION: An action taken by the medical staff or Board which restricts, limits, denies or terminates the privileges or medical staff membership of a practitioner for reasons of unprofessional conduct or concerns about clinical competence and which entitles the practitioner to procedural rights as outlined in the Corrective Action and Fair Hearing Manual of these Bylaws. Required evaluations, warnings, reprimands, and performance monitoring are not considered corrective actions.

CVO: Any Credentials Verification Organization employed by or contracted with the Hospital or St. Luke's Health System.

DATE OF RECEIPT: The date any notice, special notice or other communication is delivered personally, by facsimile, by electronic mail (email) or if such notice, special notice, or communication was sent by mail, it shall mean 72 hours after the notice, special notice or other communication was deposited, postage prepaid, in the United States mail.

DAYS: Calendar days, unless otherwise noted.

DELEGATION OF FUNCTIONS: When a function is to be carried out by a person or committee, the person, or the committee through its chairperson, may delegate performance of the function to one or more qualified designees.

DENTIST: A dentist or oral surgeon holding a D.D.S., D.M.D., or equivalent degree and a valid license to practice dentistry in the State of Idaho or Oregon.

EX OFFICIO: Serve as a member of a body by virtue of an office or position held and unless otherwise expressly provided, means *without* voting rights.

7

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

FAIR HEARING PLAN: That part of the medical staff bylaws that describes the formal hearing due process rights and which are articulated in Part II of these bylaws, referred to as the Corrective Action and Fair Hearing Manual.

FEDERAL HEALTH CARE PROGRAM: Refers to any plan or program that provides health benefits whether directly, through insurance or otherwise, which is funded directly in whole or in part by the United States government or a state health program (with the exception of the Federal Employees Health Benefits program). The most significant federal health care programs are Medicare, Medicaid, Blue Cross Federal Employees Program (FEP/Tricare/CHAMPUS) and the veterans' programs.

FOCUSED PROFESSIONAL PRACTICE EVALUATION (FPPE): Whenever a practitioner is granted a new privilege(s) by the Board (either as a new applicant to the medical staff or in response to a requested expansion of existing privileges) the medical staff shall confirm that individual's competency in the privilege(s) through a peer review activity referred to as Focused Professional Practice Evaluation (FPPE). In addition, when ongoing monitoring of practitioner performance raises concerns about quality or conduct, the medical staff may undertake closer analysis to determine if a significant quality or conduct issue exists. This process is also considered FPPE and is fully described in relevant medical staff policies.

HEALTH SYSTEM: St. Luke's Health System, Ltd., an Idaho nonprofit corporation that operates multiple hospitals and health care facilities in Idaho and Oregon.

HOSPITAL: St. Luke's Regional Medical Center, including St. Luke's Boise Medical Center and St. Luke's Meridian Medical Center, all its related facilities and all its personnel nd organizational entities, including the medical staff.

INVESTIGATION: A process specifically authorized by the Medical Executive Committee of the medical staff to determine the validity, if any, of a concern or complaint regarding a member of the medical staff or individual holding clinical privileges prior to the MEC making a recommendation for corrective action to the Hospital Board. An Investigation is a precursor to a Corrective Action.

JOINT CONFERENCE: A meeting between representatives of the Board (appointed by the Board Chair) and representatives of the medical staff (appointed by the Chief of Staff).

MAJORITY: Unless otherwise specified in these bylaws, the position on an issue or the individual in an election that receives the greatest number of eligible votes cast shall be considered to have received the majority of votes on the matter.

MEDICAL EXECUTIVE COMMITTEE (MEC): The executive committee of the medical staff.

MEDICAL STAFF: The formal organization created by the Board to carry out delegated functions and comprised of all individuals who are appointed to it by the Board. Sometimes referred to as the 'organized medical staff'.

MEDICAL STAFF SERVICES DEPARTMENT: This refers to the medical staff services professional(s) and documents retained by the Hospital to support the activities of the medical staff.

**EXHIBIT 2, Page 8**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

MEDICAL STAFF OFFICER: The officers of the medical staff are the Chief of Staff, the Chief of Staff Elect and the Secretary/Treasurer.

MEDICAL STAFF SERVICES PROFESSIONAL (MSSP): This refers to one or more individuals employed by the Hospital to provide administrative support to the activities of the medical staff and maintain the responsibilities of the Medical Staff Services Department.

MEDICAL STAFF YEAR: The period from January 1 to December 31.

MEMBER: An individual who has been appointed by the Board to the medical staff. Membership on the medical staff confers specific rights.

MONTHLY: Each month of the calendar year. Committees required by these Bylaws to meet "monthly" shall hold at least ten meetings in a calendar year, at the discretion of such committee, but need not hold twelve meetings.

NOTICE: A written communication delivered personally to the addressee or sent by United States mail, first-class postage prepaid, addressed to the addressee at the last address as it appears in the official records of the medical staff or Hospital. Notice may also be delivered electronically to a practitioner when sent to the email address that individual has on record with the Medical Staff Services Department.

NURSE PRACTITIONER:  A certified nurse practitioner who is licensed in the state of Idaho and/or Oregon to carry out clinical activities in accordance with statues and regulations applicable to those trained in an accredited nurse practitioner training program. Nurse practitioners are required to have a sponsoring physician with whom they regularly collaborate.

ONGOING PROFESSIONAL PRACTICE EVALUATION (OPPE): This is a process by which the medical staff undertakes ongoing monitoring of the clinical performance of practitioners holding privileges. It is considered a part of medical staff peer review and is described in relevant medical staff policies.

ORAL SURGEON: Oral and maxillofacial surgeons who have completed dental school and/or four or more years of a hospital surgical residency. Oral surgeons are certified by the American Board of Oral and Maxillofacial Surgery.

ORGANIZED HEALTHCARE ARRANGEMENT: A clinically integrated care setting in which individuals typically receive health care from more than on provider and which is defined in 45 C.F.R. § 164.501 commonly known as the HIPAA Privacy Regulations.

PEER REVIEW: The process for review of a practitioner's professional conduct and/or competence as part of the medical staff's quality oversight, performance improvement, and patient safety responsibilities.

PEER REVIEW COMMITTEE: Any body of medical staff members and Hospital or St. Luke's Health System personnel, including invited guests, who are organized under the authority of the MEC or Board to address matters of quality performance, competence, and professional conduct on part of Practitioners with privileges.

9

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

PHYSICIAN: A Doctor of Medicine (MD) or Doctor of Osteopathy (DO) who is licensed to practice in the State of Idaho and/or Oregon.

Physician Assistant: A certified physician assistant who is licensed in the state of Idaho and/or Oregon to carry out clinical activities in accordance with the statutes and regulations applicable to those trained in an accredited training program for physician assistants.  Physician Assistants are required to have a sponsoring physician with whom they regularly collaborate.

PODIATRIST: A Doctor of Podiatric Medicine (DPM) who is licensed to practice podiatry in the State of Idaho and/or Oregon.
POLICIES: Rules, regulations, guidelines, standards, and principles enacted to guide the activities and operations of the medical staff and its members. Medical staff policies are approved by the MEC. Hospital policies are approved through appropriate hospital approved mechanisms. Medical staff members may obtain copies of any policies through the Hospital's Medical Staff Services Department or via online postings where such arrangements have been made.

PRACTITIONER: Any clinician who has been granted medical staff membership and/or clinical privileges by the Hospital Board. In Volume II of these Bylaws (Corrective Action and Fair Hearing Manual) references to Practitioner shall include members of the medical staff who do not hold clinical privileges and applicants for medical staff membership and/or privileges.

PRIVILEGES: The permission granted by the Board to a clinician to render or exercise specific diagnostic, therapeutic, medical, surgical, or dental services and/or procedures in the Hospital.

PRONOUNS: The use for any gender specific pronoun (he/his/him/she/her) throughout these Bylaws is applicable to either male or female individuals.

RULES & REGULATIONS: Rules and regulations (if any) are considered medical staff policies and are approved by the MEC.

SERVICE LINE: An administrative structure created by Hospital management to organize and coordinate operational and clinical activities in an interdisciplinary manner relevant to a set of diseases, clinical specialties, and/or patient needs.

SPECIAL NOTICE: Written notification sent by hand delivery, certified, or registered mail return receipt requested.

TELEMEDICINE: Practitioners who provide diagnostic or treatment services to St. Luke's patients using medical information exchange from one site to another via electronic communications.  Devices used involve interactive audio, video, or data communications between the provider and the patient, but not including telephone or electronic mail communications between a provider and a patient.

TIME LIMITS: All time limits referred to in these Bylaws, including those in the Corrective Action and Fair Hearing Procedures and in any other medical staff policies, are advisory only and are not mandatory unless a specific provision states that a particular right is waived by failing to take action within a specified time period.

**EXHIBIT 2, Page 10**

# ARTICLE I
## PURPOSE

The Medical Staff of St. Luke's Hospital is established by the Hospital Board to assist the Hospital in meeting its mission and to carry out duties assigned to it by the Board to enhance the quality and safety of care, treatment, and services provided to patients. The Medical Staff is considered part of an Organized Healthcare Arrangement and works with the Board and Hospital management to perform effective quality monitoring, peer review, credentialing, performance improvement and maintenance of professionalism. The medical staff is also established to facilitate communication between practitioners who utilize the Hospital's facilities and the institution's management and Board.

The medical staff shall exercise its power as reasonably necessary to meet its obligations under these Bylaws, rules and regulations, and medical staff and Hospital policies and procedures. The medical staff shall act in compliance with applicable laws, accreditation standards and regulations, and Hospital policy and procedure, and is subject to the ultimate approval and authority of the Board.

These Bylaws do not constitute a legal contract between the practitioner, the medical staff, the Hospital, or any other entity.

# ARTICLE II
## MEDICAL STAFF MEMBERSHIP, CATEGORIES, & RIGHTS

2.1   Eligibility and Qualifications for Membership and/or Privileges

Membership on the medical staff, with or without clinical privileges, is granted at the discretion of the Board to professionally competent physicians, dentists, podiatrists, and advanced practice providers who contribute to the mission and the strategy of St. Luke's Regional Medical Center and continuously meet the qualifications, standards and requirements set forth in these Bylaws and in medical staff and Hospital rules, regulations, and policies. The Board may appoint individuals to medical staff membership *with* clinical privileges or medical staff membership *without* clinical privileges. The Board may also grant clinical privileges to individuals who are not members of the medical staff after review of their credentials using the same medical staff process applied to those individuals who seek membership on the medical staff.

Applicants to the medical staff and those requesting clinical privileges must demonstrate to the satisfaction of the Board that they will contribute to meeting the mission of the Hospital and can do so competently, safely, and collaboratively by providing requested information on their:

1. Background;
2. clinical experience;
3. education and training:
4. clinical judgment;
5. demonstrated current professional competence;

11

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

6. individual character and ability to work with others collaboratively;
7. physical and mental capabilities and ability to safely and competently exercise any clinical privileges requested;
8. intended practice plans; and
9. adherence to the ethics of their profession

Specifically, applicants wishing to be on the medical staff and/or requesting privileges must:

a. have an applicable current and unrestricted license to practice in Idaho and/or Oregon;
b. where applicable to their practice, have a current, unrestricted DEA registration;
c. have current valid professional liability insurance coverage, issued by a carrier recognized by the state of Idaho and/or Oregon, in a form and in amounts satisfactory to the Board and in accordance with applicable medical staff polices. (This requirement may be waived for applicants who will not be providing clinical care in any Hospital facility and who do not hold privileges);
d. have successfully completed an Accreditation Council for Graduate Medical Education (ACGME) or American Osteopathic Association (AOA), or a Royal College of Physicians and Surgeons of Canada approved residency training program or a DDS or DMD post graduate training program approved by the American Dental Association's Commission on Dental Accreditation or if not a doctor or dentist, have successfully completed an approved training program in a clinical profession that the board has determined is eligible to hold privileges;
e. be eligible, where applicable, to participate in Medicare, Medicaid, or other federal or state health care payer programs;
f. not request clinical privileges for procedures or activities for which the Hospital and medical staff have not adopted privileging criteria;
g. meet the volume requirements when required as part of the requested privileges
h. not be seeking a position on the medical staff that is closed under any plan or contract adopted by the Board;
i. be able to demonstrate that they have no physical or mental health issue which would compromise their ability to perform requested privileges safely;
j. be seeking clinical privileges that are **not** subject to an exclusive contract or arrangement with the Hospital unless the applicant is a party to that contract/ arrangement or employed by the Hospital;
k. agree to comply with any health screening and physical examination requirements of the Hospital before exercising any privileges that may be granted by the Board;
l. demonstrate to the satisfaction of the Board the ability to provide continuity of care for Hospital patients for whom they take on clinical responsibilities and to provide such care in a timely fashion;
m. have a history of consistently acting in a professional, appropriate and collegial manner with others in previous clinical and professional settings;
n. not have been convicted, or entered a plea of guilty or no contest to, any felony, or to a misdemeanor relating to controlled substances, illegal drugs, insurance or health fraud, child abuse or exploitation, elder abuse or exploitation, a hate crime, battery, or sex-related offense unless, after consideration by the MEC and Board,

**EXHIBIT 2, Page 12**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

> it is determined by these bodies that a waiver of this condition of appointment is warranted.

In addition, all applicants initially applying for clinical privileges must meet one of the following criteria where it applies to their qualifying degree or specialty:

- To be eligible to apply for initial privileges, applicants must, as applicable, be certified in their primary area of practice at the Hospital by the appropriate specialty or subspecialty Board of the American Board of Medical Specialties (ABMS), the American Osteopathic Association (AOA), the American Board of Oral and Maxillofacial Surgery; Canadian Royal College of Physicians & Surgeons; or applicable board certification for advanced practice providers. The MEC shall have discretion to determine the applicable specialty Board certification for each applicant.

