Keely E. Duke
ISB 6044; ked@dukeevett.com
Molly E. Mitchell
ISB 10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 W. River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Dr. Michael Hajjar, MD, an individual, Dr. Thomas Manning, MD, PhD, an individual, and NS Support, L.L.C. d/b/a Neuroscience Associates,<br><br>                    Plaintiffs,<br><br>v.<br><br>St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates, Dr. Kenneth Little, MD, an individual,<br><br>                    Defendants. | Case No. 1:23-CV-367<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## I.    INTRODUCTION

Defendants' Motion to Dismiss mischaracterizes the nature of Plaintiffs', Dr. Michael Hajjar, MD, Dr. Thomas Manning, MD, and NS Support, L.L.C. d/b/a Neuroscience Associates (collectively "Neuroscience Associates") antitrust claims by attempting to diminish them as workplace grievances for independent neurosurgeons not being paid for call coverage. While Plaintiffs do have an independent cause of action based on Defendants wrongfully terminating payment to Neuroscience Associates for call coverage since 2018, that claim is only part of the story.  The rest of the story brings the antitrust claims into full light.

As has been alleged, Defendants' attempt to purge all independent neurosurgeons from

St. Luke's Health System – so that St. Luke's can erase competition in the neurosurgery market – was not a complete success even after St. Luke's stopped paying for call coverage. That is because Plaintiffs Dr. Hajjar and Dr. Manning kept their St. Luke's privileges.  Defendants then needed a Phase Two of their plan to succeed in getting the last two remaining neurosurgeons to cry uncle and relinquish their St. Luke's privileges. What did Defendants then do in the hopes of ridding themselves of the last two remaining independent neurosurgeons?  They arbitrarily and unjustifiably adopted and unfairly enforced an untenable call schedule policy for the neurosurgeons that requires 24/7/365 days of call coverage if the neurosurgeon had treated the patient in the last two years. Defendants then applied such policy differently based on employed neurosurgeon versus independent.

It is not true when Defendants allege that the call policy is equal to all neurosurgeons because when Defendants concocted and then implemented the 24/7/365 policy, Defendants only wanted independent neurosurgeons to be crushed by the unbelievable weight of this new policy. Stated otherwise, Defendants knew they had to protect their employed neurosurgeons from application of such untenable 24/7/365 call schedule, or the plan could backfire, and Defendants may unintentionally cause employed neurosurgeons to leave.  How did Defendants make the effect of this policy non-uniform between Defendants' employed neurosurgeons and the independent neurosurgeons (and therefore have the requirements to be part of Medical Staff be unequal)? They shielded their employed neurosurgeons from the unreasonable burdens of these call requirements. They did so by disproportionately assigning call between Northwest Surgery Associates (with eight neurosurgeons to cover) and Neuroscience Associates (with two neurosurgeons to cover). Then, knowing the call requirements were unreasonable, Defendants brought in and paid locum tenens neurosurgeons to cover call for **only** the <u>eight</u> Northwest Surgery Associates' neurosurgeons and **not** the <u>two</u> remaining independent neurosurgeons.

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 2**

Defendants then hoped the new call coverage policy would be a nearly impossible obligation for the two remaining independent neurosurgeons (Plaintiffs Dr. Hajjar and Dr. Manning) to meet and they would resign, leaving no independent neurosurgeons.

The plan worked in part because Dr. Thomas Manning took a one-year leave of absence after the 24/7/365 call policy was put into place by Defendants and then ultimately resigned his privileges at the end of that leave. One independent down, and only one to go. Tellingly, in their opposition, Defendants made no effort to justify the reason behind their call policy: to place untenable burdens on the last two independent neurosurgeons in the St. Luke's Health System so they would have no choice but to relinquish their privileges at St. Luke's; privileges Dr. Hajjar has held since 2003 and Dr. Manning since 2007.

