UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DR. MICHAEL HAJJAR, MD, an individual; DR. THOMAS MANNING, MD, PhD, an individual; and NS SUPPORT, L.L.C. d/b/a Neuroscience Associates,<br><br>        Plaintiffs,<br><br>     v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD; CLINICAL NEUROSCIENCE MANAGEMENT, PC, d/b/a Northwest Neurosurgery Associates; and DR. KENNETH LITTLE, MD, an individual,<br><br>        Defendants. | Case No. 1:23-cv-00367-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkts. 4, 11). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons set forth below, the Court grants Defendants' motion.

## I.   BACKGROUND

Plaintiff Neuroscience Associates (Neuroscience) is the "only independent medical provider for neurological surgery" in southwestern Idaho. (Dkt. 4 at ¶ 24). Six independent neurosurgeons own Neuroscience, including Plaintiffs Dr. Michael Hajjar and Dr. Thomas Manning. (*Id.* at ¶ 25). To treat patients, Neuroscience's independent neurosurgeons must have medical staff privileges at one or more of the four area hospitals, which include Saint Alphonsus Regional Medical Center, Treasure Valley Hospital, West Valley Medical Center, and Defendant St. Luke's Health System, Ltd. (St. Luke's). (*Id.* at ¶¶ 27-28).

Defendant Clinical Neuroscience Management, P.C., doing business as Northwest Neurosurgery Associates (Northwest), is a direct competitor of Neuroscience. (*Id.* at ¶¶ 24, 33). Northwest exclusively provides neurosurgery services at St. Luke's under a professional services agreement (PSA) with St. Luke's. (*Id.* at ¶¶ 31-32). Defendant Dr. Kenneth Little is the president of Northwest. (*Id.* at ¶ 11).

Under federal law, St. Luke's must maintain continuous neurosurgery on-call coverage in its emergency department, which Neuroscience refers to as "24/7/365 call coverage." (*Id.* at ¶¶ 38, 65). St. Luke's requires independent neurosurgeons to participate in 24/7/365 call coverage as a condition of maintaining their medical staff privileges to treat patients at St. Luke's hospitals. (*Id.* at ¶ 45). Until April 2018, St. Luke's paid Neuroscience's neurosurgeons for their on-call coverage. (*Id.* at ¶ 44). At that time, however, St. Luke's stopped paying independent neurosurgeons for their on-call services despite continuing to require their participation in 24/7/365 call coverage to maintain their privileges. (*Id.* at ¶ 45). Two Neuroscience neurosurgeons

eventually relinquished their St. Luke's privileges to avoid St. Luke's "disproportionate, uncompensated call burden," leaving only Drs. Hajjar and Manning from Neuroscience with St. Luke's privileges. (*Id.* at ¶¶ 54-55).

Then, in August 2022, St. Luke's implemented a new on-call policy requiring "each neurosurgeon group to [provide on-call coverage] for patients who consulted [with] or saw a neurosurgeon from that group during the last two years." (*Id.* at ¶ 56). This new policy required a Neuroscience neurosurgeon to be continuously on-call—despite that a Northwest neurosurgeon was also on-call. (*Id.* at ¶ 57). At about the same time in August 2022, Dr. Manning look a leave of absence. He later resigned his medical staff privileges at St. Luke's in August 2023, leaving only Dr. Hajjar to provide continuous on-call coverage at St. Luke's on Neuroscience's behalf. (*Id.* at ¶¶ 61-62).

Although Neuroscience objected to this new on-call policy, St. Luke's represented that Northwest ran its neurosurgery department and that, as a result, it was unable to do anything about the policy. (*Id.* at ¶ 59). Meanwhile, Plaintiffs allege that St. Luke's has always paid and continues to pay Northwest neurosurgeons for their on-call services and that St. Luke's contracts with and pays locum tenens (temporary, substitute) physicians to provide coverage for Northwest's on-call responsibilities. (*Id.* at ¶¶ 47, 49).

