Keely E. Duke
ISB 6044; ked@dukeevett.com
Molly E. Mitchell
ISB 10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 W. River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Dr. Michael Hajjar, MD, an individual, Dr. Thomas Manning, MD, PhD, an individual, and NS Support, L.L.C. d/b/a Neuroscience Associates,<br><br>    Plaintiffs,<br>v.<br><br>St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates,<br><br>    Defendants. | Case No. 1:23-CV-367<br><br>**SECOND AMENDED COMPLAINT**<br><br>**(Demand for Jury Trial)** |

Plaintiffs Dr. Michael Hajjar, MD, Dr. Thomas Manning, MD, PhD, and NS Support, L.L.C. d/b/a Neuroscience Associates ("Neuroscience Associates"), by and through their attorneys of record, Duke Evett, PLLC, and for a Second Amended Complaint against Defendants St. Luke's Health System, LTD, Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates, plead and allege as follows:

## I.    INTRODUCTION

1.    Over the years, St. Luke's Health System, LTD ("St. Luke's") has obtained a

dominant share of Southwest Idaho's healthcare market by systematically acquiring independent medical providers. More recently, St. Luke's has focused its attention on professional neurosurgery services and neurosurgery hospital services to maintain and enhance its monopoly power in those markets. St. Luke's is now the area's largest healthcare provider by far and leverages its size to charge rates that are well above competitive levels. This has become evident within the professional neurosurgery services and neurosurgery hospital services markets. In short, commercial payors are forced to play ball with St. Luke's regardless of the reasonableness of its rates because—due to the market share St. Luke's commands—health care plans for insureds in Southwest Idaho absolutely must provide coverage for healthcare provided at St. Luke's facilities, otherwise insureds will not have sufficient options for their healthcare needs. The trickle-down effect from leveraging St. Luke's dominant market share to charge higher than competitive rates is apparent: to account for St. Luke's higher than competitive rates, commercial payors must charge higher premiums for their health care plans, and when employers must pay more for healthcare plans, these increased costs are ultimately borne by the employees.

2.      Commercial payors, employers, and employees are not the only ones affected by St. Luke's efforts to monopolize healthcare in Southwest Idaho. Such monopolization is achieved by significantly diminishing the market share for independent healthcare providers so that St. Luke's is effectively the only game in town. This lawsuit deals with St. Luke's efforts to significantly diminish the market share for independent neurosurgeons.

3.      St. Luke's and its neurosurgery provider, Northwest Neurosurgery Associates, have placed untenable call coverage burdens on independent neurosurgeons to force them to relinquish their medical staff privileges at St. Luke's facilities. St. Luke's efforts started in 2018,

when it stopped paying independent neurosurgeons for emergency department call coverage (which independent neurosurgeons were required to provide to maintain their medical staff privileges). Northwest Neurosurgery Associates employed neurosurgeons were and are still compensated for call coverage, as are locum tenens physicians St. Luke's pays to alleviate call coverage burdens for its own physicians (but not independent neurosurgeons). This forced some but not all the independent neurosurgeons to relinquish their medical staff privileges. In August 2022, St. Luke's and Northwest Neurosurgery Associates dialed up their concerted efforts to drive out the two remaining independent neurosurgeons by changing the call coverage policy in a way that effectively requires the independent neurosurgeons to be on call 24/7/365 (and with absolutely no compensation for this call coverage). These anticompetitive efforts have been for the specific intent of excluding independent neurosurgeons from the professional neurosurgery market, and to then monopolize both the professional neurosurgery market and the neurosurgery hospital market.

4. By driving out independent neurosurgeons, St. Luke's and Northwest Neurosurgery Associates are increasing St. Luke's share of the professional neurosurgery market in Southwest Idaho and in turn further expanding its share of the area's market for neurosurgical hospital services (i.e. services related to neurosurgical services, such as radiology, imaging services, and physical therapy). This is because independent neurosurgeons may—and almost always do—refer patients to non-St. Luke's facilities for further care (e.g. imaging, physical therapy, etc.), whereas St. Luke's neurosurgeons only refer patients to St. Luke's facilities.

5. St. Luke's efforts to significantly diminish the independent neurosurgeons' market share and monopolize the neurosurgery market and the neurosurgical hospital services market are anticompetitive and must be stopped.

## II.     PARTIES

6.     Dr. Michael Hajjar, MD is an individual residing in Ada County, Idaho and is a member of Neuroscience Associates.

7.     Dr. Thomas Manning, MD, PhD, is an individual residing in Ada County, Idaho, and is a member of Neuroscience Associates.

8.     NS Support, L.L.C. is an Idaho limited liability company with its principal place of business in Ada County, Idaho doing business under the name Neuroscience Associates.

9.     St. Luke's Health System, LTD, is an Idaho non-profit corporation doing business in Idaho with its principal place of business in Ada County, Idaho.

10.     Clinical Neuroscience Management, PC is an Idaho professional service corporation with its principal place of business in Ada County, Idaho doing business under the name Northwest Neurosurgery Associates.

## III.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331. Plaintiffs assert federal subject matter pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in the Southern Division of the United States District Court for the District of Idaho pursuant to 28 U.S.C. § 1391.

## IV.   GENERAL ALLEGATIONS

### The Entities

**A.   Neuroscience Associates**

14.    Neuroscience Associates is Southwest Idaho's only independent medical provider for neurological surgery.

15.    Neuroscience Associates is owned by six neurosurgeons, including Dr. Hajjar and Dr. Manning.

16.    Independent physicians have significantly more freedom to assist patients in choosing where to get medical care, based on quality and affordability, rather than employed physicians who steer the patient's medical care to the employer hospital.  As such, independent physicians have the freedom to recommend patients to whichever medical facility that, in their professional opinion, would provide the appropriate care and at oftentimes more affordable costs than St. Luke's, based on that patient's particular needs and circumstances.

17.    Neuroscience Associates' independent neurosurgeons must maintain medical staff privileges ("Medical Staff Membership") at area hospitals so they can treat patients, including Neuroscience Associates' patients, at each hospital.

18.    Neuroscience Associates is affiliated with St. Luke's, Saint Alphonsus, Treasure Valley Hospital, and West Valley Medical Center, meaning some or all its independent neurosurgeons have Medical Staff Membership at these hospitals.

19.    Neuroscience Associates has had neurosurgeons on St. Luke's Medical Staff since the 1990's.

20.    Maintaining Medical Staff Membership is critically important for independent neurosurgeons, because without being members of the medical staff they cannot treat their

hospitalized patients.  For example, independent neurosurgeons who do not have Medical Staff Membership at St. Luke's cannot treat their patients at St. Luke's.

21.     The inability of a patient's physician to practice at St. Luke's is a significant impediment for those patients who prefer St. Luke's or who are members of managed care plans that prefer or require treatment at St. Luke's.

**B.      St. Luke's Professional Services Agreement with Northwest Neurosurgery Associates.**

22.     At all relevant times, Northwest Neurosurgery Associates has been St. Luke's exclusive provider of neurosurgery services pursuant to a professional services agreement ("the PSA").

23.     Commonly, under a professional service agreement, a physician practice group agrees to provide health care services exclusively for the hospital. Payors reimburse the hospital for the services provided by the practice group. Although there is no direct employment relationship between the hospital and physicians practicing under a professional services agreement, the agreement sets forth the compensation the hospital will pay for services provided by the group's physicians. Because the hospital negotiates the managed care rates with payors and is reimbursed by payors for the services provided under the professional service agreement, physicians under a PSA are contributing to the hospital's market power.

24.     Under the PSA between St. Luke's and Northwest Neurosurgery Associates, St. Luke's engaged Northwest Neurosurgery Associates to provide professional neurosurgery services and to take a lead role in developing and directing a comprehensive neuroscience program at St. Luke's.

25.     The PSA provides all professional physician fees attributable to Northwest Neurosurgery Associates shall be the income of St. Luke's.

26.     Accordingly, St. Luke's pays Northwest Neurosurgery Associates the agreed upon compensation described in the PSA as payment in full for all professional neurosurgery services.

27.     Northwest Neurosurgery Associates must maintain its own professional malpractice insurance and St. Luke's shall be named as an additional insured.

28.     The PSA declares that St. Luke's engaged Northwest Neurosurgery Associates as an independent contractor to render the Medical Services, and that nothing in the PSA should be construed to create a joint venture, partnership, association, or other affiliation between St. Luke's and Northwest Neurosurgery Associates beyond independent parties to a contractual relationship.

29.     Northwest Neurosurgery Associates is a direct competitor of Neuroscience Associates.

30.     Defendants alleged in their Memorandum in Support of Motion to Dismiss [Dkt. 11-1] that Dr. Kenneth Little, is the sole neurosurgeon employed by Northwest Neurosurgery Associates while the remaining neurosurgeons at St. Luke's (minus Neuroscience Associates and locum tenens) are employees. *See Memorandum in Support of Motion to Dismiss* [Dkt. 11-1], p. 4.

## **Trade & Commerce**

**C.     St. Luke's efforts to monopolize the neurosurgery market impacts interstate commerce.**

31.     St. Luke's is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Hundreds of millions of dollars (and close to a majority) of St. Luke's, Saint Alphonsus' and Treasure Valley Hospital's ("TVH") revenues come from sources located outside of Idaho, including payments from the federal government through such

programs as Medicare and payments from out of state commercial payors such as Select Health, Coventry, Aetna and United Healthcare.  This includes payments for both hospital and physicians' services.  St. Luke's and Saint Alphonsus borrow at least tens of millions of dollars from lenders in interstate commerce, through their bond offerings.  Moreover, St. Luke's sells medical services in interstate commerce, and its conduct has an effect on the citizens of several states.  St. Luke's activities at issue include activities in Oregon, where it owns and operates medical facilities.  Both St. Luke's and Saint Alphonsus treat a substantial number of patients from other states, including in particular eastern Oregon. Further, these hospitals spend millions of dollars on the purchase of supplies in interstate commerce.

