UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DR. MICHAEL HAJJAR, MD, an individual; DR. THOMAS MANNING, MD, PHD, an individual; and NS SUPPORT, L.L.C. D/B/A NEUROSCIENCE ASSOCIATES,<br><br>Plaintiffs,<br><br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD; CLINICAL NEUROSCIENCE MANAGEMENT, PC, D/B/A NORTHWEST NEUROSURGERY ASSOCIATES,<br><br>Defendants. | Case No. 1:23-cv-00367-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

### I.   INTRODUCTION

Plaintiffs Dr. Michael Hajjar, Dr. Thomas Manning, and NS Support L.L.C. d/b/a Neuroscience Associates (Neuroscience) bring this antitrust action against Defendants St. Luke's Health System, Ltd. (St. Luke's) and Clinical Neuroscience Management, PC, d/b/a Northwest Neurosurgery Associates (Northwest), challenging St. Luke's on-call coverage policy for independent neurosurgeons under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Idaho Competition Act, Idaho Code §§ 48-104 and -105. Plaintiffs also claim unjust enrichment under Idaho law.[1]

---

[1]   Plaintiffs originally sued Dr. Kenneth Little but dropped their claims against him in their Second Amended Complaint.

**MEMORANDUM DECISION AND ORDER - 1**

This Court previously granted Defendants' motion to dismiss Plaintiffs' First Amended Complaint with leave to amend. Defendants now move to dismiss Plaintiffs' Second Amended Complaint (Dkt. 16).[2] Also pending before the Court is Plaintiffs' Motion for Leave to File a Surreply (Dkt. 21). For the reasons set forth below, the Court grants Defendants' motion to dismiss without leave to amend and denies Plaintiffs' motion for leave to file a surreply.

## II. BACKGROUND[3]

### A. The Parties and Market Structure

As detailed in this Court's prior decision, this lawsuit involves competing neurosurgery providers in southwestern Idaho's healthcare markets. St. Luke's is the region's dominant healthcare provider, controls sixteen hospitals and medical centers throughout southwest Idaho, employs over 15,000 people, and maintains a medical staff exceeding 1,800 physicians. Northwest operates under an exclusive Professional Services Agreement with St. Luke's to provide neurosurgery services and employs one neurosurgeon. Neuroscience Associates is the only independent medical provider for neurological surgery in southwestern Idaho and is owned by six independent neurosurgeons, including Plaintiffs Dr. Michael Hajjar and Dr. Thomas Manning.

To treat patients, Neuroscience's independent neurosurgeons must have medical staff privileges at one or more area hospitals, including Saint Alphonsus Regional Medical Center, Treasure Valley Hospital, West Valley Medical Center, and St. Luke's. Of those hospitals,

---

[2] Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented, and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings.").

[3] The Court draws the following facts from Plaintiffs' Second Amended Complaint, accepting factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

St. Luke's holds approximately 65 percent of the neurosurgical hospital services market in Ada and Canyon Counties, and Saint Alphonsus Regional Medical Center holds 35 percent. The professional neurosurgical services market includes approximately twenty practicing neurosurgeons: eight employed by St. Luke's, one employed by Northwest, five working exclusively at Saint Alphonsus, and six independent practitioners at Neuroscience. Both markets qualify as "highly concentrated" under federal antitrust guidelines.

### B. St. Luke's Call Coverage Requirements

Under federal law, St. Luke's must maintain continuous neurosurgery on-call coverage in its emergency department. St. Luke's requires independent neurosurgeons to participate in on-call coverage as a condition of maintaining medical staff privileges. Until April 2018, St. Luke's paid Neuroscience's neurosurgeons for their on-call coverage. St. Luke's then ceased compensating independent neurosurgeons for call coverage while continuing to pay Northwest and employed neurosurgeons for identical services. Following this policy change, two Neuroscience neurosurgeons eventually relinquished their St. Luke's privileges, leaving only Drs. Hajjar and Manning from Neuroscience with St. Luke's privileges.