- Applicants who are not Board certified at the time of application, but who have completed their residency or fellowship training within the last five years will be eligible for clinical privileges. However, to remain eligible for appointment and/or privileges, these applicants much achieve Board certification in their primary area of practice within the eligibility period specified by their applicable Board certification organization, unless such requirement is waived by the Hospital Board. In the absence of a waiver by the Hospital Board, failure to achieve specialty Board certification within the specified time period shall make the individual ineligible for reappointment and/or the renewal of clinical privileges, and the practitioner's appointment and/or clinical privileges shall expire at the end of the then current appointment term.

- Physicians with previous surgical or surgical assisting experience requesting only surgical assistant privileges must have been initially certified in their primary specialty but are not required to maintain certification.

Additionally, all applicants where it applies, are required to maintain Board certification as determined by the specialty board organization in their specialty unless granted an exception from the Board.

The above criteria for medical staff/privileges eligibility are not meant to be exhaustive. Additional membership and privileging requirements, which are considered *associated details,* can be found in the Medical Staff Credentials Procedure Policy or in the medical staff delineation of privileges forms.

An individual who does not meet membership qualifications as established by the Board is ineligible to apply for medical staff membership/privileges and the application, even if complete by other measures specified in these bylaws, shall not be processed. The qualifications for membership and/or privileges must be documented with sufficient adequacy to satisfy the medical staff and Board that each has enough information to make a fully informed decision regarding appointment and assignment of privileges.

No individual is entitled to membership on the medical staff or to the exercise of particular clinical privileges in the Hospital merely by virtue of licensure to practice in

13

**EXHIBIT 2, Page 13**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

Idaho or any other state, membership in any professional organization, certification by any professional organization or certifying body, privileges at another hospital, or the demonstration of clinical competence.

No applicant shall be appointed to the medical staff and/or be granted requested privileges if the Hospital, in its sole discretion, is unable to provide adequate facilities and support services for the privileges requested by that applicant.

The Board, after consultation with the Medical Executive Committee, may make exceptions or additions to any of the membership qualifications and/or privileging requirements. Applicants who are seeking membership to the Emeritus category of the medical staff and who are not practicing clinical medicine do not have to meet the eligibility requirements of this section.

2.2     Non-Discrimination

The Hospital will not discriminate in granting medical staff membership and/or privileges based on gender, gender identity, race, religion, age, national origin, sexual orientation, disability unrelated to the provision of patient care or required medical staff responsibilities or any other basis prohibited by applicable law, to the extent the applicant is otherwise qualified.

2.3     Responsibilities of Membership

Each member of the medical staff and all practitioners holding privileges must continuously comply with the provisions of these Bylaws, medical staff and Hospital manuals, rules, regulations, and policies. Members and privileged practitioners must:

a.  Provide for the continuous and timely care to all patients for whom the practitioner has responsibility;
b.  Provide, with or without request, new and updated information to the Hospital as it occurs, pertinent to any question found on the initial application or reappointment application. Such information shall include (but is not limited to) any voluntary or involuntary revocation, restriction, surrender, or suspension of a professional license or professional liability insurance, and/or any limitation, restriction, suspension, or termination of clinical privileges at any hospital or health care organization because of concerns about professional conduct or clinical competence;
c.  Appear for personal interviews (in person or by teleconference) regarding an application for initial appointment or reappointment as requested by relevant committees of the medical staff;
d.  Abide by all applicable state and federal laws regarding healthcare fraud and abuse;
e.  Refrain from deceiving patients as to the identity of any individual providing treatment or services;
f.  Seek appropriate consultation whenever necessary to promote adequate quality of care;

14

**EXHIBIT 2, Page 14**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

g.  Complete in a manner consistent with medical staff and Hospital policies all medical and other required records, inputting in a timely manner all information required by the Hospital;

h.  Support the mission of St. Luke's Health System;

i.  Satisfy continuing medical education requirements as may be required under policies adopted from time to time by the medical staff;

j.  Supervise or sponsor the work of any APP with whom the member has a collaboration or supervisory agreement or other obligation to provide oversight;

k.  Pay all fees and dues assessed by the medical staff;

l.  Follow the policies and practices of St. Luke's that support the orderly operations of the Hospital;

m.  Treat Hospital employees, patients, visitors, and all members of the medical staff and other professionals in a dignified and respectful manner at all times and comply with all medical staff and Hospital policies on professional conduct.

Furthermore, each member of the medical staff by accepting medical staff appointment, agrees:

n.  To abide by these bylaws and medical staff manuals, medical staff policies, rules and regulations, and Hospital policies and procedures;

o.  If there is any material misstatement in, or material omission from, an application for appointment or reappointment, the Hospital may stop processing the application. If appointment has been granted prior to the discovery of a misstatement or omission, appointment and privileges may be deemed by the Board to be automatically relinquished. In either situation, there shall be no entitlement to a hearing or appeal;

p.  To participate in and collaborate with the peer review, risk management and performance improvement activities of the medical staff and Hospital. These include monitoring and evaluating tasks performed as part of the medical staff and Hospital efforts to meet quality standards, including but not limited to those established by the Joint Commission, the Centers for Medicare and Medicaid Services (CMS) other governmental, accreditation and healthcare agencies and entities, and public and private insurers;

q.  To provide patient care and management only within the parameters of his or her professional competence, as reflected in the scope of clinical privileges granted the practitioner by the Board;

r.  To undergo any type of health evaluation, including random or "for cause" drug testing, as requested by any two of the following: officer of the medical staff, department chair, the Hospital CEO (or designee), CMO, and/or the MEC when it appears necessary to protect the well-being of patients and/or hospital staff, or when requested by the MEC or credentials committee as part of an evaluation of the member's ability to exercise privileges safely and competently or as part of a post-treatment monitoring plan consistent with the provisions of any Medical Staff and Hospital policies addressing physician health or impairment;

s.  To participate in any type of competency evaluation when determined necessary by the MEC and/or Board in order to properly delineate that member's clinical privileges;

**EXHIBIT 2, Page 15**

t.  To hold harmless and agree to refrain from legal action against any individual, the medical staff, or Hospital that appropriately shares peer review and performance information with a legitimate health care entity or state medical board assessing the credentials of the practitioner;

u.  To abide by any applicable codes of conduct adopted by the medical staff and/or Hospital, including corporate compliance policies and codes of ethics;

v.  To abide by all local, state and federal laws and regulations, Hospital accreditation and survey standards, as applicable to the member's professional practice;

w.  To maintain the capability to receive email communication from the Hospital and members of the Medical Staff and to agree to utilize electronic health record tools implemented by the Hospital for use with all Hospital delivered services;

x.  To provide patients with a quality of care that meets at all times the professional standards and requirements of the medical staff and Hospital;

y.  To properly supervise/sponsor healthcare professionals under his/her supervision/ sponsorship, including advanced practice professionals privileged by the medical staff and students/trainees in education programs at the Hospital; and

z.  To prepare and complete in a timely fashion medical records for all patients for whom the member provides care in a Hospital facility.

In addition, all medical staff members and privileged practitioners must assist the Hospital in fulfilling its responsibilities for providing emergency and charitable care, including without limitation service call coverage, in accordance with policies  approved by the MEC and/or Hospital.

2.4   Categories of Medical Staff Membership

The Medical Staff shall be divided into the following categories:

- Active
- Associate
- Emeritus

Category status for each practitioner will be recommended by the MEC at the time of appointment or reappointment. MEC recommendations for medical staff category will be ratified by the Board.

2.4.1   Active

a.  QUALIFICATIONS: Appointees to this category must:

Be a physician, podiatrist, oral surgeon, or dentist appointed to the medical staff and who provides clinical care in a service area of the Hospital and is involved in at least 50 patient contacts over a 24-month period. A patient contact is defined as any inpatient admission, consultation or attending visit, treatment of a patient in a Hospital outpatient clinic or observation unit, a procedure performed in any Hospital clinical facility, outpatient diagnostic orders, or a day on the Hospital call schedule. For radiologists and pathologists, 50 hours will be required over a

24-month period. Active category status will be assigned at reappointment time based on contact activity during the previous 24-month period. Members may be appointed to this category at initial appointment where it is anticipated they will meet this criterion. However, if a practitioner has not completed 50 patient contacts in his or her first 24 months on staff, his or her staff category will be changed to Associate. Practitioners exclusively exercising telemedicine privileges will not be eligible for the Active category and will be granted privileges and telemedicine staff status.

b.  PREROGATIVES: Appointees to this category may:

1)  Exercise those clinical privileges granted by the Board.
2)  Vote on all matters presented to the medical staff and at meetings of medical staff committees to which they are appointed.
3)  Hold office and sit on or act as chair of any medical staff committee to which they are appointed by the Chief of Staff or MEC, unless otherwise specified in these Bylaws.
4)  Attend all educational programs presented by the medical staff and/or Hospital and applicable medical staff social functions.

c.  RESPONSIBILITES: Appointees to this category must:

1)  Meet the basic responsibilities of medical staff membership, as defined in Article 2.3, and contribute to the organizational and administrative affairs of the medical staff.
2)  Actively participate in recognized functions of medical staff appointment as required or requested, including performance improvement, peer review, risk and utilization management, the monitoring of initial appointees through Focused Professional Practice Evaluation (FPPE), credentialing activities, medical records completion, and the discharge of other medical staff functions, including medical staff committee and clinical service obligations as may be required from time to time.
3)  Comply with the Medical Staff Bylaws and with all applicable rules, regulations, policies and procedures of the medical staff and Hospital.
4)  Participate in providing any call coverage or other patient coverage arrangements as defined in medical staff or Hospital policies.
5)  Perform such further duties as may be required under these Bylaws or medical staff policies, procedures, rules, and regulations, as all may be amended from time to time.

2.4.2  Associate

a.  QUALIFICATIONS: Medical staff members appointed to this category must meet the criteria in section 1 or 2, and section 3 below. APPs are automatically in the Associate Category.

1)  Maintain an active clinical practice in a service area of the Hospital.

**EXHIBIT 2, Page 17**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

    2) Engage in the active practice of medicine at a medical office or an accredited/licensed health care facility other than the Hospital so that the medical staff and Board can assess the practitioner's compliance with membership and privileging requirements as stated under these Bylaws and medical staff policies.

    3) Engage in fewer than 50 patient contacts in a 24-month period as defined above under 2.4.1 (a) describing the Qualifications for Active membership.

b. PREROGATIVES: Appointees to this category may:

    1) Exercise those clinical privileges granted by the Board.

    2) Attend meetings of the medical staff and its committees to which they are appointed. Members of the Associate category shall ***not*** have voting privileges at general medical staff meetings or on medical staff bylaw amendments but may vote on committees to which they are appointed.

    3) Not run for an elected medical staff position or serve as a medical staff officer.

    4) Attend all educational programs presented by the medical staff and/or Hospital and applicable medical staff social functions.

c. RESPONSIBILITES:

    1) Meet the basic responsibilities of medical staff membership, as defined in Article 2.3, and contribute to the organizational and administrative affairs of the medical staff.

    2) Actively participate in recognized functions of medical staff appointment as required or requested, including performance improvement, peer review, risk and utilization management, the monitoring of initial appointees through Focused Professional Practice Evaluation (FPPE), credentialing activities, medical records completion and the discharge of other medical staff functions, medical staff committee and clinical service obligations as may be required from time to time.

    3) Comply with the Medical Staff Bylaws and with all applicable rules, regulations, and policies and procedures of the medical staff and Hospital.

    4) Participate in providing call coverage and other patient coverage arrangements as defined in policies adopted by the MEC and Hospital Board.

    5) Perform such further duties as may be required under these Bylaws or medical staff policies, procedures, rules, and regulations, as all may be amended from time to time.

2.4.3 <u>Emeritus</u>

a. QUALIFICATIONS:

18

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

1) The Emeritus category is restricted to those individuals the medical staff wishes to honor, including, but not limited to clinical professionals who have a history of participation in medical staff and/or Hospital affairs and those who may have had a medical staff leadership role. Emeritus members who are not in the active practice or medicine or do not seek Hospital privileges do not need to meet the eligibility requirements listed in 2.1 above.

b. PREROGATIVES: Appointees to this category may:

1) Not admit or exercise clinical privileges at the Hospital.
2) Not vote at any meetings of the medical staff or its departments or committees.
3) Not run for election or serve as a medical staff officer.
4) Attend education and social functions of the Hospital and medical staff as appropriate.
5) Be appointed as non-voting members of committees when interested so that the medical staff may take advantage of their unique experience or talents.

c. RESSPSONSIBILITIES

1) Practitioners in the Emeritus medical staff category shall conduct themselves in a professional manner consistent with medical staff and Hospital policies and codes of conduct. Practitioners must follow Hospital and medical staff policies wherever applicable to their activities.

2.4.4    Change in Staff Category

Pursuant to a request by the medical staff member, upon a recommendation by the Credentials Committee, or pursuant to its own action, the MEC may recommend a change in medical staff category of a member consistent with the requirements of these Bylaws. The Board must approve any change in category. Determinations regarding assignment of medical staff category are not subject to review under the due process provisions of the Corrective Action and Fair Hearing Manual of these Bylaws.

2.4.4    Limitations of Prerogatives

The prerogatives of medical staff membership set forth in these Bylaws are general in nature and may be subject to limitation or restriction by special conditions attached by the Board to a member's appointment, reappointment, or privileges, by state or federal law or regulations, by other provisions of these Bylaws or medical staff and Hospital policies or by commitments, contracts, or agreements of the Hospital.

2.5    Member Rights and Conflict Management Mechanisms

Members appointed to the medical staff shall have the following rights, in addition to the procedural due process rights enumerated in the Corrective Action and Fair Hearing Manual of these Bylaws or as limited by Section 2.5.13 below. In addition, 2.5.1, 2.5.2, 2.5.3, 2.5.7 and 2.5.8 will also apply to practitioners who hold privileges but not medical staff membership.

2.5.1   Immunity from liability

There shall be, to the fullest extent permitted by the law, immunity from civil liability arising from any act, communication, report, recommendation, or disclosure, performed at the request of an authorized member of the Hospital, medical staff or any other health care facility or accrediting/regulating agency for the purpose of improving or maintaining the quality and safety of patient care.