The effect of this call policy is equally apparent: St. Luke's expands its share of the neurosurgery market in Southwest Idaho by forcing independent neurosurgeons to relinquish their decades long privileges at what is the largest healthcare facility in the State (St. Luke's is indeed the largest employer in the State by substantial margin). By doing so, St. Luke's expands its share of the market for independent hospital services (e.g. radiology, imaging, surgery, and physical therapy) because the evidence will show St. Luke's neurosurgeons almost exclusively refer patients within the St. Luke's Health System, whereas independent neurosurgeons most often refer patients to non-St. Luke's facilities.[1] Dkt. 4, ¶ 4. These effects do not harm only Dr. Hajjar and Dr. Manning. They also harm competition in Southwest Idaho's neurosurgery market and the market for neurosurgical hospital services by limiting patients' ability to see providers outside of St. Luke's (with increasing market concentration). This allows St. Luke's to charge higher than competitive prices, the increased cost of which is borne first by health insurers, then

---

[1] The Motion to Dismiss includes a conclusory denial of this allegation, but that is not how a Rule 12(b)(6) motion works. Dkt. 11, p. 4. at n. 7. Factual allegations must be accepted as true, with all inferences from them construed in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 3

passed down to local employers, and then passed on to patients. Defendants' actions are intended to harm competition and therefore the Motion to Dismiss should be denied.

The Motion to Dismiss should also be denied based on Defendants' failure to follow the Court's policy relating to Federal Rule of Civil Procedure 12(b)(6) motion practice.[2] Defendants' counsel never contacted Neuroscience Associates' counsel prior to filing the Motion to Dismiss to advise of perceived shortcomings with the Complaint and attempt to reach an agreement regarding the filing of an amended complaint. The First Amended Complaint ("Complaint") has adequately pled antitrust claims, but if the Court disagrees, Defendants' failure to follow the Court's policy weighs heavily in favor of granting Neuroscience Associates leave to amend because they have not been given this benefit. Lastly, if this Court finds fully in favor of the Defendants and denies leave to amend, Neuroscience Associates respectfully request the claim for unjust enrichment remanded to state court for further proceedings.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955 (2007)). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief. *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679,

---

[2] https://www.id.uscourts.gov/district/judges/brailsford/Motion_Practice.cfm

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 4**

129 S.Ct. 1937.  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). If a court determines that a complaint fails to state a claim, the court should grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts. *See Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

### III.    ARGUMENT

**A.    By attaching exhibits that are not properly incorporated by reference, Defendants have converted their Motion to Dismiss into a Motion for Summary Judgment, and Plaintiffs should be permitted discovery.**

When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a motion for summary judgment and give the nonmoving party an opportunity to respond. *Doe v. Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 837 F. Supp. 2d 1145, 1156 (D. Idaho 2011). However, documents attached to the complaint, incorporated by reference in the complaint, or matters of judicial notice can be considered without converting the motion to dismiss into a summary judgment motion. *Id.* A document not attached to the complaint may be incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's complaint." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

If a party submits documents that do not meet the requirements for incorporation by reference (or any other exception to considering matters outside the pleadings), the district court has discretion to either decline to consider the extrinsic materials or consider the materials and convert the motion to one for summary judgment. *Doe*, 837 F. Supp. 2d at 1156-57. If the latter, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* (citing F.R.C.P. 12(d)). This option contemplates allowing discovery into

matters relevant to opposing the summary judgment motion. *Id.* ("Discovery in this case is in its infancy, and the parties have not yet been given a reasonable opportunity to present all materials that would be pertinent to a motion for summary judgment.").

Defendants submitted three exhibits in support of their Motion to Dismiss (the Professional Services Agreement, St. Luke's Bylaws, and the Organized Medical Staff Policy) plus two articles, none of which meet the standard for incorporation by reference. The Professional Services Agreement ("PSA") between Northwest Neurosurgery Associates and St. Luke's is referenced in two paragraphs (31 and 59) of the 119-paragraph Complaint. *See* Dkt. 4. The limited references to the PSA are made for purposes of providing relevant background information about the relationship between the Defendants, and in no way amount to "refer[ring] extensively" to this document. *Ritchie*, 342 F.3d at 908. The PSA does not form the basis of the Complaint. Rather, the document that forms the basis of the Complaint is the policy implemented in August 2022 which requires Neuroscience Associates to provide 24/7/365 call coverage (in addition to the 24/7/365 call coverage provided by St. Luke's employed physicians and locums tenens), which Defendants have not provided to the Court.

The Complaint makes no reference to St. Luke's bylaws. There is a single reference to proposed *revisions* to the Medical Staff Bylaws in paragraph 68, but the operative set of bylaws attached as Exhibit 2 are not referenced anywhere in the Complaint. Dkt. 4, ¶ 68; Dkt. 11-1 at Ex. 2. The bylaws are not referenced extensively in the Complaint, nor do they form the basis of the Complaint. The Complaint similarly makes absolutely no reference to the Organized Medical Staff Policy attached as Exhibit 3 to the Motion to Dismiss. *See* Dkt. 4. This document does not form the basis of the Complaint and cannot be properly incorporated by reference. Thus, none of the three exhibits attached to the Motion to Dismiss can properly be incorporated by reference.