Plaintiffs filed this action against Defendants, challenging St. Luke's 24/7/365 on call coverage policy under both state and federal antitrust laws. (Dkt. 4). Neuroscience's allegations center around St. Luke's disproportionately favorable treatment of Northwest related to emergency on-call coverage responsibilities. Plaintiffs allege that the policy requiring uncompensated 24/7/365 call coverage at St. Luke's adversely impacts Neuroscience's "ability to grow its business

and compete more vigorously in the market," its "ability to recruit and hire new neurosurgeons," its "ability to compete in the market because many patients have insurance that requires or incentivizes them to receive care at St. Luke's facilities," and also adversely impacts Neuroscience's neurosurgeons' "ability to compete in the neurosurgery market" because they have relinquished their medical staff privileges at St. Luke's. (*Id.* at ¶¶ 70-71).

Plaintiffs allege three claims for relief. Count I alleges Defendants attempted "to attain monopoly power in the relevant product and geographic market" in violation of the Sherman Act, 15 U.S.C. § 2, and the Idaho Competition Act, Idaho Code § 48-105. (Dkt. 4 at ¶ 102). Count II alleges Defendants "conspired to create an unreasonable restraint of commerce by implementing policies that disproportionately and unfairly burden independent neurosurgeons in an effort to force independent surgeons to relinquish their [privileges] at St. Luke's" in violation of 15 U.S.C. § 1 and I.C. § 48-104. (Dkt. 4 at p. 27). Count III alleges that under Idaho state law, it would be unjust enrichment "for Defendants to retain the benefits of [Plaintiffs'] call coverage without compensating [Plaintiffs]. (*Id.* at ¶ 117). In response, Defendants filed a Rule 12(b)(6) motion. (Dkt. 11).

## II.  LEGAL STANDARD

A dismissal under Rule 12(b)(6) is appropriate where a complaint fails to state a claim upon which relief can be granted.  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a short and plain statement of the claim, showing the plaintiff is entitled to relief and giving the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it requires "more than labels and

conclusions." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

To survive a Rule 12(b)(6) motion, a claim requires a complaint to have enough factual basis which, if true, states a plausible claim for relief. *Twombly*, 550 U.S. at 556. A claim has facial plausibility when the plaintiff pleads factual content allowing the court to draw a reasonable inference the defendant is liable for the alleged misconduct. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557.

## III.  ANALYSIS

### A.    Matters Outside the Pleadings

In support of their Rule 12(b)(6) motion, Defendants attach three exhibits to their brief, including the PSA between St. Luke's and Northwest, dated October 10, 2012, and five subsequent amendments to that PSA; St. Luke's Medical Staff Bylaws; and its Organized Medical Staff Policy (Dkt. 11-1 at pp. 27-147). Additionally, St. Luke's cites two articles in its brief in support of its claim that "it consistently ranks among the highest quality hospitals in the region." (Dkt. 11-1 at p. 11 n.3-4).  Plaintiffs assert that these materials are matters outside the pleadings and that the Court should ignore them, or alternatively, that the Court should grant Plaintiffs the opportunity to conduct discovery. (Dkt. 12 at p. 7). Defendants respond that the Court may take judicial notice of the articles about St. Luke's under Rule 201(b) of the Federal Rules of Evidence and that the

Court may consider the three exhibits under the doctrine of incorporation by reference because "each exhibit is central to Plaintiffs' claims." (Dkt. 13 at pp. 6-7).

Generally, a court only considers the complaint's well-pled allegations when resolving a Rule 12(b)(6) motion. *Twombly*, 550 U.S. at 555. When a party presents matters outside the pleadings and the court does not exclude them, the court converts a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). A court, however, may consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

The doctrine of incorporation by reference "is a judicially created doctrine that treats certain documents as though they are part of the complaint." *Khoja*, 899 F.3d at 1002. The doctrine provides the complaint may incorporate a document if the complaint refers extensively to the document or the document forms the basis of the plaintiff's claim. *Ritchie*, 342 F.3d at 908. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002. If a complaint incorporates a document by reference, then the defendant may offer it in support of a Rule 12(b)(6) motion, and the district court may treat it as part of the complaint, assume its contents are true, and rely on it for purposes of resolving a Rule 12(b)(6) motion. *Ritchie*, 342 F.3d at 908 (noting the doctrine of incorporation by reference may apply to contents of coverage plan where plaintiff claims coverage or to SEC filings where plaintiff claims

stock fraud). Mere mention of a document's existence, however, is insufficient to incorporate the document's contents. *Khoja*, 899 F.3d at 1002.