32.     As a result of the fact that much of St. Luke's, Saint Alphonsus' and TVH's revenues come from sources located outside of Idaho, including payments from out of state commercial payors, the increases in the market power of St. Luke's, and weakening of Saint Alphonsus and TVH, described herein, will substantially affect the prices and rates negotiated with the commercial payors and, therefore, substantially affect the parties' revenues in interstate commerce.  Such actions will also substantially affect the flow of patients across state lines and purchase of supplies in interstate commerce, substantially increasing St. Luke's volume of patients and interstate purchases and decreasing the volumes of other area hospitals.

### Current Market Structure

**D.     St. Luke's dominates Southwest Idaho's healthcare market.**

33.     St. Luke's is Southwest Idaho's largest healthcare provider and operates numerous hospitals in the area.

34.     As of 2014, St. Luke's operated the following hospitals in the area:

(1) St. Luke's Boise Medical Center, a 400–plus bed medical center in Boise; (2) St. Luke's Meridian Medical Center, a 165–plus bed hospital in Meridian; (3)

St. Luke's Magic Valley Regional Medical Center, a 228–bed hospital in Twin Falls; (4) St. Luke's Jerome, a 25–bed critical-access hospital in Jerome; (6) St. Luke's McCall, a 15–bed critical access hospital in McCall; and (7) North Canyon Medical Center, a 15–bed critical access hospital in Gooding.

*Saint Alphonsus Med. Ctr. – Nampa, Inc. v. St. Luke's Health Sys., Ltd.,* No. 1:12-CV-00560-BLW, 2014 WL 407446, at *2 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015).

35.     St. Luke's market share has only increased since then. St. Luke's also operates the St. Luke's Eagle Medical Plaza, St. Luke's Elmore Medical Center, Long-Term and Rehabilitation at St. Luke's Elmore, St. Luke's Rehabilitation Hospital in Boise, St. Luke's Nampa Medical Center, Idaho Elks Children's Pavilion, St. Luke's Canyon View Behavioral Health Services, St. Luke's Wood River Medical Center, St. Luke's Fruitland Medical Plaza, St. Luke's Children's Hospital in Boise, and Gwen Neilsen Anderson Rehabilitation Center in Twin Falls.

36.     St. Luke's operates sixteen hospitals and medical centers throughout Southwest Idaho.

37.     St. Luke's operates 277 medical clinics in Southwest Idaho and Eastern Oregon.

38.     St. Luke's is Idaho's largest employer, with a medical staff of over 1,800 physicians and advanced practice providers. St. Luke's employs over 15,000 people. For context, this is almost twice as many people as Wal-Mart employs in Idaho (Wal-Mart is the largest employer in over twenty states and is Idaho's second largest employer) and is about the same number of employees as Micron, Albertson's, and Saint Alphonsus *combined*.

39.     These numbers are especially startling since St. Luke's operations in Idaho are concentrated to the southwest part of the state. Although St. Luke's operations are limited to a geographical area that only encompasses about a third of the state, it is employing far more employees than any other employer in the state, including businesses that operate statewide like

Wal-Mart and Albertson's.

40.     Beyond sheer presence, St. Luke's dominates exclusive contracts with insurers in the area.

41.     Select Health is the second largest insurer in Southwest Idaho and has an exclusive contract with St. Luke's, meaning a Select Health patient must be seen at St. Luke's for surgery or other hospital procedures.

42.     Other insurances such as Pacific Source, Medicare HMO's, Medicare Advantage Plans, Regence BlueShield of Idaho, and plans on the Health Insurance Marketplace require St. Luke's as the primary hospital.

43.     St. Luke's is also in the process of rolling out St. Luke's Health Care Plan, a private healthcare insurance product that competes in the general insurance market and will presumably result in enrolled patients receiving medical care exclusively – or at a substantially lesser cost – at St. Luke's facilities.

**E.     Relevant Market and Geographic Structure**

44.     For purposes of this Complaint, one relevant product market is the provision of professional neurosurgical services. Neurosurgical services include diagnosis and surgical treatment of injuries, disorders, and diseases to the brain, spinal cord, spinal column, and peripheral nervous system.

45.     A second relevant product market is neurosurgical hospital services, which are hospital services related to the provision of neurosurgical care, including radiology, imaging and other diagnostic services and physical therapy.

46.     There are no close substitutes for professional neurosurgical services provided by other types of physicians. Although orthopedic surgeons may perform spinal surgery, and

therefore compete with neurosurgeons to a limited degree, no managed care plan could successfully offer a network of providers that only included orthopedic surgeons but no neurosurgeons. This is because only neurosurgeons perform both spinal and cranial surgery, and therefore any health care system possessing a monopoly of professional neurological services in a relevant geographic market would be able to raise prices above a competitive level.

47.     There are no close substitutes for neurosurgical hospital services. Patients who require neurosurgery do not have alternatives and the majority of these cases must be completed within a hospital to ensure the proper safety procedures and resources are accessible.

48.     For purposes of this Complaint, the relevant geographic market is Ada and Canyon Counties for both professional neurosurgical services and neurosurgical hospital services (referred to as neurosurgical care). Patients do not wish to travel long distances for neurosurgical care —which is often times needed on an emergency basis—and there is no competition for neurosurgical services for hundreds of miles outside of Ada and Canyon counties. As a result, no managed care plan could successfully offer a network in Ada and Canyon Counties without including neurosurgeons located in the area.

49.     Within the relevant geographic market are St. Luke's, Saint Alphonsus, Treasure Valley Hospital and West Valley Medical Center, representing nine hospitals in total.

50.     St. Luke's has five hospitals located in Boise, Eagle, Meridian, and Nampa, Idaho.

51.     Three of those hospitals have Emergency Departments. On St. Luke's website, it reports that in fiscal year 2023 the St. Luke's Meridian location was the busiest Emergency Department in Idaho with 58,020 visits. The Boise location had 45,137 visits while the Nampa location had 41,228.

52.     Saint Alphonsus has two hospitals located in Boise and Nampa, Idaho.

53.     Saint Alphonsus has four emergency departments in the relevant geographic locations.

54.     Treasure Valley Hospital is one hospital located in Boise, Idaho, with no Emergency Department. Treasure Valley is not a full-service hospital similar to St. Luke's or Saint Alphonsus. While some cranial cases can be conducted at Treasure Valley, most cannot. Most elective spinal cases can be conducted at Treasure Valley, while more complex surgeries, such as complex skull base and cerebrovascular surgeries, or high-risk patients, such as old or sick patients that need an Intensive Care unit postop, are more appropriate at St. Luke's or Saint Alphonsus due to Treasure Valley's limited services in comparison.

55.     West Valley Medical Center is one hospital located in Caldwell, Idaho, and has an Emergency Department. West Valley is not a full-service hospital similar to St. Luke's or Saint Alphonsus. While most elective spinal cases can be conducted at West Valley Medical, more complex surgeries, such as complex skull base and cerebrovascular surgeries, or high-risk patients, such as old or sick patients that need an Intensive Care Unit postop, are more appropriate at St. Luke's or Saint Alphonsus due to West Valley's limited services in comparison.

56.     Consequently, Treasure Valley Hospital and West Valley Medical Center are not close substitutes to St. Luke's due to the limited surgeries that can be conducted at their facilities.

57.     As for professional neurosurgeons, based upon information and belief, there are currently twenty professional neurosurgeons who practice in the relevant geographic market. This number does not include the locum tenens that Plaintiffs are aware of due to the fleeting nature of locum tenens.

58.     To Plaintiffs' knowledge, there are eight neurosurgeons who are employed by St. Luke's.

59.     One neurosurgeon, Dr. Kenneth Little, is employed by Northwest Neurosurgery Associates and is subject to the PSA between Northwest Neurosurgery Associates and St. Luke's.

60.     To Plaintiffs' knowledge, there are five neurosurgeons that work exclusively at Saint Alphonsus.

61.     Lastly, Neuroscience Associates is the only independent neurosurgery clinic with six practicing neurosurgeons.

62.     The nearest neurosurgeons from Ada and Canyon County are in Pocatello (4 hrs 20 min) and Idaho Falls. There are also neurosurgeons in Portland, Lewiston, Seattle and Salt Lake City (5 hrs+). Importantly there are none in Eastern Oregon and none in Twin Falls or the Wood River Valley. This makes the neurosurgery professional market geographically isolated in Ada and Canyon County.

63.     The market for professional neurosurgical services and neurosurgical hospital services in Ada and Canyon Counties are highly concentrated.

64.     The American Hospital Directory, ahd.com, provides data, statistics, and analytics about more than 7,000 hospitals nationwide. The data is pulled from Medicare Cost Reports that each hospital must provide to the federal government each year.

65.     According to ahd.com, St. Luke's has sixty-five percent of the neurosurgical hospital services market, Saint Alphonsus thirty-five percent, and West Valley zero. Treasure Valley was not recorded by the AHD.

66.     Since professional neurosurgical services are conducted within the hospital, the market shares for professional neurosurgical services should approximate the neurosurgical hospitals services market, meaning St. Luke's has approximately sixty-five percent of the neurosurgical professional services market as well.  Additionally, as the result of Defendants' anticompetitive actions (as will be further described below), virtually all the neurosurgery cases within St. Luke's are conducted by St. Luke's and Northwest Neurosurgery Associates' employed neurosurgeons, meaning St. Luke's and Northwest Neurosurgery Associates' have 65% market share of the professional neurosurgical services market as well.