In August 2022, St. Luke's implemented a new policy requiring each neurosurgeon group to provide call coverage for any patient the group had treated within two years. This required Neuroscience to maintain continuous call coverage in addition to St. Luke's own coverage. Dr. Manning resigned his privileges in August 2023, leaving only Dr. Hajjar to provide uncompensated 24/7/365 call coverage for Neuroscience.

### C. Plaintiffs' Second Amended Complaint

Plaintiffs' Second Amended Complaint reprises their core theory from the First Amended Complaint while expanding both the scope of their claims and the factual allegations supporting

MEMORANDUM DECISION AND ORDER - 3

them. The basic allegation remains the same: St. Luke's allegedly crafted its call policy to place untenable burdens on independent neurosurgeons to effectively exclude them from St. Luke's medical staff. They contend the call coverage requirements operate as a serious deterrent that impacts independent neurosurgeons' ability to enter or compete in the professional neurosurgical market. Plaintiffs further allege these policies create substantial barriers to entry for new neurosurgeons, inhibit expansion by existing independent neurosurgeons, and allow St. Luke's to maintain and expand its monopoly power.

Seeking to cure the deficiencies in its First Amended Complaint, Plaintiffs' Second Amended Complaint makes several additions. First, Plaintiffs expand their relevant market definition to include neurosurgical hospital services in addition to professional neurosurgical services. They allege St. Luke's exclusion of independent neurosurgeons serves the additional purpose of controlling downstream neurosurgical hospital services—such as radiology, imaging, and physical therapy—that follow neurosurgical care. According to Plaintiffs, independent neurosurgeons, unlike employed physicians, have freedom to refer patients to competing hospitals based on quality and cost considerations, creating patient "leakage" that St. Luke's seeks to prevent. By excluding independent neurosurgeons, Plaintiffs argue, St. Luke's ensures that patients entering through its emergency departments receive all subsequent care within St. Luke's system.

Second, Plaintiffs add specific allegations of competitive harm, including comparative pricing data showing St. Luke's charges significantly higher rates than competitors for identical neurosurgical procedures. They allege these higher prices, enabled by St. Luke's market dominance, are passed through to employers and ultimately to patients and employees through higher premiums and out-of-pocket costs.

**MEMORANDUM DECISION AND ORDER - 4**

With these expanded allegations, the Second Amended Complaint includes six counts: five antitrust claims under Sections 1 and 2 of the Sherman Act and the Idaho Competition Act, and an unjust enrichment claim under Idaho law. In Counts I-V, Plaintiffs claim that St. Luke's and Northwest conspired to implement the call coverage policy to unlawfully restrain trade and monopolize, or attempt to monopolize, the professional neurosurgical services market, and St. Luke's has used the call policy to cement its monopoly power in the neurosurgical hospital market. In Count VI, Plaintiffs seek recovery for the value of unpaid emergency call coverage provided since April 2018.

Defendants move to dismiss the Second Amended Complaint, arguing Plaintiffs still fail to allege anticompetitive conduct, harm to competition, and antitrust injury. As to the neurosurgical hospital services market, Defendants contend Plaintiffs fail to identify any injury they have suffered in that market.

### III.  LEGAL STANDARD

A dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where a complaint fails to state a claim upon which relief can be granted. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a short and plain statement of the claim, showing the plaintiff is entitled to relief and giving the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it requires "more than labels and conclusions." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

To survive a Rule 12(b)(6) motion, a claim requires a complaint to have enough factual basis which, if true, states a plausible claim for relief. *Twombly*, 550 U.S. at 556. A claim has facial

plausibility when the plaintiff pleads factual content allowing the court to draw a reasonable inference the defendant is liable for the alleged misconduct. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557.