2.5.2   Right of Indemnification

The Hospital shall indemnify the legal related expenses of any medical staff member or practitioner that are incurred as a result of a third-party action arising from that practitioner's performance of assigned administrative/medical staff duties which were performed in good faith and in the best interest of the Hospital and proper functioning of the medical staff.

2.5.3   Right to Notification of Investigations

Members of the medical staff shall be notified if they are the subject of an Investigation (as defined in Volume II of these Bylaws) within seven days of the commencement of such investigation or as otherwise provided in these Bylaws.

2.5.4   Access to Committees

Members of the medical staff are entitled to be present at any medical staff committee meeting except during proceedings designated by the chair to involve peer review activities or when a committee is in executive session with only the voting committee members or others whose presence is specifically requested to provide relevant information in attendance. Presence at a meeting shall not entitle a member to speak unless permitted to do so by the committee chair. For MEC, Credentials Committee, and the Peer Review Committee, members may attend at the invitation of the respective chair.

2.5.5   Communication and Influence with MEC

Each member of the medical staff has the right to meet with the MEC on matters relevant to the responsibilities of the MEC. If the Chief of Staff determines that such member is unable to resolve a matter of concern after discussion with the appropriate committee or department chair or other appropriate medical staff

20

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

leader(s), that member may, upon written notice to and approval of the Chief of Staff at least two weeks in advance of a regular meeting of the MEC, meet with the MEC or an MEC subcommittee to discuss the issue. The Chief of Staff will have discretion regarding the meeting date, timing, and placement of the issue on the MEC agenda or direction of the issue to a subcommittee.

2.5.6   Right to Information

The MEC will promptly publish by letter or by post on a medical staff website and/or notification of active members by email, announcement of any pending or proposed changes to the Bylaws (Volumes I and II) thirty days in advance of a medical staff vote, for all active medical staff members to review and comment on.

The MEC will promptly publish by letter or by post on a medical staff website and/or by email all new policies, procedures, rules, or regulations enacted by the MEC and all changes or modifications to existing medical staff policies, procedures, rules, or regulations carried out by action of the MEC.

2.5.7   Access to Credentials Files

Each member shall be allowed an opportunity to review his own credentials or peer review/clinical performance file in the manner prescribed by the Medical Executive Committee or in accordance with relevant policies passed by the MEC.

2.5.8   Confidentiality

Effort shall be made to maintain as confidential any matter deemed to be confidential by Hospital or medical staff leaders, including matters concerning a medical staff member discussed in committee or by representatives of the medical staff. Medical staff members and other attending medical staff committee meetings will commit to treating such information as confidential, peer review protected material.

2.5.9   Recall of Elected Leaders

A member of the medical staff in the active category has the right to initiate a recall vote of medical staff officers in accordance with the recall provisions provided in these Bylaws.

2.5.10  Right to Initiate Meetings and Address Medical Staff Conflicts

A member of the medical staff in the active category may request a general medical staff meeting to discuss a matter relevant to the medical staff, including to address conflicts that may arise between the MEC and other medical staff members. Upon presentation of a petition signed by 25% of the members of the

**EXHIBIT 2, Page 21**

active category, the MEC shall schedule a general medical staff meeting within 30 days for the specific purposes addressed by the petitioners. No business other than that detailed in the petition may by transacted.

2.5.11  Right to Request Review of Policies

A member of the medical staff in the active category may raise a challenge to any rule, regulation, or policy established by the MEC. If presented by such a member with a signed petition by at least 25% of the active members of the medical staff, the MEC, acting through the Chief of Staff, shall do one of the following:
(a) Provide the petitioners with information clarifying the intent of such rule, regulation or policy and the justifications for its adoption; and/or
(b)Schedule a meeting with the petitioners to discuss the issues raised regarding the rule, regulation, or policy.

2.5.12  Right to Petition for Medical Staff Bylaws Amendments

Active medical staff members have the right to petition for an amendment to the medical staff bylaws in accordance with Section 11.2 of these bylaws.

2.5.13  Further Due Process Rights

The above sections on Member Rights (2.5.1 through 2.5.12) do not pertain to issues involving individual peer review or performance evaluation (including focused and ongoing professional practice evaluation), formal investigations of professional performance or conduct, denial of requests for appointment or privileges, restriction or conditions placed on appointment or privileges or any other matter relating to individual membership or privileges. Recourse regarding these matters is described in the Corrective Action and Fair Hearing Manual (Volume II) of the Bylaws.

### ARTICLE III
### CREDENTIALING AND THE DETERMINATION OF PRIVILEGES

3.1   Appointment and Reappointment to Medical Staff Membership and/or Clinical Privileges With and/or Without Membership

In accordance with these bylaws and relevant medical staff polices, eligible clinicians may be granted membership on the medical staff with privileges, membership on the medical staff without privileges or clinical privileges without medical staff membership. The following steps describe the process for credentialing (appointment and reappointment) of Medical Staff members and/or assignment for clinical privileges. *Associated details* may be found in the Medical Staff Credentials Procedure Policy.

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

a. Individuals interested in appointment to the medical staff may request an application from the Hospital or its designated agent along with a list of the eligibility requirements for membership. Individuals applying for initial medical staff membership or for reappointment must complete the appropriate application forms, including those to request specific privileges. Clinicians ineligible for or not seeking medical staff membership but who are eligible for privileges will complete the electronic application and electronic privilege requests that are available from the Hospital or its designated agent. Eligible practitioners will automatically be sent an electronic application for reappointment and/or renewal of privileges in a timely fashion to the St. Luke's email address.

b. Upon completion and submission of the application to the Hospital, an individual designated by the Hospital will review the contents and confirm that the applicant is eligible to have the application processed further. An application is considered complete only when all questions on the forms have been completed and the forms signed where applicable, associated fees are paid, all supporting information has been verified (including responses from references) and all information requested by committees of the medical or Board has been provided. An applicant for medical staff membership and/or privileges has the burden of providing a complete application, including all associated forms, and requested information. If the application shows the applicant is not eligible for membership and/or privileges, he/she will be notified that no further evaluation or action will occur regarding the application. At the discretion of the Medical Staff Services Department and the Chief of Staff or Chair of the Credentials Committee, an incomplete application will not be forwarded for further consideration to either the medical staff or Board. An application that remains incomplete for more than 60 days may be considered to have been voluntarily withdrawn. The St. Luke's Health System Credentials Verification Office (CVO) will complete primary source verifications on information in the application as required under accreditation requirements.

c. A completed and verified application will be forwarded by the Hospital to the appropriate department chair (or designee) for assessment. The application and completed department chair assessment will then be forwarded to the Credentials Committee. As part of a review of application, the Credentials Committee may seek additional information from the applicant or from any organizations or parties it believes can provide input relevant to its assessment. This may include input requested from one or more subject matter experts on the medical staff or from outside the medical staff. When the Credentials Committee has completed its evaluation of the application it will forward its recommendations regarding the application to the Medical Executive Committee.

d. The MEC will review the recommendation of the Credentials Committee regarding the application and at its discretion may further assess the application prior to forwarding its recommendation to the Board regarding membership, medical staff category, and privileges. The MEC may also refer an application back to the Credentials Committee if more information or evaluation concerning the applicant is necessary before it can render a recommendation to the Board.

**EXHIBIT 2, Page 23**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

e. The Board will review the recommendation of the MEC regarding the application and at its discretion may further assess the application prior to determining whether to grant the applicant membership and/or privileges and whether any restrictions or conditions should be attached to membership or clinical privileges. Membership and/or privileges will become effective upon action by the Board granting membership and privileges.

f. Applicants may appeal recommendations by the MEC and decisions made by the Board in accordance with provisions in the Medical Staff Corrective Action and Fair Hearing Manual of these Bylaws.

g. Failure of the MEC to act on an application within 120 days after receipt of the complete application will be construed as a positive recommendation to the Board.

3.2   Temporary, Disaster, and Emergency Privileges

Temporary, disaster and emergency privileges may be assigned to individuals in accordance with Hospital and medical staff policies and the associated credentialing and privileging details enumerated in the Medical Staff Credentials Procedure Policy. In accordance with this policy, when the disaster plan has been implemented, the Chief Executive Officer (or designee), COO/CNO, Department Chair or the Chief of Staff may use a modified credentialing process to grant disaster privileges after verification of the volunteer's identity and licensure.

3.3    Medical Staff Credentials Procedure Policy

*Associated details* elaborating on the credentialing and privileging process can be found in the Medical Staff Credentials Procedure Policy that will be adopted and amended from time to time by action of the MEC.


**ARTICLE IV**
**OFFICERS OF THE MEDICAL STAFF**


4.1   Officers of the Medical Staff

The officers of the Medical Staff shall be:

        Chief of Staff
        Chief of Staff Elect
        Secretary/Treasurer


4.2    Qualifications

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

Officers of the medical staff must satisfy the following criteria at the time of nomination and continually throughout the term of their office:

    a.  be an appointee to the active medical staff category and have been a member of the medical staff for at least two years;

    b.  have no pending adverse recommendation before the Board concerning medical staff appointment or clinical privileges;

    c.  have constructively participated in medical staff activities, including, but not limited to activities such as performance improvement, peer review, and credentialing;

    d.  have the ability and be willing to discharge faithfully the duties and responsibilities of the position;

    e.  have some experience in a leadership role at a medical institution or group practice (e.g., department chair, committee chair or member, service line or division chief) or other involvement in performance improvement functions for at least a year;

    f.  be willing to attend continuing education programs relating to medical staff leadership and/or peer review and credentialing functions prior to or during the term of office;

    g.  be in compliance with all policies of the medical staff and Hospital, including any Conflict of Interest Policies;

    h.  have demonstrated an ability to work well with and communicate well with others;

    i.  may not, at any other health system or hospital, be the chief medical officer, a department chair or service chief, medical staff officer or a medical staff executive committee member;

    j.  may not be serving in a Hospital executive role, including but not limited to Chief Medical Officer;

    k.  the Chief of Staff will be Board certified in his/her specialty.

4.3   <u>Selection</u>

A medical staff ad hoc Nominations Committee will be appointed approximately four (4) months in advance of the annual general medical staff meeting in years where elections will be held. The committee will elect one of its members to serve as Chair. The Nominations Committee shall select nominees for placement on the election ballot for all officers. The members of the ad hoc Nominations Committee will be appointed by the Chief of Staff who will chair the committee. The Chief of Staff shall appoint members to the Nominations Committee with a goal of achieving some diversity representation. This diversity shall take into consideration gender, specialty, age, race, and practice location. At least one member of the Nominations Committee will be a past Chief of Staff. The Hospital CMO shall be a non-voting ex officio member of the Nominations Committee. No member of the Nominations Committee may be considered for an upcoming elected position.

The ad hoc Nominations Committee will meet at least 90 days prior to the general medical staff meeting at which the results of the election will be announced. The

25

committee will produce a slate of nominees with at least one name placed on the ballot for each open position.

The ad hoc Nominations Committee shall circulate and formally post the slate of nominees to the active members of the medical staff at least 45 days prior to the annual meeting at which election results will be announced. Such posting may occur electronically (e.g., email, website, or electronic bulletin board) or by postal mail.

A petition signed by at least 25 percent of active members may also make nominations for officers. Such petition must be submitted to the chair of the ad hoc Nominations Committee at least 30 days prior to the election for placement on the ballot. Any candidate(s) nominated by petition must be confirmed by the Nominations Committee to meet the qualifications for the medical staff officer position before he or she can be placed on the ballot.

4.4    Election

The medical staff officers shall be chosen using a secret ballot which will be distributed to all eligible voting members of the medical staff by postal mail, or electronically. The deadline for return of ballots will be no less than 14 calendar days from the date of distribution. This election will occur prior to the annual medical staff meeting in accordance with the timelines outlined above. The election will be scheduled by the MEC, and the elected officers will be announced at the annual medical staff meeting or through electronic communication to all medical staff members. The mechanics of distributing ballots and counting votes will be determined by the MEC. Only members of the active medical staff shall be eligible to vote. The winner of an election shall be the individual who received the greatest number of votes from active medical staff members who voted. Voting by proxy is not permitted. The Chief of Staff Elect will assume the Chief of Staff office without a vote upon completion of their term as Chief of Staff Elect.

All newly elected officers shall assume office on January 1st following their election.

4.5    Term

Officers shall serve a term of two years from the first day of January following their election. There is no limit on the number of terms an individual may serve.

4.6    Duties of Elected Officers

a. Chief of Staff:
The Chief of Staff shall serve as the chief administrative officer and principal elected official of the Medical Staff. As such, he/she shall be responsible for implementing the general responsibilities of the medical staff, including, without limitation:

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

1) Facilitating the coordination of medical staff activities with the applicable activities and concerns of the Board, Hospital Administration, nursing leadership and other managers of patient care services.

2) Assuming responsibility for the enforcement of these Bylaws, Hospital policies as applicable to practitioners, and medical staff rules, regulations, or policies, and for implementation of appropriate sanctions where indicated, and for the medical staff's compliance with procedural safeguards in all instances where appropriate, as provided under these Bylaws.

3) Collaborating with the MEC and the Administration of the Hospital and St. Luke's Health System to account to the Board and medical staff, for the quality, efficiency and performance of patient care services delivered by privileged practitioners within the Hospital.

4) Developing and implementing, in coordination with the Hospital, other medical staff leaders and experts, continuing education programs, utilization review activities, performance improvement programs, and methods for credentials review, delineation of privileges and the monitoring of the quality of patient care.

5) Communicating and representing the concerns and recommendations of the medical staff to the Chief Medical Officer, the Hospital CEO (or designee), the Board and other leaders of the medical staff and Hospital.

6) Calling, setting the agenda, and presiding at all general and special meetings of the medical staff.

7) Serving as a voting member of the MEC and as an ex-officio member of all the other medical staff committees without the right to vote.