Defendants' Motion should be converted to a motion for summary judgment and

Neuroscience Associates respectfully request this Court grant them the opportunity to conduct discovery in response. First, Defendants referred to these handful of documents in violation of the Federal Rules of Civil Procedure. Second, Defendants also know they are only providing documents (wrongfully) to the Court that paint a misleading picture to advance their self-serving argument that the call coverage burdens are a byproduct of uniform and equitable application of St. Luke's Bylaws and Organized Medical Staff Policy.  That is not accurate. The Complaint specifically alleges that St. Luke's pays other specialty independent physicians (e.g. oral maxillofacial surgery and orthopedics) for call coverage, but not neurosurgeons. Dkt. 4, ¶ 52. St. Luke's also pays locum tenens physicians to cover call for only the employed physicians, not the independent neurosurgeons. Dkt. 4, ¶ 51. Defendants should not be permitted to circumvent the Federal Rules of Civil Procedure, the Motion denied, and discovery should be permitted.

Defendants also reference articles about St. Luke's accolades in an apparent attempt to refute the Complaint's allegations about quality of care. *See* Dkt. 11-1, p. 4 at n. 3 and n.4, *see also* Dkt. 4, ¶ 34 (independent neurosurgeons typically refer patients for hospital services outside the St. Luke's systems based on factors such as quality of care and cost). Again, not proper and discovery is necessary.

Because Defendants submitted matters outside the pleadings in support of their Motion to Dismiss, Neuroscience Associates should be given an opportunity to conduct discovery on matters that are pertinent to opposing the Motion.  Alternatively, the Court may also ignore those documents and rule on the Motion without considering them.  As discussed next, the Motion to Dismiss should be granted based on the four-corners of the Complaint and applicable law.

**B.    Neuroscience Associates have sufficiently pled claims under the Sherman Act to raise a reasonable expectation that antitrust conduct will be uncovered in discovery.**

The Complaint provides detailed factual allegations that establish the requisite elements

of antitrust claims under the Sherman Act. The relevant market is professional neurosurgical services and neurosurgical hospital services in Ada and Canyon County, Idaho. Dkt. 4., ¶ 84, 86. There is no competition for neurological services for hundreds of miles outside Ada and Canyon County. *Id.*, ¶ 86. Additionally, there is no close substitute to supplement professional neurosurgical services. *Id.*, ¶ 84. Therefore, neurosurgeons and neurosurgical departments are competing directly with each other without outside influence. Currently, St. Luke's has dominated control over the professional neurological services in Ada and Canyon County, with over 50% of the market. *Id.*, ¶ 88. Since 2018, 75% of independent neurosurgeons have been forced to relinquish medical privileges at St. Luke's due to untenable call conditions Defendants have specifically imposed on independent neurosurgeons. *Id.*, ¶¶ 53-54, 60-61.

Neuroscience Associates have alleged claims under both Section 1 and Section 2 of the Sherman Act. Section 1 prohibits "[e]very contract, combination...or conspiracy, in restraint of trade or commerce among the several States, or with foreign nationals." 15 U.S.C. § 1. To state a claim under Section 1 of the Sherman Act, a plaintiff must allege: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

To state a claim for attempted monopolization in violation of Section 2 of the Sherman Act, a plaintiff must allege four elements: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997), aff'd, 525 U.S. 299, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999), and overruled for unrelated reasons by *Lacey v. Maricopa Cnty.*, 693 F.3d

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 8**

896 (9th Cir. 2012).  Defendants argue Neuroscience Associates have failed to show (1) harm to competition; (2) an antitrust injury; (3) concerted action for purposes of Section 1; and (4) any anticompetitive or exclusionary conduct with a specific intent to monopolize for purposes of Section 2. Each is addressed below.