The Court disagrees with Defendants that the complaint incorporates the PSA, the Bylaws, or the Medical Staff Policy by reference. Plaintiffs do not reference the Bylaws in their complaint at all.  Meanwhile, Plaintiffs only refer to the PSA a few times in their thirty-page complaint. (Dkt. 4 at ¶¶ 31, 59, 77 (noting Northwest physicians provide services under PSA), ¶ 32 (generally discussing St. Luke's relationship with physician practice groups under PSA), ¶ 89 (citing case law concluding PSA provides discretion for referrals but in practice referrals are to St. Luke's)). These references to the PSA are limited to background information. Contrary to Defendants' assertion, they are not "central" to any of Plaintiffs' claims.

Rather, Plaintiffs' claims are based on St. Luke's 24/7/365 call coverage policy and that policy's impact on competition. (*See, e.g.*, Dkt. 12 at p. 6). The challenged policy appears to be at least a small portion of the broader Medical Staff Policy which Defendants have attached to their brief. Regarding the attached Policy, however, Defendants only state "Neuroscience Associates' physicians are required to cover call for their patients [and] that requirement is consistent with the requirements imposed on all physicians." (Dkt. 11-1 at p. 12). This general statement, however, is not inconsistent with Plaintiffs' allegations. Because Defendants only offer the Policy for a proposition that is consistent with Plaintiffs' allegations and because the complaint neither incorporates by reference the PSA nor the Bylaws, the Court declines to consider them in resolving Defendants' Rule 12(b)(6) motion.

The Court also declines to take judicial notice of the articles St. Luke's cites in its brief. Federal Rule of Evidence 201(a) governs judicial notice of adjudicative facts. "The court may

judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The accuracy of information in news articles, however, cannot readily be determined and can be reasonably questioned. *Gerritsen v. Warner Bros. Ent., Inc.*, 112 F. Supp. 3d 1011, 1028 (C.D. Cal. 2015). For this reason, judicial notice of news articles is generally "limited to a narrow set of circumstances . . . e.g., in securities cases for the purpose of showing that particular information was available to the stock market." *Id.*; *see also In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1003 (N.D. Cal. 2017).

Defendants offer no explanation how the articles it cites come within the narrow circumstances justifying judicial notice. Accordingly, the Court declines to judicially notice them. Because the Court does not consider any matters outside the pleadings in resolving Defendants' Rule 12(b)(6) motion, it neither converts the motion to a summary judgment motion nor grants Plaintiffs' request to conduct discovery under Rule 56(d) before resolving Defendants' motion.

### B.      Alleged Violations of Sections 1 and 2 of the Sherman Act

Plaintiffs allege violations of Sections 1 and 2 of the Sherman Act. Section 4 of the Clayton Act allows private persons to sue for antitrust violations under Sections 1 and 2. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003). Section 1 targets *concerted* anticompetitive conduct. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989-90 (9th Cir. 2020). It prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has interpreted Section 1 as "outlaw[ing] only unreasonable restraints." *Brantley v. NBC*

*Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). Courts generally evaluate whether a practice unreasonably restrains trade in violation of Section 1 under the "rule of reason."[1] *Id.*

To state a claim under the rule of reason under Section 1, a plaintiff must allege four elements. The first three elements relate to concerted action and injury to competition; they include: (1) the existence of a contract, combination, or conspiracy among two or more people or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce; (3) which actually injures competition. *Id.* The fourth element of a Section 1 claim is the antitrust injury element which, as discussed below, is also referred to as "antitrust standing."

While Section 1 targets *concerted* anticompetitive conduct, Section 2 targets *independent* anticompetitive conduct. *Qualcomm*, 969 F.3d at 989-90. Section 2 provides an attempt to monopolize trade or commerce is unlawful. 15 U.S.C. § 2. To state a claim for attempted monopolization under Section 2, a plaintiff must allege: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).

---

[1]     The Supreme Court has identified certain restraints of trade which always or almost always tend to restrict competition and to decrease output, including horizontal agreements among competitors to fix prices or to divide markets, and deemed these restraints to be unlawful per se. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 n.6 (9th Cir. 2012). Plaintiffs' allegations do not allege a per se violation. (Dkt. 4 at ¶ 107). Accordingly, the Court analyzes Plaintiffs' allegations under the rule of reason.