67.     Under the Herfindahl-Hirschman Index ("HHI") test, a measure of market concentration set forth by the federal antitrust agencies in their Horizontal Merger Guidelines, competition is assessed by summing the squares of the market shares of the competitors. By that measure, the relevant markets are each "highly concentrated," defined by the federal antitrust agencies as markets with HHIs over 2,500. When markets are highly concentrated, even small shifts of patients from hospitals with smaller shares to hospitals with greater market shares can be anticompetitive; an increase of 200 HHI points is presumed anticompetitive.

68.     Applying the ahd.com numbers into the HHI formula comes out to an index of 5,450 ($65^2 + 35^2 + 0^2 = 5,450$), the market for neurosurgical hospital services is well over the 2,500 threshold for highly concentrated markets.

69.     Although these numbers are solely based upon Medicare cases, it is reasonable to assume the private insurer market would reflect similarly. Even if Plaintiffs generously provided West Valley and Treasure Valley each eleven percent of the market (based upon their market share of hospital locations) and lowered both St. Luke's and Saint Alphonsus by eleven percent, the HII index would be 3,734 ($54^2 + 24^2 + 11^2 + 11^2$) for neurosurgical hospital services.

70.     Because the neurosurgical professional and services markets in Ada and Canyon County are highly concentrated, even the smallest shift of market shares to the largest competitor, St. Luke's, may be considered anticompetitive.

## DEFENDANT'S ANTICOMPETITIVE ACTIONS

**F.     Emergency Department Call Coverage**

71.     Federal law requires St. Luke's to have 24/7/365 neurosurgery coverage in its Emergency Department.

72.     According to St. Luke's Organized Medical Staff Policy, originally authorized on March 8, 2022, and revised on October 18, 2023, being on-call requires a proximity time limit of thirty minutes, defined as the amount of time necessary to travel by ground transportation in order to be physically present at the designated St. Luke's Boise or Meridian Medical Center site.

73.     St. Luke's requires independent neurosurgeons to participate in Emergency Department call coverage in order to maintain Medical Staff Membership at St. Luke's facilities.

74.     Emergency Department call coverage includes coverage for all of St. Luke's hospitals throughout Southwest Idaho.

75.     As such, when on call, independent neurosurgeons such as Neuroscience Associates are helping St. Luke's meet its federal law requirement across the entire St. Luke's network, a benefit that is now, as outlined below, going unpaid by St. Luke's over Neuroscience Associates' objections.

76.     The First Amendment to Professional Services Agreement, effective October 1, 2015, between St. Luke's and Northwest Neurosurgery Associates included an "Amendment to Description of Services" to include "Call Coverage."

**SECOND AMENDED COMPLAINT - 15**

77.     The Amendment provided that Northwest Neurosurgery Associates,

will provide neurosurgery call coverage for St. Luke's consistent with other neurosurgeons providing call coverage at St. Luke's. Generally, the goal is for call coverage to be no more than one-in-eight days for an individual physician. The Parties recognize, however, that there may be times when community neurosurgeons do not take call which may place a greater burden on Company Providers. Company Providers agree, therefore, to individually cover up to one-in-four days when necessary on a temporary basis to assure St. Luke's has seven day per week call coverage. When an individual physician's call burden falls below one-in-six (e.g. one-in-five) for more than thirty days, St. Luke's and Provider shall work together to reduce the call burden in an effort to bring the call burden back to no more than one-in-six, including accelerating recruitment efforts or contracting with other local providers. During extreme emergencies, Provider Physicians may be called upon to provide more than one-in-six call coverage, but in such events St. Luke's shall immediately take all reasonable measures to retain locum tenens neurosurgeons or otherwise retain additional neurosurgeons to assist with call to bring the call burden back to at least one-in-four.

78.     While the Amendment was terminated on December 1, 2017, and no longer in effect, the Second Amendment through the Fifth Amendment (which to Plaintiffs' knowledge and belief is the most current PSA, effective as of December 21, 2023) all state under Description of Services Section 5. Work Scheduled that "Company agrees to deliver Medical Services pursuant to a schedule consistent with past practices and customary historic hours of operation."

79.     Maintaining "a schedule consistent with past practices and customary historic hours" suggests that past goals for call coverage of no more than one-in-eight days for an individual physician remains an appropriate goal.

80.     Compensation for on-call coverage is complicated since a physician may be on-call but never be called in to perform services. If that physician is never called in, then there are no services or hospital fees to bill for, therefore no revenue was generated. Yet, compensation for

on-call coverage is common and expected by physicians since the proximity time requirements are burdensome and restrict personal time and the ability to rest.

**G.    Neuroscience Associates and St. Luke's Had a Longstanding Relationship Prior to the Recent Policy Changes.**

81.    Neuroscience Associates have had staff with medical staff privileges at St. Luke's since the 1990s.

82.    Around 2009, Neuroscience Associate neurosurgeons were each performing surgeries at St. Luke's at least weekly.

83.    From 2005 to 2022, Dr. Hajjar had a full day of operating room block time every Tuesday.

84.    Prior to April 16, 2018, Neuroscience Associates had five out of six neurosurgeons with medical staff privileges at St. Luke's.

85.    These Neuroscience Associate neurosurgeons participated in on-call coverage and were financially compensated for being on call.

86.    Prior to April 16, 2018, independent neurosurgeons were treated the same as employed neurosurgeons and had the same expectations regarding call coverage. This meant all neurosurgeons that performed surgeries at St. Luke's whether employed, contracted, or independent, worked equally to ensure St. Luke's had appropriate call coverage over the Emergency Department.

**H.    Defendants' Initial Efforts to Significantly Reduce the Market Share of Independent Neurosurgeons**

87.    Over the years, St. Luke's has acquired a myriad of independent medical groups and now dominates the medical care market in Idaho. Indeed, St. Luke's tried to purchase Idaho's largest independent physician practice, Saltzer Medical Group, but the merger was struck

down by the United States District Court for the District of Idaho (and later the Ninth Circuit) as anti-competitive and in violation of the Clayton Antitrust Act.

88.     Neurosurgery has not been immune from St. Luke's efforts to reduce the market share of independent physicians and acquire more and more market share.

89.     Prior to April 16, 2018, St. Luke's compensated all independent neurosurgeons, including Dr. Hajjar, Dr. Manning, Dr. Kelly Bridges, MD, and Dr. Richard Lochhead, MD, for Emergency Department call coverage.

90.     As of April 16, 2018, St. Luke's stopped paying independent neurosurgeons for their call coverage. Nevertheless, for an independent neurosurgeon to maintain or acquire Medical Staff Membership at St. Luke's (the state's largest healthcare provider) one of the conditions is that the independent neurosurgeon must provide call coverage for no compensation.

91.     There were no changes in circumstances that created an efficiency-related justification for the sudden shift from paying independent neurosurgeons for call coverage prior to April 16, 2018, and then ending compensation for call coverage while still mandating it under medical staff requirements.

92.     Neuroscience Associates and its neurosurgeons objected to St. Luke's about-face on compensation to no avail; from April 16, 21018 to present, St. Luke's has refused to compensate Neuroscience Associates' neurosurgeons for call coverage but still requires call coverage as mandatory for Medical Staff Membership.

93.     St. Luke's reasoning for this decision is circular and simply makes no sense. As St. Luke's explained in its Motion to Dismiss:

> Moreover, St. Luke's has legitimate reasons for its decision. As anyone would expect, St. Luke's pays its own employed and exclusively contracted neurosurgeons for all of the services they provide, including call services. Neuroscience Associates likewise is free to bill for services and compensate its employees however it chooses. ***Nothing***

*stops them from having a system for paying their own providers for taking call, for example. And, presumably, Neuroscience Associates already bills, collects, and retains fees for physician services rendered while working at St. Luke's*. Of course, the money that went into payments for call services would be a loss to Neuroscience Associates' bottom line. But the same is true for St. Luke's.

Dkt. 11-1 (emphasis added). Suggesting that Neuroscience Associates should pay its independent neurosurgeons for call *St. Luke's mandates but does not compensate Neuroscience Associates or its independent neurosurgeons for* is nonsensical; Neuroscience Associates cannot pay its independent neurosurgeons for call it is not being compensated for in the first place. And justifying non-payment based on the fact that an independent neurosurgeon may be compensated for a case that comes in while on call similarly misses the point; the independent neurosurgeons are not being paid for their time on call—which requires them to remain within thirty minutes of St. Luke's at all times—even though St. Luke's employed physicians are compensated for this very same burden. It is not the payment of cases that come in through on call coverage that is at issue; it is the onus of being on call 24/7/365 without any compensation that is at issue.

94.     Although St. Luke's refuses to pay independent neurosurgeons for St. Luke's mandated Emergency Department call coverage, St. Luke's continued to pay Northwest Neurosurgery Associates and St. Luke's employed neurosurgeons for Emergency Department call coverage after April 16, 2018, through the present.

95.     Defendants' efforts to significantly reduce the market share of independent neurosurgeons did not stop at refusing to pay independent neurosurgeons for Emergency Department call coverage (with the threat of terminating Medical Staff Membership if they refused to provide call coverage free of charge).

96.     Through Northwest Neurosurgery Associates, the Defendants have disproportionately alleviated the call load of employed and contracted neurosurgeons (who St.

Luke's pays for Emergency Department call coverage) by entering into contracts with locum tenens physicians to alleviate the call burden for only Northwest Neurosurgery Associates and St. Luke's neurosurgeons.