## IV.  ANALYSIS

### A.  Plaintiffs' Motion for Leave to File Sur-Reply

A district court has the discretion to permit or deny a surreply. *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1203 (9th Cir. 2009), *overruled on other grounds by U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015). Courts "highly disfavor" surreplies because they "usually are a strategic effort by the nonmoving party to have the last word." *Sims v. Paramount Gold & Silver Corp.*, 2010 WL 5364783, at *8 (D. Ariz. Dec. 21, 2010). A court may deny a motion for a surreply absent extraordinary circumstances, such as when a party raises new issues or evidence in its reply brief. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

Plaintiffs argue Defendants raised "new arguments" by citing cases not previously addressed. This argument misapplies the applicable standard. Defendants' citation of new cases was responsive to novel theories Plaintiffs raised for the first time in their opposition. Defendants had no obligation to anticipate these arguments and properly addressed them in reply. The Court finds no extraordinary circumstances warranting a surreply and denies Plaintiffs' motion.

MEMORANDUM DECISION AND ORDER - 6

### B. Antitrust Claims: The Sherman Act

Plaintiffs renew their contention that Defendants violated Sections 1 and 2 of the Sherman Act by implementing changes to St. Luke's call coverage policy. To state a viable claim under either section, Plaintiffs must plausibly allege that Defendants engaged in anticompetitive conduct that harmed competition—either through concerted action that unreasonably restrains trade, in violation of Section 1, or through independent conduct aimed at monopolizing, or attempting to monopolize, the relevant market, in violation of Section 2. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990-94 (9th Cir. 2020); *see also Epic Games, Inc. v. Apple*, Inc., 67 F.4th 946, 973-74 (9th Cir. 2023). Additionally, Plaintiffs must establish antitrust standing by showing they suffered "antitrust injury." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003).

Defendants argue Plaintiffs still fail to plead facts showing anticompetitive conduct or harm to competition, even with the "new, significant, and more specific allegations" in the Second Amended Complaint. The Court agrees.

### 1. Anticompetitive Conduct

The antitrust laws impose no general duty to deal with competitors. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Even monopolists "may generally choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). This principle applies even when a monopolist seeks to "limit entry" of new rivals or impede the growth of existing ones. *Trinko*, 540 U.S. at 407-08.

The no-duty-to-deal rule rests on three fundamental concerns: first, compelled sharing can dampen innovation and investment; second, it forces courts into a quasi-regulatory role of setting prices, quantities, and terms—"a role for which they are ill suited"; and third, it "may facilitate the

MEMORANDUM DECISION AND ORDER - 7

supreme evil of antitrust: collusion." *Id.* These concerns are particularly acute in the healthcare context, where courts lack expertise to determine appropriate compensation levels for call coverage or to balance the complex operational needs of hospital systems.

### a. Conditional Refusal to Deal

Plaintiffs attempt to circumvent the no-duty-to-deal doctrine by characterizing the call coverage requirements as a "conditional refusal to deal" that unlawfully "raises rivals' costs." While the Ninth Circuit has recognized that conditional dealing arrangements may constitute anticompetitive conduct where they foreclose competition without procompetitive justifications, . *Qualcomm Inc.*, 969 F.3d at 990-92, Plaintiffs' theory fails for multiple reasons.

First, the mere fact that conduct increases a rival's costs does not make it anticompetitive or exclusionary. As the Tenth Circuit explained in *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079 (10th Cir. 2013) (Gorsuch, J.), "in almost any case where a monopolist first shares and then withdraws its property . . . the dominant firm might be said to raise the rival's costs," but this fact alone does not establish anticompetitive conduct. Conduct allegedly raising rivals' costs must still satisfy traditional tests for exclusionary conduct, including demonstrating harm to the competitive process itself, not merely to individual competitors.