8) Appointing the members of all standing, special, and multi-disciplinary medical staff committees, except the MEC, in consultation with the chair of each such committee except as such committee membership is otherwise determined by medical staff policy or these bylaws.

9) Reporting to the Board (or designated Board subcommittee) on quality of care and performance improvement issues as recommended by the medical staff.

10) Representing the medical staff in its professional and community relations.

11) Upon request from the Hospital, serving as a liaison to outside accreditation or licensing agencies.

12) Performing all other functions as are typically performed by the elected Chief of Staff or assigned by the MEC.

27

**EXHIBIT 2, Page 27**

13) Attending a minimum of 75% of MEC meetings and Board meetings to which he/she is invited over the two-year term of office.

14) Attend meetings of the Board when invited.


b. Chief of Staff Elect

The Chief of Staff Elect will assume the duties of Chief of Staff whenever the individual in that role is unavailable or unable to perform those duties. The Chief of Staff Elect will be a member of the MEC and will carry out all duties delegated to him or her by the Chief of Staff or MEC. The Chief of Staff Elect shall be expected to attend a minimum of 75% of all MEC meetings over the two-year term of office. The Chief of Staff Elect shall attend meetings of the Board when invited.

c. Treasurer

The Treasurer shall present a report of the financial status of the Medical Staff and an audit of Medical Staff funds at the annual Medical Staff meeting. Be responsible for the oversight of the distribution of Medical Staff funds; serve as a member of the MEC; provide direct supervision of the counting of ballots for the election of Medical Staff Officers; and serve on other committees as appointed.


4.7   Removal

a. A recall election of an officer shall be held if requested through a petition signed by no fewer than 25% of the active members of the Medical Staff, there is a request signed by at least two-thirds of the members of the MEC, or there is a request made by the Board. Officers may be removed by an affirmative vote of more than two-thirds of the active medical staff present and voting at any general or special meetings of the medical staff, in circumstances where the medical staff believes removal is necessary to protect the interests of the medical staff and/or Hospital. The following conditions constitute a reasonable basis for removal of an officer from office:

1) Failure to comply with or support enforcement of the medical staff Bylaws, medical staff rules, regulations, or polices;
2) Failure to abide by Hospital policies and procedures;
3) Failure to perform the required duties of the office;
4) Failure to adhere to professional ethics;
5) Abuse of office;
6) Conduct unbecoming a medical staff member and officer;
7) Failure to continuously meet the qualifying criteria to be an officer as set forth above in these Bylaws;
8) Failure to comply with the obligations of medical staff membership.

This list is not meant to be an exhaustive enumeration of possible grounds for recall from office.

28

**EXHIBIT 2, Page 28**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

b. At least ten (10) days prior to the initiation of any removal action, they shall be given special notice of the date of the meeting at which action is to be considered. The individual shall be afforded an opportunity to speak to the medical staff prior to a vote on removal.

c. Automatic removal will occur (without need for a vote) in the event any of the following affect the Officer in question:
a) Loss or suspension of the officer's medical license in the State of Idaho and/or Oregon;
b) Ineligibility of membership in the active category;
c) A recommendation by the MEC or the Board for the imposition of corrective action.

4.8     Vacancy in the Position of Chief of Staff

If the Chief of Staff is temporarily unable to fulfill the responsibilities of the office, the Chief of Staff Elect shall assume these responsibilities until the Chief of Staff can resume those duties. When the position of Chief of Staff is vacant for more than 60 days or otherwise becomes permanently vacant, as determined by the MEC, the Chief of Staff Elect will assume this position for the remainder of the existing term. If the Chief of Staff Elect is unable to assume this role, the Immediate Past Chief of Staff will serve as Chief of Staff for the remainder of the existing term. If no officer is able to serve, an election for the Chief of Staff will be held.

4.9     Vacancy of Chief of Staff Elect

If the Chief of Staff Elect is temporarily unable to fulfill the responsibilities of the office, the Chief of Staff shall assume these responsibilities or delegate them to an MEC member until the Chief of Staff Elect can resume those duties. In the event the position of Chief of Staff Elect becomes vacant for longer than 60 days or otherwise becomes permanently vacant, as determined by the MEC, the Chief of Staff will identify an individual to fill the position until the next regularly scheduled election for Officers. Such an appointment by the Chief of Staff must be ratified by a majority vote of the MEC and the Board.

4.10    Vacancy in the Position of Immediate Past Chief

If the Immediate Past Chief is not willing or able to service, this position shall remain vacant until a new Immediate Past Chief is available to fill the position.

**ARTICLE V**
**CLINICAL ORGANIZATION OF THE MEDICAL STAFF**

29

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

The medical staff of St. Luke's Regional Medical Center is a departmentalized organization that carries out its responsibilities through clinical departments and divisions, committees and individuals assigned specific tasks.

5.1   Designation of Medical Staff Departments

The medical staff shall be divided into the following clinical departments: Medicine, General Surgery, Department of Surgical Sections, Orthopedics, Cardiac & Vascular, Emergency Medicine, Family Medicine, Medical Imaging, Obstetrics & Gynecology, Oncology, Pathology, Pediatrics, and Anesthesiology. The MEC will determine which clinical specialties are assigned to which particular department.

The Hospital Board, contingent upon recommendation endorsed by at least two-thirds of the members of the MEC, may eliminate, consolidate, or create additional medical staff departments where this would improve the effectiveness of the medical staff in carrying out its responsibilities.

5.2   Organization of Medical Staff Departments

Each medical staff department shall have a qualified chair who has the authority, duties, and responsibilities set forth in these Bylaws. Each department is accountable to the oversight and authority of the MEC and the Board. Each department may organize itself into sections with the approval of the Department and MEC where this would enhance the efficiency and effectiveness of medical staff activities. Approved departmental sections and their responsibilities will be described in medical staff policies adopted from time to time by the MEC.

5.3   Functions of Medical Staff Departments

a.   Review and Evaluation Activities

The primary responsibility delegated to each medical staff department shall be to implement and conduct specific review and evaluation activities that contribute to the preservation and improvement of the quality and efficiency of patient care provided by members of that clinical department. These may include discussion of information relevant to the care and treatment of patients served by members of the department along with the detailed consideration of relevant cases, including, without limitation, operative and other procedure review, medical record review, efficiency of clinical practice patterns, significant departures from established patterns of clinical practice, quality and peer review reports, patient safety initiatives, and medical assessment and treatment of patients within the clinical department and the Hospital. Some or all of this work may be performed on behalf of the department by interdisciplinary committees of the medical staff and/or Hospital as well as coordination of call coverage and other patient coverage arrangements within the department. The department will also provide information or

30

**EXHIBIT 2, Page 30**

recommendations when requested by the MEC or another medical staff committee regarding medical staff policies and procedures, issues of standard of practice and/or clinical competence, criteria for clinical privileges, or indicators for the monitoring of clinical performance, and any other functions deemed necessary by the department.

b.    Additional Activities

At the discretion of department members and its chair, the department may organize and promote any of the following collegial and professional activities: continuing medical education; communication and dialogue regarding issues relevant to members of the department; social networking; and interdisciplinary projects and coordination.

c.    Member Accountability

Members assigned to the department are accountable to the department chair and must be responsive to requests for information, participation in departmental activities, participation in any mandatory special meetings, and compliance with Hospital, medical staff, or department rules, regulations, policies, procedures, or requirements.

5.4   <u>Department Chair</u>
a. Qualifications

Each department chair shall be:

1) A member of the active staff category and assigned to the relevant department;
2) Board certified by a specialty board recognized by the ABMS,  AOA, Royal College of Physicians and Surgeons of Canada, or found to have comparable competency by actions of the Credentials Committee and MEC;
3) Qualified by experience (5 years on the active medical staff for department chairs and two years on the active medical staff for section chairs) within the department and/or by administrative ability to supervise the functions of the department; and
4) Willing and able to discharge the functions of the department chair.
5) In extenuating circumstances, the Chief of Staff shall be allowed to appoint a department/section chair if the minimum year requirements have not been met.

b. Selection and Term

Each department chair shall be elected every two years. The term of office will be two years and there will be no limitation on the number of successive terms that may be served. Only members of the active medical staff assigned to the department shall be eligible to cast a vote. Any department member who meets the qualifications in 5.4(a) above may run for department chair. In advance of the election, nominees for the department chair must be approved by the MEC as

qualified and elections shall be held in a manner specified by the Medical Staff Services Department and approved by the MEC. The individual garnering the most votes in the elections for department chair shall assume the office on January 1st of the year following the election.

5.5     Removal of a Medical Staff Department Chair

Upon petition by twenty-five percent (25%) of department members in the active category or upon recommendation of the MEC, a recall vote shall be held. The chair shall be removed if 2/3 of votes cast by department members support recall or by a 2/3 vote cast by members of the MEC in favor of removing the department chair. Any recall votes regarding a department chair shall be arranged by the Chief of Staff with the assistance of the Medical Staff Services Department.

5.6     Department Chair Responsibilities

Each department chair shall have responsibility for the organization and administration of the department, including, without limitation:

a)  All clinically related activities of the department;
b)  All administratively related activities of the department (including presiding at all meetings of the department), unless otherwise provided for by the Hospital;
c)  Continuing surveillance of the professional performance of all individuals in the department who have delineated clinical privileges;
d)  Recommending to the medical staff the criteria for clinical privileges that are relevant to the care provided in the department;
e)  Recommending clinical privileges for each member of the department;
f)  Assessing and recommending to the relevant Hospital authority off-site sources for needed patient care services not provided by the department or the organization;
g)  The integration of the department or service into the primary function of the Hospital;
h)  The coordination and integration of inter-departmental and intra-departmental services;
i)  The development and implementation of policies and procedures that guide and support the provision of care, treatment, and services;
j)  The recommendations for a sufficient number of qualified and competent persons to provide care, treatment, and services;
k)  Advising on the qualifications and competence of department or service personnel who are not licensed independent practitioners and who provide patient care services;
l)  The continuous assessment and improvement of the quality of care, treatment, and services;
m) The maintenance of quality control programs, as appropriate;
n)  The orientation and continuing education of all persons in the department;
o)  The recommendation to the MEC of criteria for Focused Professional Practice Evaluation (FPPE) of new members of the department or those requesting new privileges, and;
p)  Recommendations for space and other resources needed by the department.

32

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

    q) Responsibility for the coordination of call coverage for the department/section.

    r) The department chair of Family Medicine may serve as the joint chair of both the St. Luke's Family Medicine Department and the St. Alphonsus' Family Medicine Department.

5.7    <u>Vacancies in the position of Department Chair</u>

If the position of Department Chair becomes permanently vacant, as determined by the MEC, the Chief of Staff shall arrange for a new election to take place to fill the position for the remainder of the vacated term. This election should take place as soon as practicable but no later than sixty days.

5.8    <u>Departmental Meetings</u>

Departments shall meet on an as-needed basis when called by the department chair, but no less than quarterly. The department chair who shall conduct the meeting will establish the agenda for such meetings. A quorum for carrying out business shall be those voting members present, but no less than two. The action of a majority of the voting members present at a meeting shall represent the action of the department. Attendance at department meetings will be maintained and shall include a record of actions taken, issues discussed, and members in attendance.

5.9    <u>Clinical Sections</u>

    a) The MEC may recognize any group of practitioners interested in forming a Clinical Section as a part of a currently organized department. Such a Clinical Section may exist to perform any of the following:
1. Assist medical staff peer review committees in the performance of peer evaluations and chart reviews.
2. Provide a vehicle for discussion of policies and procedures or equipment needs in a specialty or service line area.
3. Develop recommendations for submission to the Department and subsequently to the MEC.
4. Participate in the development of criteria for clinical privileges when requested for input by the Credentials Committee or MEC.
5. Participate in the development of clinical protocols when asked by the MEC, the Department, or an appropriate medical staff committee.
6. Discuss a specific issue at the request of a medical staff committee.

Such a Clinical Section could also perform the following:
1. Offer continuing medical education and promote forums for the discussion of patient care issues.
2. Sponsor "grand rounds", peer review protected morbidity & mortality (M&M) conferences, or clinic-pathologic conferences (CPCs).
3. Create an opportunity for networking and collegial interaction among practitioners with common interests.

**EXHIBIT 2, Page 33**

b)  Clinical Sections are required to hold regular meetings, keep minutes, and track attendance.

5.9.1   <u>Section Chair Responsibilities</u>

The chair of the section will be responsible for the following:
a)  All clinical related activities of the section;
b)  All administratively related activities of the section, unless otherwise provided for by the medical center;
c)  Continuing surveillance of the professional performance of all individuals in the section who have delineated clinical privileges;
d)  Recommending criteria for clinical privileges that are relevant to the care provided in the section;
e)  Evaluating requests for clinical privileges for each member of the section;
f)  The integration of the section into operations and functions of the medical center;
g)  The development and implementation of section policies and procedures that guide and support the provision of services;
h)  Recommendation to the Department, MEC and the Board regarding a sufficient number of qualified and competent persons to provide care of services within the section;
i)  Determination of the qualifications and competence of section personnel who provide patient care services;
j)  Continuous assessment and improvement of the quality of care, treatment, and services provided by the section;
k)  Maintenance of section quality monitoring programs; as appropriate;
l)  Recommendations regarding continuing education of all persons in the section;
m)  Implement section procedures, in cooperation with the Department Chair and consistent with the provisions of these Bylaws, that guide and support the provisions of services, the orientation and continuing education of all persons in the section and the development of criteria for clinical privileges;
n)  Attend all required meetings and follow section and department rules and regulations;
o)  Responsibility for the coordination of call coverage for members within the section;
p)  Recommendations to the Department Chair of criteria for Focused Professional Practice Evaluation (FPPE) of new members of the section or those requesting new privileges.


**ARTICLE VI**
**<u>MEDICAL STAFF COMMITTEES AND LIAISONS</u>**


6.1   <u>Types of Committees</u>

There shall be an executive committee of the medical staff (referred to in these Bylaws as the Medical Executive Committee or MEC) and standing committees of the medical staff accountable to the MEC as may be established in these Bylaws or created by the MEC from time to time to accomplish medical staff functions. Additional ad hoc committees may be created by action of the MEC or Chief of Staff to address specific time-limited issues or problems.