> 1.      **Defendants have created higher prices to patients, diminished patient choices, and severally limited a neurosurgeon's ability to compete within the relevant market.**

Defendants suggest Neuroscience Associates have failed to plead harm to competition, focusing on their claims of personal financial injury instead. That is not the case.  First, injury to competition can exist in either the relevant job market or the relevant patient market. *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447 (9th Cir. 1988). Injuries to the relevant patient market are diminished consumer choices and increased prices resulting from the defendant's artificial restraint on the competitive market. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

To survive a motion to dismiss, Neuroscience Associates need only allege sufficient facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547, 127 S.Ct. 1955. Defendants suggest the allegations are conclusory yet ignore how Neuroscience Associates has, based on its neurosurgeons' personal experience and observations, laid out the foundational facts, schemes, and motivation for Defendants to drive out independent neurosurgeons from medical privileges. Neuroscience Associates need only provide sufficient facts to show there is a reasonable expectation that evidence will be uncovered within discovery proceedings. *See Toranto v. Jaffurs*, 297 F. Supp. 3d 1073, 1090 (S.D. Cal. 2018).  The Complaint is the roadmap.

St. Luke's has over fifty percent of the professional neurosurgical market in Ada and Canyon County. Dkt. 4, ¶ 58. Beyond that, St. Luke's is the largest employer in the State by a landslide; despite being located in only the southwest portion of Idaho. *Id.*, ¶¶ 17, 22, 23. St.

Luke's substantial presence and market control provides them the leverage to charge higher rates which in turn causes higher premiums to insureds. *Id.*, ¶¶ 1, 90, 94, 95. The United States District Court for the District of Idaho has previously recognized the substantial leverage St. Luke's has in negotiating reimbursement rates due to its size and has curbed St. Luke's anti-competitive efforts. *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-CV-00560-BLW, 2014 WL 407446, at *9 (D. Idaho Jan. 24, 2014), aff'd, 778 F.3d 775 (9th Cir. 2015). Further, St. Luke's has worked with several insurers in the relevant geographic market (e.g. Select Health, Mountain Health Co-Op, PacificSource, and Medicare Advantage) to offer narrow-network insurance products **that only provide coverage for care at St. Luke's**.

Not only has St. Luke's created higher prices to patients and insureds, but it is also diminishing **patient choice** by forcing all but one independent neurosurgeon off its medical staff. This ensures that St. Luke's has full control of its referrals from all neurosurgeons within its over 50% market share.[3] Dkt. 4, ¶¶ 88, 89. St. Luke's is operating sixteen hospitals and medical centers through Southwest Idaho. *Id.*, ¶¶ 18–20. By forcing independent neurosurgeons off its medical staff, St. Luke's ensures that any patient who comes into St. Luke's emergency department will almost assuredly remain circulating within the St. Luke's system for neurosurgical hospital services, such as imaging and physical therapy. *Id.*, ¶¶ 88, 89, 93. If Defendants were to allow independent neurosurgeons to remain on the medical staff, there is a higher probability that these new patients would be referred to outside resources that do not involve St. Luke's and at that point, St. Luke's has lost payment opportunity for a patient. *Id.*, ¶¶ 26, 34, 35. Defendants created untenable call coverage policies (written and in practice) that they

---

[3] St. Luke's relies on the PSA to dispute this allegation. Dkt. 11-1, p. 4 at n. 7. As discussed above, this document is not properly incorporated by reference. Even if the Court were to consider this document, it still fails to refute the Complaint's allegation that St. Luke's employs neurosurgeons and locums tenens only refer to St. Luke's facilities; this allegation is based physician practices, not the language of the PSA. Dkt. 4, ¶ 4. What these physicians are theoretically allowed to do and what they are actually doing are two separate inquiries.

lessened for their employed neurosurgeons but not for the remaining independent physicians; thus almost ensuring independent neurosurgeons cannot maintain medical staff privileges at St. Luke's. *Id.*, ¶¶ 39-40, 45, 47-50, 54, 56-57, 60, 62. This is also unequal treatment related to call coverage obligations. Such unreasonable policies have harmed competition and ensured Defendants can both insulate themselves from competition while also dominating the market, restricting patient choice, and raising prices for all payors and patients, creating harm to the relevant patient market and payors in the market.

Furthermore, there is a harm to the neurosurgical job market in both Ada and Canyon County when St. Luke's is forcing independent neurosurgeons to relinquish medical staff membership due to the 24/7/365 policy and how it unequally implemented by Defendants. Medical staff membership is critically important for independent neurosurgeons in general but medical staff membership at Southwest Idaho's largest and dominant healthcare provider is essential. *Id.*, ¶¶ 70, 91. First, St. Luke's size, dominance, and presence ensures St. Luke's is a preferred provider in Idaho's numerous medical insurances. Dkt. 4, ¶¶ 71, 81, 88, 91. Therefore, if an independent neurosurgeon does not have privileges at St. Luke's, they are severally limited in their ability to meet patient needs and compete within the relevant market since St. Luke's controls over 50% of the neurosurgical market. *Id.* at ¶¶ 91-92.