### 1.  Antitrust Injury

Defendants argue the Court should dismiss both Plaintiffs' Section 1 and 2 claims because Plaintiffs fail to allege an antitrust injury, a prima facie element of both claims. (Dkt. 11-1 at p. 16). Courts sometimes also refer to this element as "antitrust standing."[2] *Brantley*, 675 F.3d at 1197. "Only those who meet the requirements for antitrust *standing* may pursue a claim under the Clayton Act[,] and to acquire antitrust standing, a plaintiff must adequately allege and eventually prove antitrust *injury*." *Glen Holly*, 352 F.3d at 371 (quotation marks omitted); *see also Rocky Mountain Med. Mgmt., LLC v. LHP Hosp. Group, Inc.*, No. 4:13-cv-00064-EJL, 2013 WL 5469890, at *12 (D. Idaho Sept. 30, 2013) ("To state a claim for either a § 1 or a § 2 antitrust claim, a plaintiff must adequately allege antitrust standing.").

"Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as injury of the type [that] the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Glen Holly*, 352 F.3d at 371 (quotation marks omitted). A plaintiff may only pursue an antitrust action if it can show an antitrust injury. There are four requirements for pleading an antitrust injury: (1) unlawful conduct, (2) causing an

---

[2]     A more accurate explanation is that an "antitrust injury" is one of the factors the court balances to determine "antitrust standing." *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Ca.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (identifying factors and noting antitrust injury given greatest weight). In determining antitrust standing, a court may balance other factors in addition to antitrust injury, including the directness of the injury, the speculative measure of the harm, the risk of duplicative recovery, and the complexity of apportioning damages. *Id.* "Nevertheless, [the court] gives great weight to the nature of the plaintiff's alleged injury." *Id.* at 1055. Regardless, a showing of antitrust injury is "not always sufficient[] to establish standing" under § 4 of the Clayton Act. *Am. Ad Mgmt.*, 190 F.3d at 1055.

injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type of injury the antitrust laws were intended to prevent. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Ca.*, 190 F.3d 1051, 1055 (9th Cir. 1999); *id.* at 1056 (clarifying plaintiff's injury must flow from *illegality* of defendant's conduct); *see also NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1073 (N.D. Cal. 2018) (noting loss must flow from *anticompetitive aspect* or effect of defendant's conduct).

Here, Plaintiffs contend "the antitrust injury" is "the arbitrary requirement that [Neuroscience's neurosurgeons must] provide 24/7/365 call coverage with no compensation simply to maintain privileges," despite St. Luke's more favorable treatment of Northwest's neurosurgeons under the policy. (Dkt. 12 at p. 12). As Defendants note, however, this "requirement" is the alleged anticompetitive *conduct*, which is only the first element of an antitrust injury. *See Am. Ad Mgmt.*, 190 F.3d at 1055 (identifying first element as "unlawful conduct"). Plaintiffs' argument that "the antitrust injury is the substance of the anticompetitive conduct" is both confusing and begs the question of whether Plaintiffs have adequately alleged the remaining elements of an antitrust injury. (Dkt. 12 at p. 13).

Other than asserting "the antitrust injury is the substance of the anticompetitive conduct," Plaintiffs' antitrust injury argument focuses on their allegations that Dr. Hajjar is providing 24/7/365 call coverage without compensation; Neuroscience's other doctors (who do not have medical staff privileges at St. Luke's) "have been cut out of over 50% of the local neurosurgical market"; "St. Luke's dominates emergency departments" in the market; and "Defendants are insulating themselves from competition by saturating" the market. (Dkt. 12 at pp. 13-14). These allegations perhaps satisfy the second element of an antitrust injury—injury to the plaintiff. They

fail, however, to satisfy the third and fourth elements of antitrust injury. Standing alone, Plaintiffs' alleged injuries are not the type that the antitrust laws were intended to prevent. Rather, the antitrust laws were enacted for the protection of competition, not for competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Plaintiffs do not argue in opposition to Defendants' Rule 12(b)(6) motion that the consequences of Defendants' alleged anticompetitive conduct is both an injury flowing from the anticompetitive aspect of that conduct and the type of injury antitrust laws are intended to prevent. *See Am. Ad Mgmt.*, 190 F.3d at 1055 (identifying elements of antitrust injury). Plaintiffs also do not cite to any allegations in their complaint that might satisfy the third and fourth elements for establishing an antitrust injury. Perhaps some of Plaintiffs' allegations may at least partially satisfy these elements. The Court, however, declines to parse through Plaintiffs' thirty-page complaint to locate those allegations if they exist.