97.     On the other hand, independent neurosurgeons have not been provided or offered the same call coverage relief through locum tenens physicians.

98.     St. Luke's also pays locums tenens neurosurgeons for Emergency Department call coverage. It is illogical and inefficient to pay locum tenens neurosurgeons for call coverage while denying compensation to independent neurosurgeons for the same service. Locum tenens neurosurgeons are substantially more expensive than an in market neurosurgeon.  That is because there is a need to pay the staffing services that employ the locum tenens physicians, and because of additional expenses associated with bringing in physicians from outside the community. Furthermore, rates paid to obtain locum tenens neurosurgeons are higher than those paid for in market neurosurgeons because locum tenens are only utilized when hospitals have no choice.

99.     Nevertheless, in this case St. Luke's does have a choice regarding the use of locum tenens neurosurgeons for call coverage. St. Luke's could choose to pay in market independent neurosurgeons for call coverage at a lower cost than locum tenens neurosurgeons and consequently lower their "need" for locum tenens in the first place by attracting rather than excluding in market independent neurosurgeons.

100.    Despite the increasingly unfair burdens put in place by Defendants as to Emergency Department call coverage and the unfairness in St. Luke's stopping its payments to independent neurosurgeons for call coverage, initially Dr. Hajjar, Dr. Manning, and two other Neuroscience Associates neurosurgeons (Dr. Bridges and Dr. Lochhead) fulfilled their call coverage obligations to maintain their Medical Staff Membership.

101.    However, in response to the disproportionate, uncompensated call burden placed on independent neurosurgeons versus contracted Northwest Neurosurgery Associate neurosurgeons, Dr. Lochhead and Dr. Bridges eventually relinquished their Medical Staff privileges in November 2020 and January 2021, respectively.

102.    Despite the disproportionate, uncompensated call burden placed on independent neurosurgeons versus contracted Northwest Neuroscience Associates neurosurgeons and St. Luke's neurosurgeons, Dr. Hajjar and Dr. Manning continued their Medical Staff Membership with St. Luke's.

**I.     Defendants Intensify Their Efforts to Eliminate Independent Neurosurgeons from St. Luke's Medical Staff**

103.    In August 2022, St. Luke's, in conjunction with Northwest Neurosurgery Associates, intensified their collective efforts to drive out the two remaining independent neurosurgeons by implementing a new policy that requires each neurosurgeon group to cover call for patients who consulted or saw a neurosurgeon from that group during the last two years.

104.    In other words, a St. Luke's neurosurgeon must always be covering Emergency Department call at St. Luke's because someone treated by a neurosurgeon within the group within the past two years could come into the Emergency Department at any time. In addition, a neurosurgeon from Neuroscience Associates must also always be covering Emergency Department call at St. Luke's because someone treated by a neurosurgeon within the group within the past two years could come into the Emergency Department at any time. This same policy would apply to any new independent neurosurgeon that sought Medical Staff Membership at St. Luke's.

105.    This new policy was a dramatic shift from the longstanding and beneficial policy for call coverage that had endured, to Neuroscience Associates knowledge, for as long as Dr.

Hajjar and Dr. Manning have had Medical Staff Membership at St. Luke's. Both Defendants and independent neurosurgeons benefited from the longstanding call coverage policy which ensured all neurosurgeons had equal expectations when it came to call coverage.

106.     This new call coverage policy was not applied to the Department of Surgery as a whole but only the neurosurgery division, again, showing Defendants had specific intent to exclude and harm independent neurosurgeons.

107.     When Neuroscience Associates asked why the long-standing policy regarding call coverage was suddenly changed, no explanation was provided by the Defendants.

108.     Northwest Neurosurgery Associates, in conjunction with St. Luke's, are enacting policies that greatly affect independent neurosurgeons' ability to practice neurosurgery at St. Luke's, but these same policies have no adverse effect on the Northwest Neurosurgery Associates' or the St. Luke's neurosurgeons. In part, this is because St. Luke's pays locum tenens physicians to alleviate a substantial call burden for the Northwest Neurosurgery Associates neurosurgeon and St. Luke's neurosurgeons, but not for the independent neurosurgeons. Northwest Neurosurgery Associates employed neurosurgeons and St. Luke's neurosurgeons are also paid for their time covering Emergency Department call (independent neurosurgeons are not). St. Luke's has eight neurosurgeons who can take turns covering Emergency Department call in the event call is not covered by a locums tenens physician.

109.     Notably, under the policy rules, Northwest Neurosurgery Associates and St. Luke's employed neurosurgeons are not required to maintain the same burden that an independent neurosurgeon or independent neurosurgeon group is mandated to bear.

110.     Neuroscience Associates' objections to this new call policy were ignored by Defendants. Although Northwest Neurosurgery Associates operates pursuant to a PSA with St.

Luke's, St. Luke's has feigned inability to do anything about these unfair policies because the neurosurgery department is purportedly run by Northwest Neurosurgery Associates, not St. Luke's.

111.    When this new policy was implemented, there were only two remaining independent neurosurgeons with medical staff privileges at St. Luke's, Dr. Manning and Dr. Hajjar, both of Neuroscience Associates. Under the new policy Dr. Manning and Dr. Hajjar, had to provide 24/7/365 call coverage between the two of them with no compensation, and thus one of them had to remain within thirty minutes of the hospital at all times.

112.    This new policy essentially created a one-in-two call coverage requirement for Dr. Manning and Dr. Hajjar; which is inconceivable when compared to the one-in-eight goal the PSA First Amendment acknowledged as an appropriate level of call coverage.

113.    Further still, a one-in-two call coverage placed Dr. Manning and Dr. Hajjar in the precarious situation that they must always be thirty minutes away from the hospital and ready to respond, no matter the circumstances. If a physician fails to respond appropriately to call coverage, this is called patient abandonment. Patient abandonment can be leveraged against a physician to be brought up for peer review and can result in termination of medical staff privileges, plus further implications to that physician's career.

114.    In response to this new policy and the untenable burden it imposes on independent neurosurgeons, Dr. Manning took an approved leave of absence, effective August 1, 2022, and later resigned his Medical Staff Membership at St. Luke's, effective August 1, 2023.

115.    Despite these unfair and untenable burdens, Dr. Michael Hajjar has continued as an active member of St. Luke's Medical Staff. As such, he is the sole independent neurosurgeon on St. Luke's Medical Staff.

116.    With Neuroscience Associates down to one neurosurgeon with Medical Staff Membership at St. Luke's, Dr. Hajjar is expected by St. Luke's and Northwest Neurosurgery Associates to provide 24/7/365 Emergency Department call coverage for St. Luke's completely on his own—with no compensation from St. Luke's and no relief from locum tenens neurosurgeons, Northwest Neurosurgery Associates employed neurosurgeon, or St. Luke's employed neurosurgeons—simply to maintain his Medical Staff Membership.

117.    In addition to the disproportionate call burden, St. Luke's has also restricted Dr. Hajjar's ability to perform elective surgeries. Since 2005, Dr. Hajjar has had a full day of operating room block time every Tuesday. The same week that Northwest Neurosurgery Associates enacted the policy of requiring two years of call coverage for any patient that any Neuroscience Associates neurosurgeon has ever seen, St. Luke's administration reduced Dr. Hajjar's operating room availability to one day a month instead of one day a week. This arbitrary and unjustifiable change is further evidence of St. Luke's intent to drive out the sole remaining independent neurosurgeon with Medical Staff Membership.

118.    Under this policy, St. Luke's is effectively (and arbitrarily) doubling up on Emergency Department call coverage since two neurosurgeons (either an employed neurosurgeon from St. Luke's or the Northwest Neurosurgery Associates neurosurgeon or locum tenens and any independent neurosurgeon) are always on call. Federal law does not require this. The new sudden change in policy from a long-term working relationship with independent neurosurgeons has no efficiency justification and serves no purpose other than: (1) providing St. Luke's with duplicative Emergency Department call coverage it does not pay for and (2) placing onerous and untenable burdens on independent neurosurgeons to effectively exclude independent neurosurgeons from Medical Staff Membership at St. Luke's.

119.     In contrast, St. Luke's further alleviated call coverage burdens for its employed neurosurgeons and Northwest Neurosurgery Associates neurosurgeon because after the new policy went into effect, St. Luke provided even more coverage from locum tenens neurosurgeons for these non-independent neurosurgeons, but not the sole remaining independent neurosurgeon who has been providing uncompensated 24/7/365 call coverage to St. Luke's.

120.     Neuroscience Associates expressed concerns about the call coverage system to the current Chief of Medical Staff, who responded he could not intervene because Northwest Neurosurgery Associates controls the neurosurgery call, not the Medical Staff. This explanation is pretext since Northwest Neurosurgery Associates is one physician and a whole committee, including St. Luke's employed physicians, worked together to implement the new call coverage policy.

121.     In addition, in at least one instance, Dr. Hajjar has been required to cover call when a St. Luke's employed neurosurgeon refused to follow the call policy.

122.     In addition, as a result of Defendants' unlawful actions, independent neurosurgeons are being excluded from the majority of the neurosurgeon services market because St. Luke's and Northwest Neurosurgery Associates have created an untenable and costly mandate to Medical Staff Membership which deters and bars independent neurosurgeons from seeking Medical Staff privileges.