Second, the "raising rivals' costs" theory requires showing that the defendant engaged in some form of unreasonable or unfair conduct, such as an exclusive dealing arrangement that raised the plaintiff's costs. *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 49 F.4th 520, 529 n.4 (5th Cir. 2022). Here, requiring physician groups to provide coverage for their own patients is neither unreasonable nor unfair. Every neurosurgeon group—whether independent or employed— must ensure continuity of care for its patients. This requirement is a fundamental professional

**MEMORANDUM DECISION AND ORDER - 8**

obligation recognized by medical ethics and malpractice law, not an artificial barrier to competition.

Third, *Novell* provides critical guidance distinguishing anticompetitive conduct from legitimate business decisions. The court distinguished between efforts to require that a monopolist "lend smaller rivals a helping hand," which it characterized as "forced sharing," from efforts "to limit the abilities of third parties to deal with rivals," which could be "anticompetitive." 731 F.3d at 1072-73. Plaintiffs argue that because hospitals and surgeons must work together to provide surgical services, St. Luke's conduct limits third parties' ability to deal with rivals. But this mischaracterizes the situation. St. Luke's is not limiting third parties' ability to deal with Plaintiffs—patients remain free to choose Neuroscience physicians, and those physicians maintain privileges at multiple hospitals. What Plaintiffs seek is forced subsidization of their call coverage costs, which falls squarely within the "forced sharing" that *Novell* and other cases reject.

### b. *Aspen Skiing* Exception

Plaintiffs alternatively argue their claims fall within the *Aspen Skiing* exception to the general no-duty-to-deal rule. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, the defendant, which owned three of the four ski resorts in the market, discontinued a joint lift-ticket package with a smaller rival—the only other competitor in the market—and then outright refused to sell the rival any lift tickets that would allow it to create its own bundles. 472 U.S. 585, 592-94 (1985). The defendant continued to sell lift tickets to everyone else while completely shutting out its only competitor. The Supreme Court has since characterized *Aspen Skiing* as "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

To fit within this narrow exception, a plaintiff must show "(1) [the defendant] unilaterally terminated a voluntary and profitable course of dealing; (2) the only conceivable rationale or

MEMORANDUM DECISION AND ORDER - 9

purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993-94 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016), and *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004)) (internal citations and quotation marks omitted). Because the *Aspen Skiing* exception is "at or near the outer boundary of § 2 liability," it should be applied only in rare circumstances. *Qualcomm*, 969 F.3d at 994 (quoting *Trinko*, 540 U.S. at 409).

Plaintiffs fail to satisfy any of these requirements. First, St. Luke's has not terminated any course of dealing. Dr. Hajjar currently maintains privileges and continues to practice at St. Luke's, as did other Neuroscience physicians until they voluntarily chose to relinquish those privileges. While St. Luke's previously compensated Neuroscience physicians for call coverage, this compensation arrangement was not the "dealing" at issue. The relevant "dealing" is the granting of medical staff privileges, which St. Luke's continues to provide—albeit subject to call coverage requirements that apply to all neurosurgeon groups. Simply because Plaintiffs do not like the new business terms offered by Defendants does not make their conduct "so onerous as to be tantamount to the conduct in *Aspen Skiing*." *Aerotec*, 836 F.3d at 1184. The Supreme Court in *Trinko* specifically rejected the notion that firms must maintain prior terms of dealing, recognizing that businesses—even monopolists—may modify the terms on which they provide access or services to others. 540 U.S. at 408-09.

Second, Plaintiffs cannot show that anticompetitive intent is the "only conceivable" explanation for St. Luke's conduct. The continuity-of-care rationale provides a legitimate, procompetitive purpose. Requiring physician groups to cover their own patients prevents patient

abandonment, ensures quality care, and maintains clear lines of medical responsibility—all recognized as legitimate business justifications in the healthcare context. *See Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 155 (D.R.I. 2014) (recognizing continuity of care as legitimate procompetitive justification).

Third, the call coverage St. Luke's provides through its employed physicians and Northwest is not a product "sold" in the market but rather part of integrated employment or contractual relationships. Independent physicians who are not employees or exclusive contractors are not "similarly situated" for purposes of this analysis. The *Aspen Skiing* exception therefore does not apply.