The medical staff shall also carry out its responsibilities through participation in committees of the Hospital and/or through individual members who act as liaisons to Hospital departments or staff.

A current list of standing and ad hoc medical staff committees will be maintained in the Medical Staff Services Department. Medical staff members serving on hospital committees and medical staff members performing other hospital functions at the request of the Hospital will be documented by the Hospital and such documentation shall be available to the MEC on request.

In addition to the MEC, standing committees of the medical staff will include (but are not limited to): Credentials Committee, Peer Review Committee, Ethics Committee, Cancer Committee, Endoscopy Standards CommitteeThrombology Committee, and Wellness Committee. Descriptions of these committees, including membership composition and designated duties, will be described in medical staff policies.

The population health Quality Management Committee is co-chaired by a member of the Medical Staff and includes medical staff quality and patient safety initiatives. The Quality Management Committee reports pertinent information to the Medical Executive Committee on a regular basis.

6.2    Committee Chairs

a.   Selection: Except for the MEC or unless stated otherwise in these Bylaws or applicable medical staff policy, the chair of each standing and ad hoc medical staff committee shall be appointed, and vacancies filled, by the Chief of Staff.

b.   Term: Unless specified otherwise in these Bylaws, each chair of a standing committee shall be appointed to a term of two years unless relieved of his/her responsibilities earlier by action of the MEC. Chairs of ad hoc committees will have terms established when the committee is formed. Any chair may serve for an unlimited number of terms.

6.3    Membership and Appointment to Committees

1.   Eligibility and Appointment

a)   Unless specified otherwise in these bylaws, the Committee Chairs may appoint all medical staff committee members after consultation with the Chief of Staff.

**EXHIBIT 2, Page 35**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

The MEC will review the membership of all medical staff committees on an annual basis.

b)  All members of the medical staff in the active and associate categories shall be eligible for appointment as voting members to one or more committees of the medical staff established to perform one or more of the functions required by these Bylaws.

c)  Where specified in these Bylaws, or where the Chief of Staff deems it appropriate to the functions of a committee of the medical staff, members of the Emeritus category and representatives from various services of the Hospital, including, without limitation, Administration, Laboratory, Nursing, Informatics, Quality Management and Pharmacy Services, shall be eligible for appointment to a committee. Participation of these individuals will be in a non-voting capacity unless specified otherwise in these Bylaws or applicable medical staff policy.

d)  In making appointments to medical staff committees, the Chief of Staff will have discretion to determining the committee size, unless otherwise specified in these Bylaws or applicable medical staff policy.

2.  Hospital Chief Medical Officer (CMO)

Unless otherwise provided in these Bylaws, the Hospital's CMO or designee shall serve as an ex-officio member, without a vote, on all medical staff committees.

3.  Voting

Only medical staff and APP members in the active or associate category may vote on medical staff committees, unless specified otherwise in these Bylaws or applicable medical staff policies.

4.  Term

Unless specified otherwise in these Bylaws, each medical staff committee member shall be appointed to a term of two years and may be reappointed as often as the individual is willing to serve or the party responsible for such appointment may deem such appointment advisable.

6.4   Medical Executive Committee

1.  Membership

Only medical staff members in the active category are eligible for voting MEC membership.

2.  Composition

The MEC shall consist of the following voting members;
a)  Chief of Staff who will serve as the MEC Chair
b)  Chief of Staff Elect
c)  Secretary/Treasurer

36

**EXHIBIT 2, Page 36**

    d)  Chair of each medical staff clinical department
    e)  Credentials Committee Chair
    f)  Population Health Quality Management physician Co-Chair

Additionally, the MEC in its discretion may invite one community member for the Hospital to serve as an ex officio member of the MEC with vote. If the MEC chooses to exercise this option, it shall make that decision by formal action and record its decision in a written and signed resolution or in the minutes of the meeting at which the decision is made.

The following will be **non-voting** ex officio members of the MEC:
    Hospital Chief Executive Officer (or designee),Chief Medical Officers (CMO), the Chief Nursing Officers (CNO), Residency representative, board representative, Peer Review Committee Chair, and APP Committee co-chairs.

The MEC may invite to its meetings additional guests as needed to assist in carrying out its work. At the discretion of the MEC Chair (Chief of Staff or designee) any portion of an MEC meeting may be restricted to the attendance of MEC members and invited guests.

3.   Automatic Removal from the MEC

Membership on the MEC will automatically terminate if an individual is removed or vacated his or her position as an officer or the ex officio position that entitled him or her to MEC membership.
Additional grounds for removal from the MEC include, but are not limited to:
    a)  Failure to meet the attendance requirements for MEC members;
    b)  Disruptive conduct at MEC meetings; and/or as defined in the medical staff Code of Conduct policy;
    c)  Failure to carry out assigned duties as an MEC member.

Such removals will occur if recommended by a vote of at least two-thirds of the current voting members of the MEC. The member being reviewed may not vote.

Physician members of the MEC will be considered to have voluntarily resigned from the committee if any of the following occur:
    a)  Termination or suspension of the member's license to practice in the State of Idaho;
    b)  Loss of membership on the active category;
    c)  The MEC recommends to the Board that the member be subject to corrective action.

4.   Responsibilities of the MEC
    a)  The MEC shall represent the medical staff, act on matters of concern and importance to the medical staff, and act at all times as the authorized delegate of the medical staff in regard to general and specific functions of the medical staff.

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

b) The MEC will work collaboratively with the hospital administration, systems, and structures to ensure that the highest level of patient care is delivered in the most effective manner possible.

c) The MEC is empowered to act for the medical staff in intervals between general medical staff meetings.

d) The MEC receives and acts on reports and recommendations from medical staff committees, clinical services, Hospital committees, consultants, and other relevant individuals.

e) The MEC consults with the Hospital Administration and the Board on quality-related aspects of contracts for patient care services, equipment, and materials with entities outside the Hospital.

f) The MEC formulates or approves medical staff policies consistent with these Bylaws.

g) The MEC carries out investigations in accordance with Corrective Action and Fair Hearing Procedures, Volume II of these Bylaws, before making recommendations to the Board to terminate, limit or restrict a practitioner's membership or privileges.

h) The MEC is responsible for making medical staff recommendations directly to the Board for its approval. Such recommendations pertain to at least the following:

   1) The medical staff's structure;
   2) The mechanism used to review credentials and to delineate individual clinical privileges;
   3) Recommendations of individuals for medical staff membership;
   4) Recommendations for delineated clinical privileges for each eligible individual;
   5) The participation of the medical staff in organization performance improvement activities;
   6) The mechanism by which medical staff membership may be terminated;
   7) The mechanism for investigation, corrective action and fair-hearing procedures;
   8) The MEC's review of and action on reports of medical staff committees, clinical services, and other assigned activity groups.

5. Regular Meetings

   The MEC shall hold at least 10 regular meetings per year and maintain a permanent record of all proceedings and actions at its meetings. The Chief of Staff or designee will preside at all meetings of the MEC.

6. Call of Special Meeting

   The Chief of Staff may call special meetings of the MEC at any time and will respond promptly to the Hospital CEO's (or designee's) request for such a meeting to allow the Hospital to communicate urgent matters to the MEC in a timely manner. Such meetings may be held in person or through telephonic or electronic conferencing.

**EXHIBIT 2, Page 38**

7.  Notice

Notice of a special meeting of the MEC shall be by means of facsimile, telephone, posting of notice, or email.

8.  Review of MEC Minutes

Members of the medical staff may review MEC minutes in the Medical Staff Services Department. Review must be in the presence of the Chief of Staff, Director of Medical Staff Services, or his/her designee. MEC minutes may not be photographed or copied and the individual reviewing the minutes must sign a confidentiality statement prior to review.

6.5   Medical Staff Representation on Hospital Committees

To further carry out the functions of the medical staff and to provide medical staff input where appropriate, the Hospital CEO (or designee), in consultation with the Chief of Staff, may appoint medical staff members to Hospital committees or to other hospital workgroups or committees as needed or as designated in an applicable policy. When medical staff members sit on a Hospital committee, the minutes of that committee shall be available to the MEC upon request. It shall be the responsibility of the medical staff member(s) sitting on a Hospital committee to bring to the attention of the MEC or a medical staff Officer any matter brought before such committee that requires the attention of the medical staff leadership.

6.6   Medical Staff Liaisons

When the medical staff is required by regulatory bodies or internal policies to collaborate with Hospital staff in carrying out a particular function, the Chief of Staff, in consultation with the Chief Medical Officer, may appoint a member of the medical staff to serve as a formal liaison for that work. The liaison will report periodically to the MEC or other appropriate medical staff committee when matters require the attention of medical staff leaders.

6.7   Special or Ad Hoc Committees

The Chief of Staff or the MEC may appoint special or ad hoc committees to address specific issues or concerns on behalf of the medical staff. In establishing such committees, there will be a notation made in the minutes of the MEC enumerating the committee's purpose and charge, timeframes for its work, and the duration of its appointment. Such committees will report to and be accountable to the MEC.

**ARTICLE VII**
**GENERAL MEDICAL STAFF MEETINGS**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

7.1     General Medical Staff Meetings

    1. Frequency & Content

There shall be at least one meeting of the entire medical staff held each calendar year. Thirty days prior to the 3rd Tuesday in February, written notice of a general staff meeting shall be sent to all medical staff members in a manner determined reasonable and appropriate by personnel in the Medical Staff Services Department. The MEC shall determine the time and place at which such meetings shall be held. The Chief of Staff may call additional general meetings for any reason he/she deems appropriate, including to promote communication with the medical staff, provide a forum for discussion on matters of medical staff interest, review quality and safety data and concerns, present educational programs, facilitate communication with Hospital administration and Board, or address proposed changes to the Medical Staff Bylaws.

7.2     Special Meetings of the Medical Staff

    1. Call of Special Meeting

A special meeting of the medical staff may be called at any time by the Chief of Staff and shall also be called at the request of the Board, the MEC, or in response to a petition presented to the Chief of Staff and signed by 25% of the active medical staff. No business shall be transacted at any special meeting, except that for which the meeting is called and stated in the notice of such meeting.

    2. Notice

Notice stating the time, place, and purpose(s) of any special meeting of the medical staff shall be conspicuously posted and shall be sent to each member of the medical staff at least seven days before the date of such meeting in a manner determined by the Medical Staff Services Department. The attendance of a member of the medical staff at the meeting shall constitute a waiver of notice of such meeting.

7.3     Attendance at General Medical Staff Meetings

Members of the medical staff are encouraged to attend general medical staff meetings.

7.4     Quorum

Those active staff members present shall constitute a quorum at a general medical staff meeting.

7.5     Minutes

EXHIBIT 2, Page 40

Minutes of each regular and special meetings of the medical staff shall be prepared and shall include a record of the attendance of members and any votes taken on matters presented at the meeting. The minutes shall be maintained in a permanent electronic file. Minutes shall be made available to any medical staff member upon request, in a manner that protects the confidentiality of peer review information consistent with state peer review protection statutes. The member will be required to sign a confidentiality statement and may not photograph or copy the minutes. Review must be in in the presence of the Chief of Staff, Director of Medical Staff Services, or his/her designee.

7.6     Conduct of Meetings

Meetings of the medical staff will be chaired by the Chief of Staff (or designee) and will be run in a manner determined by the chair who presides at such a meeting. Compliance with rules of parliamentary procedure is ***not*** required.

## ARTICLE VIII
## COMMITTEE MEETINGS

8.1     Regular Meetings

Medical staff committees may, by resolution, establish the time for holding regular meetings without providing their respective members notice other than by announcement of such resolution in meeting minutes.

8.2     Special Meetings

A special meeting of any committee may be called by or at the request of its chair, by the Chief of Staff, or by written request signed by 25% of the current members of the committee, but not by fewer than two such members. Special committee meetings will be held within a reasonable period of time as determined by the chair.

8.3     Notice of Meetings

Written, electronic, or oral notice stating the place, day, and hour of any regular or special meeting shall be provided to each member of the committee. Unless urgent circumstances warrant, notice shall be given not less than three days before the time of such meeting. If mailed, the notice of the meeting shall be posted to the member, at his or her address as it appears on the records of the medical staff, at least seven days before the meeting. The attendance of a member at a meeting shall constitute a waiver of notice of such meeting.

8.4     Quorum

41

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

A quorum for the MEC to take an action is fifty percent (50%) of voting members. A quorum for the Medical Staff Credentials Committee and the Medical Staff Multidisciplinary Peer Review Committee is fifty percent (50%) of voting members to take an action. For all other medical staff committees, unless otherwise specified in these Bylaws or applicable policy, a quorum will be those voting members present, but not less than two. No quorum is required to discuss business at any committee meeting.

8.5     Manner of Action

The action of a majority of the members participating in a committee meeting at which a quorum is present shall be the action of such committee. Action may be taken without a meeting by unanimous consent in writing or via electronic confirmation, setting forth the action so taken and signed by each member who was entitled to vote at that meeting.

8.6     Minutes

Minutes of the meeting of medical staff committees shall be prepared, including a record of the members in attendance and the results of any votes taken at the meeting. All minutes shall be made available to the MEC. Each medical staff committee shall maintain an electronic file in the Hospital Medical Staff Services Department of the minutes of each meeting. Minutes shall be made available to any committee member upon request, in a manner that protects the confidentiality of peer review information consistent with state peer review protection statutes. The member will be required to sign a confidentiality statement and may not photograph or copy the minutes. Review must be in the presence of the Chief of Staff, Director of Medical Staff Services, or his/her designee.

8.7     Attendance Requirements

Members of the MEC are expected to attend seventy-five percent of committee meetings held each year unless excused by the Chief of Staff. The Chief of Staff may grant permission of MEC members to participate in meetings by teleconference. Only the Chair Elect or immediate Past Chair may attend in the Department Chair's absence.