Yet, Defendants are making it all but impossible to be an independent neurosurgeon with medical staff privileges at St. Luke's due to their arbitrary and unreasonable call coverage policies. *Id.*, ¶¶ 45-47, 56-58, 62, 64. As the Organized Medical Staff Policy states, being on call means a neurosurgeon must be within thirty minutes of the hospital at all times. Dkt. 11-1, Ex. 3. The St. Luke's employed neurosurgeons are both paid and provided relief with locum tenens physicians to ensure on call is less burdensome on both their professional and personal lives. Dkt. 4, ¶¶ 47, 49, 58.  In contrast, Dr. Hajjar must remain within thirty minutes of the hospital

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 11**

and drop all personal plans or obligations 24/7/365 if a patient he has seen within the past two years comes into a St. Luke's emergency room (even though there is a St. Luke's or locums tenens neurosurgeon on call who could also treat the patient).[4] St. Luke's and Northwest Neurosurgery Associates have not offered or provided any locum tenens physician to relieve Dr. Hajjar from this unbearable obligation. *Id.*, ¶¶ 45, 50, 56, 58, 62. When comparing the expectations on employed neurosurgeons to the expectations on independent neurosurgeons, it becomes clear how these policies are unequally applied and are affecting competition and inhibiting competitors' abilities to compete against St. Luke's and its neurosurgeons.

In summary, St. Luke's is large enough and powerful enough to exclude competition which in turn also creates higher prices and lower quality of care for the patient market. "Given that the ability to raise price and to exclude competition are hallmarks of market power, the finding of actual harm to competition suffices under Sherman Act § 1 even in the absence of extended market analysis." *Oltz*, 861 F.2d at 1448. There are sufficient allegations pled in the Amended Complaint to show harm to competition.

2.    **Neuroscience Associates have shown that the Defendants' anticompetitive conduct is substantially the antitrust injury itself.**

Defendants contend there is no antitrust injury since non-payment for call coverage does not flow from any anticompetitive conduct. Again, this misstates the antitrust injury, which is the arbitrary requirement that Neuroscience Associates provide 24/7/365 call coverage with no compensation simply to maintain privileges, even though St. Luke's is paying its neurosurgeons for a much-lessened 24/7/365 call coverage and paying locum tenens physicians thousands of dollars per call day to alleviate the call burdens of the employed neurosurgeons and not the independent neurosurgeons. There is no reason for this other than to harm competition – a life of

---

[4] Before Dr. Manning relinquished his privileges, either he or Dr. Hajjar had to divvy up call coverage such that one of them was always on call.  With Dr. Manning gone, Dr. Hajjar is on his own 24/7/365.

24/7/365 call is not one that can be sustained for long and Defendants know and admit given how they have lessened such untenable burden for their employed neurosurgeons, as described above.  As such, once Dr. Hajjar can no longer handle such unreasonable requirements that are unduly onerous on him, Defendants' call plan will have succeeded – it will have rid St. Luke's of all independent neurosurgeons leaving Defendants to have complete control over patient care and referrals related to neurosurgery.

"A plaintiff must allege facts showing he was harmed by the defendant's anti-competitive contract, combination or conspiracy, and that this harm flowed from an anti-competitive aspect of the practice under scrutiny." *Brantley*, 675 F.3d at 1197 (quotations omitted). As explained above, the anticompetitive conduct is Defendants' burdensome call coverage policies to ensure independent neurosurgeons cannot maintain privileges at St. Luke's. Contrary to what Defendants suggest, the antitrust injury is the substance of the anticompetitive conduct. Only Dr. Hajjar has maintained his privileges at St. Luke's. Dkt. 4, ¶ 61. Therefore, Dr. Hajjar is providing 24/7/365 call coverage to St. Luke's for no compensation, even though St. Luke's neurosurgeons are simultaneously providing 24/7/365 call coverage (and are being compensated for it). *Id.* at ¶ 62. Dr. Manning, Dr. Lochhead and Dr. Bridges have all relinquished their medical staff privileges at St. Luke's due to the disproportionate and uncompensated call burden placed on them. *Id.*, ¶¶ 54, 60. Dr. Manning, Dr. Lochhead, and Dr. Bridges have been cut out of over 50% of the local neurosurgical market, a substantial limitation to their ability to practice as neurosurgeons. While there are other opportunities, these hospitals make up less than half the neurosurgical market in comparison to St. Luke's individually. Further, being part of the call coverage in the emergency department is an important part of being competitive within the professional neurosurgical market. St. Luke's dominates emergency departments in Ada and Canyon County while simultaneously making absurd demands on independent neurosurgeons