Defendants' citation to *Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653 (7th Cir. 2014), and Plaintiffs' opposing citation to *Toranto v. Jaffurs*, 297 F. Supp. 3d 1073 (S.D. Cal. 2018), are not particularly helpful. In *Fisher*, the Seventh Circuit concluded Fisher failed to allege antitrust standing based on the "directness" and the "causal connection" between his alleged injury and the alleged antitrust violation. *Fisher*, 558 F. App'x at 655-56. The Seventh Circuit also concluded that Fisher's injury—the loss of medical staff privileges—"does not appear to be the type that Congress sought to redress within antitrust law," stating, "Fisher points to no case law that directly supports the argument that the loss of medical services provided by *independent physicians* is the type of injury recognized by antitrust laws." *Id.* at 656.

Meanwhile, the district court in *Toronto* reached the opposite conclusion, ruling a physician may assert an antitrust claim based on the denial of medical staff privileges. In support, the court noted that the Defendants "cite to no case suggesting a plaintiff may not assert a claim against a defendant for the allegedly arbitrary denial of privileges that results in a restraint of trade." 297 F. Supp. 3d at 1089. In that case, the court concluded Toronto had alleged an antitrust injury because he had alleged (1) unlawful conduct; (2) any injury, i.e., the denial of his application for privileges; and (3) an injury to competition, including longer patient wait times, higher costs, and elimination of certain procedures. *Id.* at 1089-90.

Regardless of whether antitrust laws were intended to address the denial of medical staff privileges—an issue on which the courts in *Toronto* and *Fisher* disagree—the inquiry at this stage is whether Plaintiffs have alleged, among other things, an antitrust injury. Because Plaintiffs have not alleged an antitrust injury—or at least have not articulated how they have in opposing Defendants' motion—the Court concludes Plaintiffs fail to allege a claim for relief under either Sections 1 or 2. Because the Court grants Plaintiffs leave to amend, however, it addresses Defendants' remaining challenges.

## 2. Injury to Competition

Defendants also challenge Plaintiffs' claims for failure "to plead harm to competition." (Dkt. 11-1 at p. 14). To plead an injury to competition, a plaintiff must at a minimum "sketch the outline of the injury to competition with allegations of supporting factual detail," raising a reasonable expectation that discovery will reveal evidence of an injury to competition. *Brantley*, 675 F.3d at 1198 (quotations and brackets omitted). A conclusory allegation that the defendants have unreasonably restrained competition is not enough. *Id.* Further, a plaintiff must plead more

than an injury to competition impacting just the plaintiff. *Id.*; *see also NorthBay*, 305 F. Supp. 3d at 1073 (noting it is not enough to show one's injury was caused by illegal behavior). Also, "[c]onclusory allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers do not sufficiently allege an injury to competition." *Prime Healthcare Servs., Inc. v. Service Employees Int'l Union*, 642 Fed. App'x 665, 667 (9th Cir. 2016) (quotations and brackets omitted). Protecting competition, not individual competitors, is at the heart of antitrust regulation. *AliveCor v. Apple, Inc.*, 592 F. Supp. 3d 904, 913-14 (N.D. Cal. 2022). Accordingly, antitrust laws target only behavior which tends to reduce or actually reduces competition. *Id.*

Defendants contend Plaintiffs' antitrust claims fail because they only allege injury to themselves and not to competition. (Dkt. 11-1 at p. 9). Specifically, Defendants argue Plaintiffs' allegations are insufficient because "they lack factual support," fail to allege "any specific instance" of St. Luke's "charging  higher than competitive rates for neurosurgical services," "providing low quality neurosurgical care," or "'steering' a patient to St. Luke's." (*Id.* at p. 14). Further, Defendants argue that "the only non-conclusory harm [alleged] is that Defendants impose supposed untenable call burdens on Plaintiffs" but that "lost profits or lost wages is not harm to competition." (*Id.* at p. 15). In response, Plaintiffs argue that Defendants' "unequal treatment related to call coverage obligations" ensures "Defendants can both insulate themselves from competition while also dominating the market, restricting patient choice, and raising prices for all payors and patients" and relatedly that "St. Luke's is large enough and powerful enough to exclude competition which in turn also creates higher prices and lower quality of care for the patient market." (Dkt. 12 at pp. 11-12).