## DEFENDANTS' HARM TO COMPETITION

**J.     Both Plaintiffs and Competition in the Professional Neurosurgical Market Have Been Injured by Defendants' Anticompetitive Efforts to Eliminate Independent Neurosurgeons from St. Luke's Medical Staff.**

123.     St. Luke's and Northwest Neuroscience Associates' policies require independent neurosurgeons to provide call coverage under onerous conditions, uncompensated, as a condition

of Medical Staff Membership. This in turn impacts independent neurosurgeons' (including Neuroscience Associates) ability to grow their business and compete more vigorously in the market.

124.     Neurosurgery is a highly competitive field, and Medical Staff Membership at area hospitals is essential for independent neurosurgeons to develop and maintain their practice. The untenable call coverage burden is a serious deterrent that impacts the ability of independent neurosurgeons, including Neuroscience Associates, to recruit and hire new neurosurgeons. Potential hires would have to elect between not having Medical Staff Membership at St. Luke's—the area's largest healthcare provider by far with the busiest Emergency Department in the State—or bearing the disproportionate and unfair burdens created by the current call system at no pay, which also exposes them to losing such membership if they fail to meet these onerous requirements.

125.     The untenable call coverage burden also significantly impacts the ability of independent neurosurgeons, including Neuroscience Associates, to compete in the market because many patients have insurance that requires or incentivizes them to receive care at St. Luke's facilities, including but not limited to patients who are insured by the St. Luke's Health Plan. Neuroscience Associates neurosurgeons who have relinquished their Medical Staff Membership at St. Luke's are unable to treat these patients, and therefore their ability and Neuroscience Associates' ability to compete in the neurosurgery market has diminished, losing a substantial patient market.

126.     Because Neuroscience Associates only has one neurosurgeon who can perform surgeries at St. Luke's, Neuroscience Associates has lost a substantial number of patients whose insurance requires St. Luke's, or the independent neurosurgeons have been forced to travel with

their patients to West Valley Medical Center where the insurance allowed treatment. Both Neuroscience Associates and the patients are harmed by being forced to travel from the Boise area to Caldwell when surgery should be conducted where it is most convenient for the patients, near their homes.

127.    For Dr. Hajjar, and in turn Neuroscience Associates, the untenable call coverage requirement at St. Luke's has forced him to turn down numerous patients that he otherwise would have accepted. For every new patient Dr. Hajjar accepts, he must consider whether that patient is likely to arrive at the emergency room due to a high-risk condition and whether the patient's insurance requires treatment at St. Luke's. This would be true for any independent neurosurgeon who attempts to maintain a Medical Staff Membership at St. Luke's.

128.    Dr. Hajjar has been forced to turn these patients away because the 24/7/365 call coverage he is required to perform interrupts his ability to focus on his practice and the patients he already has. To protect his current patients, he has been limited in his ability to take on new patients that seek his help and care.

129.    Dr. Hajjar is not being compensated for this 24/7/365 call coverage, and the services he does bill for when called in are insufficient to compensate him for his 24/7/365 call coverage, which is also hurting his and Neuroscience Associates' practice.

130.    Neuroscience Associates has not been reimbursed for Dr. Hajjar's call coverage from April 16, 2018, to the present and is owed payment for such unreimbursed call coverage.

131.    Neuroscience Associates has not been reimbursed for Dr. Manning's call coverage from April 16, 2018, to August 1, 2022, and is owed payment for such unreimbursed call coverage.

132.    Neuroscience Associates has not been reimbursed for call coverage for two of its other neurosurgeons, Dr. Bridges and Dr. Lochhead, from April 16, 2018, through the dates of their relinquishment of Medical Staff Membership at St. Luke's, and is owed payment for such call coverage.

133.    St. Luke's and Northwest Neurosurgery Associates have worked together with the purpose of driving out independent neurosurgeons—thereby allowing Northwest Neurosurgery Associates and St. Luke's employed group of neurosurgeons to dominate and control the market and ensure patients are sent only to St. Luke's facilities—and they have done so by imposing unfair, inequitable, and untenable Emergency Department call coverage burdens and refusing to compensate independent neurosurgeons, which includes Neuroscience Associates, for the valuable services they provide for St. Luke's to meet its federal law call coverage requirements.

134.    St. Luke's is also in the process of rolling out St. Luke's Health Care Plan, a private healthcare insurance product that competes in the general insurance market and will presumably result in enrolled patients receiving medical care exclusively – or at a substantially lesser cost – at St. Luke's facilities. As such, Neuroscience Associates is down to one neurosurgeon who can care for such patients at St. Luke's.

135.    Finally, the exclusion of Neuroscience Associates' access to St. Luke's means Neuroscience Associates has lost a large source of patients through St. Luke's Emergency Department.

136.    This has reduced the number of Neuroscience Associates' neurosurgeons who can practice at St. Luke's from four neurosurgeons to only one neurosurgeon, and increased St. Luke's market share. Consequently, St. Luke's possesses monopoly power over neurosurgical professional services and neurosurgical hospital services in Ada and Canyon Counties.

137.    Neuroscience Associates is St. Luke's and Northwest Neurosurgery Associates largest and most direct competitor within the neurosurgical professional services market.

138.    Neuroscience Associates has been and continues to be St. Luke's and Northwest Neurosurgery Associates' largest competitor with six independent neurosurgeons in the relevant geographic market compared to Saint Alphonsus's five neurosurgeons.

139.    More importantly, unlike Saint Alphonsus neurosurgeons who only conduct their services at Saint Alphonsus, Neuroscience Associates neurosurgeons historically have worked under medical staff privileges at St. Luke's. Meaning Neuroscience Associates were directly competing against St. Luke's and Northwest Neurosurgery Associates under their own roof.

140.    The enhancement of barriers to entry for independent neurosurgeons and the weakening of Neuroscience Associates allows St. Luke's to maintain its monopoly power over the professional neurosurgical services market. This dominance allows it to demand higher rates for managed care plans and harm customers.

141.    Further, the policies create a substantial barrier to entry by independent neurosurgeons. Because these policies make it untenable for an independent neurosurgeon to practice at St. Luke's, any neurosurgeon considering entering the market would realize that he or she effectively cannot practice at St. Luke's, and therefore only a minority of the market is available. That makes entry much more difficult and unprofitable, and therefore much less likely. Since the policies have been adopted, no independent neurosurgeons have entered the market.

K.    **Anticompetitive Effects on Neurosurgical Hospital Services Market.**

142.    The actions described above have allowed St. Luke's to maintain it dominant, monopolistic position in the neurosurgical hospital services market which has created the following anticompetitive effects.

i.      **Increasing market dominance and controlling the flow of patients.**

143.    With respect to primary care physician referrals, Judge Winmill previously found that patients "largely accept the recommendations of their primary care physician as to what hospital, specialist, and ancillary services to use" and that, although physicians operating under a PSA have discretion referring patients, "in practice that discretion has been exercised to favor the hospital where the physician was employed." *Saint Alphonsus Medical Center – Nampa, Inc.*, 2014 WL 407446, at \*13.

144.    St. Luke's and Northwest Neurosurgery Associates' neurosurgeons are not independent neurosurgeons. This means that if a patient comes into the St. Luke's Emergency Department and sees a Northwest Neurosurgery Associates or St. Luke's neurosurgeon, similar to primary care physician referrals, these patients will be further directed to St. Luke's neurosurgical hospital services, including, radiology, imaging and other diagnostic services and physical therapy (to the financial benefit of St. Luke's); this allows St. Luke's to maintain dominance over the relevant neurosurgical hospital services market.

145.    In contrast, St. Luke's knows that it cannot force independent neurosurgeons and their patients to remain within St. Luke's for all neurosurgical hospital services. Because St. Luke's cannot control an independent neurosurgeon, St. Luke's will lose out on both neurosurgical professional services and neurosurgical hospital services revenue when an independent neurosurgeon recommends that a patient receives treatment at Saint Alphonsus, Treasure Valley Hospital, or West Valley,  i.e., leakage.

146.    For example, Dr. Hajjar typically refers patients for medical care at other area hospitals based on factors such as quality and cost of care when appropriate under the patient's insurance.

147.    Before relinquishing his Medical Staff Membership at St. Luke's, Dr. Manning similarly would refer patients for medical care at other area hospitals based on factors such as quality and cost of care.

148.    Most of Neuroscience Associates' elective work is conducted at Treasure Valley Hospital, which has proven to Neuroscience Associates to be much less expensive than St. Luke's for spine and joint replacement, aspects of neurosurgery.

149.    It is advantageous to St. Luke's and Northwest Neurosurgery Associates to reduce the number of and/or eliminate independent neurosurgeons from the St. Luke's Medical Staff so that St. Luke's can steer all patients that come through its Emergency Department (the largest in the State) to its neurosurgical hospital services, including, for example, radiology, imaging and other diagnostic services and physical therapy, while avoiding the loss of patients to competitors such as Saint Alphonsus, Treasure Valley Hospital, and West Valley Medical Center, and increase its dominance over the neurosurgical hospital services market.  Most hospital cases involving cranial neurosurgery, which only a neurosurgeon can conduct, originate in hospital emergency departments.

150.    Further still, independent neurosurgeons who are not on medical staff at St. Luke's will lose the opportunity to accept new patients because the patient will not come to them in the first place since St. Luke's is not an option. If the patients had the opportunity to meet with the independent neurosurgeon, it may have been determined that a different hospital was more suited to the patients' need because of cost or quality reasons, and the patient may have agreed.

151.    If patients are cut off from independent neurosurgeons in the first place and go to St. Luke's for neurosurgical care instead, then St. Luke's will be utilized whether or not it is the best choice for the patient on price and quality. While independent neurosurgeons create a

competitive market wherein the best interest of the patient is considered, employed physicians do not.