### 2. Injury to Competition

Beyond the failure to allege anticompetitive conduct, Plaintiffs have not adequately alleged injury to competition. A plaintiff must plead more than injury to itself; it must show harm to competition generally. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012). Plaintiffs' allegations that the call requirements impact their "ability to grow [their] business," "compete more vigorously in the market," and "recruit and hire new neurosurgeons" describe harm to a competitor, not competition. (Dkt. 15 at ¶¶ 124-25). As the Supreme Court has repeatedly emphasized, "the antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Even "[t]he elimination of a single competitor, without more, does not prove anticompetitive effect." *McGlinchy v. Shell Chemical*, 845 F.2d 802, 811-12 (9th Cir. 1988).

While Plaintiffs argue that Defendants' conduct creates barriers to entry for all independent neurosurgeons, the alleged barriers are of Plaintiffs' own making. If other neurosurgeons in Dr. Hajjar's group were on St. Luke's medical staff, the call burden would be distributed among them.

**MEMORANDUM DECISION AND ORDER - 11**

Nothing prevents independent neurosurgeons from seeking admission to St. Luke's medical staff and sharing call coverage duties. The burden about which Plaintiffs complain exists because members of their own group choose not to participate in call coverage, not because of anticompetitive exclusion.

Plaintiffs' allegations regarding hospital pricing fare no better. While they provide pricing comparisons showing St. Luke's charges more than competitors, they fail to establish any causal connection between the call coverage requirements and these price differentials. Higher prices alone, absent exclusionary conduct, do not violate Section 2. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022) ("[C]harging monopoly prices—without accompanying anticompetitive conduct—is not enough to state a claim under Section 2."). Plaintiffs must plausibly allege how requiring independent physicians to cover their own patients' call duties enables St. Luke's to charge more for hospital services. This causal link is entirely absent from the Second Amended Complaint.

### 3. Antitrust Injury

Plaintiffs also still fail to establish antitrust injury, also known as antitrust standing. As this Court previously explained, there are four requirements for pleading antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Ca.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Even assuming unlawful conduct, Plaintiffs' injuries fail to satisfy the remaining elements. Their injuries are self-inflicted. As discussed, nothing prevents Neuroscience's other physicians from rejoining St. Luke's medical staff to share call duties with Dr. Hajjar. Their voluntary decision not to do so breaks the causal chain between Defendants' conduct and Plaintiffs' alleged

injury. *See Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738, 748 (9th Cir. 2020) (noting purely "self-inflicted injuries" are insufficient to establish traceability requirement for standing); *Craghtten v. United States*, No. 1:24-cv-00409-DKG, 2025 WL 1886708, at *3 (D. Idaho Jan. 31, 2025) ("To the extent that an injury is self-inflicted or due to the plaintiff's own fault, the causal chain is broken and standing will not be established."); *US Airways Grp., Inc. v. Brit. Airways PLC*, 989 F. Supp. 482, 489 (S.D.N.Y. 1997) (self-inflicted injury does not provide antitrust standing).

Moreover, the desire for compensation for covering calls for one's own patients is not the type of injury antitrust laws were designed to prevent. The antitrust laws protect the competitive process, not individual competitors' profit margins. *Brunswick Corp.*, 429 U.S. at 487-88 (finding respondents' injury was not of the type that the antitrust statute was intended to forestall); *see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1226 (10th Cir. 2009) (concluding physician failed to establish antitrust injury where hospital refused to grant him privileges because antitrust laws protect consumers from suppliers, rather than to protect suppliers from each other).