Members of the Medical Staff Credentials Committee and the Medical Staff Multidisciplinary Peer Review Committee are expected to attend at least fifty percent of meetings held each year unless excused by the committee chair. Failure to meet the attendance requirements of these committees will make the member eligible for removal by action of the Chief of Staff with ratification by a two-thirds majority of the MEC. Attendance is encouraged, but not required, for continuing membership on other medical staff committees.

8.8     Mandatory Special Appearance Requirement

EXHIBIT 2, Page 42

Whenever suspected deviation from standard clinical or professional practice is identified, a practitioner may be required to attend a meeting of a standing or ad hoc committee considering the matter. The practitioner will be given special notice of the meeting, including the date, time and place, a statement of the issue involved and a statement that the practitioner's appearance is mandatory. Failure to attend a specially noticed meeting when requested is handled in accordance with Article III of the Corrective Action and Fair Hearing Manual (Volume II of these Bylaws).

**ARTICLE IX**
**CONFIDENTIALITY, IMMUNITY, AUTHORIZATIONS AND RELEASES**

9.1     Agreements, Authorizations and Releases

Each medical staff member or practitioner granted privileges shall, when requested by the Hospital, as part of initial appointment or reappointment to the medical staff or as part of an application for privileges, execute general and specific releases and provide documents when requested by the Chief of Staff, Chair of the Credentials Committee, the Hospital CEO, or their designees. Failure to execute such releases or provide requested documentation shall result in an application for appointment, reappointment and/or clinical privileges being deemed voluntarily withdrawn and it shall not be further processed. By submitting an application for medical staff appointment or reappointment or by applying for or exercising privileges or providing specified patient care services within the Hospital, all applicants and practitioners, without limitation:

1. Authorize representatives of the Hospital and of the medical staff to solicit, procure, provide and/or act upon information bearing on or reasonably believed to bear upon the practitioner's professional abilities and qualifications;

2. Agree to be bound by the provisions of these Bylaws and Hospital policies, medical staff rules, regulations and policies regardless of whether membership or clinical privileges are granted or subsequently restricted;

3. Agree to actively participate in recognized functions as required or requested, including performance improvement, peer review, risk and utilization management, medical records completion, and the discharge of other medical functions, medical staff committee and clinical service obligations as may be required.

4. Acknowledge that the provisions of this Article are express conditions to an application for, or acceptance of, medical staff membership and the continuation of such membership and/or the exercise of privileges or provision of specified patient care services at the Hospital;

5. Agree to release legal liability and hold harmless the Hospital, medical staff and any representatives of the Hospital or medical staff who acts to carry out medical staff or Hospital policies or functions, including all persons engaged in

processing medical staff applications and reapplications as well as those who participate in peer review and performance improvement activities. In addition, all applicants and practitioners agree that their sole remedy for any corrective action or peer review action taken or recommended by the MEC or Board for failure to comply with these Bylaws or medical staff or Hospital policies, will be the right to seek legal or equitable relief after they have exhausted the administrative remedies in these Bylaws.

6. Agree to release from legal liability and hold harmless any individual or entity that provides information (including peer review information) regarding the applicant to the Hospital or its representatives within the limitations provided by law;

7. Agree to consent to drug testing in a manner designated in the Impaired Physician Policy, by any two of the following: an officer of the medical staff, department chair, the Hospital CEO (or designee), or the Chief Medical Officer because of suspicion of improper use of a restricted or illegal substance and/or impairment of ability to safely care for patients. Agree that a failure to consent may result in precautionary suspension pursuant to the applicable provisions of the Medical Staff Corrective Action and Fair Hearing Manual; however, before the imposition of a precautionary suspension, the member may be given an opportunity to (i) voluntarily resign medical staff membership and/or privileges permanently or (ii) agree not to exercise privileges pending an investigation.

8. Agree to consent to physical, cognitive, or neuropsychological testing in a manner designated in the Impaired Physician Policy by any two of the following, officer of the medical staff, department chair, the Hospital CEO or designee, or the Chief Medical Officer because of suspicion of decline in capacity and/or impairment of ability to safely care for patients. Agree that a failure to consent may result in precautionary suspension pursuant to the applicable provisions of the Medical Staff Corrective Action and Fair Hearing Manual; however, before the imposition of precautionary suspension, the member may be given an opportunity to (i) voluntarily resign medical staff membership and/or privileges permanently or (ii) agree not to exercise privileges pending an investigation.

9.2     Confidentiality

Information with respect to any practitioner submitted, collected, or prepared by any representative of the Hospital or any other health care facility or organization or medical staff, for the purpose of evaluating and improving quality patient care, reducing morbidity or mortality, promoting efficiency, or contributing to medical education or clinical research, shall, to the fullest extent permitted by the law, be confidential except as otherwise provided herein. Confidential information shall not be disseminated to anyone other than a representative(s) of the Hospital or of the medical staff with a legitimate need for access in order to carry out required functions or to third party health care entities performing legitimate credentialing and peer review activities. Such confidentiality shall also extend to information of like kind that may be provided by third parties. Breaches of appropriate

44

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

confidentiality by medical staff members shall be considered unprofessional conduct and disciplined in accordance with provisions of professional conduct in medical staff policies and these Bylaws.

9.3     Immunity from Liability

1. For Actions Taken

Representatives of the Hospital and the medical staff shall have absolute release from any and all liability in any judicial proceeding for damages or other relief for any action taken or statement or recommendation made within the scope of their duties as such representatives, after a reasonable effort under the circumstances to ascertain the facts underlying such actions, statements or recommendations and in the reasonable belief that the action, statement or recommendation is warranted by such facts.

2. Providing Information

Representatives of the Hospital, the medical staff and any third party shall have absolute release from any and all liability in any judicial proceeding for damages or other relief by reason of providing information, including otherwise privileged or confidential information, to a representative of the Hospital or of the medical staff or to any other hospital, organization or health professionals, or other health-related organizations, concerning practitioners who are or have been an applicant to, or member of the staff, or who did or does exercise privileges, or provide specified services at the Hospital.

9.4     Activities and Information Covered

1. Activities

The provisions of this article shall apply to acts, communications, reports, recommendations, or disclosures in connection with this or any other health-related organization's activities to the extent provided by law, including:

a)  Applications for appointment, clinical privileges or specified services;
b)  Periodic reappraisals for reappointment, clinical privileges or specified services;
c)  Disciplinary measures, including warnings and reprimands, or imposition of terms of probation;
d)  Investigations and corrective actions;
e)  Hearings and appellate reviews;
f)  Performance improvement activities including the creation and dissemination of performance profiles;
g)  Peer review activities, including external peer review;
h)  Utilization and claims review; and
i)  Other Hospital or medical staff committee activities related to monitoring and maintaining of quality patient care and appropriate professional conduct.

**EXHIBIT 2, Page 45**

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

2. Information

The acts, communications, reports, disclosures, and other information referred to in this Article may relate to an applicant's or practitioner's professional qualifications, clinical or procedural abilities, judgement, character, physical and mental health, emotional stability, professional ethics, professional conduct, or any other matter that might directly or indirectly affect patient care.

9.5     Cumulative Effect

Provisions in these Bylaws and in application forms relating to authorizations, releases, confidentiality of information and immunities from liability shall be in conformance with and in addition to other protections provided by local, state, and federal law and not in limitation thereof.

## ARTICLE X
## GENERAL PROVISIONS

10.1     Medical Staff Rules, Regulations, and Policies

Subject to the ultimate authority of the Board, the MEC shall adopt such rules, regulations and policies as may be necessary to carry out the responsibilities and functions of the medical staff and implement its operations. These documents will be incorporated into medical staff polices.

10.2     Payment of Fees and Dues

All members of the medical staff are required to pay any initial and reappointment application fees in an amount determined by the CVO. All members of the medical staff will be required to pay medical staff dues in an amount determined from time to time by the MEC. Failure to pay Medical Staff dues and fees will result in administrative suspension of privileges until all back dues and fees owed are paid in full.

10.3     Conflict of Interest

All members of the medical staff are required to abide by any conflict of interest polices adopted by the medical staff and/or the Hospital. Medical staff members who occupy medical staff leadership roles, such as medical staff officers, committee chairs, and members of the MEC, carry with them a requirement and expectation to discharge their duties diligently and honestly, exercising their best care, skill, and judgement or the promotion of professionalism and the fulfillment of the mission and strategy of St. Luke's Health System. Accordingly, it is the responsibility of each medical staff member who occupies a leadership role or

46

participants in a medical staff deliberation to make full disclosure to the MEC, or other committee(s) as applicable, any duality of interest that might result in a real or perceived conflict on his/her part. The chair of the committee where a conflict of interest is disclosed will determine whether the disclosing individual may participate in further discussion or voting on that matter.

10.4    Peer Review Body

The MEC, the Board, medical staff committees, any group or body of medical staff members and/or Hospital personnel which monitors, evaluates, and/or takes action to review the credentials and competence of applicants and practitioners or to improve the delivery, quality, safety and/or efficiency of services provided by members of the medical staff and other practitioners credentialed by the Hospital, shall be considered, for purposes of protecting confidential information and providing immunity from liability under applicable law, a Peer Review Body as defined under applicable federal and state laws.

The files, records, findings, opinions, recommendations, evaluations and reports of such committees and bodies, information provided to or obtained by such committees and bodies, and the identity of persons providing information to such committees or bodies, to the fullest extent permitted by law, shall be considered privileged and confidential information.

The members of such committees and bodies, persons acting as staff to such committees and bodies, persons who participate with or assist such committees or bodies, and such committees and bodies themselves, to the fullest extent permitted by law, shall be immune from liability for actions taken or recommendations made within the scope of the functions of the committee or body.

10.5    Joint Conference

Whenever the Board's proposed decision will be contrary to a recommendation of the MEC, the Board shall submit the matter to a Joint Conference of an equal number of medical staff and Board members and a representative of the Hospital Administration for review and attempt to find a position acceptable to all parties. In the event that such a position cannot be reached, the Board will review a summary of the Joint Conference submitted by each party before making its final decision and giving notice of final decision. Individuals participating in a Joint Conference will be appointed by the Chief of Staff and Chair of the Board.

The MEC, the Board, the Chief of Staff, or the Hospital CEO (or designee) may also request the convening of a Joint Conference to discuss any matter of controversy or concern that would benefit from enhanced dialogue between medical staff, Hospital, and Board leaders.

10.6    Interpretation of Bylaws

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

Whenever the bylaws do not specifically address a topic or cover a matter, or there is need for interpretation, the Medical Executive Committee (MEC) may issue an interpretation. In arriving at an interpretation, the MEC may consider the usual and customary policies and practices of the medical staff, whether written or unwritten, and in its discretion, may also bring to bear the expert medical knowledge of its members.

Because members of the MEC are not typically attorneys, the bylaws are to be interpreted as permitting reasonable leeway in the proceedings of the medical staff and in the interpretation of the bylaws and policies of the medical staff. At all times, there should be an effort by the medical staff and its leaders to substantially comply with the provisions of medical staff bylaws and policies. In the event of a substantial deviation, the reason(s) for such deviation should be specified.

10.7     <u>Histories and Physicals</u>

A medical history and physical examination shall be completed for each Hospital patient no more than 30 days before or 24 hours after admission or registration. A history and physical must be completed prior to any surgery or procedure requiring anesthesia services. The medical history and physical examination must be completed and documented by a physician, oromaxillofacial surgeon or other qualified licensed individual under state law and hospital policy. Histories and physicals provided by clinicians not privileged at a St. Luke's Hospital must be confirmed and countersigned by a physician privileged to do so at the Hospital.

When the medical history and physical examination is completed within 30 days before admission or registration, a physician or oromaxillofacial surgeon or other qualified licensed individual under state law and hospital policy, must complete and document an updated examination of the patient within 24 hours after admission or registration, but prior to surgery or a procedure requiring anesthesia services.

The following elements are required for a history and physical:
- A medical history that includes a chief complaint or reason for admission; details of present illness; relevant past, social and family history; a review of systems, current medications and drug allergies.
- Findings of a physical examination.
- Conclusions or impressions drawn from the medical history and physical exam.
- Diagnosis or diagnostic impressions.
- A plan of care.

A focused History and Physical may be performed and documented when procedures that do not require anesthesia or moderate sedation will be performed on Hospital outpatients. A focused H&P should include a presenting diagnosis or condition, description of symptoms, significant past medical history, current

48

**EXHIBIT 2, Page 48**

medications, any drug allergies, indications for the procedure, focused physical exam as indicated and proposed treatment, or procedure(s).

A medical history and physical examination should be dated and authenticated at the time of completion. Except in an emergent situation, an invasive procedure will be delayed until a fully authenticated (signed and dated) history and physical is recorded in the patient's medical record.

Additional requirement relating to history and physical examinations may be found in medical staff and Hospital policies.

10.8    Dentists and Podiatrists

Patients admitted to inpatient status for dental or podiatry service shall be under the general care of a physician member of the active medical staff.


## ARTICLE XI
## ADOPTION AND AMENDMENT OF MEDICAL STAFF GOVERNING DOCUMENTS

11.1    Formulating and Reviewing Medical Staff Bylaws Amendments

At the discretion of the Chief of Staff, a bylaws workgroup shall be appointed to formulate, review at least every two years, and recommend to the Board any medical staff bylaws amendments as needed, which shall be effective when approved by the Board.