who are trying to compete in the same market. *See Id.*, ¶¶ 17-20, 40, 64. Again, Defendants are insulating themselves from competition by saturating Ada and Canyon County with St. Luke's medical facilities and ensuring that patients who come into a St. Luke's emergency room for neurological care continue to receive other hospital services at St. Luke's facilities only.

Defendants look to case law outside the Ninth Circuit—and ignore case law within the Ninth Circuit—to support their argument that a hospital's staffing decisions cannot give rise to an antitrust injury. Defendants compare this case to *Fisher v. Aurora Health Care, Inc.*, 558 Fed. Appx. 653, 654 (7th Cir. 2014), where an individual independent family practice physician was denied staff privileges and subsequently sued the hospital under Sherman Act Section 1 and 2. In that case, the hospital required all medical staff, including independent physicians, to be on call 24 hours a day, 7 days a week. *Id.* At the outset, this case is distinguishable from the case at bar because the call policy was uniform to all medical staff, whereas here independent neurosurgeons are singled out based on their specialty and their independent status (St. Luke's pays its own neurosurgeons for call, pays locum tenens for call, and pays independent physicians in other specialties for call). Further, the Seventh Circuit's analysis was based on a lack of standing, finding that the individual physician lacked standing but that certain other groups such as "consumers, insurance companies, *or even groups of doctors* serve as better plaintiffs" to vindicate potential antitrust violations. *Id.* at 656. Neuroscience Associates is the only group of independent neurosurgeons in the relevant geographic market and is therefore an appropriate plaintiff to bring a claim for antitrust violations. Dkt. 4, ¶ 24.

Courts within the Ninth Circuit have found sufficiently pled antitrust claims based on hospital staffing decisions. *Toronto*, 297 F. Supp. 3d 1073. In *Toronto*, an individual physician asserted claims for violations of Sections 1 and 2 of the Sherman Act against certain hospitals and members of their medical staff based on their bad faith conduct aimed at preventing him

from obtaining staffing privileges. *Id.* at 1087. The antitrust injury described in his complaint included allegations of procedural unfairness in applying for privileges, a restraint on his ability to practice his medical specialty in the relevant geographic market, longer wait times, higher costs, and certain highly complex surgery procedures from being available in the relevant geographic market. *Id.* These allegations demonstrated "injury to competition sufficient to raise a reasonable expectation that discovery will reveal evidence of an injury to competition." *Id.* (internal quotes omitted).

Like the complaint in *Toronto*, Neuroscience Associates' Complaint does not merely recite bare legal conclusions about an unreasonable restraint on competition, but instead "sketch[es] the outline of the injury to competition" with supportive factual allegations that "raise a reasonable expectation that discovery will reveal evidence of an injury to competition." *Brantley*, 675 F.3d at 1198 (outlining standard for pleading Section 1 claim). The Complaint spells out Defendants' efforts to implement an arbitrary and unfair call coverage policies designed to force independent neurosurgeons to relinquish their privileges at St. Luke's—the State's largest healthcare provider by far—which limits the independent neurosurgeons' ability to compete in the market while simultaneously increasing Defendants' share of the market for neurosurgery services and neurosurgical hospital services. This dominant market share enables St. Luke's to demand insurers pay higher than competitive prices, which all trickles down to Idaho patients and insureds. And because St. Luke's does not have to worry about competition, from independent neurosurgeons or other hospitals, the quality of their care will and has regressed. Dkt. 4, ¶ 93, 98, 100. Neuroscience Associates have been directly injured from the Defendants' conduct due to untenable call coverage conditions as well as no financial compensation for complying with these policies. There are sufficient allegations pled in the Complaint to show an antitrust injury.