The Court agrees with Defendants that Plaintiffs have failed to plead an actual injury to competition. Plaintiffs assert the relevant market is neurosurgical services and neurosurgical hospital services (which they define as "services related to the provision of neurosurgical care, including radiology, imaging and other diagnostic services, and physical therapy") in Ada and Canyon Counties. (Dkt. 12 at p. 8; *see also* Dkt. 4 at ¶¶ 84-87 (alleging relevant market)). In this market, Plaintiffs allege Defendants' 24/7/365 call coverage policy has caused Neuroscience's neurosurgeons to relinquish their medical staff privileges which in turn "impacts [Neuroscience's] ability to grow its business," "compete more vigorously in the market," and "recruit and hire new neurosurgeons," resulting in an overall "diminished" ability to complete in the neurosurgery market. (Dkt. 4 at ¶¶ 69-71). A competitor's diminished ability to compete, however, is inadequate to allege an actual injury to competition. *See Brantley*, 675 F.3d at 1198 (ruling plaintiff must plead more than injury to competition impacting just plaintiff)*; NorthBay*, 305 F. Supp. 3d at 1073 (noting it is not enough to show one's injury was caused by illegal behavior). Even "[t]he elimination of a single competitor, without more, does not prove anticompetitive effect" because "[t]he antitrust laws were enacted for the protection of *competition*, not *competitors*." *McGlinchy v. Shell Chemical*, 845 F.2d 802, 811-12 (9th Cir. 1988).

Plaintiffs' general allegations that Defendants' conduct injures patients in the relevant market likewise are inadequate to aver an actual injury to competition. These allegations include that Defendants' conduct limits patients "ability to see providers outside of St. Luke's" and its "facilities and services are higher cost, lower quality, and may result in longer lengths of stay." (Dkt. 4 at ¶¶ 93, 100). In support of these general propositions, Plaintiffs identify numerous articles purportedly concluding that "high market concentration" results in "lesser quality health care" and

increases hospital prices, which are passed onto "employers and their employees." (*Id.* at ¶¶ 94-99). None of these articles, however, address the relevant market Plaintiffs identify in this case: neurosurgical and related services in Ada and Canyon Counties. Moreover, conclusory allegations of adverse effects on consumers, such as reduced choices or increased prices, are not sufficient to allege actual injury to competition.  *See, .e.g.*, *Prime Healthcare*, 642 Fed. App'x. at  667 ("Conclusory allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers do not sufficiently allege an injury to competition."). Plaintiffs' failure to allege an injury to competition is an independent, alternative basis to dismiss their claims for violation of Sections 1 and 2.

### 3.  Exclusionary Conduct With Specific Intent

Defendants also argue Plaintiffs fail to "allege any anticompetitive or exclusionary conduct with a specific intent to monopolize" necessary to state a claim of attempted monopolization under Section 2. (Dkt. 12 at p. 9). "[I]ntent may be inferred from either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary." *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 740 (9th Cir. 1985). "In the Ninth Circuit, the question of intent is subsumed in an analysis of exclusionary conduct." *Nationwide Power Solutions, Inc. v. Eaton Electrical, Inc.*, No. SACV 07-883 JVS, 2008 WL 11408997, at *11 (C.D. Cal. Oct. 10, 2008) (citing *Drinkwine*, 780 F.2d at 739).

Here, Plaintiffs assert the Court may infer specific intent because "Defendants arbitrarily stopped paying independent neurosurgeons for call coverage" despite that St. Luke's continued to pay its "employed neurosurgeons and other specialty independent physicians" and because Defendants' 24/7/365 call coverage policy is "unreasonable, arbitrary, and patently unfair."

(Dkt.  12 at p. 19). Further, Plaintiffs assert that "requiring independent neurosurgeons to conduct their own call coverage not in conjunction with St. Luke's employed neurosurgeons . . . is exclusionary." (*Id.*). In support, Plaintiffs note the policy forced two Neuroscience neurosurgeons to relinquish their medical staff privileges at St. Luke's. (*Id.*).