### ii.    Higher than Competitive Prices.

152.    Hospitals and other healthcare providers receive revenue through government programs (e.g. Medicare and Medicaid) and through payments by commercial payors who provide insurance to their members.

153.    Payments by commercial payors are critical to the success of any hospital due to the lower level of payments made by Medicare and Medicaid. No hospital or physician group could operate successfully based only on reimbursement from Medicare or Medicaid.

154.    Competition among healthcare providers occurs in two stages. In the first stage, providers compete to be selected as in-network providers by commercial payors (i.e. health insurance companies). Commercial payors seek to offer convenient networks of healthcare providers for their members. Typically, employees and subscribers want plans that allow them to choose from a variety of providers in convenient locations near where they live. Commercial payors negotiate contracts with hospitals and physicians to create provider networks which provide these choices.

155.    Employees and subscribers pay higher out-of-pocket costs when they see an out-of-network provider, and in some instances may have no insurance coverage for such care. Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers to minimize or avoid out-of-pocket expenses. Healthcare providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

156.    Price competition occurs primarily at the first step of competition, in negotiations between payors and providers.

157.    In the second stage, healthcare providers compete with other in-network providers to attract patients. Typically, managed care plans offer multiple in-network providers with similar out-of-pocket costs. In this second stage, providers compete primarily on non-price factors to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors.

158.    Increasing St. Luke's market share allows St. Luke's to leverage its dominant position to demand higher reimbursements from commercial health plans. *Id.* at *12. And "[w]hen health plans pay more, they pass that increase along to their customers in the form of higher premiums and higher out-of-pocket costs." *Id.*

159.    Based upon information and belief, St. Luke's is able to charge higher prices to insurers and by consequence patients. This is supported by the economic research that overwhelmingly shows high market concentration substantially increases prices. For example:

a.   A 2019 study found that increases in the concentration of inpatient hospital services are associated with increases in outpatient hospital prices, as well as inpatient hospital prices. Baker LC, Bundorf MK, Kessler DP, Competition in Outpatient Procedure Markets, MEDICAL CARE 2019; 57:36-41.

b.   a 2012 study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—Update, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

c. A 2011 study examining the effect of hospital market concentration on specific procedures found that in concentrated hospital markets, hospitals charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology*, 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

d. Another 2011 study examining the effect of concentrated hospital markets on hospital prices in 2001 and 2004 found that "hospital prices are higher in more concentrated markets." Glenn A. Melnick, Yu-Chu Shen and Vivian Yaling Wu, The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices, 30(9) HEALTH AFFAIRS 1728, 1729-31 (2011).

e. A 2009 study examining the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996 found that non-merging hospitals increased prices 40 percent in response to hospital mergers. Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers*, 52 J. L. & Econ. 523, 544 (2009).

f. A 2005 study examining the effect of hospital consolidation through system acquisition (i.e. a hospital joining a wider hospital system) found that "managed care prices were higher in system hospitals than in nonsystem hospitals by an average of $103 per day." Alison Evans Cuellar and Paul J. Gertler, *How the*

*Expansion of Hospital Systems has Affected Consumers*, 24(1) HEALTH
AFFAIRS 213, 217 (Jan. 2005).

160.   Most of these studies included neurosurgical prices. For example, the 2019 study
included all outpatient procedures for patients 65 and under with non-zero prices. That would
include outpatient neurosurgical procedures. The second 2011 study (160(d)) was based on total
hospital net revenue, which would include revenues for neurosurgical procedures. Similarly, the
2009 study looked at average net revenue per case mix adjusted discharge, for all hospital
revenues. This included neurosurgical procedures. The 2005 study examined average discount
price per day paid by managed care plans, which would include those prices for all procedures,
including neurosurgical procedures.

161.   Additionally, studies on the relationship between concentration and price
generally are highly informative regarding the relationship of concentration and price for any
particular service. That is because the major elements of price for any hospital service are
common to other hospital services. For example, every inpatient has a room, and there is a room
rate that is charged, which is generally the same across services. Every surgical patient has
surgery done in an operating room, and there are standard operating room charges. There are
many other charges that are common to most or all hospital procedures, and therefore a
relationship between concentration and price overall is highly indicative of a similar relationship
for neurosurgical procedures.

162.   Additionally, many hospital rates cut across different kinds of procedures. As in
one of the studies above, managed care plans often pay for hospital services on a per day rate,
regardless of the procedure. In other cases, managed care plans pay for services at a multiple of
Medicare's rates. The same multiple is typically used across all services.

163.    For all these reasons, the analysis of the relationship between concentration and price overall is highly informative regarding that relationship for neurosurgical procedures. There is no reason to believe that the relationship is any different for neurosurgical procedures, and the economic literature does not suggest that there are any particular services for which this strong relationship does not apply.

164.    Price increases from higher concentration are passed on to local employers and their employees. Self-insured employers pay the full cost of their employees' health care claims and directly bear the full burden of higher rates. Commercially insured employers are harmed by higher rates because health plans must pass on at least a portion of hospital rate increases to these employers.

165.    Employers then pass on increased health care costs to their employees, in whole or in part, in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services. This can cause Ada and Canyon County residents to forego or delay necessary health care services because of the higher costs, whereas others may drop their insurance coverage altogether.

166.    Further, research shows that employment of physicians by hospitals with market power increases prices. For example:

   g.    A 2013 study found that "total per-beneficiary spending was $849 higher" at larger hospital-based physician groups as compared to independent groups. J. Michael McWilliams et al., Delivery System Integration and Health Care Spending and Quality for Medicare Beneficiaries, 173 JAMA INTERNAL MED. 1447, 1451 (June 17, 2013). That study also found that "[patient] readmission rates were highest for [larger] hospital-based groups." Id. at 1452.

h.     A 2014 study found that "recent increases in the employment of physicians and acquisition of community-based physician practices by hospitals . . . result[ed] in more and more services being paid at higher hospital outpatient rates." James D. Reschovsky and Chapin White, Location, Location, Location: Hospital Outpatient Prices Much Higher than Community Settings for Identical Services, 16 NAT'L INSTITUTE FOR HEALTH CARE REFORM 2 (June 2014). This was due to "likely large differences in bargaining power."

i.     A 2018 study found that prices increased when physicians' practices were acquired by hospitals, and these increases were "larger when the acquiring hospital has a larger share of its inpatient market." Capps, Dranove and Ody, "The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending" Journal of Health Economics 59 (2018) 139-152.

167.   It is in Neuroscience Associates' experience that elective surgeries such as joint and spinal replacement are less expensive at Treasure Valley Hospital in comparison to St. Luke's. This is one of the reasons why Neuroscience Associates prefers to conduct these elective surgeries at Treasure Valley, to the benefit of its patients.

168.   To further support the notion that Treasure Valley Hospital has significantly lower prices than St. Luke's, Neuroscience Associates compared prices for two procedures and the approximate prices that Treasure Valley Hospital negotiated with two insurers in comparison to St. Luke's negotiated prices.

169.   St. Luke's provides its patients price transparency on its website. There, patients can download what are called hospital charge masters. Neuroscience Associates downloaded the

St. Luke's Boise Standard Charges found at https://www.stlukesonline.org/resources/before-your-visit/price-estimates/price-transparency.

170.   Treasure Valley Hospital shared with Neuroscience Associates an approximate negotiated price, guaranteed to be close to the actual price without disclosing the specific number.

171.   The prices from St. Luke's and Treasure Valley Hospital are compared within the following table and show that St. Luke's has significantly higher prices which in turn will harm the patient:

| Description | Code\|Code type | Blue Cross of Idaho PPO | CIGNA | Hospitals |
|---|---|---|---|---|
| Major Hip and Knee Joint Replacement or Reattachment of Lower Extremity with McC or Total Ankle Replacement | 469 \| MS-DRG | $76,853.77 --------- $25,000.00 | $137,527.10 ------------ $52,000 | St. Luke's Reported price ----------- Treasure Valley Health's approximate price |
| Cervical spinal fusion without cc/mcc | 473 \| MS-DRG | $63,155.17 --------- $19,500.00 | $106,538.60 ----------- $38,750.00 | St. Luke's Reported price ----------- Treasure Valley Health's approximate price |
| Lumbar spine fusion (outpatient) | 22558 \| CPT | $20,801.30 -------- $4,250.00 | $19,463.20 ---------- $11,512.00 | St. Luke's Reported price ----------- Treasure Valley Health's approximate price |
| Neck spine fusion (outpatient) | 22554 \| CPT | $12,803.63 --------- $4,250.00 | $11,980.00 --------- $10,800.00 | St. Luke's Reported price ----------- Treasure Valley Health's approximate |

| | | | | price |
|---|---|---|---|---|
| Neck spine disk surgery (outpatient) | 63020 \| CPT | $11,016.00<br>---------<br>$4,375.00 | $10,967.20<br>---------<br>$11,940.00 | St. Luke's Reported price<br>-----------<br>Treasure Valley Health's approximate price |

172.    Furthermore, according to ahd.com the average charge at St. Luke's Boise Medical Cener for neurosurgery was $149,916 with a case mix index of 3.9883; while the average charge at Saint Alphonsus Regional Medical Center located in Boise was $114,503 with a case mix index of 4.1048. Saint Alphonsus charges 76% of what St. Luke's charges while providing the same service.

173.    A Medicare case mix index (CMI) represents the average diagnosis related group (DRG) relative weight for that hospital; the higher the number the more complex, resource-intensive patients. To account for the CMI, it is common to divide the average cost by the CMI for a better comparison.