4. **Neurosurgical Hospital Market**

With respect to Counts II and IV, which allege harm in the hospital services market, Plaintiffs lack standing because they are not participants in that market. Antitrust injury requires participation in the restrained market. *N. Highlands I, II, LLC v. Comerica Bank*, 328 F. App'x 358, 360 (9th Cir. 2009) (citing *Vinci v. Waste Mgmt.*, 80 F.3d 1372, 1376 (9th Cir. 1996)). Plaintiffs provide neurosurgical services, not the "radiology, imaging and other diagnostic services and physical therapy" that comprise the hospital services market. (Dkt. 15 at ¶¶ 15, 45).

Plaintiffs argue they are "participants" because they "refer patients to hospitals for neurosurgery." (Dkt. 19 at 15). This theory stretches antitrust standing beyond recognition. Physicians recommend medical services based on professional judgment and patient needs, not as economic agents making purchasing decisions. Referring patients does not make physicians market participants sufficient to confer antitrust standing. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983) (requiring plaintiff be participant in allegedly restrained market).

Plaintiffs' reliance on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), is misplaced. In *McCready*, the plaintiff was a consumer denied reimbursement for psychologist services due to an anticompetitive conspiracy—she was directly injured as a purchaser in the relevant market. Here, Plaintiffs are neither consumers nor competitors in the hospital services market. They are complementary service providers whose connection to the hospital services market is too attenuated to confer standing.

### C. State Law Claims

Because Plaintiffs base their state antitrust claims on the same facts as their federal claims, the Court's federal analysis is determinative. *Rocky Mountain Med. Mgmt., LLC v. LHP Hosp. Group, Inc.*, 2013 WL 5469890, at *12 (D. Idaho Sept. 30, 2013). Having dismissed all federal claims, the Court declines to exercise supplemental jurisdiction over the unjust enrichment claim. 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966).

### D. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure provides that courts should grant leave to amend freely when justice so requires. Fed. R. Civ. P. 15(a)(2). However, leave to amend may be denied when the plaintiff has had multiple opportunities to cure deficiencies, and further

amendment would be futile. *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). The court's discretion is "particularly broad" where, as here, the court has previously granted leave to amend. *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1116 (9th Cir. 2014).

Plaintiffs have now had three attempts to plead viable antitrust claims: their original complaint, their First Amended Complaint, and their Second Amended Complaint. Despite this Court's prior guidance identifying specific deficiencies, the fundamental problems remain unchanged. St. Luke's has no duty to subsidize its competitors, and its decision to require all physician groups to cover their own patients reflects legitimate business judgment, not anticompetitive exclusion.

The core weakness in Plaintiffs' case cannot be cured through amendment. Their theory—that St. Luke's must pay independent neurosurgeons for call coverage or else violate the antitrust laws—is legally untenable. The availability of alternative hospitals, the uniform application of call policies, the voluntary nature of the physician resignations, and the absence of substantial market foreclosure all confirm that no set of facts could transform St. Luke's legitimate business decisions into antitrust violations.

Moreover, Plaintiffs' evolving theories demonstrate they have exhausted potential amendments. They have invoked the conditional refusal-to-deal doctrine, the *Aspen Skiing* exception, the raising rivals' costs theory, and expanded their market definitions—yet none overcomes the fundamental principle that competitors have no duty to subsidize each other. Further amendment would be futile. *See Broadnax v. Adams & Assocs., Inc.*, 817 F. App'x 512, 514 (9th Cir. 2020) (affirming denial of leave to amend where plaintiffs had multiple opportunities to cure deficiencies).

**MEMORANDUM DECISION AND ORDER - 15**

V. ORDER

**IT IS ORDERED** that:

1. Defendants' Motion to Dismiss Second Amended Complaint (Dkt. 16) is **GRANTED**. Plaintiffs' Second Amended Complaint (Dkt. 15) is **DISMISSED** without leave to amend. Plaintiffs' antitrust claims are dismissed with prejudice, and their unjust enrichment claim is dismissed without prejudice.

2. Plaintiffs' Motion for Leave to File Sur-Reply is **DENIED.**

DATED: August 27, 2025

_Amanda K. Brailsford_
**Amanda K. Brailsford**
U.S. District Court Judge