11.2    Methods of Adoption and Amendment to Volume I, (Medical Staff Governance, Structure and Function) and the Volume II (Corrective Action and Fair Hearing Manual) of these Bylaws

a.  Proposed amendment to the Medical Staff Bylaws (Volume I or II) may be offered for consideration by any medical staff committee, member of the active medical staff, the Board, or by the MEC.
b.  All proposed amendments shall be referred to MEC to review proposed changes and suggest modification to the language of a proposed change as well as recommend adoption or rejection of any proposed change. The MEC may appoint a task force or ad hoc committee to assist it in this work.
c.  Following an affirmative majority vote by the MEC, all active members of the medical staff shall receive a description of the proposed amendment(s) by postal or electronic mail accompanied by a voting ballot. The deadline for return of ballots will be no less than fourteen (14) calendar days from the date of distribution. To be adopted, the proposed amendment(s) must be affirmed by a majority of the members of the medical staff in the active category who cast votes and the Board must subsequently ratify the amendment. If an active member of the medical staff fails to return a ballot by the deadline for casting

such ballot, it shall be recorded as a vote in favor of the recommendation of the MEC for the bylaws amendment.

d.  If the MEC does not vote affirmatively to present a proposed amendment for vote by the medical staff, individuals supporting the amendment can nevertheless request such a vote by presenting the Chief of Staff with a supportive petition signed by 25% of the active members of the Medical Staff. Upon receiving such a petition, the Chief of Staff will proceed to arrange a vote by the entire active medical staff following the procedures above for an amendment proposal voted on affirmatively by the MEC. Voting shall be as described above in section 11.2.c except that ballots not returned by active members of the medical staff shall be recorded as in favor of the MEC recommendation not to accept the proposed bylaws amendment.

If a proposed amendment originated from the Board and is not supported by a majority of the MEC, the Board will participate in a Joint Conference as outlined in section 10.5. When the Joint Conference produces a proposed amendment acceptable to both the MEC and the Board, presentation to the active membership will proceed as described above in section 11.2.c.

11.3   Methods of Adoption and Amendment to the Medical Staff Credentials Procedure Policy, and medical staff rules, regulations, and policies and procedures

a.  All proposed amendments to the Medical Staff Credentials Procedure Policy, rules and regulations, or medical staff policies and procedures, whether originated by members of the medical staff, MEC or another standing or ad hoc committee, must be reviewed and discussed by the MEC prior to an MEC vote and may not conflict with these Bylaws or with Hospital policy.

b.  The MEC shall vote on the proposed language changes at a regular meeting, or at a special meeting called for such purpose. Following an affirmative vote by the MEC any of these documents may be adopted, amended, or repealed, in whole or in part. The Board, Hospital, medical staff, and privileged providers will be informed of all such changes.

11.4   Technical/Legal Changes to Medical Staff Documents

The MEC may adopt such changes to Medical Staff Bylaws that are, in the committee's judgement, technical or legal modifications or clarifications, consist of reorganization or renumbering of material or are needed due to punctuation, spelling, or other errors of grammar or expression. Such amendments made to the medical staff bylaws must be ratified by the Board.

11.5   Adoption of the Bylaws

These Bylaws, upon adoption by the medical staff, shall replace and supersede existing Bylaws and shall become effective when approved by the Board. They shall, when adopted and approved, be equally binding on the Board and the medical staff. The MEC, at is discretion, may adopt reasonable bridging

St. Luke's Regional Medical Center Medical Staff Bylaws Volume I

procedures to assure a smooth transition to these bylaws from any previous medical staff governance documents.

**EXHIBIT 2, Page 51**

| St Luke's | **ORGANIZED MEDICAL STAFF POLICY** | **OM054 TV** |
|---|---|---|
| **TITLE** | **Treasure Valley Medical Staff General Regulations** | |
| **PURPOSE** | Outline of regulations for the Treasure Valley Medical Staff. | |

| **SCOPE** | This document applies to the organized medical staff and to the members of the organized medical staff for the selected Facility/Facilities below: |
|---|---|
| | ☐ St. Luke's Elmore Medical Center |
| | ☐ St. Luke's Jerome |
| | ☐ St. Luke's Magic Valley Regional Medical Center |
| | ☐ St. Luke's McCall |
| | ☐ St. Luke's Nampa Medical Center |
| | ☒ St. Luke's Regional Medical Center (Boise, Meridian, Eagle, Fruitland, SL Cancer Institute) |
| | ☐ St. Luke's Wood River Medical Center |

This document also applies to selected Post-Acute/Specialized Services Locations below:

☐ All Post-Acute/Specialized Services

☒ Selected Post-Acute/Specialized Services listed below
  ☐ St. Luke's Canyon View Behavioral Health Services
  ☐ St. Luke's Clinic-Eastern Oregon Medical Associates
  ☐ St. Luke's Clinic-Trinity Mountain Medical
  ☐ St. Luke's Elmore Long Term Care
  ☐ St. Luke's Home Care (MC, TV, WR)
  ☐ St. Luke's Hospice (MC, TV)
  ☐ St. Luke's Jerome Family Medicine
  ☐ St. Luke's Magic Valley Home Health
  ☐ St. Luke's Magic Valley Hospice
  ☐ St. Luke's Magic Valley Inpatient Rehab (Gwen Neilsen Anderson Rehabilitation Center)
  ☒ St. Luke's Rehabilitation Inpatient Acute Care Unit (Boise)
  ☒ St. Luke's Rehabilitation-Subacute Rehab Unit (Boise)
  ☐ St. Luke's Salmon River Medical
☐ Not Applicable

| **Practice Areas / Departments** |
|---|
| ☐ All Practice Areas / Departments |
| ☐ Listed Practice Areas / Departments below |
| Click here to list departments/units. |
| ☒ Not Applicable |

This document is Confidential pursuant to St. Luke's Policy on Policies, LD001 SLHS. This document contains proprietary information and may not be distributed or shared outside of St. Luke's except as provided by St. Luke's policy.

If this is a patient care document, the information contained herein is used to provide guidance in the care of patients, but should not, and does not replace or preclude the use of clinical judgment.

| *For Document Administration use only.  Please DO NOT add or remove dates.* | | |
|---|---|---|
| Originator: | Medical Staff | Original Authorization Date | 03/08/22 |
| Revised Date: | 10/18/23 | | Page 1 of 11 |

**EXHIBIT 3, Page 1**

**Treasure Valley Medical Staff General Regulations**                                      **OM054 TV**

| | Patient Care Population |
|---|---|
| | ☐ All Patient Care Populations<br>☐ Selected Patient Care Populations listed below<br>  ☐ Neonatal (Nursery/NICU)  ☐ Pediatric <18 yrs  ☐ Adult > 18 yrs<br>☒ Not Applicable |
| **DEFINITIONS** | N/A |
| **APPENDICES AND/OR RELATED DOCUMENTS** | N/A |

I.    **Admission and Discharge Requirements:**

A.    Admission Requirements: Per CMS, all patients must be under the care of a physician. All patients admitted to St. Luke's shall be admitted to the hospital until a provision diagnosis has been stated.  In case of an emergency, the provisional diagnosis shall be stated as soon as possible after admission.

B.    For transfer center patients requiring urgent/emergent admission, if the on-call physician does not accept the patient within 20 minutes, the transfer center will auto-accept the patient in accordance with policy #PC515 SLHS, Transfer Center Auto-Accept.

C.    Physicians admitting private patients shall be held responsible for giving such information as may be necessary to assure the protection of other patients from those who are a source of danger from any cause whatsoever, or to assure protection of the patient from self-harm.

D.    Patients admitted to the hospital will be evaluated in person within the following timeframes:

1.    Newborn Nursery:   Newborns must be seen by a physician or Advanced Practice Provider within 24 hours of the patient's written admission order to the hospital. If the APP writes the admission order, the admission order must be co-signed by a physician within 24 hours of the patient's admission.

2.    Pediatric ICU:  Within 1 hour of admission

3.    Pediatric Floor:  Within 8 hours of admission

4.    Critical Care Units:  Within 1 hour of admission except during the tele-ICU timeframe of 7:00 pm to 7:00 am – within 3 hours of admission

5.    Acute Care Surgery: Within 12 hours of admission

6.    All other areas of the hospital: Within 18 hours of admission

II.    **Laboratory Requirements on Admission:**

A.    Physicians and advanced practice providers will order tests as indicated and, on a patient, specific basis for all patients, excluding obstetrical patients.

III.    **Routine OB Admission Laboratory Requirements:**

A.    A dated, recorded, CBC, urinalysis dated, recorded, CBC, urinalysis (may be done by dipstick on Labor and Delivery), ABO, urine analysis testing for syphilis; and a rubella titer or screen, which were performed during pregnancy.  Documentation of Rh status will be required on all women undergoing delivery, abortion, or invasive obstetric procedures.

**EXHIBIT 3, Page 2**

**Treasure Valley Medical Staff General Regulations**                    **OM054 TV**

B.    Urine tests done for the detection of urine albumin and glucose during the pregnancy shall be recorded and dated.

C.    Upon admission, if none of the above have been performed during the pregnancy, all of the tests in (a) will be ordered, to be performed by the laboratory stat. Urinalysis may be performed by dipstick on L & D. (Rubella titer or screen and serological testing for syphilis will be performed on a routine basis.)

D.    Upon routine admission where the protocol in (I) and (II) have been followed
    a.   Labor & Delivery (L&D) testing urine for presence of albumin and glucose on admission.
    b.   A CBC shall be drawn.
    c.   A pink-top tube shall be drawn at this time and maintained in Transfusion Service for possible use in type and cross matching.

E.    GBS documentation within six (6) weeks or obtain culture at time of presentation.

## IV.  Pre-Admission Testing:

A.    For elective admission, pre-admission laboratory tests may be performed up to 96 hours prior to the day of surgery and/or the day following the actual day of admission.

## V.  Patient Leave of Absence Restrictions:

A.    Refer to RI049 St. Luke's Health System Patient Leave of Absence Policy.

## VI.  Medical Records Rules:

A.    History and physical will be completed as per the Medical Record Completion policy and Medical Record Content policy.

B.    Progress Notes:  Pertinent detailed progress notes (sufficient to permit continuity of care and transferability) should be recorded at the time of observation.  Each of the patient's acknowledged clinical problems should be clearly identified in the progress notes and correlated with specific orders as well as results of tests and treatment. Progress notes should be written at least daily on each patient.

C.    Consultations:  The patient's physician is responsible for personally requesting consultations when indicated.  It is the duty of the hospital staff through its department chairs and Medical Executive Committee to make certain that members of the staff do not fail in the matter of calling consultations as needed.

1.    A consultation must be well qualified to give an opinion in the field in which his opinion is sought.  The status of the consultant is determined by the department chair. Consultations shall show evidence of a review of the patient, the patient's record, pertinent physical, lab and radiologic findings, the consultant's opinion and recommendations.  This report should be made a part of the patient's record and should be recorded within 24-hours of consultant. A limited statement such as "I concur" does not constitute an acceptable report of consultation.  When operative procedures are involved, the consultation note shall, except in emergency situations as so verified on the record, be recorded prior to the operation.

D.    Medical Imaging Films/Report Folders: The films, report folders and file envelopes of the Medical Imaging Department are the property of St. Luke's and an essential part of the patient record. Film envelopes and report folders must only be removed from the department after having been properly signed out and transferred to a temporary film jacket identified by the patient's name and a record number.  All films shall be returned to the department as soon as possible.

E.    Pathology Slides/Tissues: The slides, tissues, serum, blood and body fluids obtained and/or prepared by the Pathology Department are the property of St. Luke's and an essential part of

**EXHIBIT 3, Page 3**

the patient's record.  These specimens must never be removed from the department, except when by the department to another appropriate testing and/or consultative facility for such services.  Slides may be removed from the department only after having been properly signed out with the director of the department or designee.

F.     Medical Records on Readmission:  In case of readmission of a patient, previous records shall be available for the use of the attending practitioner at his/her request.  This shall apply whether or not the patient is attended by the same practitioner.

G.     Records Release/Access: All records are the property of St. Luke's and shall only be removed from the custody of the medical center by court order, subpoena, or statue.  In such cases, the records must remain in the custody of the Director of Health Information Services before court proceedings.

1.     Access to medical record of patients shall be afforded staff members in good standing for bonafide study and research, consistent with preserving the confidentiality of the records in accordance with medical center policy.

## VII.  Operating Room Regulations:

A.     Scheduling/Scheduled Surgery:  There shall be no scheduling of fictitious cases.  The operating room schedule must list, as the operator, the name of the surgeon who intends to perform the designated procedure.

1.     Hours during which the operating room is available for elective surgery shall be defined by individual hospital policies.  However, surgery shall not commence until 9:00 a.m. on the day of the Annual Medical Staff meeting.

2.     The operative room time reserved for a scheduled procedure shall be sufficient for anesthetic induction, as well as post-operative dressings, casts, etc. Operations shall begin at the scheduled time, and the patient in room time shall coincide with the posted time.  In event of cancellation, the attending physician of the next patient in line who wishes to move up may do so.

B.     Scheduling/Emergency Cases: Emergency and/or critically ill patients shall be granted operating room in preference to those scheduled for elective surgery.  The nature of the emergency condition shall be documented in the patient's chart.  Surgeons wishing to schedule emergency surgery at a time outside of normal working hours shall make arrangements with the nursing supervisor, OR charge nurse and/or administrative supervisor.

1.     Should two or more emergencies arise at the same time, the surgeons involved shall mutually determine which case(s) has/have priority.  If a priority cannot be determined, the surgeons shall have the option to request an additional operating room be opened pending availability of staff.  Such request shall be subject to retrospective review by the OR Surgical Supervisory Committee.

C.     Preoperative - Requirements:

1.     Admissions – Outpatient: Patients scheduled for outpatient surgery who have completed preadmission testing should arrive at the hospital one and a half (1-1/2) hours prior to the scheduled surgery; two hours if not pretested.

2.     Admissions – Inpatient: Patients scheduled for elective surgery shall be admitted to the hospital not later than one and one half (1-1/2) hours prior to operation on the morning of surgery, if diagnostic and lab work has been completed prior to the day of surgery, or two (2) hours if not pre-tested.

3.     No surgical operation shall be undertaken unless the clinical chart contains a consent form signed by the patient or his/her legal guardian and the physician, except in the event of an emergency.  A physician order (verbal, telephone, or personal) must appear with the precise wording to be inserted on the consent form.  It is strongly recommended that the

**EXHIBIT 3, Page 4**

physician dictate in the history and physical regarding the discussion of the proposed procedure, including risks, benefits, and alternatives, and understanding and acceptance by the patient and family.