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 15**

**3.** **Neuroscience Associates has sufficiently pled allegations regarding a conspiracy between St. Luke's and Northwest Neurosurgery Associates.**

Neuroscience Associates acknowledge that typically an employer and employee cannot conspire together. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147–48 (9th Cir. 2003). The issue with Defendants' argument is they have taken conflicting and self-serving positions on whether an employer-employee relationship exists. As explained in the Complaint, St. Luke's disclaimed any ability to address the arbitrary and unreasonable call coverage policies implemented by Northwest Neurosurgery Associates because Northwest Neurosurgery Associates purportedly controls the Neurosurgery Department, not St. Luke's. Dkt. 4, ¶ 66. Further, the PSA specifically disclaims an employer-employee relationship.[5] Dkt. 11-1, Ex. 1 at ¶ 9.1 ("It is understood and agreed that in the performance of all Services under this Agreement, Company and Company Providers shall at all times act as independent contractors of St. Luke's and the same are not agents or employees of St. Luke's for any purpose.").

Thus, St. Luke's disclaimed any agency relationship while contracting with Northwest Neurosurgery Associates and when it chose to sit on its hands pre-litigation. Now that suit has been filed, St. Luke's wants to avail itself of an agency relationship it has repeatedly disclaimed in an attempt to avoid liability under Section 1 of the Sherman Act. St. Luke's cannot have it both ways. Further, all reasonable inferences must be drawn in favor of Neuroscience Associates at this stage of the litigation. Based on the Complaint's allegations, there is no basis for inferring an employer-employee relationship exists between Defendants. Whether neurosurgeons (other than Dr. Little) are directly employed by St. Luke's or Northwest Neurosurgery Associates is irrelevant to establishing conspiracy. What matters is that Northwest Neurosurgery

---

[5] As discussed above, the PSA was improperly submitted in support of the Motion to Dismiss. Despite the contractual language, the relationship between St. Luke's and Northwest Neurosurgery is murky at best. As such, Neuroscience Associates should be permitted to conduct discovery regarding this relationship so it has "a reasonable opportunity to present all the material that is pertinent to the motion." F.R.C.P. 12(d).

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS- 16

Associates/Dr. Little—the entity and individual St. Luke's claims is entirely responsible for these call coverage policies—are legally distinct entities, a fact which cannot be disputed at the 12(b)(6) stage based on the Complaint's allegations (and which also cannot be disputed under the plain language of the PSA).[6] *See Toronto*, 297 F.Supp.3d at 1086.

Next, Defendants argue there is no alleged conspiratorial agreement. "Because direct evidence of concerted action in violation of antitrust laws is so rare, the Supreme Court has traditionally granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances." *Oltz*, 861 F.2d at 1450. Defendants contend the enforcement of the Medical Staff Bylaws is the alleged conspiracy at play. Again, Defendants focus on the wrong circumstances. It is Defendants' specific and unreasonable call coverage policies which proves the conspiracy to eliminate all independent neurosurgeons from St. Luke's facilities. There is no logical explanation for requiring two neurosurgeons to be on call at all times, while treating the independent neurosurgeons completely different from (1) St. Luke's employed neurosurgeons (who have much less onerous call coverage burdens and are compensated for call), and (2) independent physicians in other specialties (who are compensated for call). Dkt. 4, ¶ 64. Conspiratorial conduct can be inferred from St. Luke's disingenuous claims that it cannot do anything to resolve issues relating to call coverage, even though the PSA states: "St. Luke's desires that Company take the lead role in developing and managing the neurosciences service line at St. Luke's **subject to the final decision-making authority of St. Luke's**." Dkt. 11-1, Ex. 1 at ¶ 1.1. T

There are sufficient allegations pled in the Complaint to support a reasonable inference

---

[6] Judge Winmill's discussion about PSA-based relationships in *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-CV-00560-BLW, 2014 WL 407446, at *3 (D. Idaho Jan. 24, 2014) pertained to the relationship between St. Luke's and physicians employed by an entity that has a PSA with St. Luke's. The opinion does not say anything about an employer-employee relationship between St. Luke's and the contracting entity, and the PSA expressly disclaims such a relationship.

that St. Luke's and Northwest Neurosurgery Associates/Dr. Little acted in concert when implementing the unfair and untenable call coverage policies designed to force independent neurosurgeons to relinquish their privileges, thereby harming competition.

### 4. Defendants' unreasonable and untenable call coverage policies prove Defendants' exclusionary conduct with the specific intent to monopolize.