Plaintiffs' arguments, however, fall short of showing exclusionary conduct. Forcing some or even all of Neuroscience's neurosurgeons to relinquish their privileges is not forcing them out of the market. As Defendants note, there are other hospitals in the market. Rather, by enforcing St. Luke's 24/7/365 call coverage policy, Defendants are essentially refusing to deal with Neuroscience's neurosurgeons. As the Ninth Circuit and other courts have repeatedly noted, generally competitors do not have a duty to deal with one another. *SmileCare Dental*, 88 F.3d at 786 ("[I]t is well-established that competitors do not have a general duty to deal with one another."); *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1221 (10th Cir. 2009) ("[T]he general rule [is] that a business, even a putative monopolist, has 'no antitrust duty to deal with its rivals at all.'").

This right not to deal with a competitor is not absolute, however. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 n.32 (1992). Rather, the right exists only if legitimate competitive reasons exist for refusing to deal with a competitor. *Id.* In this case, Defendants explain that it pays its physicians for call coverage because it is paying them for their services and that Plaintiffs can likewise bill their patients for Neuroscience's neurosurgeons' call coverage services and posits perhaps Neuroscience is already doing so. (Dkt. 11-1 at p. 22). On its face, this

**MEMORANDUM DECISION AND ORDER - 17**

explanation appears to be a legitimate reason for Defendants' refusal to pay Neuroscience for call coverage. Plaintiffs do not respond with an explanation why it is not a legitimate reason. Accordingly, the Court concludes Plaintiffs fail to plead a claim for attempted monopolization.

### 4.  Concerted Action under Section 1

Finally, Defendants challenge Plaintiffs' Section 1 claim, arguing Plaintiffs failed to allege concerted action. "Section 1 applies only to concerted action that restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). "[C]oncerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities." *Id.* at 191.  "[T]here is not necessarily concerted action simply because more than one legally distinct entity is involved." *Id.* at 192. Rather, the court considers "how the parties involved in the alleged anticompetitive conduct actually operate." *Id.* at 191. "The question is whether the agreement joins together 'independent centers of decisionmaking.' If it does, the entities are capable of conspiring under § 1." *Id.* at 196.

In contrast, entities with "economic unity" are treated as a single entity and cannot conspire for purposes of Section 1. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1450 (9th Cir. 2003). Generally, economic unity occurs "[w]here there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses." *Id.* The nature of entities and their ability to conspire is ordinarily a question of fact. *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1449 (9th Cir. 1988). The Ninth Circuit has declined to establish a rule as a matter of law that "hospitals cannot conspire with the medical staff." *Id.* (ruling doctors' and hospital's interests were sufficiently different to allow for concerted action despite that doctors may have been hospital's agents for some purposes).

Here, Defendants assert Plaintiffs have failed to allege concerted action because, "[a]s pled, St. Luke's, Northwest, and Dr. Little share a complete unity of economic interest and cannot conspire for Section 1 purposes." (Dkt. 11-1 at p. 19). In support, they argue that Plaintiffs' complaint "consistently refers to Northwest's neurosurgeons as employees of St. Luke's or 'functionally equivalent' to employees" and that "St. Luke's cannot conspire with its alleged employees or with those who are 'functionally equivalent' to employees, especially where [Plaintiffs allege] Defendants have the same economic interests." (*Id.*).

Defendants, however, misconstrue Plaintiffs' allegations. Plaintiffs specifically allege "there is no direct employment relationship between St. Luke's and [the] physicians practicing under the PSA." (Dkt. 4 at ¶ 32). Despite this allegation, Plaintiffs note in their complaint that the district court in *Saint Alphonsus Med. Ctr. – Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-CV-00560-BLW, 2014 WL 407446 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015), construed "a PSA arrangement" for "purposes of [that] case" as "a relationship functionally equivalent to employment to the extent that it provides, at the group level, the same clinical and financial alignment that employment provides at the individual level." *Id.* at *3 n.1. Why Plaintiffs included this reference to *Saint Alphonsus* in their complaint is unclear. Regardless, the Court declines to construe the footnote in that case as an allegation by Plaintiffs that the alleged concerted action is between St. Luke's and "its alleged employees or with those who are 'functionally equivalent to employees'" or that Defendants "share a complete unity of economic interest." (Dkt. 11-1 at p. 19).