174.    With that formula, St. Luke's Boise Medical Center for neurosurgery averages $37,588.95 while Saint Alphonsus Regional medical Center located in Boise for neurosurgery averages $27,894.90. These numbers show Saint Alphonsus charges 74% of what St. Luke's charges while providing the same service.

175.    St. Luke's higher than competitive prices reflect St. Luke's greater bargaining power due to its dominant market share.

176.    Patients that are forced to use St. Luke's due to insurer preference and/or St. Luke's scheme to control patient flows have to pay these absurdly higher prices.

### iii.   Limited Patient Choices.

177.   The competitive effects of these actions also limit patients' ability to see providers outside of St. Luke's, even if the patients may receive better quality or lower priced healthcare elsewhere. By forcing independent neurosurgeons to give up their Medical Staff Membership and ensuring new neurosurgeons will not seek Medical Staff Membership, let alone start a new neurosurgery clinic, St. Luke's ensures that all patients who come into the St. Luke's Emergency Departments needing neurosurgical care will be directed to St. Luke's facilities for neurosurgical hospital services including, radiology, imaging and other diagnostic services and physical therapy, thereby preventing any leakage out of St. Luke's system. This stymies the patient's and attending physician's ability to freely choose a doctor or facility that best meets the patient's needs.

178.   Further, the growth of St. Luke's market share gives it more power over prices, and results in more patients having to use the higher priced St. Luke's physicians since they make up such a substantial portion of the market.

179.   By significantly reducing the market share of independent neurosurgeons, St. Luke's increases its control of physician referrals and causes its patients to use St. Luke's facilities and services even where those facilities and services are higher cost, lower quality, and may result in longer lengths of stay. This is consistent with numerous economic studies. St. Luke's is able to charge higher rates and provide lesser quality healthcare without losing business because of its dominant market share gained by anticompetitive practices.

### iv.   Barriers to Entry.

#### a.   Neurosurgical Hospital Services Market

180.   Neither hospital entry nor expansion by any hospital will deter or counteract

St. Luke's anticompetitive actions.

181.     New hospital entry or significant expansion in Ada or Canyon Counties would not be timely.  Construction of a new general acute-care hospital would take more than two years from the initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk.  In August of 2015 St. Luke's broke ground on an inpatient expansion of its Nampa facility that did not offer inpatient care.  The new inpatient facility opened in October 2017, 26 months after construction began.  Besides that, no new hospital facility has been constructed in the Treasure Valley since TVH in 1996 and St. Luke's Meridian in 2001.

182.     Construction and operation of an independent competitive hospital is likely to be especially difficult given the large number of physicians employed by St. Luke's since these physicians are unlikely to admit patients at a competitive hospital.  Such a hospital would have a very difficult time attracting admissions and operating successfully.

### b.   Outpatient Surgery Services

183.     Neither outpatient surgery services entry nor expansion by any hospital or physician group will deter or counteract St. Luke's anticompetitive actions.

184.     New outpatient entry or significant expansion in Ada or Canyon Counties would not be timely.  Construction of a new outpatient facility would take more than two years from the initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk, along with significant outpatient facility overcapacity in the Ada and Canyon county area.

185.     Construction and operation of an independent outpatient surgery facility is also likely to be very difficult given the large number of surgeons employed by St. Luke's, since

these surgeons are unlikely to admit patients at a competitive hospital.  Such a hospital would have a very difficult time attracting admissions and operating successfully.  Certainly, facilities will not be constructed with sufficient capacity to offset the effect of St. Luke's anticompetitive activities.

**L.      Anticompetitive Effects on the Neurosurgical Professional Services Market.**

      **i.      Increased Monopolization.**

186.      When St. Luke's shifted to the EPIC electronic medical record platform, it set up its system such that primary care physicians could refer to a St. Luke's neurosurgeon from a simple one-click, drop-down menu within EPIC. Referral to an independent neurosurgeon at Neuroscience Associates requires an old fashioned, labor intensive, faxing of documents.

187.      Many medical assistants attempting to make referrals to Neuroscience Associates, due to patient preference, end up telling patients that it is simply not possible within the limits of EPIC to refer to the Neuroscience Associates neurosurgeons.

188.      It is based upon information and belief that there are administrators within St. Luke's whose job involves running surveillance on the referral pattern of St. Luke's employed primary care physicians and who initiate conversations and pressure when the pattern of referrals leads to cases leaving their system.

189.      St. Luke's and Northwest Neurosurgery Associates are intentionally increasing their monopolization over neurosurgery professional services by insulating themselves from competition.

      **ii.      Barriers to Entry.**

190.      Defendants' efforts to monopolize neurosurgical services and neurosurgical hospital services in Ada and Canyon Counties will impact new independent surgeons' ability to

**SECOND AMENDED COMPLAINT - 42**

compete in the area.

191.     It is difficult if not impossible for new independent neurosurgeons to enter the market if they are unable to maintain privileges at the largest healthcare provider in the area.

192.     Developing an independent neurosurgery practice in Ada and Canyon Counties with medical staff privileges at St. Luke's would require the new neurosurgeon or private practice to conduct their own call coverage, such as Dr. Hajjar is doing today. This burden alone immediately deters any new neurosurgeon from seeking medical staff privileges at St. Luke's; no compensation effectively ensures no new independent neurosurgeon would seek medical staff privileges at St. Luke's due to the burdens of uncompensated call coverage.

193.     In turn, without medical staff privileges at St. Luke's, the new neurosurgeon is immediately cut out of over half the neurosurgery market before he or she even gets started. Further still, the neurosurgeon will be denied referrals from St. Luke's expansive healthcare system (with the highest Emergency Department in the State) because he or she is not St. Luke's affiliated, and St. Luke's keeps referrals in house as much as possible.

194.     St. Luke's and Northwest Neurosurgery Associates' efforts have also raised their competitors' cost. The inequitable and exclusionary policies that solely effect independent neurosurgeons significantly raises the costs of operation and providing care for independent neurosurgeons since independent neurosurgeons are forced to absorb the cost of maintaining call coverage without any offsetting compensation.

### iii.  Limited Patient Choices.

195.     The competitive effects of these actions also limit patients' ability to see providers outside of St. Luke's, even if the patients may receive better quality or lower priced healthcare elsewhere. By forcing independent neurosurgeons to give up their Medical Staff

Membership and ensuring new neurosurgeons will not seek Medical Staff Membership, let alone start a new neurosurgery clinic, St. Luke's ensures that all patients who come into the St. Luke's Emergency Departments and need neurosurgical care will be directed to Defendants' neurosurgeons for professional services.

196.     Additionally, excluding independent neurosurgeons from St. Luke's medical staff ensures that patients with insurance that prioritizes or requires St. Luke's can only receive neurosurgical professional services from Defendants' neurosurgeons, limiting patient choices in who they want their neurosurgeon to be.

197.     Lastly, the growth of St. Luke's market share gives it more power over prices, and results in more patients having to use the higher priced St. Luke's physicians since they make up such a substantial portion of the market.

198.     By significantly reducing the market share of independent neurosurgeons, St. Luke's increases its control of physician referrals and causes its patients to use St. Luke's and Northwest Neurosurgery Associates' neurosurgeons even when those services are higher cost, lower quality, and may result in longer lengths of stay.

### IV.     CAUSES OF ACTION

<u>Count I</u>
**Violation of Sherman Act (15 U.S.C. § 2) and
Idaho Competition Act (Idaho Code § 48-105)**
*Attempt to monopolize the professional neurosurgical market*

199.     Plaintiffs incorporate paragraphs 1 – 198 as though fully set forth herein.

200.     St. Luke's and Northwest Neurosurgery Associates have demonstrated their specific intent to monopolize the professional neurosurgical market by excluding their only competition for professional neurosurgical services serving St. Luke's.

201.    While St. Luke's controls 65% market share of the neurosurgical hospital services, as the result of these anticompetitive actions, virtually all the neurosurgery cases within St. Luke's are conducted by St. Luke's and Northwest Neurosurgery Associates' employed neurosurgeons, meaning St. Luke's and Northwest Neurosurgery Associates' have 65% market share of the professional neurosurgical services market as well.  Based upon Defendants' high market share of 65%, the high barriers to entry, blatantly higher than competitive prices, and other anticompetitive actions described above, there is a dangerous probability that Defendants will achieve their goals and attain monopoly power in the professional neurosurgical services in Ada and Canyon Counties in which they did not already possess monopoly power.

202.    Additionally, St. Luke's and Northwest Neurosurgery Associates' behavior was exclusionary because it reversed a pattern of equal treatment of all neurosurgeons with regard to call coverage and admission to the medical staff that had been maintained for many years. There was no effective purpose for this change in practice, and the change provided no benefits to patient care, nor improved quality or cost. Instead, the change raised costs since highly expensive locum tenens coverage was implemented to unburden the employed neurosurgeons at the expense of independent neurosurgeons.

203.    No justification was offered for the change in behavior that started in 2018. The only justification offered has been in litigation, and that offer, as described above, was nonsensical.

204.    Such actions constitute unlawful attempted monopolization of the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

205.    As a direct and proximate result of these violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further, such injury is threatened if Defendants' actions are not enjoined.

206.    The actions of Defendants have substantially harmed competition and, if not enjoined, threaten to further harm competition in the relevant products and geographic market.

**Count II**
**Violation of Sherman Act (15 U.S.C. § 2) and**
**Idaho Competition Act (Idaho Code § 48-105)**
*Attempt to monopolize the neurosurgical hospital market*

207.    Plaintiffs incorporate paragraphs 1-206 as though fully set forth herein.

208.    St. Luke's has demonstrated its specific intent to monopolize the neurosurgical hospital market by excluding the only physicians that are able to divert patients away from St. Luke's neurosurgical hospital services, also known as leakage.