D.   Clinical Pathology Testing: Physician will order tests as indicated on a patient specific basis for all patients.  This pertains to all types of anesthesia. All tests are to be done by a laboratory with current CLIA (Clinical Laboratory Improvement Amendment of 1988) certification.

1.   All patients having a D&C associated with pregnancy will have a Rh type dictated.  Rh negative patients will have blood drawn for appropriate antibody testing.  This requirement pertains to all types of anesthesia.

E.   Operations:  The surgeon or other qualified member of the surgical team must be in the building before a general or regional anesthetic is started and will remain in the operating suite until the patient is in the Recovery Room.

F.   Specimens: Those categories of specimen that may be exempted from the requirement to be examined by a pathologist include, but not necessarily limited to, the following:

1.   Specimens that by the nature or condition do not permit fruitful examination, such as a cataract, orthopedic appliance, foreign body, fatty tissue removed for cosmetic purpose, or portion of rib removed only to enhance operative exposure;

2.   Therapeutic radioactive sources, the removal of which shall be guided by radiation safety monitoring requirements;

3.   Traumatically injured members that have been amputated and for which examination for either medical or legal reasons is not deemed necessary;

4.   Foreign bodies (for example, bullets) that for legal reason are given directly in the chain of custody to law enforcement representatives;

5.   Placentas that are grossly normal and have been removed in the course of operative and non-operative obstetrics;

6.   Teeth, provided the number, including fragments, is recorded in the medical record; and

7.   Tonsil specimens from patients age 12 and under will be sent to pathology at the discretion of the surgeon; those from patients age 13-17 years old will be routinely sent for gross pathological evaluation, and those from patient's 18 years and older will be sent for completed histological evaluation.
a.   These exemptions should be made only when the quality of care has not been comprised by the exemption, when another suitable means of verification of the removal has been routinely employed, and when there is an authenticated operative or other official report which includes a brief, adequate, gross description of the specimen removed.
b.   Extent of examination of those specimens removed and sent to the lab will be at the discretion of the pathologist.

G.   Post-Operative Requirements:  During normal working hours and immediately following completion of the surgical procedure, all patients insufficiently recovered from the effects of anesthesia, shall be taken to the recovery room or special care unit.

1.   The anesthesiologist or other member of the surgical team shall accompany each unconscious patient to the Recovery Room.  No patient who has received a general anesthetic may be removed from the Recovery Room without prior approval of an Anesthesiologist in accordance with anesthesia criteria.  A operative note will be required on all patients having surgery.

H.   Environmental Safety – Asepsis Control: Each person in the operating room shall be attired in clean scrub clothing provided for such purpose, as well as clean shoes or other acceptable foot

**EXHIBIT 3, Page 5**

coverings.  Persons not properly attired shall not be permitted beyond that point in the operating area indicated by a sign or distinctive marking.

I.      Anesthesia Services:  The anesthesia service and administration shall formulate policies on matters relating to safety and anesthetic agents, and any questions relative to same shall be referred to the chairman of department.

J.      Observers in the OR: Any person to be admitted to the operating room as an observer must possess sufficient knowledge and training in Operating Room conduct and technique to assure the Operative Room Director that the standards for quality patient care, safety, privacy, and confidentiality will be assured.  If any disagreement arises it should be resolved by the Operating Room Director and the Chairman of the respective department.

1.      Any observer to be admitted to the operating room must have permission of the Operating Room Director, the operating surgeon, the anesthesiologist, and the patient.

2.      The operating surgeon shall be responsible for obtaining the patient's permission and will assume the responsibility for the observer.  Prior to the procedure, the identity and title of the observer, shall be submitted to the operating room control desk to expedite operating room admission for the designated procedure.

3.      Follow current St. Luke's Health System policies for who can observe.

**VIII. Resident Staff, Medical Students:**

A.      Residents: Residents are considered physicians-in-training, and thus function under the direct supervision of a fully qualified medical staff preceptor.  In surgery, residents do not function independently, but under direct supervision of the attending surgeon.  Thus, residents may not give written or verbal orders, other than on behalf of the attending surgeon.

B.      Medical Students:  Medical student may assist in the examination and treatment of patients under the direction and supervision of an attending physician and within the context of the Medical Practice Act of the Idaho Code.

C.      Undergraduate Health Students:  Undergraduate health students of a paramedical nature in a training capacity of St. Luke's may be authorized to assist in the examination and treatment of patients under the direction and supervision of an attending physician.

**IX.   General Regulations:**

A.      Call Schedule Assignments:

1.      All major clinical departments, consultative clinical departments and the clinical services within them will provide for 24 hour/day, 7 day/week emergency room coverage for patients who present to St. Luke's Boise or Meridian Medical Centers.

2.      Each department or clinical section shall be responsible for creating specific call assignments to provide coverage for that specialty for the emergency department.  The chairman or his/her designee will be accountable for this function.  Individuals who are placed on the call schedule must be credentialed and have admitting privileges at one or multiple St. Luke's Treasure Valley hospitals; however, call will only be required at one site.

3.      The call assignments shall be published in Lightning Bolt.  Any changes to the call schedule after being published, shall be updated in Lightning Bolt.

4.      The Medical Staff Services Department is responsible only for the call schedules they enter.  Call assignments or change notification processes require a straight alphabetical rotation.

5.      Per the Bylaws, staff members with admitting privileges are required to take emergency room call.  When on call and contacted by the emergency room physician to come to the

emergency room, it is the responsibility of the individual on call to physically present him/herself to the emergency department, assess the patient, assume the care of the patient, and require consultations as indicated.  Incumbent on the individual is the responsibility to respond in a timely fashion, and to come into the hospital and assess the patient when required to do so.

B.    Proximity Requirements:

    1.    Medical Staff members shall be located close enough to the Medical Center to provide continuous care to their patients.

    2.    The proximity requirement time limit for any individual applying for medical staff appointment is 30 minutes, defined as the amount of time necessary to travel by ground transportation in order to be physically present at the designated St. Luke's Boise or Meridian Medical Center site.

    3.    The proximity requirement time limit may be lowered by the medical staff department as deemed necessary for quality of care.

    4.    If a hospital contracted or employed group of physicians provide a hospital-based service and the group provides continuous discipline specific coverage of their patients, the proximity requirement of any member of that group will be required when that member is scheduled to provide patient care.

## X.  Securing Autopsies:

A.    The medical staff should attempt to secure autopsies in all deaths that meet the following criteria:

    1.    All deaths in which the cause of death or a major diagnosis is not known with reasonable certainty on clinical grounds;

    2.    Deaths in which an autopsy may help to explain unknown and unanticipated medical complications to the attending physician;

    3.    Cases in which autopsy may help to allay concerns of, and provide reassurance to, the family and/or the public regarding the death;

    4.    Unexpected or unexplained deaths occurring or following any dental, medical, or surgical diagnostic procedures and/or therapies within 48 hours;

    5.    Deaths of patients who have participated in clinical trails (protocols) approved by institutional review boards;

    6.    Unexpected or unexplained deaths that are apparently natural and not subject to forensic medical jurisdiction;

    7.    Natural deaths that are subject to, but waived by, a forensic medical jurisdiction, such as persons death on arrival at hospitals; deaths occurring in hospitals within 24 hours of admission; and deaths in which the patient sustained or apparently sustained an injury while hospitalized;

    8.    Deaths resulting from high-risk infections and contagious diseases;

    9.    All obstetrics deaths;

    10.   All unexpected perinatal and pediatric deaths;

    11.   Deaths in which it is believed that an autopsy would disclose a known or suspected illness that may have a bearing on survivors or recipients of transplant organs; and

    12.   Deaths known or suspected to have resulted from environmental or occupational

B.    The mechanism for documenting permission to perform an autopsy is defined in the Authorization of Autopsy policy.

**EXHIBIT 3, Page 7**

**Treasure Valley Medical Staff General Regulations**  **OM054 TV**

C.   All autopsies will be performed or directly supervised by a pathologist.

D.   The medical staff and the attending(s) will be informed via telephone when an autopsy is being performed.  Every attempt will be made to schedule the procedure when the interested staff can attend.

E.   Appropriate organs and tissues are retained for an appropriate period for staff gross review dissection as practical.

F.   The findings from the autopsies will be used as a source of clinical information in quality improvement activities.

G.   In a Medical Examiner or Coroner case, the criteria for autopsies should be coordinated with local jurisdictional guidelines and should be follow the statues of the jurisdiction.

H.   Cases reportable to the coroner include:

1.   Deaths apparently due entirely to or in part to a factor other than natural disease.  These include homicidal, suicidal or accidental deaths, deaths due in part of remote trauma, chemicals, violence or mechanical, thermal, electrical, radiational injury or suspicious circumstances.

2.   When the physician is not in attendance (unattended death) at the time of death and the body is found dead outside of the hospital or sudden unexpected death not caused by readily recognized disease.

3.   Patient expires within 24 hours of admission to the hospital, and all deaths within the emergency room.

4.   When Physician is unable to state the cause of death.

5.   Deaths within the Operating Room or under general or local anesthesia or within the recovery room.

6.   Death occurring when a person is in a place of incarceration or while under sentence or within custody or peace officers, including death of inmates of public institutions.

7.   Deaths of patients within public or private treatment centers.

8.   Deaths of comatose patients who are brought into the hospital unconscious and die before regaining consciousness.

9.   Poisoning of any type involving food poisoning, household medications, pharmaceuticals, biological agents, industrial agents, plants, etc.

10.   Death alleged to have been caused iatrogenically or by medical malpractice.

11.   Still birth of fetuses of 20 or more week's gestation if unattended by a physician.

12.   Death by neglect, exposure, starvation, or decedent's occupation.

13.   Death of children under 18 years of age where medical history is not established with condition consistent with sudden death.

14.   Any unclaimed, exposed, or unidentified remains.

15.   Deaths due to infections or contagious disease or other hazards to public health if diagnoses and extent of disease are undetermined at the time of death.

16.   Whenever the Coroner conducts a complete investigation and before signing the Death Certificate, he/she shall determine the manner and cause of death.  The Coroner may also certify that the cause of death cannot be determined with reasonable medical certainty.

**XI.  Executive Session Definition:**

**EXHIBIT 3, Page 8**

**Treasure Valley Medical Staff General Regulations**                    **OM054 TV**

    A.    Executive Session of the Medical Executive Committee is defined as the voting members, the Vice President of Population Health, the Chief Medical Officer, the Medical Staff Services Director or designee, and others at the discretion of the Chief of Staff.

    B.    Executive sessions of the department, clinical sections, and standing committees will include the voting members and the Medical Staff Director or designee and others at the discretion of the chairperson.

**XII.  Respiratory Therapy:**

    A.    The Medical Director of the Respiratory Therapy Services at St. Luke's shall be responsible for the clinical supervision of, and shall approve on behalf of the Medical Staff, the clinical policies and procedures of the service.  The Medical Director will seek consultation, where appropriate, from the clinical departments of the medical staff whose patients will be affected by such procedures.

APPROVED BY:               Charles Washington, MD           10/10/2023
                                    Chief of Staff/Chair of MEC               Date

**EXHIBIT 3, Page 9**

**OM054 TV**

### INTERIM CHANGE APPROVAL APPLICATION

| Do not leave any section blank. | | |
|---|---|---|
| IF SCHEDULED REVIEW, UPDATE THE SCHEDULED REVIEW APPLICATION ON THE NEXT PAGE ONLY | | |
| Summary of Change | Author / Title | Date |
| | | |

**Collaborators and/or Approvers:**

| Name | Role/Title/Location | Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT 3, Page 10

OM054 TV

**SCHEDULED REVIEW / NEW DOCUMENT APPROVAL APPLICATION**

| Do not leave any section blank. Enter "NA" if not applicable.<br>**IF INTERIM CHANGE, UPDATE INTERIM CHANGE APPLICATION ON THE PREVIOUS PAGE ONLY** ||
|---|---|
| **Responsible Party** | **Practice Area/Department** |
| Kay Holmes | Medical Staff Services |
| **Lead** | **Practice Area/Department** |
| Michelle Bitoni | Director of Medical Staff Services |
| **Review Outcome**: | **Review Frequency:** |
| Minor Changes | Every 2 Years |

| Summary of Change / Reason for Retirement / Statement of Need (if new) | Author / Title | Date |
|---|---|---|
| Scheduled Review:  Added language regarding APP's admitting newborns | Michelle Bitoni | 10/10/23 |

**Education / communication plan needed to implement document?**

☐ Yes  ☒ No   If yes, describe plan: **NA**

**Documents that will be replaced and need to be retired:**

Replace TV Medical Staff Rules & Regulations

**Keywords:  Add keywords, abbreviations, acronyms, or phrases.  Separate each with a comma.**

**Medical Staff, admission, auto-accept, medical record, autopsy, respiratory therapy, executive session, resident, medical student**

**Collaborators:** List people or Practice Areas/departments who have special skills or subject matter expertise on a specific topic (e.g. Legal, Accreditation, Quality), task (nursing practice/business process), and/or specialty (e.g. area of medicine) that will provide input to ensure accuracy and completeness of content:

| Name | Role/Title/Location | Date |
|---|---|---|
| Heidi Thompson | Director, Medical Staff Services | 11/09/2021 |
| Kay Holmes | Manager, Medical Staff Services | 11/09/2021 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Approvers:** List Communities of Practice (CoP), Practice Areas, Committees and/or Leadership responsible for oversight of service or activity captured in document, which may be dictated by regulatory, statutory, or business requirements, to ensure continual survey readiness, patient safety, and a successful implementation:

| Name | Role/Title/Location | Date |
|---|---|---|
| Charles Washington | Chief of Staff/Medical Executive Committee | 10/10/2023 |
|  |  |  |
|  |  |  |
|  |  |  |

**EXHIBIT 3, Page 11**