Defendants argue Neuroscience Associates' Sherman Act Section 2 claim should be dismissed for failure to allege anticompetitive conduct or specific intent to monopolize. "Monopoly power is 'the power to control prices or exclude competition.'" *Toranto*, 297 F. Supp. 3d at 1092 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Market share has recently been addressed in the 9th Circuit:

> A market share of sixty-five percent or more usually establishes a prima facie case of monopoly power in Section 2 contexts. *Id.* at 1206 (citation omitted). But "the minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). We have held that a market share as low as forty-four percent is sufficient to support a finding that a party was dangerously close to monopoly power where barriers to entry were high and competitors could not expand their short-run output. *Id.*

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir. 2021).

A specific intent to monopolize "may be inferred from well-pleaded allegations of predatory or anti-competitive conduct." *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1023 (N.D. Cal. 2016). "Whatever its origins, the existence of specific intent may be established not only by direct evidence of unlawful design, but by circumstantial evidence, principally of illegal conduct." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981). "This 'inference may be drawn from conduct . . . with an unreasonable restraint of trade in violation of section 1 of the Sherman Act.'" *Optronic Techs.*, 20 F.4th at 483 (quoting *Inglis*, 668 F.2d at 1028).

A specific intent to monopolize can be inferred from the allegations and circumstances

outlined in the Complaint. In 2018, Defendants arbitrarily stopped paying independent neurosurgeons for call coverage even though St. Luke's employed neurosurgeons and other specialty independent physicians continued to be paid for call coverage. Dkt. 4, ¶¶ 44-47, 52. This forced two Neuroscience Associates' surgeons to relinquish their privileges at St. Luke's. *Id.*, ¶¶ 53-54. But with Dr. Hajjar and Dr. Manning still on the medical staff, Defendants doubled down and added an untenable 24/7/367 that it applies differently based on employment status. *Id.*, ¶¶ 56-71. Requiring independent neurosurgeons to conduct their own call coverage not in conjunction with St. Luke's employed neurosurgeons (thereby having two surgeons on call at all times—which is not required by federal law—with one surgeon being paid and the other is not) is exclusionary. *Id.*, ¶¶ 57-58. It is because these policies are unreasonable, arbitrary, and patently unfair that specific intent to monopolize can be inferred. *Id.*, ¶ 64. As has been repeatedly emphasized, this case is distinct from other physicians' allegations of Sherman Act violations because of St. Luke's current market control. Monopolies are typically presumed as an acquisition or merger, something that causes the business to grow. In this case, St. Luke's size and presence is bordering on monopoly with over fifty percent neurosurgery market control (the Ninth Circuit has found forty-four percent sufficient to show attempt to monopolize. *See Optronic Techs.*, 20 F.4th at 484) if not already a monopoly, which gives it the ability to now exclude competition rather than absorb competition. *See* Dkt. 4, ¶ 17-23, 42, 88. By excluding competition (independent neurosurgeons), St. Luke's will retain more patients within its system because patients will not be referred to outside resources or providers. *Id.*, ¶¶ 26, 34-35, 88-89, 93. The Complaint has clearly laid out exclusionary conduct and specific intent to monopolize.

**III.    In the alternative, Neuroscience Associates respectfully request leave to amend.**

Defendants failed to comply with this Court's policy regarding 12(b)(6) motion practice, as explained in the Introduction. Accordingly, leave to amend should be granted if the Court is

inclined to grant the Motion. Further, it would not be futile to allow Neuroscience Associates leave to amend if the Court seeks amendment related to the improper documents submitted by Defendants in opposition to the Motion.

## IV.   CONCLUSION

Neuroscience Associates respectfully requests this Court deny Defendants' Motion to Dismiss. In the alternative, Neuroscience Associates respectfully requests this Court grant leave to amend Neuroscience Associates' Amended Complaint to address any perceived deficiencies. Finally, if this Court grants the Motion and denies leave to amend, Neuroscience Associates respectfully request that this Court dismiss Neuroscience Associates' claims for unjust enrichment without prejudice and remand to state court.

Dated this 29th day of January 2024.

DUKE EVETT, PLLC

_/s/ Keely E. Duke_____
Keely E. Duke – Of the Firm

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 29th day of January, 2024, I electronically filed the foregoing document using the ECF system, which sent a Notice of Electronic Filing to the following persons:

A Dean Bennett                adbennett@hollandhart.com
Zachery J. McCraney        zjmccraney@hollandhart.com

                           /s/ Keely E. Duke
                          Keely E. Duke