Plaintiffs allege Northwest is a "professional service corporation" distinct from St. Luke's which is a "non-profit corporation." (Dkt. 4 at ¶¶ 9-10). Further, Plaintiffs allege St. Luke's and

Northwest "have conspired to create an unreasonable restraint of commerce by implementing policies that disproportionately and unfairly burden independent neurosurgeons in an effort to force [them] to relinquish their [medical staff privileges] at St. Luke's, thereby reducing [their] market share" and that this conduct ensures "patients are steered to St. Luke's providers and facilities [reducing independent neurosurgeons'] market share." (Dkt. 4 at ¶¶ 107-08). Finally, as Plaintiffs allege, St. Luke's has previously asserted Northwest "controls the neurosurgery call," suggesting St. Luke's and Northwest do not have a complete unity of interest. These allegations sufficiently allege concerted action between St. Luke's and Northwest for purposes of Rule 12(b)(6).

In summary, Plaintiffs have failed to allege sufficient facts of an antitrust injury and an injury to competition, both of which elements are necessary for a claim under Sections 1 and 2. Plaintiffs also fail to allege exclusionary conduct necessary for an attempt to monopolize claim under Section 2. Plaintiffs do, however, allege concerted action for purposes of a claim under Section 1.[3] Because Plaintiffs base their state law antitrust claims on the same facts on which they base their federal claims, the Court's analysis under federal law is determinative of Plaintiffs' state

---

[3]     Plaintiffs appear to concede the alleged concerted action is between St. Luke's and Northwest and does not involve Dr. Little. (*See* Dkt. 12 at p. 16) ("Neuroscience Associates has sufficiently pled allegations regarding a conspiracy between St. Luke's and Northwest."). The parties briefing does not address Dr. Little's involvement in alleged wrongful conduct. Defendants do not request, however, to have Dr. Little dismissed as a defendant. (Dkt. 11-1 at p. 26). To the extent Plaintiffs concede Dr. Little should not be an individual defendant, any amendment to their complaint should reflect that concession.

antitrust claims. *Rocky Mt. Med. Mgmt.*, 2013 WL 5469890, at \*12. For these reasons, the Court grants Defendants' motion to dismiss Counts I and II.

### C.    Unjust Enrichment

Plaintiffs also allege a state law claim for unjust enrichment, asserting that for Defendants to retain the benefits of Plaintiffs' call coverage services without compensating Plaintiffs would be unfair and unjust.  A district court may decline to exercise supplemental jurisdiction, however, if it has dismissed all claims over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Having dismissed Counts I and II, the Court declines to exercise supplemental jurisdiction over Plaintiffs' unjust enrichment claim, Count III. *See Perry v. Rado*, 504 F. Supp. 2d 1043, 1050 (E.D. Wash. 2007), *aff'd*, 343 F. App'x 240 (9th Cir. 2009) (dismissing pendent state law claims without prejudice due to dismissal of federal antitrust claims).

### D.    Leave to Amend

Plaintiffs request the Court grant them leave to file another amended complaint to "address any perceived deficiencies." (Dkt. 12 at p. 20). Rule 15 of the Federal Rules of Civil Procedure provides a trial court should grant leave to amend freely when justice so requires. Fed. R. Civ. P. 15(a)(2). The policy favoring leave to amend is to be applied with "extreme liberality." *Sonoma Cnty. Ass'n of Retired Employees v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013). Whether to grant or deny a motion to amend is within the district court's discretion, but "outright refusal to grant the leave without any justifying reason appearing for the denial is not

an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Accordingly, although the Court dismisses Plaintiffs' complaint, it does so without prejudice and grants Plaintiffs' request to file an amended complaint.

## IV.  ORDER

**IT IS ORDERED that:**

1.      Motion to Dismiss (Dkt. 11) is **GRANTED**. Plaintiffs' Amended Complaint (Dkt. 4) is **DISMISSED** without prejudice. Plaintiffs must file an amended complaint with thirty (30) days of the issuance of this Order.

DATED: July 16, 2024

Amanda K. Brailsford
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 22