209.    Based on St. Luke's high market share of 65%, the high barriers to entry, blatantly higher than competitive prices, and other anticompetitive actions described above, there is a dangerous probability that St. Luke's will achieve its goal and attain monopoly power in the neurosurgical hospital services in Ada and Canyon Counties in which it did not already possess monopoly power.

210.    Additionally, St. Luke's behavior was exclusionary because it reversed a pattern of equal treatment of all neurosurgeons with regard to call coverage and admission to the medical staff that had been maintained for many years. There was no effective purpose for this change in practice, and the change provided no benefits to patient care, nor improved quality or cost. Instead, the change raised costs since highly expensive locum tenens coverage was implemented to unburden the employed neurosurgeons at the expense of independent neurosurgeons.

SECOND AMENDED COMPLAINT - 46

211.    No justification was offered for the change in behavior that started in 2018. The only justification offered has been in litigation, and that offer, as described above, was nonsensical.

212.    Such actions constitute unlawful attempted monopolization of the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

213.    As a direct and proximate result of these violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further, such injury is threatened if St. Luke's actions are not enjoined.

214.    The actions of St. Luke's have substantially harmed competition and, if not enjoined, threaten to further harm competition in the relevant products and geographic market.

**Count III**
**Violation of Sherman Act (15 U.S.C. § 2) and**
**Idaho Competition Act (Idaho Code § 48-105)**
*Monopolization of the professional neurosurgical market*

215.    Plaintiffs incorporate paragraphs 1-214 as though fully set forth herein.

216.    St. Luke's and Northwest Neurosurgery Associates possess and have possessed monopoly power in the professional neurosurgical market. St. Luke's actions described above, directly and through Northwest Neurosurgery Associates are being undertaken in order to maintain and enhance St. Luke's monopoly power. These actions are exclusionary and constitute unlawful monopolization of the professional neurosurgical market.

217.    While St. Luke's controls 65% market share of the neurosurgical hospital services, as the result of these anticompetitive actions, virtually all the neurosurgery cases within St. Luke's are conducted by St. Luke's and Northwest Neurosurgery Associates' employed neurosurgeons, meaning St. Luke's and Northwest Neurosurgery Associates' have 65% market

share of the professional neurosurgical services market as well. Controlling 65% of the professional neurosurgical market, a highly concentrated market, proves monopoly power.

218.    Additionally, St. Luke's and Northwest Neurosurgery Associates' behavior was exclusionary because it reversed a pattern of equal treatment of all neurosurgeons with regard to call coverage and admission to the medical staff that had been maintained for many years. There was no reason for this change in practice, and the change provided no benefits to patient care, nor improved quality or cost. Instead, the change raised costs since highly expensive locum tenens coverage was implemented to unburden the employed neurosurgeons at the expense of independent neurosurgeons.

219.    No justification was offered for the change in behavior that started in 2018. The only justification offered has been in litigation, and that offer, as described above, was nonsensical.

220.    Such actions constitute unlawful monopolization of the professional neurosurgical market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

221.    As a direct and proximate result of these violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further such injury is threatened if Defendants' actions are not enjoined.

222.    The actions of Defendants have substantially harmed competition and, if not enjoined, threaten to further harm competition in the professional neurosurgical services and geographic market.

**Count IV**
**Violation of Sherman Act (15 U.S.C. § 2) and**
**Idaho Competition Act (Idaho Code § 48-105)**
*Monopolization of the neurosurgical hospital market*

223.    Plaintiffs incorporate paragraphs 1-222 as though fully set forth herein.

224.    St. Luke's possesses and has possessed monopoly power in the neurosurgical hospital market. St. Luke's actions described above, directly and through Northwest Neurosurgery Associates, are being undertaken in order to maintain and enhance St. Luke's monopoly power. These actions are exclusionary and constitute unlawful monopolization of the professional neurosurgical market.

225.    St. Luke's 65% share of the neurosurgical hospital services proves monopoly power, especially within the highly concentrated market of neurosurgical hospital services.

226.    Additionally, the higher than competitive prices in comparison to both Saint Alphonsus and Treasure Valley Hospital, as alleged above, demonstrates St. Luke's monopolization of the neurosurgical hospital market.

227.    Furthermore, St. Luke's and Northwest Neurosurgery Associates' behavior was exclusionary because it reversed a pattern of equal treatment of all neurosurgeons with regard to call coverage and admission to the medical staff that had been maintained for many years. There was no effective purpose for this change in practice, and the change provided no benefits to patient care, nor improved quality or cost. Instead, the change raised costs since highly expensive locum tenens coverage was implemented to unburden the employed neurosurgeons at the expense of independent neurosurgeons.

228.    No justification was offered for the change in behavior that started in 2018. The only justification offered has been in litigation, and that offer, as described above, was nonsensical.

229.    Such actions constitute unlawful monopolization of the neurosurgical hospital services market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

230.    As a direct and proximate result of these violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further such injury is threatened if St. Luke's actions are not enjoined.

231.    The actions of Defendants have substantially harmed competition and, if not enjoined, threaten to further harm competition in the neurosurgical hospital services and geographic market.

**Count V**
**Violation of Sherman Act (15 U.S.C. § 1) and**
**Idaho Competition Act (Idaho Code § 48-104)**
***Unreasonable Restraint of Trade***

232.    Plaintiffs incorporate paragraphs 1 – 231 as though fully set forth herein.

233.    St. Luke's and Northwest Neurosurgery Associates have conspired to create an unreasonable restraint of commerce by implementing policies that disproportionately and unfairly burden independent neurosurgeons in an effort to exclude competing neurosurgeons from the professional neurosurgical services market.

234.    St. Luke's has feigned an inability to control or change these policies relying upon the stance that Northwest Neurosurgery Associates controls and directs the neurosurgery clinic at St. Luke's. This is pretext because Northwest Neurosurgery Associates is one neurosurgeon while it was a whole committee, including St. Luke's employed physicians, who decided to implement these unfair and burdensome policies.

235.    Yet, Defendants' conjoined efforts to exclude competing independent neurosurgeons is to further Defendants' interests in ensuring patients are steered to St. Luke's providers and facilities, including labs, imaging, operating rooms, inpatient care, therapy care, etc., and in ensuring a reduction in market share held by independent neurosurgeons.

236.     Defendants' efforts to restrain commerce substantially harmed competition in the relevant markets as alleged above.

237.     In addition to harming competition, Defendants' violations of Section 1 of the Sherman Act have had a direct and proximate result of injuring and damaging Plaintiffs' business and property, as alleged above.

238.     In addition to the amounts owed for call coverage that Neuroscience Associates, Dr. Hajjar, and Dr. Manning provided, Plaintiffs also seek injunctive relief enjoining Defendants' unfair policies relating to Emergency Department call coverage, declaratory relief, and/or treble damages pursuant to 15 U.S.C. § 15(a).

### Count VI
*Unjust Enrichment*

239.     Plaintiffs incorporate paragraphs 1 – 238 as though fully set forth herein.

240.     Plaintiffs conferred benefits on Defendants by providing Emergency Department call coverage for neurosurgery services.

241.     Defendants retained the benefits of Plaintiffs' call coverage and continue to do so without providing compensation since April 16, 2018.

242.     It would be unfair and unjust for Defendants to retain the benefits of Emergency Department call coverage without compensating Plaintiffs.

243.     It is further unfair and unjust for Defendants to threaten to take away independent neurosurgeons' Medical Staff Membership if they refuse to provide call coverage at no cost.

244.     As a direct and proximate result of Defendants' retention of these benefits, Plaintiffs have been damaged in an amount to be determined by a jury at trial.

### DEMAND FOR ATTORNEY FEES

As a further direct and proximate cause of Defendants' conduct, Plaintiffs have been

required to retain counsel for the purposes of prosecuting this action, and they are entitled to recover all reasonable costs and attorneys' fees incurred in the prosecution of this lawsuit pursuant to various provisions of federal and Idaho law, including, but not limited to, 15 U.S.C. § 15(a), Idaho Code §§ 12-120(3), 12-121, 12-123, 48-113(a) and Rule 54 of the Federal Rules of Civil Procedure, and any other applicable statute, rule, regulation, and/or contractual provision. Plaintiffs are further entitled to an award of attorney fees in the amount of $10,000 in the event of default.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants as follows:

1) For compensatory damages;

2) For treble damages pursuant to 15 U.S.C. § 15(a) and Idaho Code § 48-113(2);

3) For injunctive relief enjoining Defendants' unfair practices and policies relating to Emergency Department coverage;

4) For a declaratory judgment declaring that Defendants' unfair practices and policies relating to Emergency Department coverage violate 15 U.S.C. § 15(a)(1) and (2) and Idaho Code §§ 48-104 and 48-105;

5) For attorneys' fees and costs;

6) For prejudgment interest pursuant to Idaho Code §28-22-104(1);

7) For post-judgment interest pursuant to 28 U.S.C. § 1961 and Idaho Code § 28-22-104(2); and

8) For such other and further relief as the Court deems just and appropriate.

DATED this 15th day of August, 2024.

DUKE EVETT, PLLC


By /s/Keely E. Duke_____
   Keely E. Duke, Of the Firm
   Molly E. Mitchell, Of the Firm
   *Attorneys for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 15th day of August, 2024, I electronically filed the foregoing document using the ECF system, which sent a Notice of Electronic Filing to the following persons:

A Dean Bennett                          adbennett@hollandhart.com
Zachery J. McCraney                     zjmccraney@hollandhart.com

    _/s/ Keely E. Duke____
    Keely E. Duke